IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
_____

State of North Dakota, et al.,

Appellees/Cross-Appellants,

vs.

Beverly Heydinger, Commissioner and Chair, Minnesota Public Utilities, Commission, et al.,

Appellants/Cross-Appellees.
_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**
_____

**BRIEF OF APPELLANTS/CROSS-APPELLEES**
_____

Thomas H. Boyd
Atty. Reg. No. 200517
Brent A. Lorenz
Atty. Reg. No. 386865
Derek R. Allen
Atty. Reg. No. 392065
Winthrop & Weinstine, P.A.
Capella Tower, Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
(612) 604-6400

Attorneys for Appellees/Cross-Appellants

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

ALETHEA M. HUYSER
Assistant Attorney General
Atty. Reg. No. 0389270
MICHAEL EVERSON
Assistant Attorney General
Atty. Reg. No. 0388310
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
Telephone: (651) 757-1243
Fax: (651) 282-5832

Attorneys for Appellants/Cross-Appellees

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

This is an appeal of a decision of the United States District Court for the District of Minnesota granting summary judgment in part in favor of Appellees on their claim that portions of the Next Generation Energy Act, Minnesota Statutes section 216H.03, subdivisions 3(2) and 3(3), violates the dormant Commerce Clause's extraterritorial doctrine. Section 216H.03, which regulates the energy resources that utilities contract with to serve Minnesota customers, has never been enforced or applied in a state proceeding. Nonetheless, the district court found Appellees' claims justiciable and proceeded to interpret the statute in a manner contrary to position of the state agency responsible for implementing the statute.

The district court also denied Appellants' cross-motion for summary judgment as to Appellees' extraterritoriality claim, and denied as moot the parties' cross-motions regarding the remaining dormant Commerce Clause claims, as well as claims alleging preemption by the Federal Power Act and Clean Air Act. The district court broadly enjoined Appellants from enforcing Minn. Stat. § 216H.03, subds. 3(2) and 3(3) in any and all circumstance.

The district court's decision involves important issues about the rights of states to exercise their traditional authority to regulate utilities. For this reason, and due to the complicity of the issues, Appellants request oral argument and suggest a total of 30 minutes.

i

# TABLE OF CONTENTS

**Page**

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ....................i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF ISSUES ...................................................................2

STATEMENT OF THE CASE...............................................................3

I.     THE NEXT GENERATION ENERGY ACT. ...........................................3

II.    MINN. STAT. § 216H.03, SUBD. 3. .................................................5

III.   THE MINNESOTA PUBLIC UTILITIES COMMISSION ...........................7

IV.    THE MIDCONTINENT INDEPENDENT SYSTEM OPERATION. ................9

V.     DISTRICT COURT PROCEEDINGS.....................................................11

SUMMARY OF ARGUMENT ...............................................................12

ARGUMENT .......................................................................................14

I.     STANDARD OF REVIEW....................................................................14

II.    APPELLEES DO NOT HAVE STANDING BECAUSE THEY FAILED TO SHOW
       A CONCRETE INJURY-IN-FACT FAIRLY TRACEABLE TO THE NGEA
       AND THEIR CLAIMS ARE NOT RIPE FOR JUDICIAL REVIEW...........................15

       A.     Appellees Have Not Proven They Have Standing. .............................15

              1.     Appellees have not shown an injury-in-fact. ...........................16

              2.     Appellees cannot show that any alleged injury is fairly
                     traceable to the challenged actions of Appellants.....................20

Appellate Case: 14-2156     Page: 3     Date Filed: 11/04/2014 Entry ID: 4213059

      3.     The district court erroneously found that three Appellees had standing. ............................................................................23

   B.   Appellees Have Not Proven That Their Claims Are Ripe. ................27

      1.     The issues are not fit for judicial decision. ...............................28

      2.     There is little hardship to the parties........................................31

      3.     The district court erroneously found that the claims of three appellees were ripe.............................................................31

III.   IF ANY UNCERTAIN ISSUES OF STATE LAW EXIST REGARDING THE PROPER INTERPRETATION OF SECTION 216H.03, THE COURT SHOULD ABSTAIN AND PERMIT THE MPUC TO INTERPRET THE LAW........................32

IV.  THE NGEA REGULATES ENERGY CONTRACTED FOR ON BEHALF OF MINNESOTA CONSUMERS AND DOES NOT APPLY TO THE MISO SHORT-TERM MARKET. ....................................................................34

   A.   Based On Its Plain Language And Purpose, Section 216H.03, Subd. 3(2) Is Inapplicable To The MISO Short-Term Energy Markets And Is Not Extraterritorial. ....................................................35

   B.   Based On Its Plain Language And Purpose, Section 216H.03, Subd. 3(3) Is Inapplicable To The MISO Short-Term Energy Markets And Is Not Extraterritorial. ....................................................40

V.   THE NGEA DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE. .........43

   A.   Section 216H.03 Does Not Violate The Extraterritorial Doctrine. ............................................................................................43

   B.   Section 216H.03 Does Not Discriminate Against Interstate Commerce In Violation Of The Dormant Commerce Clause. ..........47

      1.     Section 216H.03 Does Not Facially Discriminate....................48

      2.     Section 216H.03 Does Not Discriminate-In-Effect...............488

   C.   Section 216H.03 Is Constitutional Under The *Pike* Balancing Test. ...................................................................................................49

Appellate Case: 14-2156   Page: 4   Date Filed: 11/04/2014 Entry ID: 4213059

| | 1. | The NGEA Imposes Virtually No Cognizable Burden On Interstate Commerce. | 50 |
| | 2. | Section 216H.03 Confers Significant Local Benefits. | 51 |

VI. SECTION 216H.03, SUBD. 3(2) AND 3(3) IS NOT PREEMPTED BY FEDERAL LAW. .......................................................................... 54

    A. The Federal Power Act Does Not Preempt Section 216H.03, Subd. 3(2) Or 3(3). ........................................................... 54

        1. Section 216H.03 Is Not Preempted by the FPA by Virtue of Field Preemption. .......................................... 54

        2. Section 216H.03 Is Not Preempted by the FPA by Virtue of Conflict Preemption. ...................................... 58

    B. The NGEA Is Not Preempted By The Clean Air Act. ..................... 59

        1. Section 216H.03, Subd. 3 Does Not Regulate Air Emissions And Is Not Subject To Field Preemption. .......... 59

        2. Section 216H.03 Does Not Conflict With the CAA. .......... 60

VII. IN THE ALTERNATIVE, THE INJUNCTION ISSUED BY THE DISTRICT COURT IS OVERBROAD. .......................................................... 61

CONCLUSION ...................................................................................... 62

Appellate Case: 14-2156     Page: 5     Date Filed: 11/04/2014 Entry ID: 4213059

# TABLE OF AUTHORITIES

**Page**

## FEDERAL COURT CASES

*American Beverage Ass'n v. Snyder,*
735 F.3d 362 (6th Cir 2013) ...............................................................44

*American Booksellers Foundation v. Dean,*
342 F.3d 96 (2nd Cir. 2003) ......................................................... 45, 46

*Arizona v. United States,*
132 S. Ct. 2492 (2012)............................................................. 54, 55, 58

*Arkansas Elec. Co-op. v. Arkansas Pub. Serv. Comm'n,*
461 U.S. 375 (1983) ...............................................................................52

*Ayotte v. Planned Parenthood,*
546 U.S. 320 (2006) ...........................................................................2, 61

*Barrett v. Claycomb,*
705 F.3d 315 (8th Cir. 2013) ............................................................2, 61

*Bates v. Dow Agrosciences LLC,*
544 U.S. 431 (2005) ....................................................................... 54, 59

*Beavers v. Arkansas State Bd. of Dental Examiners,*
151 F.3d 838 (8th Cir. 1998) ...............................................................32

*Bell v. Cheswick Generating Station,*
734 F.3d 188 (3rd Cir. 2013)................................................................60

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.,*
476 U.S. 573 (1986) ..............................................................................44

*C&A Carbone, Inc. v. Town of Clarkstown,*
511 U.S. 383 (1994) ..............................................................................47

*California Fed. Sav. & Loan v. Guerra,*
479 U.S. 272 (1987) ..............................................................................60

v

Appellate Case: 14-2156    Page: 6    Date Filed: 11/04/2014 Entry ID: 4213059

*Cincinnati Indem. Co. v. A&K Const. Co.*,
542 F.3d 623 (8th Cir. 2008) ...............................................................32

*City of Philadelphia v. New Jersey*,
437 U.S. 617 (1978) ...........................................................................43

*Clapper v. Amnesty Intern.*,
133 S. Ct. 1138 (2013) ................................................................ passim

*Commonwealth Edison Co. v. Montana*,
453 U.S. 609 (1981) ...........................................................................49

*Cotto Waxo Co. v. Williams*,
46 F.3d 790 (8th Cir. 1995) ...........................................................2, 44

*CTS Corp. v. Dynamics Corp. of America*,
481 U.S. 69 (1987) .............................................................................43

*Dep't of Revenue of Ky. v. Davis*,
553 U.S. 328 (2008) ...........................................................................50

*E.E.O.C. v. Arabian Am. Oil Co.*,
499 U.S. 244 (1991) ...........................................................................38

*Edwards v. Arkansas Power & Light Co.*,
683 F.2d 1149 (8th Cir. 1982) ...........................................................33

*Electric Power Supply Ass'n v. FERC*,
753 F.3d 216 (D.C. Cir. 2014) ...........................................................57

*Federal Power Comm'n v. Southern Cal. Edison Co.*,
376 U.S. 205 (1964) ...........................................................................55

*Fitz v. Dolyak*,
712 F.2d 330 (8th Cir. 1983) .............................................................14

*Grand River Enterprises Six Nations, Ltd. v. Beebe*,
574 F.3d 929 (8th Cir. 2009) .............................................................47

*Granholm v. Heald*,
544 U.S. 460 (2005) ...........................................................................47

Appellate Case: 14-2156    Page: 7    Date Filed: 11/04/2014 Entry ID: 4213059

*Gray v. City of Valley Park, Mo.,*
567 F.3d 976 (8th Cir. 2009) ........................................................................ 17, 24

*Hampton Feedlot, Inc. v. Nixon,*
249 F.3d 814 (8th Cir. 2001) ......................................................................... 50

*Harman v. Forssenius,*
380 U.S. 528 (1965) ........................................................................................ 32

*Harmon v. City of Kansas City, Mo.,*
197 F.3d 321 (8th Cir. 1999) ......................................................................... 19

*Healy v. Beer Inst.,*
491 U.S. 324 (1989) ........................................................................................ 44

*Hughes v. Oklahoma,*
441 U.S. 322 (1979) ................................................................................... 49, 50

*Hunt v. Washington Apple Adver. Comm'n,*
432 U.S. 333 (1977) ........................................................................................ 48

*Instructional Sys., Inc. v. Computer Curriculum Corp.,*
35 F.3d 813 (3rd Cir. 1994) ........................................................................... 44

*International Truck and Engine Corp. v. Bray,*
372 F.3d 717 (5th Cir. 2004) ......................................................................... 51

*Iowa League of Cities v. Environmental Prot. Agency,*
711 F.3d 844 (8th Cir. 2013) ......................................................................... 27

*White Stallion Energy Center, LLC v. United States Environmental
Protection Agency,*
748 F.3d 1222 (D.C. Cir. 2014) ..................................................................... 21

*Kassel v. Consol. Freightways Corp. of Del.,*
450 U.S. 662 (1981) ................................................................................... 44, 45

*KCCP Trust v. City of North Kansas City,*
432 F.3d 897 (8th Cir. 2005) ......................................................................... 30

*Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Util. Com'n,*
837 F.2d 600 (3rd Cir. 1988) ......................................................................... 55

Appellate Case: 14-2156     Page: 8     Date Filed: 11/04/2014 Entry ID: 4213059

*Kiobel v. Royal Dutch Petroleum Co.,*
    133 S. Ct. 1659 (2013) ....................................................................38

*Longaker v. Boston Scientific Corp.,*
    872 F. Supp.2d 816 (D. Minn. 2012) ........................................... 38, 42

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................... 16, 20

*Macias v. New Mexico Dept. of Labor,*
    21 F.3d 366 (10th Cir. 1994).........................................................40

*McDermott v. Royal,*
    613 F.3d 1192 (8th Cir. 2010) ......................................................14

*Minnesota v. Clover Leaf Creamery, Co.,*
    499 U.S. 456 (1981) ................................................................... 51, 52

*Minn. Pub. Util. Comm'n v. F.C.C.,*
    483 F.3d 570 (8th Cir. 2007)....................................................... 27, 28

*Missouri ex rel. Nixon v. Am. Blast Fax, Inc.,*
    323 F.3d 649 (8th Cir. 2003) ........................................................14

*National Ass'n of Optometrists & Opticians v. Harris,*
    682 F.3d 1144 (9th Cir. 2012) ......................................................51

*National Elec. Mfrs Ass'n v. Sorrell,*
    272 F.3d 104 (2nd Cir. 2001) ..................................................... 44, 50

*National Paint & Coatings Ass'n v. Chicago,*
    45 F.3d 1124 (7th Cir. 1995).........................................................50

*National Right to Life Political Action Comm. v. Connor,*
    323 F.3d 684 (8th Cir. 2003) ........................................................15

*National Solid Wastes Management Ass'n v. Killian,*
    918 F.2d 671 (7th Cir. 1990).........................................................59

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Oregon,*
    511 U.S. 93 (1994) ..................................................................... 43, 48

viii

Appellate Case: 14-2156     Page: 9     Date Filed: 11/04/2014 Entry ID: 4213059

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
  461 U.S. 190 (1983) ............................................................ 55, 56, 59

*Panhandle Eastern Pipe Line Co. v. Michigan Pub. Serv. Comm'n,*
  341 U.S. 329 (1951) .............................................................. 52

*Pharm. Care Mgmt. Ass'n v. Rowe,*
  429 F.3d 294 (1st Cir. 2005) .................................................... 52

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970) .............................................................. 47

*Public Water Supply District No. 10 of Cass Co., Mo. v. City of Peculiar, Mo.,*
  345 F.3d 570 (8th Cir. 2003) ................................................. 28, 31

*Railroad Comm'n of Tex. v. Pullman Co.,*
  312 U.S. 496 (1941) ........................................................ 2, 32, 34

*Raines v. Byrd,*
  521 U.S. 811 (1997) .............................................................. 15

*Sabri v. United States,*
  541 U.S. 600 (2004) .............................................................. 14

*San Remo Hotel v. City and County of San Francisco,*
  145 F.3d 1095 (9th Cir. 1998) ............................................... 32, 33

*Simon v. Eastern Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ............................................................... 16

*South Carolina Pub. Serv. Auth. v. FERC,*
  726 F.3d 41 (D.C. Cir. 2014) ................................................... 57

*Southern Union Co. v. Missouri Pub. Serv. Comm'n,*
  289 F.3d 503 (8th Cir. 2002) ............................................... 52, 53

*SPGGC, LLC v. Blumenthal,*
  505 F.3d 183 (2nd Cir. 2007) ................................................. 2, 46

*Texas v. United States,*
  523 U.S. 296 (1998) ........................................................ 2, 28, 29

Appellate Case: 14-2156   Page: 10   Date Filed: 11/04/2014 Entry ID: 4213059

*Toilet Goods Ass'n, Inc. v. Gardner,*
   387 U.S. 158 (1967) ...................................................................29

*U&I Sanitation v. City of Columbus,*
   205 F.3d 1063 (8th Cir. 2000) .................................................47

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,*
   550 U.S. 330 (2007) ...................................................................52

*United States v. Salerno,*
   481 U.S. 739 (1987) ......................................................... 2, 15, 61

*United States v. Stephens,*
   594 F.3d 1033 (8th Cir. 2010) .................................................14

*Valley Forge Christian Coll. v. Americans United for Separation of Church
   and State,*
   454 U.S. 464 (1982) ...................................................................16

*Vorbeck v. Schnicker,*
   660 F.2d 1260 (8th Cir. 1981) .................................................30

*Wallace v. ConAgra Foods,*
   747 F.3d 1025 (8th Cir. 2014) .................................................24

*Washington State Grange v. Washington State Republican Party,*
   552 U.S. 442 (2008) ............................................................. 61, 62

*Waste Sys. Corp. v. County of Martin, Minn.,*
   985 F.2d 1381 (8th Cir. 1993) .................................................43

*White Stallion Energy Center, LLC v. EPA,*
   748 F.3d 1222 (D.C. Cir. 2014) ...............................................21

## STATE COURT CASES

*Appeal of Sinclair Mach. Products, Inc.,*
   498 A.2d 696 (N.H. 1985) ................................................... 55, 56

*Christianson v. Henke,*
   831 N.W.2d 532 (Minn. 2013) .................................................35

Appellate Case: 14-2156    Page: 11    Date Filed: 11/04/2014 Entry ID: 4213059

*In re Request of Interstate Power Co.,*
    574 N.W.2d 408 (Minn. 1998) ............................................................52

*Minnesota Center for Envtl. Advocacy v. Minnesota Pollution Control*
    *Agency,*
    644 N.W.2d 457 (Minn. 2002) ............................................................42

*Pike County Light and Power Comp. v. Pennsylvania Pub. Util. Com'n,*
    465 A.2d 735 (Pa. Cmwlth. 1983) ......................................................56

*Premier Bank v. Becker Dev., LLC,*
    785 N.W.2d 753 (Minn. 2010) ............................................................35

*Rohmiller v. Hart,*
    811 N.W.2d 585 (Minn. 2012) ............................................................35

*State v. Frazier,*
    649 N.W.2d 828 (Minn. 2002) ............................................................14

## ADMINISTRATIVE LAW

*California Pub. Util. Comm'n*
    134 FERC ¶ 61044 (2011) ....................................................................56

*Central Vermont Pub. Serv. Corp.,*
    84 FERC ¶ 61194 (1998) ......................................................................56

*In re Midwest Power Systems, Inc.,*
    78 FERC ¶ 61067 (1997) ......................................................................57

*In re S. Cal. Edison Co.,*
    70 FERC ¶ 61215 (1995) ......................................................................57

*Pennsylvania Power & Light Co.,*
    23 FERC ¶ 61006 (1983) ......................................................................56

## FEDERAL STATUTES

16 U.S.C. § 791a et seq ............................................................................2

16 U.S.C. § 824 ................................................................................9, 55

28 U.S.C. § 1291, ....................................................................................1

Appellate Case: 14-2156    Page: 12    Date Filed: 11/04/2014 Entry ID: 4213059

28 U.S.C. § 1331 ...................................................................................1

42 U.S.C. § 7401 et seq ..........................................................................2

42 U.S.C. § 7416 ............................................................................ 60, 61

**STATE STATUTES**

Minn. Stat. § 216A.05 ..............................................................................7

Minn. Stat. § 216B.01 ............................................................................53

Minn. Stat. § 216B.09 ..............................................................................7

Minn. Stat. § 216B.241 ............................................................................9

Minn. Stat. § 216B.243 ............................................................................8

Minn. Stat. § 216B.1691 ......................................................................9, 37

Minn. Stat. § 216B.2421 ..........................................................................6

Minn. Stat. § 216B.2422 .......................................................................8, 9

Minn. Stat. § 216H.03 ..................................................................... passim

Minn. Stat. § 645.16 ..............................................................................35

Minn. Stat. § 645.17 ........................................................................ 35, 39

Minn. Stat. chs. 216-216H .......................................................................7

**STATE LEGISLATIVE BILLS**

85 Minn. S.J. 5964 (May 20, 2007) ..........................................................3

85 Minn. H.J. 7518 (May 20, 2007) .........................................................3

**FEDERAL CONSTITUTION**

U.S. Const.art. I, § 8 ................................................................................2

U.S. Const.art. III, § 2 .............................................................................2

U.S. Const. art. VI ...................................................................................2

Appellate Case: 14-2156    Page: 13    Date Filed: 11/04/2014 Entry ID: 4213059

**FEDERAL RULES AND REGULATIONS**

FERC Order No. 888, 61 Fed. Reg. 21540 (May 10, 1996) ............... 56, 57, 58, 59

National Emission Standards for Hazardous Air Pollutants From Coal- and
    Oil-Fired Electric Utility Steam Generating Units and Standards of
    Performance for Fossil-Fuel-Fired Electric Utility, Industrial-
    Commercial-Institutional, and Small Industrial-Commercial-Institutional
    Steam Generating Units,
    77 Fed. Reg. 9304 (Feb. 16, 2012) ......................................................................21

Standards of Performance for Greenhouse Gas Emissions From New
    Stationary Sources: Electric Utility Generating Units,
    79 Fed. Reg. 1430 (January 8, 2014)............................................................. 5, 20

Carbon Pollution Emission Guidelines for Existing Stationary Sources:
    Electric Utility Generating Units,
    79 Fed. Reg. 34829 (June 18, 2014).....................................................................5

**ADDITIONAL AUTHORITIES**

*American Heritage Dictionary* (4th ed. 2002).........................................................36

Brian Gehring, *Speakers Warn of Impact of EPA Rules*, The Bismark
    Tribune, October 7, 2010......................................................................................21

Brad Plumer, *Study: The Coal Industry is in Far More Trouble Than
    Anyone Realizes,* The Washington Post, April 8, 2013................................. 20, 21

Press Release, *Lignite Energy Council, Lignite Energy Council Statement
    on EPA Proposed Regulation of Existing Power Plants* (June 2,
    2014)......................................................................................................................22

Press Release, *Office of Congressman Kevin Cramer, Cramer Statement on
    EPA Power Plant Regulations* (Sept. 20, 2013)..................................................22

Press Release, *Office of Senator John Hoeven, Hoeven Statement on the
    EPA's New Rules for Existing Power Plants* (June 2, 2014) ..............................23

Press Release, *U.S. Chamber of Commerce, U.S. Chamber Comments on
    EPA Proposed Regulation for New Power Plants* (Sept. 19, 2013) ....................22

Appellate Case: 14-2156   Page: 14   Date Filed: 11/04/2014 Entry ID: 4213059

Uma Outka, *The Renewable Energy* Footprint,
  30 Stan. Envtl. L.J. 241 (2011)..............................................................37

United States Energy Information Administration,
  *AE02014 Early Release Overview*, DOE/EIA-0383ER (Dec. 16, 2013)............ 21

Appellate Case: 14-2156     Page: 15     Date Filed: 11/04/2014 Entry ID: 4213059

# STATEMENT OF JURISDICTION

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331, which provides for original jurisdiction over all civil actions arising under the Constitution or laws of the United States. On April 18, 2014, the district court issued a final decision on the merits and judgment was entered. Appellant's Appendix ("Appx.") 461-62. Appellants filed their timely notice of appeal on May 16, 2014. Appx. 463-64. As such, appellate jurisdiction is conferred on this Court by 28 U.S.C. § 1291, which allows for jurisdiction over appeals from final decisions of the district courts of the United States.

Appellate Case: 14-2156     Page: 16     Date Filed: 11/04/2014 Entry ID: 4213059

# STATEMENT OF ISSUES

1.  Did the district court err in finding Appellees presented a justiciable claim where the statute at issue has not been applied to Appellees and where Appellees failed to present evidence of an actual injury-in-fact?

    *Clapper v. Amnesty Intern.*, 133 S. Ct. 1138 (2013)
    *Texas v. United States*, 523 U.S. 296 (1998)
    U.S. Const. art. III, § 2.

2.  Did the district court err in refusing to abstain from exercising jurisdiction where a state agency's construction of Minn. Stat. § 216H.03, subds. 3(2) and 3(3) could avoid the need to consider Appellees' constitution question?

    *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941)

3.  Did the district court improperly grant summary judgment to Appellees based on an erroneous interpretation of Minn. Stat. § 216H.03, subds. 3(2) and 3(3) and because these provisions only apply to utility services provided to Minnesota customers?

    *SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2nd Cir. 2007)
    *Cotto Waxo Co. v. Williams*, 46 F.3d 790 (8th Cir. 1995)
    U.S. Const. art. I, § 8.

4.  Did the district court err in failing to grant summary judgment to Appellants?

    U.S. Const. art. I, § 8.
    U.S. Const. art. VI
    42 U.S.C. § 7401 et seq.
    16 U.S.C. § 791a et seq.

5.  Did the district court err by broadly enjoining all enforcement of Minn. Stat. § 216H.03, subds. 3(2) and 3(3)?

    *Ayotte v. Planned Parenthood*, 546 U.S. 320 (2006)
    *United States v. Salerno*, 481 U.S. 739 (1987)
    *Barrett v. Claycomb*, 705 F.3d 315 (8th Cir. 2013)

2

I.   **THE NEXT GENERATION ENERGY ACT.**

In 2007, the Minnesota Legislature passed with strong bipartisan support the Next Generation Energy Act ("NGEA").  85 Minn. S.J. 5964 (May 20, 2007); 85 Minn. H.J. 7518 (May 20, 2007).  The NGEA was part of Governor Tim Pawlenty's "Next Generation Energy Initiative," which consisted of a series of proposals designed to ensure Minnesota's energy future through increased reliance on renewable energy sources and energy conservation measures.  Appx. 86-87 (Governor Pawlenty press release).  In announcing the initiative Governor Pawlenty stressed that for both economic and environmental reasons Minnesota's electric utilities needed to invest in energy sources that prepare the State for a less carbon-dependent future.  (*Id*.).

The legislative history of the NGEA reflects similar economic and environmental concerns of the Minnesota Legislature.  In particular, legislators heard testimony from several witnesses about the likelihood that future federal regulations would increase energy costs for consumers that depend heavily on carbon dioxide-emitting facilities to meet their long-term energy needs. Appx. 116, 119-20   (House committee hearing transcript).  One expert, for example, testified that a failure to plan for future carbon regulations would result in higher long-term electricity rates:

3

There is going to be federal action and increased international action. The question is when. But I think there are few people that would say 10, 20 years from now we will not have constraints on emissions and prices associated with carbon pollution. . . [I]t is clear that the costs of carbon tremendously affects the cost of power from new coal plants.

Appx. 119-20.

The same expert testified that construction and maintenance of electric generating facilities requires significant long-term investments, and that it would be imprudent to rely on energy from "new big emission sources because as I said controls [on] carbon pollution are clearly coming down the pike." Appx. 120. He added, "[y]ou don't want to create another generation of stranded investments like we experienced in the 1980s and '90s with nuclear power that have to be passed through to the rate payers in some way." *Id*. One state senator explained: "[I]f we act now it will prevent us from making some very costly mistakes in the next decade that our rate payers will be paying the price for, for decades after CO2 regulations become enacted across the county." Appx. 191 (Senate committee hearing transcript).

As the Legislature anticipated, the Environmental Protection Agency ("EPA") in 2012, promulgated regulations regarding mercury and other air toxins, which directly impacts electricity generating plants that emit carbon dioxide. In

addition, the EPA recently proposed extensive rules that will specifically regulate carbon dioxide emissions from new and existing power plants.[1]

The Legislature also heard testimony about environmental reasons for promoting clean energy. Scientists testified that burning coal generates carbon dioxide, which traps heat in the atmosphere and results in higher temperatures. Appx. 240-41 (Legislative Joint Hearing Transcript). They stated that increased temperatures directly impact Minnesota in numerous ways, including reducing water availability, agricultural output, and timber resources. Appx. 251. Scientists and other experts also testified that warming temperatures would significantly harm Minnesota's ecosystem, infrastructure, economy, and overall human health. Appx. 240-58.

## II.  MINN. STAT. § 216H.03, SUBD. 3.

The portion of the NGEA at issue in this case is Minn. Stat. § 216H.03, subd. 3. It provides, subject to several exceptions, that on or after August 1, 2009 no person shall:

> (1) construct within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions;

---

[1] Standards of Performance for Greenhouse Gas Emissions From New Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 1430 (Jan. 8, 2014); Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 34829 (June 18, 2014).

5

(2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or

(3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions.

As part of a utility's resource planning, the statute effectuates the legislative intent in three ways. First, it prohibits the construction of a future so-called "new large energy facility"[2] in Minnesota that would produce carbon dioxide emissions. *Id*. (1). Second, it prohibits the purchase, commitment to purchase, or other importation of electricity for use in Minnesota to be generated from a future "new large energy facility" in another state that would produce carbon dioxide emissions. *Id*. (2). Third, the statute prohibits a utility from entering into contracts of five years or more to purchase at least 50 megawatts of electricity for use in Minnesota if the generation of the electricity would increase the annual carbon dioxide emissions produced with respect to the utility's aggregate amount of electricity obtained for use to serve retail customers in the State.[3] *Id*. (3).

---

[2] A "new large energy facility" is generally defined as an electric power generating plant that produces at least 50,000 kilowatts that is connected to the transmission system and was not in operation as of January 1, 2007. Minn. Stat. § 216B.2421, subd. 2(1). It does not include, for example, a facility that uses natural gas as a primary fuel and satisfies certain other conditions. Minn. Stat. § 216H.03, subd. 1. *See also* Minn. Stat. § 216H.03, subd. 7 (exempting various power plants from the provisions of § 216H.03, subd. 3).

[3] The statutory term of "statewide power sector carbon dioxide emissions' is defined as "the total annual emissions of carbon dioxide from the generation of electricity within the state and all emissions of carbon dioxide from the generation

(Footnote Continued on Next Page)

6

The Legislature did not preclude shorter-term contracts (less than five years) to purchase any amount of electricity for use in Minnesota from then-existing power plants, wherever located, even if the plant emits carbon dioxide. The exceptions to the law, *id*. subds. 4-7, include the ability of a utility to demonstrate "it will offset the new contribution to statewide power sector carbon dioxide emissions with a carbon dioxide reduction project" as specified in the statute. *Id*., subd. 4.

## III.   THE MINNESOTA PUBLIC UTILITIES COMMISSION.

As with other Minnesota laws that regulate electric utilities, the NGEA is implemented and administered by the Minnesota Public Utilities Commission ("MPUC"). The MPUC has extensive regulatory authority over a utility that directly or indirectly serves the electricity needs of Minnesotans, even if the utility also generates or purchases electricity for use in other states. Minn. Stat. § 216A.05. This authority has long included the ability to regulate the provision of electricity to meet Minnesota's energy needs. *See, e.g.,* Minn. Stat. § 216B.09. *See generally* Minn. Stat. chs. 216-216H. The MPUC, for example, must issue a certificate of need before a utility may construct any type of a new large generating

---

(Footnote Continued from Previous Page)
of electricity imported from outside the state and consumed in Minnesota." Minn. Stat. § 216H.03, subd. 2.

7

facility in Minnesota.  *See* Minn. Stat. § 216B.243 (listing criteria the MPUC must consider when determining whether to issue a certificate of need).

The MPUC also reviews the "resource plan" of utilities that acquire electricity for retail sale in Minnesota.  Minn. Stat. § 216B.2422, subds. 2, 4.  A "resource plan" is defined as "a set of resource options a utility could use to meet the service needs of its customers over a forecast period, including an explanation of the supply and demand circumstances under which, and the extent to which, each resource option would be used to meet those service needs."  *Id.*, subd. 1(d). *See also* Appx. 369 (Expert report of Seth Blumsack, Ph.D. ("Blumsack Report") ¶ 16).

The MPUC reviews a utility's resource plan to determine whether it is "consistent with the public interest," section 216B.2422, subd. 2, including that a utility has sufficient capacity[4] to meet its anticipated energy demand in Minnesota, and is complying with certain renewable energy and conservation mandates.  *See* Minn. Stat. §§ 216B.1691, 216B.241.  The MPUC considers carbon dioxide

---

[4] Capacity refers to the a utility's capability to supply a stated quantity of electric energy on demand.  Various state, federal, and industry rules require utilities to show that they have sufficient capacity to meet anticipated energy demand. Appx. 335-36 (Expert report of Scott Hempling ("Hempling Report") ¶¶ 12-13). Utilities may meet these capacity requirements by owning generating facilities or by entering into so-called "capacity contracts" with generating facilities to ensure the availability of a particular quantity of electricity for its retail customers. Appx. 336-37 (Hempling Report ¶ 24).  The wholesale price of the purchased electricity is set at the time the electricity is transmitted.  *Infra* at 9.

Appellate Case: 14-2156     Page: 23     Date Filed: 11/04/2014 Entry ID: 4213059

emissions as part of its review of a utility's resource plan. *See* Minn. Stat. § 216B.2422, subd. 4.

## IV. THE MIDCONTINENT INDEPENDENT SYSTEM OPERATION.

The Federal Energy Regulatory Commission ("FERC") is responsible for regulating the interstate transmission and wholesale sales of electricity. 16 U.S.C. §§ 824 (a), (b)(1). FERC has approved a number of "regional transmission organizations" that are responsible for operating the transmission grid in their assigned territory. Appx. 269 (Export Report of Randall W. Porter ("Porter Report") ¶ 18); Appx. 342-43 (Hempling Report ¶ 41). The Midcontinent Independent System Operation ("MISO"), which is not a party to this case, is a FERC-approved regional transmission organization. It serves the midwestern United States, including Minnesota. Appx. 271-72 (Porter Report ¶¶ 22-26); Appx. 342-43 (Hempling Report ¶ 41).

As part of facilitating the transmission of electricity, MISO operates several short-term energy markets, referred to as "organized energy markets." These markets match supply and demand of electricity by hour on any given day, which allows MISO to set an hourly wholesale market energy rate. Appx. 273 (Porter Report ¶ 31); Appx. 345, 348 (Hempling Report ¶¶ 46). A generating facility then places electricity into the transmission system and a utility that purchased

9

electricity from the generating facility removes the purchased quantity of electricity from the system. Appx. 333-34 (Hempling Report ¶¶ 19, 22).

Due to the commingling of electrons in the transmission system, it is not possible to trace the electricity from a specific generating facility to a specific retail utility that is receiving the electricity for use in Minnesota. Appx. 277 (Porter Report ¶ 40); Appx. 333 (Hempling Report ¶ 19); Appx. 373-74 (Blumsack Report ¶ 23). However, the amount of electricity transmitted to a utility through MISO is subject to the terms of the purchasing contract or other agreement between the generating facility and the utility receiving the electricity for retail sale in Minnesota. Appx. 350 (Hempling Report ¶ 56). In other words, MISO assists in the transmission of the designated quantity of electricity to the utility in Minnesota.

Although the MPUC has not had the opportunity to interpret section 216H.03, subd. 3 in an administrative proceeding,[5] as parties to this litigation, the MPUC Commissioners and Minnesota Commissioner of Commerce, have taken the position that for numerous reasons the statute does not apply to the MISO market.

_____

[5] A handful of dockets before the MPUC have raised NGEA concerns, but for various reasons the dockets were decided without a need to interpret subdivision 3. *See Matter of Dairyland Intergrated Resource Plan*, Appx. 392 (finding exemption to NGEA applied); *Matter of Great River Energy*, Appx. 383-84 (same); *Matter of Basin Electric Resource Plan*, Appx. 407, 410 (granting extension on resource plan without reaching NGEA issue).

Appellate Case: 14-2156     Page: 25     Date Filed: 11/04/2014 Entry ID: 4213059

## V.    DISTRICT COURT PROCEEDINGS.

Appellees commenced this litigation in November 2011, more than four years after the NGEA was enacted, challenging the constitutionality of section 216H.03, subdivisions 3(2) and 3(3).  They filed an Amended Complaint on December 1, 2011, alleging that the legislation violated the dormant Commerce Clause, the Supremacy Clause based on alleged preemption by the Federal Power Act and Clean Air Act, the Privileges and Immunities Clause, and the Due Process Clause of the Fourteenth Amendment.  Appx. 1-44.  The district court granted partial judgment on the pleadings and dismissed Appellees' claims under the Due Process Clause and the Privileges and Immunities Clause.  Appx. 84.

The parties brought cross-motions for summary judgment on all remaining claims.  The court granted Appellees' motion for summary judgment in part as to their dormant Commerce Clause claim.   Appx. 460.   In so doing, the court concluded that section 216H.03, subds. 3(2) and 3(3) were facially unconstitutional under the dormant Commerce Clause because, contrary to Appellants' position, the plain language of the legislation applied to transactions in the MISO short-term energy market.  Relying exclusively on its interpretation of the law as applying to MISO, the court reasoned that the impossibility of knowing where an electron travels renders the legislation extraterritorial and therefore unconstitutional.  Appx. 454-59.

11

The district court denied as moot summary judgment as to all remaining claims. It also broadly enjoined Appellants and their successors in office from enforcing section 216H.03, subdivisions 3(2) and 3(3). Appx. 460.

Appellants now bring this appeal.

## SUMMARY OF ARGUMENT

Minn. Stat. § 216H.03, subds. 3(2) and 3(3) are a valid exercise of traditional state authority to regulate the provision of electricity to Minnesota customers. Appellees' claims fail for both jurisdictional reasons and because the NGEA neither violates the dormant Commerce Clause nor is preempted by federal law.

Federal courts have a fundamental responsibility to ensure that a litigant demonstrates an actual or "certainly impending" injury-in-fact that is fairly traceable to the challenged action. Appellees fail to show either an injury-in-fact or causation. Subdivisions 3(2) and 3(3) have never been enforced against any Appellee. Rather, Appellees' alleged injuries rest on speculation about how the NGEA might be applied to them, and result from Appellees' own actions and federal regulatory and market conditions. Likewise, Appellees' claims are not ripe because the MPUC has not had the opportunity to apply subdivisions 3(2) or 3(3) in the context of an actual, concrete case, and the Complaint involves hypothetical inquiry under these circumstances.

Appellate Case: 14-2156    Page: 27    Date Filed: 11/04/2014 Entry ID: 4213059

The district court also erred by rejecting the interpretation of subdivisions 3(2) and 3(3) of Appellant MPUC Commissioners in this litigation, or at the very least by not abstaining so that the MPUC could issue a formal interpretation as part of a state administrative proceeding. Both the plain language and purpose of the NGEA demonstrate that subdivisions 3(2) and 3(3) do not apply to MISO short-term markets and are not extraterritorial. Instead, the provisions regulate contracts and other commitments to serve Minnesota customers with electricity from generating facilities that emit carbon dioxide.

Accordingly, as properly interpreted, subdivisions 3(2) and 3(3) do not violate the dormant Commerce Clause. The provisions are neither extraterritorial nor discriminatory and involve areas of traditional state authority. As such, subdivisions 3(2) and 3(3) easily satisfy the *Pike* balancing test.

Subdivisions 3(2) and 3(3) also are not preempted by either the Federal Power Act or the Clean Air Act. The NGEA regulates the resource acquisition decisions of utilities that serve Minnesota, which is an area of traditional state concern. Subdivisions 3(2) and 3(3) do not regulate wholesale rates, the transmission of electricity, or air emissions.

Subdivisions 3(2) and 3(3) are a traditional exercise of state authority to regulate the energy resources used to serve Minnesota customers. The district court should have granted summary judgment in favor of Appellants.

Appellate Case: 14-2156    Page: 28    Date Filed: 11/04/2014 Entry ID: 4213059

**ARGUMENT**

## I.  STANDARD OF REVIEW.

This Court reviews *de novo* the district court's grant of summary judgment. *Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 653 (8th Cir. 2003). The district court's decision regarding justiciability, the constitutionality of a state statute, as well as its interpretation of a state law, are also reviewed *de novo*. *McDermott v. Royal*, 613 F.3d 1192, 1193 (8th Cir. 2010).

State legislation is presumed to be constitutional. *Fitz v. Dolyak*, 712 F.2d 330, 333 (8th Cir. 1983). Appellees have the heavy burden to show beyond a reasonable doubt that a state law is unconstitutional. *State v. Frazier*, 649 N.W.2d 828, 832 (Minn. 2002).

In addition, facial constitutional challenges, such as Appellees' argument in this case, are strongly disfavored because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *United States v. Stephens*, 594 F.3d 1033, 1037 (8th Cir. 2010). "Facial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 608-09 (2004).

As the Supreme Court has recognized, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the

14

challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## II. APPELLEES DO NOT HAVE STANDING BECAUSE THEY FAILED TO SHOW A CONCRETE INJURY-IN-FACT FAIRLY TRACEABLE TO THE NGEA AND THEIR CLAIMS ARE NOT RIPE FOR JUDICIAL REVIEW.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To satisfy the case-or-controversy requirement, Appellees have the burden to establish both standing and ripeness. *National Right to Life Political Action Comm. v. Connor*, 323 F.3d 684, 689 (8th Cir. 2003). Appellees can establish neither.

### A. Appellees Have Not Proven They Have Standing.

The U.S. Supreme Court recently stated in *Clapper v. Amnesty Intern.*, 133 S. Ct. 1138, 1146 (2013), that "[t]he law of Article III standing, which is built on separation of powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." Accordingly, the Court instructed that the "standing inquiry" is "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by" another branch of government is constitutional. *Id.* at 1147. Appellees have not satisfied this rigorous standard.

15

To show standing, Appellees must first demonstrate an "injury-in-fact," *i.e.,* "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted). This requirement ensures that legal questions are resolved not in the abstract, "but in a concrete factual context conductive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982). If Appellees establish an injury-in-fact, they must then demonstrate the injury was "fairly . . . trace[able] to the challenged action of the defendant." *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). Appellees cannot establish either an injury-in-fact or that any asserted injury is fairly traceable to the challenged action of Appellants.

### 1. Appellees have not shown an injury-in-fact.

Allegations of possible future injury do not establish an "injury-in-fact" because Article III confers the power of judicial review only "as a necessity in the determination of real, earnest and vital controversy." *Valley Forge Christian Coll.*, 454 U.S. at 471. As such, a litigant must prove an actual or "certainly impending" injury to meet the injury-in-fact requirement. *Clapper*, 133 S. Ct. at 1147 (stating that "we have repeatedly reiterated that 'threatened injury must be *certainly*

16

*impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient") (italics and alternations in original).

A perceived threat of injury based on speculation about contingent future events is not "certainly impending." *See id*. at 1148. Parties claiming injury from an unenforced statute must at a minimum show that the statute has a direct and immediate impact on them, and that there is an actual, well-founded fear that the law will be enforced against them. *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 984 (8th Cir. 2009).

The NGEA has never been enforced against any Appellee, or any other entity. There is also no current threat to enforce the NGEA. Nevertheless, Appellees speculate that the MPUC might construe section 216H.03 as applying to them, and that the MPUC's application might somehow adversely affect Appellees' business interests. Appellees' claims fail for a number of reasons.

First, Appellees' purported injury is based on contingencies about how the MPUC might construe and apply the NGEA to them. For example, Appellee Minnkota Power ("Minnkota") claims it is "apprehensive that Minnesota will attempt to enforce the [NGEA] against Minnkota in connection with Minnkota's sales of surplus energy." Appx. 310 (Tschepen Declaration ¶ 12). Likewise, Basin Electric allegedly worries about transactions that "*might be* construed to be violations of subdivisions 3(2)[.]" Appx. 302 (Rutter Declaration ¶ 10) (emphasis

17

added). Appellees' purported injuries are all contingent on the MPUC interpreting section 216H.03 in a particular manner and enforcing it against them. *See Clapper,* 133 S. Ct. at 1150 (rejecting standing theory based on "guesswork as to how [federal governmental agencies] will exercise their judgment"). Appellees' allegations are based on speculative concerns, not "certainly impending" injuries-in-fact.

Second, no Appellee has shown that it operates or has contracted to serve its Minnesota retail customers with electricity from a new large energy facility subject to subdivision 3(2). Likewise, no Appellee has shown any concrete and particularized plans or proposals to construct or contract with such a facility. *E.g.,* Appx. 99-100 (admitting that the NGEA does not prohibit them from developing a coal-fired generating facility or leasing it to a third-party); Appx. 323-25 (identifying projects, but admitting that each failed to materialize for reasons unrelated to the NGEA).

Third, Appellees have conceded that they are unaware of any long-term power purchase agreements subject to subdivision 3(3) that failed to materialize but for the NGEA. Appx. 92 ("Plaintiffs are not aware of specific new long-term power purchase agreements that they would have entered into, but did not because of Minn. Stat. § 216H.03") Appx. 111 (admitting that Appellee Minnkota cannot identify a single sale that was cancelled because of the NGEA); Appx. 109

18

(acknowledging that Basin Electric has not "changed [its] day-to-day operations"). Power purchase agreements for a period of less than five years are not prohibited by subdivision 3(3), and there is no evidence of even a single agreement for a period longer than five years that would have occurred in the absence of the NGEA. Thus, Appellees have shown no concrete and particularized injury resulting from subdivision 3(3).

Fourth, Appellees cannot show injury related to their concern that the NGEA might apply to MISO short-term energy markets. As part of this litigation, all the MPUC Commissioners and the Commissioner of Commerce have confirmed that the NGEA does not apply to transactions in the MISO energy markets. Therefore, Appellees' purported apprehension does not support standing for this additional reason. *See, e.g.*, *Harmon v. City of Kansas City, Mo.*, 197 F.3d 321, 327 (8th Cir. 1999) (finding that plaintiff lacked standing to seek injunctive relief against the enforcement of a city ordinance based on the city's representation that it does not now interpret the ordinance as applying to plaintiff's conduct, notwithstanding the fact that the city had previously enforced the ordinance against plaintiff). *See also Clapper*, 133 S. Ct. at 1151 (stating that a party "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending" and recognizing that a party cannot "secure a

19

lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear").

Appellees cannot show the requisite injury-in-fact. They therefore lack standing.

## 2. Appellees cannot show that any alleged injury is fairly traceable to the challenged actions of Appellants.

Even assuming Appellees can establish an injury-in-fact, they did not and cannot demonstrate that their alleged injury is "fairly . . . trace[able] to the challenged action of the defendant." *See Lujan*, 504 U.S. at 560. An alleged injury is not fairly traceable to a challenged statute if other factors caused the asserted injury. *See Clapper*, 133 S. Ct. at 1149.

Appellees fail to demonstrate that the NGEA, rather than other factors, inhibited their business or financial interests. For years, cheaper energy options have shifted market interest away from coal.[6] This shift has been accelerated by

---

[6] Standards of Performance for Greenhouse Gas Emissions From New Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 1430, 1433 (Jan. 8, 2014) (stating that, even in the absence of proposed federal regulations, "existing and anticipated economic conditions mean that few, if any, solid fossil-fired [generating facilities] will be built in the foreseeable future . . . [and] electricity generators are expected to choose new generating technologies (primarily natural gas combined cycle) that would meet the proposed standards"); Brad Plumer, *Study: The Coal Industry is in Far More Trouble than Anyone Realizes*, The Washington Post, April 8, 2013, *available at* www.washingtonpost.com/blogs/wonkblog /wp/2013/04/08/study-the-coal-industry-is-in-far-more-trouble-than-anyone-
(Footnote Continued on Next Page)

Appellate Case: 14-2156   Page: 35   Date Filed: 11/04/2014 Entry ID: 4213059

existing and proposed federal regulations regarding the emission of carbon dioxide, as well as the tightening of existing standards regulating sulfur dioxide and mercury.[7]

Indeed, in 2012, the EPA promulgated the mercury and air toxics standards (MATS) rule limiting emissions of mercury and other air toxins from new and existing power plants.[8] Appellee North Dakota and a number of other states, along with industry and labor groups, challenged the MATS rule in the D.C. Circuit, arguing that the rule would result in "early [coal-fired] plant retirements" and "effectively end the construction of new coal-fired facilities."[9] The D.C. Circuit upheld the MATS rule on April 15, 2014. *White Stallion Energy Center, LLC v. EPA*, 748 F.3d 1222 (D.C. Cir. 2014), *petition for cert. filed* (July 14, 2014) (No. 14-46, 14).

_____

(Footnote Continued from Previous Page)

realizes/; Brian Gehring, *Speakers Warn of Impact of EPA Rules*, The Bismark Tribune, October 7, 2010, *available at* http://bismarcktribune.com/news/local/speakers-warn-of-impact-of-epa-rules/article_b989b99a-d25a-11df-bfb3-001cc4c03286.html.

[7] *Id. See also* United States Energy Information Administration, *AEO2014 Early Release Overview*, DOE/EIA-0383ER (Dec. 16, 2013), *available at* http://www.eia.gov/forecasts/aeo/er/early_elecgen.cfm (stating that "[t]he combination of slow growth in electricity demand, competitively priced natural gas, programs encouraging renewable fuel use, and the implementation of environmental rules dampens future coal use").

[8] 77 Fed. Reg. 9304 (Feb. 16, 2012 (to be codified at 40 C.F.R. parts 60 and 63).

[9] Joint Brief of Petitioners, *White Stallion Energy Center, LLC v. United States Environmental Protection Agency*, 748 F.3d 1222 (D.C. Cir. 2014), at 42 n.39 (No. 12-1100 (and consolidated cases)).

Similarly, after release of the EPA's proposed regulations for new power generating facilities in September 2013, North Dakota Congressman Kevin Cramer stated that the proposed EPA regulations would "effectively block the construction of any new coal-fired power plant in the United States."[10] The U.S. Chamber of Commerce described the EPA rules as "essentially outlawing the construction of new coal plants."[11]

Following release of the EPA proposed carbon dioxide regulations for existing power facilities in June 2014, Appellee Lignite Energy Council issued a statement in which it said the "proposal to regulate existing power plants so far indicates that it is a recipe for disaster for coal-based generating stations[,]" and "utilities will be forced to move away from coal to less reliable and more expensive sources of electricity."[12] North Dakota Senator John Hoeven released an

---

[10] Press Release, *Office of Congressman Kevin Cramer, Statement on EPA Power Plant Regulations* (Sept. 20, 2013), *available at* http://cramer.house.gov/media-center/press-releases/cramer-statement-on-epa-power-plant-regulations.

[11] Press Release, *U.S. Chamber of Commerce, Comments on EPA Proposed Regulation for New Power Plants* (Sept. 19, 2013), *available at* https://www.uschamber.com/press-release/us-chamber-comments-epa-proposed-regulation-new-power-plants.

[12] Press Release, *Lignite Energy Council, Council Statement on EPA Proposed Regulation of Existing Power Plants* (June 2, 2014), *available at* https://www.lignite.com/news-events-public/news-releases-archive/lignite-energy-council-statement-on-epa-proposed-regulation-of-existing-power-plants/.

22

official statement declaring that the proposed regulations will "prevent investment and shutdown [coal-fired] power plants."[13]

By Appellees' own admission, the proximate cause of alleged reluctance to build or enter into long-term contracts for new coal-powered electricity plants is based on existing and proposed federal regulations. As such, Appellee's alleged injury is not fairly traceable to the NGEA.

### 3. The district court erroneously found that three Appellees had standing.

The district court summarily and incorrectly concluded that three Appellees had standing based on their concerns about how the MPUC might apply the NGEA. Appx. 433-35. The district court erroneously determined that Appellee Missouri River Energy Services ("MRES") had shown injury because it was "concerned" that a transaction involving a coal-fired facility in Wisconsin "would have been viewed as violation of Minn. Stat. § 216H.03 [subd. 3(3)]." Appx. 323-24. This transaction, however, did not close because "there was a potential legal dispute relating to a right of first refusal purportedly owned by another utility," not due to the NGEA. Appx. 323-24 (Wahle Declaration ¶ 23).

---

[13] Press Release, *Office of Senator John Hoeven, Statement on the EPA's New Rules for Existing Power Plants* (June 2, 2014), *available at* http://www.hoeven.senate.gov/public/
index.cfm/2014/6/hoeven-statement-on-the-epa-s-new-rules-for-existing-power-plants.

Appellate Case: 14-2156     Page: 38     Date Filed: 11/04/2014 Entry ID: 4213059

In addition, as discussed above, MRES's subjective concern about how a law might apply does not establish an injury-in-fact fairly traceable to the actions of Appellants. *See Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 984 (8th Cir. 2009) (stating that pre-enforcement challenge to a statute requires that the impact of the law be direct and immediate and there exists "an actual, well-founded fear that the law will be enforced against them").

There has been no threat of enforcement against MRES. Indeed, MRES has acknowledged that the purpose of this lawsuit was "a preemptive strike so that we understand and so the State of Minnesota understands how this statute would be applied," rather than to remedy a concrete and particularized injury. Appx. 96-97 (Wahle Deposition at 66:24-67:2). *See Wallace v. ConAgra Foods*, 747 F.3d 1025, 1031 (8th Cir. 2014) ("Time and again the Supreme Court has reminded lower courts that speculation and conjecture are not injuries cognizable under Article III").

The district court also erroneously determined that Appellee Minnkota had standing because of "its concern that sales of its surplus energy will implicate Minn. Stat. § 216H.03 [subd. 3(3)]." Appx. 435. As with MRES, Minnkota's "concern" does not establish the necessary injury-in-fact. Indeed, Minnkota admits it cannot identify a single sale that was cancelled because of the NGEA. Appx. 111 (Tschepen Deposition at 92:10-14).

24

Minnkota also cited "positions taken by the [Commerce Department]" in certain MPUC proceedings,[14] but Minnkota misunderstands the Commerce Department's position in those matters.[15]  In any event, the Commerce Department merely serves as an advocate for ratepayers in MPUC proceedings.  Minnkota's concerns with how it believes the MPUC might apply the NGEA, which is contrary to the MPUC's (as well as the Commerce Commissioner's) position in this litigation, does not establish a concrete injury-in-fact fairly traceable to the NGEA.  *Supra* at 15-17.

The final Appellee that the district court incorrectly found had standing, Basin Electric, claimed injury-in-fact based on its alleged uncertainty regarding how section 216H.03 would apply to certain power transfers.  Appx. 292-93 (Raatz Declaration ¶¶ 20-23).  Basin Electric raised the issue of these power transfers one month before this case was commenced as part of a request to the MPUC for a one-year extension on filing its next resource plan.  Appx. 398 (Basin Electric Notice).  The Commerce Department, serving as an advocate for ratepayers in the proceeding, responded to Basin Electric by suggesting that the issue be briefed.

---

[14] Appx. 310 (Tschepen Declaration ¶ 12).

[15] For example, while Minnkota wants to *export* surplus energy, the Commerce Department's position focused on Dairyland's plan to *import* power on behalf of its Minnesota members.  *Infra* at 34-43 (discussing the statutory interpretation of the NGEA).  Ultimately, the MPUC found that the project in question was subject to an exemption to the NGEA, so the MPUC did not reach the merits of how to apply subd. 3(2) and (3) as part of that docket.  Appx. 392.

Appellate Case: 14-2156     Page: 40     Date Filed: 11/04/2014 Entry ID: 4213059

Appx. 401-03 (Commerce Department Comments). Basin took the position that there was no violation of the NGEA, and the Commerce Department never took a contrary position. *Id.* The MPUC granted Basin Electric's request for a one-year extension of time to file its resource plan. Appx. 407 (MPUC Order).

Basin Electric subsequently requested that the MPUC take no action to interpret the NGEA. Appx. 410 (Letter from Basin Electric). Accordingly, there has been no actual or threatened enforcement action against Basin Electric, let alone a certainly impending threat of enforcement.

The district court also mentioned Basin's alleged concern that the NGEA may prevent it from entering into long-term power purchase agreements to serve increased load outside Minnesota. Appx. 429. Basin has admitted, however, that five years after the NGEA went into effect it has not "changed day-to-day operations" based on the NGEA. Appx. 109 (Rutter Deposition at 86:10-13).

Finally, the district court mistakenly relied on Basin's assertion that it was unable to evaluate costs associated with developing a parcel of land in Selby, South Dakota into a coal-fired generation facility. Appx. 427. However, Basin did not and cannot show that the NGEA is the reason that the South Dakota parcel of land has not yet been developed. *See* Appx. 295 (Raatz Declaration ¶ 28); *see also, e.g.,* Appx. 99-100 (admitting that the NGEA doesn't prohibit them from developing coal or leasing it to a third-party); *supra* at 20-23 (noting statements by

26

Appellees blaming other regulations for stopping use of coal-fired generating facilities).

Indeed, the district court erred in failing to assess whether any purported injury-in-fact alleged by Appellees was fairly traceable to the NGEA. In this regard, the court failed to consider an essential part of the standing analysis, *i.e.*, whether other reasons unrelated to the NGEA accounted for Appellees' alleged injury. *Supra* at 20.

The district court incorrectly concluded that Appellees had standing.

### B. Appellees Have Not Proven That Their Claims Are Ripe.

In addition to standing, Appellees must show that their claims are ripe for judicial review. *Iowa League of Cities v. Environmental Prot. Agency*, 711 F.3d 844, 867 (8th Cir. 2013). The ripeness doctrine "flows from both the Article III 'cases' and 'controversies' limitation and also from prudential consideration for refusing to exercise jurisdiction." *Id.* Its basic rationale is "to protect [administrative] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Minn. Pub. Util. Comm'n v. F.C.C.*, 483 F.3d 570, 582 (8th Cir. 2007). Ripeness is "peculiarly a question of timing and is governed by the situation at the time of review, rather than the situation at the time of the events under review." *Iowa League of Cities,* 711 F.3d at 867.

27

The ripeness inquiry requires an examination of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Texas v. United States*, 523 U.S. 296, 300-01 (1998). Appellees cannot satisfy either prong.

### 1. The issues are not fit for judicial decision.

The first prong of the ripeness test – the fitness of the issues for judicial decision – focuses on "a court's ability to visit an issue . . . [and] whether it would benefit from further factual development." *Public Water Supply Dist. No. 10 of Cass Co., Mo v. City of Peculiar, Mo.*, 345 F.3d 570, 573 (8th Cir. 2003). The primary consideration is whether the case is contingent on future possibilities such that further factual development would aid in the proper adjudication of the issue. *Id. See also Minn. Pub. Util. Comm'n*, 483 F.3d at 582-83 (dismissing claim for lack of ripeness because, although F.C.C. order strongly suggested how the agency would resolve an issue, "the order does not purport to actually do so and until that day comes it is only a mere predication").

A claim is not ripe when there is uncertainty regarding how an implementing authority would apply a statute in particular circumstances. For example, in *Texas v. United States*, 523 U.S. 296 (1998), the State of Texas challenged a determination by the U.S. Attorney General that a state statute could violate the

Appellate Case: 14-2156    Page: 43    Date Filed: 11/04/2014 Entry ID: 4213059

Voting Rights Act if implemented in a certain manner. The Court found the challenge was not ripe because:

> The operation of the statute is better grasped when viewed in light of a particular application. Here, as is often true, determination of the scope . . . of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function. In the present case, the remoteness and abstraction are increased by the fact that [the Texas law] has yet to be interpreted by the Texas courts. Thus, postponing consideration of the questions presented, until a more concrete controversy arises, also has the advantage of permitting the state courts further opportunity to construe the provisions.

*Id.* at 301.

Appellees' claims are not yet fit for judicial determination. As discussed above, the MPUC has not applied section 216H.03 in any actual, concrete case. Determining the scope and constitutionality of section 216H.03 "in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an injury for the proper exercise of the judicial function." *See id.* The practical workings of the NGEA, and its constitutional application to Appellees and other entities, is better evaluated after it is applied by the MPUC. *See Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967) (finding challenge to an unapplied regulation lacked ripeness because "judicial appraisal of [the regulation] is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here").

29

Moreover, Appellees' claims are dependent on a number of contingencies that may or may not occur. *See KCCP Trust v. City of North Kansas City*, 432 F.3d 897, 899 (8th Cir. 2005) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all"). Appellees' Amended Complaint exemplifies the many contingent events underlying their claims. Appellees allege that the NGEA "could be interpreted to condition or prohibit" certain power transfers, Appx. 15 (Amended Complaint ¶ 47); they claim "uncertainty about the application of the NGEA," Appx. 16 (Amended Complaint ¶ 48); and they assert that "[t]he NGEA could be applied" to certain transactions. Appx. 17-18 (Amended Complaint ¶ 54). Appellees' claims therefore depend on speculative actions of the MPUC.

In addition, proposed and existing federal regulations of not just carbon emissions, but also mercury and sulfur dioxide, create uncertainty as to whether either challenged provision will ever be implicated. *Supra* at 20-23. In essence, Appellees seek an advisory opinion about how the NGEA would apply in particular circumstances that may or may not occur. *See Vorbeck v. Schnicker*, 660 F.2d 1260, 1265 (8th Cir. 1981) ("[F]ederal courts established pursuant to Article III of the Constitution do not render advisory opinions").

Appellees' claims are not fit for judicial determination.

30

### 2.    There is little hardship to the parties.

The second factor requires Appellees to show the hardship to the parties of withholding judicial consideration. *Public Water Supply Dist. No. 10*, 345 F.3d at 572-73. Allegations of abstract injury do not satisfy the hardship prong; instead, Appellees must be "immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *Id.* at 573. For the reasons set forth above, Appellees have shown no such hardship. Indeed, Appellees do not currently operate or contract with facilities subject to subdivision 3(2), and have not entered into long-term contracts subject to subdivision 3(3). They are free to contract with any existing power plant generating electricity for a period of up to five years and for an unlimited amount of electricity. Furthermore, any alleged uncertainty about whether the NGEA applies to transactions in the MISO energy markets has been clarified by the MPUC's position in this litigation.

Beyond their claims not being fit for judicial decision, Appellees have not satisfied the hardship prong of the ripeness test.

### 3.    The district court erroneously found that the claims of three appellees were ripe.

The district court summarily found Minnkota, MRES, and Basin Electric's claims about the uncertain application of the NGEA to be ripe. Appx. 435. It erred by not even applying the required two-prong test. In any event, as discussed

31

above, a proper application of the ripeness doctrine demonstrates that Appellees' claims are not ripe. *Supra* at 27-31.

## III. IF ANY UNCERTAIN ISSUES OF STATE LAW EXIST REGARDING THE PROPER INTERPRETATION OF SECTION 216H.03, THE COURT SHOULD ABSTAIN AND PERMIT THE MPUC TO INTERPRET THE LAW.

Federal courts have long recognized "a doctrine of abstention appropriate to our federal system whereby the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments." *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). In particular, where resolution of a federal constitutional question "is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Beavers v. Arkansas State Bd. of Dental Examiners*, 151 F.3d 838, 841 (8th Cir. 1998) (quoting *Harman v. Forssenius*, 380 U.S. 528, 534 (1965)).

Abstention may be raised by a party at any time, or it may be raised by a court *sua sponte*. *See Cincinnati Indem. Co. v. A&K Const. Co.*, 542 F.3d 623, 625 (8th Cir. 2008) (stating that "[t]his court may raise the issue of the appropriateness of abstention *sua sponte*"); *San Remo Hotel v. City and County of San Francisco*, 145 F.3d 1095, 1104-05 (9th Cir. 1998) (holding that *Pullman* abstention may be

invoked by any party for the first time on appeal because abstention furthers "the rightful independence of the state governments and . . . the smooth working of the federal judiciary").

The MPUC has not yet had an opportunity to apply section 216H.03 in the context of a MPUC proceeding. As part of this litigation, however, all the MPUC Commissioners, as well as the Commissioner of Commerce, have made clear that section 216H.03 does not apply to transactions in the MISO energy markets. The district court, contrary to Appellants' position, erroneously interpreted section 216H.03. Appx. 439-41.

The Court should reverse the district court's interpretation for multiple reasons. *Infra* at 34-43. However, if the Court has any concerns regarding Appellants' interpretation of the statute as not applying to MISO's energy markets, it would be appropriate to abstain so that the MPUC can issue a formal interpretation as part of an administrative proceeding. If there is any other disputed issue requiring interpretation of section 216H.03 that is necessary to adjudicate the statute's constitutionality, it would similarly be appropriate to abstain and provide the MPUC the opportunity to consider the issue.

The MPUC has expertise in interpreting and implementing statutes of this nature, which must be viewed in the context of the state's overall regulation of utilities. *See Edwards v. Arkansas Power & Light Co.*, 683 F.2d 1149, 1156 (8th

Appellate Case: 14-2156    Page: 48    Date Filed: 11/04/2014 Entry ID: 4213059

Cir. 1982) (recognizing that abstention is particularly appropriate when a state statute presents difficult and important issues of state law). For the above reasons, if the Court believes that there is an uncertain issue of state law regarding the interpretation of section 216H.03, the Court should abstain. The MPUC could then exercise its authority to interpret the law, thereby avoiding unnecessary interference with federal-state relations and premature constitutional adjudication. *See, e.g.*, *Pullman*, 312 U.S. at 500 (recognizing that abstention avoids the "needless friction with state policies").

## IV. THE NGEA REGULATES ENERGY CONTRACTED FOR ON BEHALF OF MINNESOTA CONSUMERS AND DOES NOT APPLY TO THE MISO SHORT-TERM MARKET.

The district court's erroneous conclusion that section 216H.03 is facially unconstitutional because it violates the 0extraterritoriality doctrine rests entirely on its incorrect interpretation of section 216H.03, subds. 3(2) and 3(3). The district court determined that the plain language of section 216H.03, subds. 3(2) and 3(3) unambiguously applied to transactions in the MISO short-term energy market and therefore was extraterritorial. Appx. 439-43, 455-59. Contrary to the court's conclusion, the plain language of subdivisions 3(2) and 3(3) establish that they do not apply to the MISO markets and are not extraterritorial. At the very least, the legislation is ambiguous and a proper construction of the statute establishes that the law neither applies to the MISO short-term markets nor is extraterritorial.

34

**A. Based On Its Plain Language And Purpose, Section 216H.03, Subd. 3(2) Is Inapplicable To The MISO Short-Term Energy Markets And Is Not Extraterritorial.**

The goal of statutory interpretation under Minnesota law is to "effectuate the intent of the legislature, reading the statute as a whole." *Rohmiller v. Hart*, 811 N.W.2d 585, 589 (Minn. 2012) (citing Minn. Stat. § 645.16). Where a statute is entirely clear and unambiguous, a court will apply the plain language. *Christianson v. Henke*, 831 N.W.2d 532, 536-37 (Minn. 2013). But where the statute's language is not clear and free of all ambiguity, a court may go beyond the plain language to determine the intent of the legislature. *Premier Bank v. Becker Dev., LLC*, 785 N.W.2d 753, 759 (Minn. 2010). It is presumed, among other things, that the Minnesota legislature does not intend "absurd, impossible of execution, or unreasonable" results, or for a statute to have extraterritorial effects. Minn. Stat. § 645.17.

Both the plain language and purpose of section 216H.03, subd. 3(2) demonstrates that the law does not apply to the MISO short-term markets nor is it extraterritorial. As a corollary to section 216H.03, subd. 3(1), which prohibits the construction of a "new large energy facility" in Minnesota that emits carbon dioxide, subdivision 3(2) prohibits the import of electricity from another state for use in Minnesota if it was generated by a "new large energy facility" that emits carbon dioxide.

35

The term "import" means "[t]o bring or carrying in from an outside source." *American Heritage Dictionary* 696 (4th ed. 2002). Subdivision 3(2) therefore clearly applies to electricity that is acquired for use by Minnesota consumers, which is effectuated through a contract between a utility that serves Minnesota and a generating facility. The MISO short-term markets merely establish the daily wholesale price for electricity. Subdivision 3(2) neither applies to MISO nor is extraterritorial because the law regulates the persons who contract with a generating facility to import electricity into Minnesota for use by Minnesota customers.

In any event, at a minimum the statute is ambiguous and for many reasons a proper construction of the law shows that it does not apply to the MISO short-term markets or is extraterritorial. First, the purpose of the section 216H.03, subd. 3 is to prevent Minnesota's long-term reliance on generating facilities that emit carbon dioxide. *Supra* at 3-5. Subdivision 3(2) furthers this purpose by limiting a Minnesota utility's investments or commitments to purchase electricity for use in Minnesota from new large energy facilities that emit carbon dioxide. Subdivision 3(2) does not regulate electrons in the MISO markets. Rather, consistent with the statutory language and purpose, subdivision 3(2) regulates contracts or other commitments to provide electricity for use in Minnesota generated from new large energy facilities that emit carbon dioxide.

36

Regulatory programs such as renewable portfolio standards work in precisely this manner. Over half the states have renewable portfolio standards, which are laws that require utilities to generate or purchase a certain percentage of their electricity using renewable energy sources. Uma Outka, *The Renewable Energy Footprint*, 30 Stan. Envtl. L.J. 241, 248-49 (2011); Minn. Stat. § 216B.1691, subd. 2a (requiring increasing percentages of each utility's energy procured for retail customers in Minnesota be generated using renewable energy sources). State regulators ensure compliance with these statutes by reviewing utility contracts and resource plans, not by tracing electrons. Appx. 375-76 (Blumsack Report ¶ 27).

Second, the clear purpose of subdivision 3(2) is to regulate the provision of electricity to Minnesota customers. Subdivision 3(2) regulates imports from a new large energy facility that would contribute to "statewide power sector carbon dioxide emissions," which is defined to include only emissions from electricity generated or consumed in Minnesota. Minn. Stat. § 216H.03, subd. 2. Electricity purchased from a generating facility for use outside of Minnesota is not included in the definition of statewide power sector carbon dioxide emissions, and therefore is not subject to regulation by subdivision 3(2).

Third, the district court incorrectly inferred some type of extraterritorial application based on the use of the term "no person shall," which is a common

37

phrase in any number of statutes. *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (recognizing the canon of statutory construction that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none"). It is presumed that the legislature does not intend to violate the constitution, including a presumption against extraterritorial application of Minnesota statutes. *See Longaker v. Boston Scientific Corp.*, 872 F. Supp.2d 816, 819 (D. Minn. 2012) (noting the presumption against extraterritorial application of Minnesota statutes); *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (recognizing the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States") (internal citations omitted).

Fourth, the district court's interpretation of section 216H.03, subd. 3(2) as applying to MISO short-term energy markets leads to an absurd result that is impossible of execution. It is not possible to control or trace the flow of electrons in the MISO short-term energy markets. Appx. 276 (Porter Report ¶ 38); Appx. 334 (Hempling Report ¶ 22). As such, a person could not knowingly purchase electrons from a new large energy facility in the MISO short-term markets, and the MPUC could not enforce a provision against such purchases. MISO markets merely serve as a mechanism for setting wholesale prices, and construing subdivision 3(2) as applying to MISO produces an absurd and

Appellate Case: 14-2156     Page: 53     Date Filed: 11/04/2014 Entry ID: 4213059

impossible result that is not intended by the Minnesota legislature. *See* Minn. Stat. § 645.17(1) (stating the presumption that "the legislature does not intend a result that is absurd, impossible of execution, or unreasonable").

Fifth, statutes are to be construed as a whole to give effect to all provisions of a law. *See* Minn. Stat. § 645.17(2) (stating the presumption that "the legislature intends the entire statute to be effective and certain"). Several of the exemptions to subdivision 3(2) expressly refer to contracts. *See* Minn. Stat. § 216H.03, subd. 7(2) (exempting certain "contract[s] . . . entered into prior to April 1, 2007, to purchase power from a new large energy facility"); *Id.* subd. 7(3) (exempting "a power purchase agreement between a Minnesota utility and a new large energy facility located outside Minnesota that the [MPUC] has determined is essential to ensure the long-term reliability of Minnesota's electric system"). Another exemption allows a utility that serves Minnesota to offset a "proposed new contribution to" statewide carbon dioxide emission, which again indicates subdivision 3(2) applies to contracts or other commitments to import electricity in the future, not the physical flow of electrons. *See* Minn. Stat. § 216H.03, subd. 4(b).

Sixth, the district court failed to give any deference to the MPUC Commissioners' interpretation of section 216H.03 as not applying to MISO short-term markets. Considering that the plain language and purpose of the law support

39

the MPUC's interpretation, deference was appropriate and the position of the MPUC Commissioners should not have been disregarded by the district court. *See Macias v. New Mexico Dept. of Labor*, 21 F.3d 366, 369 (10th Cir. 1994) (recognizing that there are "compelling reason[s] for a federal court to give deference to a state administrative agency's interpretation and application of a state statute which it is charged with administering").

For all of the above reasons, the district court erred in interpreting subdivision 3(2) as applying to MISO short-term markets and was therefore extraterritorial.

**B. Based On Its Plain Language And Purpose, Section 216H.03, Subd. 3(3) Is Inapplicable To The MISO Short-Term Energy Markets And Is Not Extraterritorial.**

Subdivision 3(3) expressly applies to a "long-term power purchase agreement," which is a contract to purchase more than 50 megawatts of electricity over a period exceeding five years. Minn. Stat. § 216H.03, subd. 3(3). Subdivision 3(3) does not apply to contracts to purchase any amount of electricity for a period of five years or less. *Id.* The plain language of subdivision 3(3) therefore does not apply to MISO short-term markets, which do not involve any long-term contracts. Appx. 345, 359 (Hempling Report ¶¶ 46-47, 79).

The plain language of subdivision 3(3) also makes clear that it applies only to long-term power purchase agreements to serve Minnesota customers. The

40

provision applies to agreements "that would increase statewide power sector carbon dioxide emissions," which as noted above is defined as emissions associated with electricity generated or consumed in Minnesota. Minn. Stat. § 216H.03, subd. 2. Absent a contract to provide electricity to customers in Minnesota, the plain language of subdivision 3(3) is not implicated. Accordingly, contrary to the district court's decision, subdivision 3(3) neither applies to MISO short-term energy markets nor is extraterritorial.

At the very least, the statute is ambiguous and for many of the same reasons discussed above, *supra* at 36-40, a proper construction of subdivision 3(3) shows that it does not apply to the MISO short-term markets. First, the purpose of section 216H.03 is to ensure that utilities serving Minnesota are not overly dependent on carbon-emitting energy sources to meet Minnesota's long-term need for electricity. Subdivision 3(3)'s application only to agreements for a term exceeding five years demonstrates the provision's focus on long-term commitments. The MISO short-term energy markets set wholesale market rates and involve no long-term power purchase agreements.

Second, the clear purpose of subdivision 3(3) is to regulate the long-term provision of electricity for Minnesota customers. Subdivision 3(3) regulates long-term agreements that would increase statewide power sector carbon dioxide emissions, which is defined to include only emissions from electricity generated or

41

consumed in Minnesota. Minn. Stat. § 216H.03, subd. 2. *See also Longaker*, 872 F. Supp.2d at 819 (noting the presumption that Minnesota statutes regulate only in-state conduct and do not apply to extraterritorial conduct).

Third, the district court's interpretation of subdivision 3(3) as applying to MISO short-term energy markets leads to an absurd result that is impossible of execution. The district court erroneously found the statute extraterritorial because non-Minnesota entities could not ensure that electricity bid into MISO "will not travel to and be removed in . . . Minnesota." Appx. 456-57. Beyond the impossibility of enforcing the provision against electrons, the plain language of subdivision 3(3) regulates "new long-term power purchase agreement[s]," not electrons. The district court's incorrect interpretation leads to absurd results and would be impossible to enforce.

Fourth, the district court wrongly rejected the MPUC Commissioners' reasonable interpretation of section 216H.03. The MPUC has expertise in applying statutes that regulate utilities. *See Minnesota Center for Envtl. Advocacy v. Minnesota Pollution Control Agency*, 644 N.W.2d 457, 463-64 (Minn. 2002) (recognizing that "deference should be shown by courts to the [administrative] agencies' expertise and their special knowledge in the field of their technical training, education, and experience"). The Commissioners' interpretation is consistent with the purpose and language of subdivision 3(3). Therefore, the

42

district court erred when interpreting subdivisions 3(2) and 3(3) as applying to MISO short-term markets.

## V. THE NGEA DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE.

Section 216H.03 is a valid, non-discriminatory exercise of Minnesota's long-standing authority to regulate utilities and energy sources used to serve Minnesota customers. The statute does not violate the dormant Commerce Clause.

The dormant Commerce Clause is an implied limitation on state authority that prevents states from discriminating against or unduly burdening interstate commerce. *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 551 U.S. 93, 99 (1994). "The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce." *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 87 (1987). As such, the critical inquiry is whether the regulation "is basically a protectionist measure or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Waste Sys. Corp. v. County of Martin, Minn.*, 985 F.2d 1381, 1385 (8th Cir. 1993) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).

### A. Section 216H.03 Does Not Violate The Extraterritorial Doctrine.

The district court did not analyze the NGEA under the longstanding two-tiered approach for considering Appellees' dormant Commerce Clause claim, but

Appellate Case: 14-2156    Page: 58    Date Filed: 11/04/2014 Entry ID: 4213059

rather relied on a rarely used narrow limitation on state authority to directly regulate activities or transactions wholly unconnected to a state. *See Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995) (citing *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)). Under the extraterritoriality doctrine, a state may not enact laws that regulate transactions having absolutely no connection to a state. *American Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir 2013). A state may not, for example, enforce price-affirmation laws that directly regulate the price an out-of-state business can charge out-of-state customers for out-of-state transactions. *See, e.g., Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 582 (1986).

But states have broad regulatory authority, and mere extraterritorial effects are not enough to invalidate a law. *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3rd Cir. 1994); *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2nd Cir. 2001) (upholding statute because "[t]o the extent the statute may be said to 'require' labels on lamps sold outside Vermont, then, it is only because the manufacturers are unwilling to modify their production and distribution systems to differentiate between Vermont-bound and non-Vermont-bound lamps"). Unless a law directly regulates wholly out-of-state transactions, the extraterritorially doctrine imposes no limit on state authority to legislate over matters of local concern. *See Kassel v. Consol. Freightways Corp. of*

Appellate Case: 14-2156    Page: 59    Date Filed: 11/04/2014 Entry ID: 4213059

*Del.*, 450 U.S. 662, 669 (1981) (stating that "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless . . . affect interstate commerce or even, to some extent, regulate it").

Section 216H.03 regulates only energy resources that utilities use to serve Minnesota customers. It does so by regulating contracts, resource plans, and the approval of energy facilities located in Minnesota. *Supra* at 35-43. A utility engaged in a wholly out-of-state transaction would not be subject to MPUC regulatory review, and contracts related to wholly out-of-state transactions would not violate section 216H.03. Nor does the statute apply to MISO short-term energy markets. *Supra* at 38-39, 42.

The cases involving internet regulation relied on by the district court are inapposite. In *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2nd Cir. 2003), the Second Circuit struck down as extraterritorial a Vermont statute prohibiting the dissemination of indecent material to a minor over the internet. In so doing, the court reasoned:

> If someone in Connecticut posts material for the intended benefit of other people in Connecticut, that person must assume that someone from Vermont may also view the material. This means that those outside Vermont must comply with [the statute] or risk prosecution by Vermont.
>
> *Id.* at 103.

Appellate Case: 14-2156     Page: 60     Date Filed: 11/04/2014 Entry ID: 4213059

However, in *SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2nd Cir. 2007), the same court upheld a Connecticut statute regulating gift cards, including gift cards sold on the internet. The court distinguished *Dean*:

> In contrast to Internet publishers affected by the Vermont statute [in *Dean*], SPGGC has readily available a near-perfect means of distinguishing between online customers . . . who reside in Connecticut and those who reside elsewhere – their credit card billing addresses. In *Dean*, we were concerned that visitors to websites featuring sexually explicit content might be forced to "forgo the anonymity otherwise available on the internet" if required to submit to an age-verification system. But online gift card buyers, who must supply some form of payment information in order to complete a transaction, have no clear expectation of or interest in remaining anonymous.

*Id.*

Setting aside the First Amendment concerns that are present in internet regulation (which are not implicated here), the Second Circuit in *SPGGC* recognized that the Connecticut statute did not force out-of-state gift-card sellers to comply with Connecticut law when engaging in transactions unconnected to Connecticut. Indeed, the gift-card seller could easily determine the statute's applicability by looking to the buyer's address.

Like in *SPGGC*, an electric utility can readily determine what contracts or agreements it is signing to serve Minnesota customers. Similarly, utilities have direct control over their resource planning. A utility engaged in a wholly out-of-state transaction would not enter into a contract to serve Minnesota customers, nor

46

would the utility identify the resource in a Minnesota resource plan. Section 216H.03 does not regulate extraterritorially.

**B.  Section 216H.03 Does Not Discriminate Against Interstate Commerce In Violation Of The Dormant Commerce Clause.**

Although not reached by the district court, the level of scrutiny applied to a statute challenged under the dormant Commerce Clause depends upon whether the law overtly discriminates against interstate commerce. *U&I Sanitation v. City of Columbus*, 205 F.3d 1063, 1067-68 (8th Cir. 2000). If a statute is overtly discriminatory, it will survive only if there are "no other means to advance a legitimate local interest." *Id.* (citing *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994)). Non-discriminatory statutes, on the other hand, are upheld unless the burden on interstate commerce is clearly excessive in relation to the putative local benefits. *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

A statute is discriminatory when it plainly "accord[s] differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Grand River Enterprises Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 942 (8th Cir. 2009) (internal quotations omitted). A statute can overtly discriminate in three ways: (1) on its face; (2) in purpose; or (3) in effect. *Granholm v. Heald*, 544 U.S. 460, 472 (2005). The NGEA does not discriminate against interstate commerce under any analysis.

47

## 1.     Section 216H.03 Does Not Facially Discriminate.

A statute is discriminatory on its face only if it expressly differentiates between in-state and out-of-state economic interests in a manner that favors in-state interests.  *See Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 99 (1994) (finding statute discriminated on its face because it imposed higher disposal fees on solid waste originating out-of-state). Section 216H.03 does not discriminate against out-of-state actors in a manner that favors intrastate interests.

Subdivision 3(1) prohibits the construction of "new large energy facilities" in Minnesota, thereby preventing Minnesota's reliance on new carbon-emitting facilities located inside the state.  Subdivision 3(2) similarly prevents utilities from serving Minnesota customers through reliance on electricity from new large energy facilities located outside the state.   Subdivision 3(3) prohibits new long-term contracts by Minnesota utilities with certain new or existing facilities, regardless of the facilities' in-state or out-of-state location.   Consequently, section 216H.03 evenhandedly applies to in-state and out-of-state interests.

## 2.     Section 216H.03 Does Not Discriminate-In-Effect.

A statute is discriminatory-in-effect if it significantly favors local economic actors at the expense of out-of-state interests.  *Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 350-52 (1977).  The fact that a law has greater impact on

48

out-of-state interests does not render it discriminatory-in-effect; instead, the discriminatory effect must be so substantial as to justify an inference of discriminatory intent. *See Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 618 (1981) (finding statute imposing severance tax on coal non-discriminatory, even though the tax fell primary on out-of-state entities, because the tax applied evenly to all coal regardless of its final destination).

The NGEA does not discriminate-in-effect. It treats electricity from sources in Minnesota the same as electricity from sources in North Dakota or elsewhere. One of the exemptions to subdivision 3 actually favors out-of-state interests by permitting reliance on electricity from a power purchase agreement with "a new large energy facility *located outside Minnesota* that the [MPUC] has determined is essential to ensure the long-term reliability of Minnesota's electricity system[.]" Minn. Stat. § 216H.03, subd. 7(3) (emphasis added). There is no basis to find any discriminatory effect from section 216H.03, let alone a significant enough effect to justify an inference of discriminatory purpose. The district court should have granted summary judgment in favor of Appellants.

## C. Section 216H.03 Is Constitutional Under The *Pike* Balancing Test.

Finally, a statute may also run afoul of the dormant Commerce Clause if it imposes burdens on interstate commerce that are "clearly excessive in relationship to the putative local benefits." *Hughes v. Oklahoma*, 441 U.S. 322, 331 (1979).

49

Statutes generally survive *Pike* balancing unless, at a minimum, the statute "imposes[s] a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *National Elec. Mfrs Ass'n v. Sorrell*, 272 F.3d 104, 109 (2nd Cir. 2001). A plaintiff must make a substantial showing under *Pike* that the burden on interstate commerce is *clearly excessive* in relation to putative local benefits. *See Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008).

### 1. The NGEA Imposes Virtually No Cognizable Burden On Interstate Commerce.

To show that a statute fails the *Pike* test, a plaintiff at a minimum must demonstrate that the law results in disparate treatment of in-state and out-of-state economic interests. *See National Paint & Coatings Ass'n v. Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995). A statute does not impose an undue burden by affecting the flow of goods or reducing demand for products that consumers will replace with other interstate products. *See Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 819 (8th Cir. 2001) (finding no undue burden from a statute regulating the price of Missouri livestock because "packers can just as easily purchase Nebraska or Kansas livestock for slaughter if they do not purchase Missouri livestock").

Section 216H.03, subd. 3 regulates without regard to geographic origin. It prohibits the construction of new carbon-emitting facilities in Minnesota and limits

50

contracts or other commitments to provide electricity to Minnesota from new out-of-state carbon-emitting generating facilities. It also restricts long-term contracts with existing carbon-emitting facilities, but places no limitations on shorter-term contracts. No preference is given to in-state interests.

Section 216H.03, subd. 3 does not restrict utilities that serve Minnesota from contracting for electricity generated using other energy sources, such as North Dakota wind or other resources located outside of Minnesota. *See International Truck and Engine Corp. v. Bray*, 372 F.3d 717, 727-28 (5th Cir. 2004) (upholding statute because shifting of business from one interstate supplier to another is not a burden on interstate commerce). States have long regulated the energy sources used to meet demand for electricity within their borders, and there is no cognizable burden associated with lost profits or reduced demand for a particular product. *See National Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1152 n.11 (9th Cir. 2012) (finding "no merit" to argument that lost profits constitute a burden on interstate commerce because "the dormant Commerce Clause does not protect a particular company's profits"). In sum, the NGEA places little to no burden on interstate commerce.

### 2. Section 216H.03 Confers Significant Local Benefits.

In considering putative local benefits, courts defer to state legislative findings and judgments unless the facts "could not reasonably be conceived to be

51

true by the governmental decisionmaker." *Minnesota v. Clover Leaf Creamery Co.*, 499 U.S. 456, 463, n.7, 471 n. 15 (1981); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 312 (1st Cir. 2005) (stating that *Pike* focuses on putative local benefits and that "[i]t matters not whether these benefits actually come into being at the end of the day"). Local benefits related to public health, safety, or environmental concerns weigh strongly in favor of upholding a statute under *Pike*, particularly when the statute covers subject matter traditionally regulated by states. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 344 (2007).

The regulation of utilities is among "the most important functions traditionally associated with the police power of the States." *Arkansas Elec. Co-op. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). It is essential to ensuring the reliability and affordability of electricity, as well as protecting the overall public interest. *Panhandle Eastern Pipe Line Co. v. Michigan Pub. Serv. Comm'n*, 341 U.S. 329, 333 (1951); *In re Request of Interstate Power Co.*, 574 N.W.2d 408, 413 (Minn. 1998). For this reason, courts give strong weight to putative local benefits conferred by statutes regulating utility resource planning. *See Southern Union Co. v. Missouri Pub. Serv. Comm'n*, 289 F.3d 503, 509 (8th Cir. 2002) ("[L]ocal public utility regulation is presumptively valid" and "the

Appellate Case: 14-2156    Page: 67    Date Filed: 11/04/2014 Entry ID: 4213059

Supreme Court has rarely invoked *Pike* balancing to invalidate state regulation under the Commerce Clause").

Energy is a vital necessity and major cost for both Minnesota businesses and individual consumers. *See* Minn. Stat. § 216B.01 (recognizing Minnesota's strong public interest in adequate, reliable, and affordable energy). The legislative history of the NGEA demonstrates that these concerns were a principal purpose behind section 216H.03. One legislator, for example, stated that Minnesota had a choice "between actively preparing for the carbon-constrained world we know is coming or just continuing to race down the path as business as usual . . . Clearly it is far wiser for us to plan for these changes so we can both reduce the risk and maximize the opportunities for Minnesota." Appx. 116 (House Committee Hearing Transcript).

The NGEA represents a state energy policy that ensures utilities serving Minnesota are not making long-term commitments using carbon-emitting energy sources. Ensuring that Minnesota utilities do not enter into these long-term commitments protects Minnesota customers from uncertain future costs, and provides significant environmental benefits. The State has a legitimate interest in minimizing long-term costs, promoting the use of clean energy, and bettering the environment, and these legitimate local interests easily satisfy the *Pike* balancing test.

Appellate Case: 14-2156    Page: 68    Date Filed: 11/04/2014 Entry ID: 4213059

The district court erred in finding a violation of the dormant Commerce Clause. Summary judgment should have been granted in favor of Appellants.

## VI. SECTION 216H.03, SUBD. 3(2) AND 3(3) IS NOT PREEMPTED BY FEDERAL LAW.

In the absence of an express preemption clause, a state law is preempted only if: (1) it regulates a field that federal law so pervasively regulates that Congress plainly intended to leave no room for states to supplement it; or (2) there is a clear and actual conflict between state and federal law. *Arizona v. United States*, __ U.S. __, 132 S. Ct. 2492, 2501 (2012). There is a strong presumption against preemption of states laws that regulate areas of traditional state authority. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

### A. The Federal Power Act Does Not Preempt Section 216H.03, Subd. 3(2) Or 3(3).

Section 216H.03, subd. 3(2) and 3(3) is a lawful exercise of state authority to regulate the provision of electricity to Minnesota customers. Section 216H.03 does not regulate wholesale electricity rates or the interstate transmission of electricity, and therefore is not preempted by the Federal Power Act ("FPA").

#### 1. Section 216H.03 Is Not Preempted by the FPA by Virtue of Field Preemption.

To establish field preemption, Appellees must demonstrate that Congress, when enacting the FPA, so comprehensively regulated the field of utility resource planning that it plainly intended to preempt state regulation. *Arizona*, 132 S. Ct. at

54

2501. Because regulation of electric utilities and energy resources is a traditional state concern, there is a strong presumption against preemption. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983). Section 216H.03 does not regulate the same field as the FPA and accordingly is not preempted.

The FPA grants certain authority to the Federal Energy Regulatory Commission ("FERC") to regulate the "transmission of electricity in interstate commerce" and the "wholesale" sale of electricity. 16 U.S.C. § 824(a), (b)(1). At the same time, the FPA expressly preserves state authority to regulate most other matters related to electricity generation and distribution. *See* 16 U.S.C. § 824(a) ("[S]uch Federal regulation, however, [is] to extend only to those matters which are not subject to regulation by the States"). *See also Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Util. Com'n*, 837 F.2d 600, 606 (3rd Cir. 1988) (stating that Congress intended the FPA "to supplement, not limit, the reach of state regulation").

Regulation of wholesale sales under the FPA refers to regulating the rates and terms offered by the seller on the wholesale market. *See Federal Power Comm'n v. Southern Cal. Edison Co.*, 376 U.S. 205, 212 (1964). Regulation of wholesale sales does not include regulation of a utility's decision to *purchase* electricity. *See, e.g., Appeal of Sinclair Mach. Products, Inc.*, 498 A.2d 696, 702-

55

04 (N.H. 1985) (noting that states have authority to review whether utilities acted prudently when purchasing electricity from various sources); *Pike County Light and Power Comp. v. Pennsylvania Pub. Util. Com'n*, 465 A.2d 735, 738 (Pa. Cmwlth. 1983) (recognizing that FERC determines the reasonableness of wholesale rates while states regulate whether a local utility acted in the public interest in selecting among various electricity generators).

FERC itself has recognized "that wholesale ratemaking does not, as a general matter, determine whether a purchaser has prudently chosen from among available supply options." *Central Vermont Pub. Serv. Corp.*, 84 FERC ¶ 61194 (Aug. 21, 1998). *See also California Pub. Util. Comm'n*, 134 FERC ¶ 61044, 61160 (2011) ("[S]tates have the authority to dictate the generation sources from which utilities may procure electric energy"). *Pennsylvania Power & Light Co.*, 23 FERC ¶ 61006, order on reh'g, 23 FERC ¶ 61325, at p. 61716 (1983) ("We do not view our responsibilities under the Federal Power Act as including a determination that the purchaser has purchased wisely or has made the best deal available").

States extensively regulate the energy sources used to meet local demand. *Pacific Gas & Elec. Co.*, 461 U.S. at 205 (recognizing the longstanding state authority to regulate the economic prudency of investing in new power plants); FERC Order No. 888, 61 Fed. Reg. 21540, 21626, n.544 (May 10, 1996) (noting

56

that states retain authority over resource planning and buy-side decisions); *In re Midwest Power Systems, Inc.*, 78 FERC ¶ 61067, 61246 (1997) (finding no preemption because states have authority to require electric utilities "to purchase from certain types of generating facilities"); *Electric Power Supply Ass'n v. FERC*, 753 F.3d 216, 221 (D.C. Cir. 2014) (noting that states retain "exclusive authority to regulate the retail market"). As recognized by FERC:

> We acknowledge [a state's] ability under its authorities over the electric utilities subject to its jurisdiction to favor particular generation technologies over others. We respect the fact that resource planning and resource decisions are the prerogative of state commissions . . . Also, under state authority, a state may choose to require a utility to construct generation capacity for a preferred technology or to purchase power from the supplier of a particular type of resource.

*In re S. Cal. Edison Co.,* 70 FERC ¶ 61215, 61676 (1995). *See also South Carolina Pub. Serv. Auth. v. FERC*, 726 F.3d 41, 65-66 (D.C. Cir. 2014) (upholding FERC order designed in part to accommodate transmission needs resulting from state laws that require the use of renewable energy resources).

Section 216H.03 subds. 3(2) and 3(3) validly regulate utilities that serve retail customers in Minnesota by preventing long-term reliance on generating facilities that emit carbon dioxide. The statute regulates contracts and other commitments to purchase electricity for use in Minnesota. This is a field completely separate from the FPA's regulation of wholesale sales.

57

The NGEA also does not regulate the transmission of electricity. Regulation of transmission involves the terms and conditions of transmitting electricity that has already been generated, not the type of resources used to generate the electricity. *See, e.g., FERC Order No. 888, 61 Fed. Reg. 21540, 21541 (May 10, 1996) (setting forth terms and conditions of access to transmission lines).

Section 216H.03 subd. 3 regulates only contracts or other commitments to acquire electricity for use by Minnesota retail customers. Nothing in the statute regulates the process of moving electricity. Section 216H.03, subd. 3 is a resource planning statute well within the traditional authority of the states. As a result, it is not subject to field preemption by the FPA.

## 2. Section 216H.03 Is Not Preempted by the FPA by Virtue of Conflict Preemption.

Conflict preemption involves state laws that conflict with federal law because: (1) compliance with both federal and state law is a physical impossibility; or (2) the challenged state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. *Arizona*, 132 S. Ct. at 2501. Appellees have not and cannot prove conflict preemption. Indeed, they failed to identify any specific provision of the FPA that is inconsistent with the section 216H.03, subd. 3, and they do not allege that subdivision 3 makes it impossible to comply with federal law. Appx. 90 (Interrog. No. 2). *See also* FERC Order 888, 61 Fed. Reg.

21540, 21626, n.544 (May 10, 1996) (recognizing that states retain authority over resource planning).

**B.    The NGEA Is Not Preempted By The Clean Air Act.**

Section 216H.03 regulates the types of facilities that utilities serving Minnesota can rely on to meet Minnesota's long-term electricity needs. Decisions about state energy policies and the types of resources relied on are not preempted by the Clean Air Act ("CAA").

**1.    Section 216H.03, Subd. 3 Does Not Regulate Air Emissions And Is Not Subject To Field Preemption.**

As discussed above, there is a strong presumption against preemption of laws that regulate in an area of traditional state authority. *Bates*, 544 U.S. at 449; *see also Pacific Gas & Elec. Comm'n*, 461 U.S. at 205 (stating the regulation of electric utilities and energy resources is a traditional state concern and there is a strong presumption against preemption); *National Solid Wastes Management Ass'n v. Killian*, 918 F.2d 671, 676 (7th Cir. 1990) ("Environmental regulation has long been recognized as an historic police power of the States").

Section 216H.03 does not regulate air emissions. It simply limits utilities that serve Minnesota from contracting or otherwise committing to purchase electricity from certain generating facilities that emit carbon dioxide.

59

Even if the NGEA regulated air pollution, the CAA expressly preserved broad state authority to regulate air pollution. *See* 42 U.S.C. § 7416. Section 116 of the CAA, entitled "Retention of State Authority," provides that:

> . . . nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect . . . such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation [imposed by the CAA].

42 U.S.C. § 7416. *See also Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3rd Cir. 2013) ("[S]tates are expressly allowed to employ standards more stringent than those specified by the [CAA]"). The CAA's savings clause therefore is inconsistent with an inference that Congress intended to occupy the regulatory field. *See California Fed. Sav. & Loan v. Guerra*, 479 U.S. 272, 281 (1987) (finding no field preemption based on Congress's inclusion of a savings clause).

## 2. Section 216H.03 Does Not Conflict With the CAA.

Section 216H.03, subd. 3 is not subject to conflict preemption. Subdivision 3 does not conflict with any provision of the CAA because it does not regulate emissions. Appellees do not contend that it is impossible to comply with both section 216H.03, subd. 3 and the CAA. Appx. 89-90 (Interrog. No. 1). Even if the NGEA regulated emissions in Minnesota, Congress expressly preserved

60

broad state authority to regulate air pollution.  *See* 42 U.S.C. § 7416.  There is no basis to find conflict preemption.

## VII.  IN THE ALTERNATIVE, THE INJUNCTION ISSUED BY THE DISTRICT COURT IS OVERBROAD.

The district court found subdivisions 3(2) and 3(3) facially invalid and broadly enjoined enforcement of the provisions without analyzing whether Appellees had "establish[ed] that no set of circumstances exist[] under which the Act would be valid."  *Salerno*, 481 U.S. at 745; *see also Barrett v. Claycomb*, 705 F.3d 315, 321 (8th Cir. 2013) (finding that a facial challenge must fail because the policy "could conceivably be implemented in such a way as to comply with the Fourth Amendment").  The district court also failed to consider whether a broad injunction against all enforcement was the narrowest remedy available.  *See Ayotte*, 546 U.S. at 329 (recognizing that a statute should only be "declared invalid to the extent that it reaches too far, but otherwise left intact"); *id.* ("[W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem").

Any injunction should have been limited to what was necessary to cure the supposed extraterritorial reach.  A broad injunction against all enforcement – including enforcement as applied to contracts or other commitments to serve Minnesota customers – is a far broader remedy than necessary, and serves only to short circuit the democratic process by needlessly "frustrat[ing] the intent of the elected representatives of the people."  *See Washington State Grange v.*

61

*Washington State Republican Party*, 552 U.S. 442, 541 (2008). Even assuming that the district court correctly concluded that section 216H.03 violated the Commerce Clause, it erred by broadly enjoining all enforcement of subdivisions 3(2) and (3).

## CONCLUSION

Based on the foregoing, Appellants respectfully request that the Court reverse the judgment of the district court granting summary judgment in favor of Appellees, and vacate the order enjoining Appellants from enforcing the NGEA. The Court should remand with instructions to enter judgment in favor of Appellants and dismiss all claims asserted by Appellees.

Dated:  November 3, 2014

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

s/Alethea M. Huyser
ALETHEA M. HUYSER, # 0389270
MICHAEL EVERSON, # 0388310
Assistants Attorney General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
Telephone:  (651) 757-1243
Fax:  (651) 282-5832

Attorneys for Appellants/Cross-Appellees

Appellate Case: 14-2156    Page: 77    Date Filed: 11/04/2014 Entry ID: 4213059

## CERTIFICATE OF COMPLIANCE
## WITH FRAP 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,943 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 pt Times New Roman font.


s/ Alethea M. Huyser
ALETHEA M. HUYSER
Assistant Attorney General

Appellate Case: 14-2156   Page: 78   Date Filed: 11/04/2014 Entry ID: 4213059

## CERTIFICATE OF COMPLIANCE
## WITH 8th Cir. R. 28A(h)(2)

The undersigned, on behalf of the party filing and serving this brief, certifies

that the brief has been scanned for viruses and that the brief is virus-free.


s/ Barbara J. Fehrman
BARBARA J. FEHRMAN

Appellate Case: 14-2156     Page: 79     Date Filed: 11/04/2014 Entry ID: 4213059

# CERTIFICATE OF SERVICE

**Re:** ***State of North Dakota, et al. v. Beverly Heydinger, Commissioner and Chair, Minnesota Public Utilities Commission, et al.,***
**Eighth Circuit Case Nos. 14-2156 and 14-2251**

I hereby certify that on November 3, 2014, I electronically submitted the Brief of Appellants/Cross-Appellees Beverly Heydinger, Commissioner and Chair, Minnesota Public Utilities Commission, et al., to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

s/Alethea M. Huyser