Nos. 14-2156 and 14-2251

_____

IN THE
United States Court Of Appeals
FOR THE EIGHTH Circuit
_____

State of North Dakota, et al.,

Appellees/Cross-Appellants,

vs.

Beverly Heydinger, Commissioner and Chair, Minnesota Public Utilities, Commission, et al.,

Appellants/Cross-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
_____

**APPELLANTS/CROSS-APPELLEES' ADDENDUM**
_____

Thomas H. Boyd
Atty. Reg. No. 200517
Brent A. Lorenz
Atty. Reg. No. 386865
Derek R. Allen
Atty. Reg. No. 392065
Winthrop & Weinstine, P.A.
Capella Tower, Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
(612) 604-6400

**Attorneys for Appellees/Cross-Appellants**

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

ALETHEA M. HUYSER
Assistant Attorney General
Atty. Reg. No. 0389270
MICHAEL EVERSON
Assistant Attorney General
Atty. Reg. No. 0388310
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
Telephone: (651) 757-1243
Fax: (651) 282-5832

Attorneys for Appellants/Cross-Appellees

# INDEX TO APPELLANTS/
# CROSS-APPELLEES' ADDENDUM

April 18, 2014 Memorandum Opinion and Order ............................................Add. 1

Minn. Stat. § 216H.03, subd. 3 ......................................................................Add. 49

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of North Dakota, et al., | Case No. 11-cv-3232 (SRN/SER) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Beverly Heydinger, Commissioner and Chair of Minnesota Public Utilities Commission, et al., | |
| Defendants. | |

John A. Knapp, Thomas H. Boyd, Derek R. Allen, and Brent A. Lorentz, Winthrop & Weinstein, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402-4629; Casey Jacobson and Claire M. Olson, Basin Electric Power Cooperative, Office of General Counsel, 1717 East Interstate Avenue, Bismarck, ND 58503-0564; John Neumann, The North American Coal Corporation, 5340 Legacy Drive, Building 1, Suite 300, Plano, TX 75024; Sandi Tabor, Lignite Energy Council, 1016 East Owens Avenue, PO Box 2277, Bismarck, ND 58502; David Sogard, Minnkota Power Cooperative, Inc., PO Box 13200, Grand Forks, ND 58208; Wayne K. Stenehjem, Office of the Attorney General, State of North Dakota, 600 East Boulevard, 1st Floor, Bismarck, ND 58505-0040; William Taylor, Woods Fuller Schultz & Smith, 300 South Phillips Avenue Suite 300, P.O. Box 5027, Sioux Falls, SD 57117-5027; and Wyatt Hogan, Great Northern Properties L.P., 601 Jefferson Street, Suite 3600, Houston, TX 77002, for Plaintiffs.

Lisa A. Crum, John S. Garry, and Michael T. Everson, Office of the Attorney General, State of Minnesota, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101-2128, for Defendants.

Scott Strand and Elizabeth Goodpaster, Minnesota Center for Environmental Advocacy, 26 East Exchange Street, Suite 206, St. Paul, MN 55101; Howard A. Learner, Environmental Law & Policy Center, 35 East Wacker Drive, Suite 1300, Chicago, IL 60601-2110; Vickie Patton and Sean Donahue, Environmental Defense Fund, 2060 Broadway, Suite 300, Boulder, CO 80302; Joanne Spalding, Sierra Club, 85 Second Street, Second Floor, San Francisco, CA 94105; and Benjamin Longstreth, Natural Resources Defense Council, 1152 15th Street NW, Suite 300, Washington DC 20005; for Amici Minnesota Center for Environmental Advocacy, Environmental Law & Policy

Appellate Case: 14-2156   Page: 3   Date Filed: 11/04/2014 Entry ID: 4213079

Center, Environmental Defense Fund, Sierra Club, Natural Resources Defense Council, Fresh Energy, and Izaak Walton League of America.

David L. Sasseville, Lindquist & Vennum PLLP, 80 South Eighth Street, Suite 4200, Minneapolis, MN 55402; Benjamin L. Gerber, Minnesota Chamber of Commerce, 400 Robert Street North, Suite 1500, St. Paul, MN 55101; for Amici Minnesota Chamber of Commerce and National Mining Association.

John M. Baker, Erin Sindberg Porter, and Karl C. Procaccini, Greene Espel PLLP, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402, for Amici American Public Power Association and National Rural Electric Cooperative Association.

---

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. No. 128] and Plaintiffs' Motion for Summary Judgment [Doc. No. 135]. Also before the Court is Defendants' Motion to Strike Plaintiffs' Demand for a Jury Trial, Amend the Scheduling Order, and Set the Case for a Trial to the Court [Doc. No. 123] ("Motion to Strike"). For the reasons set forth below, Defendants' Motion for Summary Judgment is denied in part and denied as moot in part, Plaintiffs' Motion for Summary Judgment is granted in part and denied as moot in part, and Defendants' Motion to Strike is denied as moot.

I.     BACKGROUND

A.     The United States Electric Utility Sector

This lawsuit arose from Minnesota's enactment of a statute regulating certain aspects of the use and generation of electric energy, and thus affecting the United States electric utility sector. The electric utility industry is comprised of many different types of entities (e.g., for-profit or investor-owned utilities, municipal utilities, generation and

**Add. 2**

transmission cooperatives, and distribution cooperatives) engaged in three basic activities:  generation, transmission, and distribution of electricity.  (See Blumsack Aff., Ex. 2 [Doc. No. 168-1] ("Blumsack Report") ¶ 8; Hempling Aff., Ex. 2 [Doc. No. 167-1] ("Hempling Report") ¶ 9.)  Generation assets convert energy sources—such as coal, natural gas, biomass, wind, and sun—into electricity.  (Hempling Report ¶ 11.)  To the extent carbon dioxide emissions occur, they occur at this stage.[1]  Transmission lines, which are interconnected and form a network, or "grid," carry the electricity from the generation source to distribution centers.  (Id. ¶¶ 19–20.)  There are three major power grids in North America:  the Western Interconnection, the Eastern Interconnection, and the Texas ERCOT Interconnection.  (Am. Compl. [Doc. No. 9] ¶ 45; Answer to Am. Compl. [Doc. No. 10] ¶ 33.)  During distribution, the electricity is transported from the transmission network to the consumer over distribution lines.  (Hempling Report ¶¶ 20, 23.)

At one point in time, "most electricity was sold by vertically-integrated utilities that had constructed their own power plants, transmission lines, and local delivery systems."  New York v. FERC, 535 U.S. 1, 5 (2002).  In 1935, however, under the Federal Power Act ("FPA"), Congress granted to the Federal Energy Regulatory Commission ("FERC") the "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce."  New Eng. Power Co. v. New

---

[1]    The parties do not discuss this issue in their summary judgment briefing.  They did, however, concede the issue in their earlier briefing on Defendants' Motion for Partial Judgment on the Pleadings.  (See Pls.' Supp. Submission Relating to Defs.' Mot. for Partial Judgment on the Pleadings [Doc. No. 25] at 2; Defs.' Resp. to Pls.' Supp. Submission [Doc. No. 26] at 2 n.1.)

Add. 3

Appellate Case: 14-2156     Page: 5     Date Filed: 11/04/2014 Entry ID: 4213079

Hampshire, 455 U.S. 331, 340 (1982) (citations omitted); see 16 U.S.C. § 824(a)

(granting FERC the responsibilities of regulating "the transmission of electric energy in

interstate commerce and the sale of such energy at wholesale in interstate commerce").[2]

And, FERC issued an order in 1999 encouraging the creation of regional transmission

organizations ("RTOs").  Regional Transmission Organizations, 89 FERC ¶ 61,285

(FERC Dec. 20, 1999) (hereinafter "FERC Order 2000").  RTOs coordinate and monitor

the minute-to-minute transmission of energy on the grid in a region or large state.  Id.

They also ensure open access to the grid and coordinate transmission planning, (Boyd

Decl., Ex. A [Doc. No. 138-1] ("Porter Report") ¶ 18), as well as oversee the safety and

reliability of the regional electric system, see FERC Order 2000 at p. 3.  Their purpose is

to ensure that the transmission grid is operated in a non-discriminatory fashion to benefit

consumers.  Id.[3]

    The Midcontinent Independent System Operator (formerly, the Midwest

Independent System Operator) ("MISO") was approved as an RTO in 2001.  (Porter

Report ¶ 22.)  MISO is an independent, non-profit organization whose members include

transmission owners, investor-owned utilities, public power utilities, independent power

---

[2]     The FPA originally delegated the authority to administer the FPA to the Federal
Power Commission, FERC's predecessor.  New Eng. Power Co., 455 U.S. at 340.
[3]     Another type of entity contemplated by FERC Order 2000, the independent system
operator ("ISO"), combines the transmission facilities of several transmission owners into
one system.  (Porter Report ¶ 19.)  ISOs must be independent of both the transmission
owners and customers.  (Id.)  Today, there is little distinction between an ISO and an
RTO.  (Id. ¶ 21.)  In fact, there are currently nine ISOs in North America, five of which
are RTOs.  (Id.)

**Add. 4**

Appellate Case: 14-2156     Page: 6     Date Filed: 11/04/2014 Entry ID: 4213079

producers, and cooperatives.  (Id. ¶ 24.)  It operates and controls transmission facilities in

the Midwest (including in Minnesota, North Dakota, Wisconsin, and Iowa).  (Id. ¶¶ 22–

23.)  Its operating area is depicted in the dark-shaded portion of the map below:



(Id. ¶ 23.)

MISO also operates organized energy and capacity markets.  (Hempling Report

¶ 41.)  In order to maintain the reliability of the transmission system, MISO must ensure

that the amount of electricity being supplied and the amount of electricity being

consumed at any given time are equal.  (See Hempling Report ¶ 44; Porter Report ¶ 30.)

Thus, MISO operates short-term energy markets in which MISO actively monitors supply

and demand.  (See Porter Report ¶ 30; Hempling Report ¶ 46; Blumsack Report ¶ 20.)  In

the "Day-Ahead Market," each buyer indicates what quantity of electricity it will need for

each hour of the following day.  (Hempling Report ¶ 46.)  Likewise, generators notify

MISO of the amount of electricity they will sell for each hour of the following day, and

the price that they will accept.  (Id.)  MISO then ranks the generators' bids according to

price and selects for each hour the amount of electricity needed to satisfy the buyers'

demand, beginning with the lowest-priced bid.  (Id.)  When MISO reaches the required

**Add. 5**

quantity, the last-selected bid becomes the market price for all electricity consumed during that hour.  (Id.)  All of the generators that were selected receive that price, and all of the buyers pay that price.  (Id.)

MISO also ensures the reliability of the transmission system by requiring buyers to demonstrate that they have the legal rights to an amount of capacity (i.e., the capability of producing electricity) sufficient to meet their customers' expected demand.  (Id. ¶¶ 13, 26, 48.)  MISO participants usually obtain this capacity through ownership of generation assets or through bilateral purchase agreements.  (See id. ¶ 49; Porter Report ¶ 38; Blumsack Report ¶ 29.)  Due to the nature of the grid, however, whether the electricity that a buyer ultimately receives is from the generation resources that it bid into the market or that it contracted for is unknown.  (Porter Report ¶¶ 38, 40; Hempling Report ¶¶ 19, 22.)  As described by Defendants' expert witness, "[o]nce the generating facility injects its output into the interconnected transmission network, the electrons move according to physical laws, unresponsive to any state law or contract provisions." (Hempling Report ¶ 22.)  He analogizes the grid to a "reservoir":  "If I want to buy 10 buckets of water, my chosen seller would dump in 10 buckets at [its] location, and I would take out 10 buckets at my location.  The molecules I take out are not the ones my seller dumped in."  (Id. ¶ 19.)  In other words, as noted by Plaintiffs' expert witness, "MISO does not match buyers to sellers."  (Porter Report ¶ 33.)  Moreover, once electricity is generated and injected into the power grid, there are no qualitative differences based on generation source, so the buyer is unaware of the type of resource that generated the electricity it receives.  (See Porter Report ¶ 33.)

**Add. 6**

In addition to demonstrating to MISO that they have sufficient capacity to meet their demand, some of the buyers in the MISO market (e.g., retail utilities) are regulated by a state public utility commission and must also submit an integrated resource plan to that agency for approval.  (Hempling Report ¶¶ 24, 26; Blumsack Report ¶ 16.)  The resource plan describes the entity's portfolio of assets that it plans to use to satisfy demand.  (Blumsack Report ¶ 16.)  As discussed above, these resources often include generation assets the entity owns and/or long-term capacity contracts.  (Id. ¶¶ 16–17, 20, 25.)

### B.   Minnesota's Next Generation Energy Act

The statute at issue in this lawsuit is Minnesota's Next Generation Energy Act ("NGEA").  The Minnesota legislature passed the NGEA in 2007, establishing energy and environmental standards related to carbon dioxide emissions.  2007 Minn. Laws Ch. 136, art. 5, § 3.  Minn. Stat. § 216H.03, subd. 3, seeks to limit increases in "statewide power sector carbon dioxide emissions."  That provision states:

> Unless preempted by federal law, until a comprehensive and enforceable state law or rule pertaining to greenhouse gases that directly limits and substantially reduces, over time, statewide power sector carbon dioxide emissions is enacted and in effect, . . . no person shall:
>
> (1) construct within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions;
>
> (2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or
>
> (3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions.  For purposes of

**Add. 7**

this section, a long-term power purchase agreement means an agreement to
purchase 50 megawatts of capacity or more for a term exceeding five years.

Minn. Stat. § 216H.03, subd. 3 (emphasis added).  "Statewide power sector carbon

dioxide emissions" are defined in the statute as "the total annual emissions of carbon

dioxide from the generation of electricity within the state and all emissions of carbon

dioxide from the generation of electricity imported from outside the state and consumed

in Minnesota."[4]  Id., subd. 2.  "Whenever the [Minnesota Public Utilities Commission] or

the [Minnesota] Department of Commerce determines that any person is violating or

about to violate [§ 216H.03], it may refer the matter to the attorney general who shall

take appropriate legal action."  Id., subd. 8.

Certain persons are exempt from the prohibitions contained in Minn. Stat.

§ 216H.03, subd. 3.  For example, "[t]he prohibitions in subdivision 3 do not apply if the

project proponent demonstrates to the [Minnesota] Public Utilities Commission's

---

[4]      Also, a "new large energy facility" is defined as "any electric power
generating plant or combination of plants at a single site with a combined capacity
of 50,000 kilowatts or more and transmission lines directly associated with the plant
that are necessary to interconnect the plant to the transmission system," as long as
the facility was not in operation as of January 1, 2007.  Minn. Stat. § 216B.2421,
subd. 2(1); id. § 216H.03, subd. 1.  The following are not considered a "new large
energy facility" under the law:

> a facility that (1) uses natural gas as a primary fuel, (2) is designed to
> provide peaking, intermediate, emergency backup, or contingency
> services, (3) uses a simple cycle or combined cycle turbine technology,
> and (4) is capable of achieving full load operations within 45 minutes
> of startup for a simple cycle facility, or is capable of achieving
> minimum load operations within 185 minutes of startup for a combined
> cycle facility.

Minn. Stat. § 216H.03, subd. 1.

8

**Add. 8**

satisfaction that it will offset the new contribution to statewide power sector carbon dioxide emissions with a carbon dioxide reduction project." Id., subd. 4(a).  The carbon dioxide reduction project must:

> offset in an amount equal to or greater than the proposed new contribution to statewide power sector carbon dioxide emissions in either, or a combination of both, of the following ways:
>
>> (1) by reducing an existing facility's contribution to statewide power sector carbon dioxide emissions; or
>>
>> (2) by purchasing carbon dioxide allowances from a state or group of states that has a carbon dioxide cap and trade system in place that produces verifiable emissions reductions.

Id., subd. 4(b).  The MPUC must ensure that proposed carbon dioxide emissions offsets are "permanent, quantifiable, verifiable, enforceable, and would not have otherwise occurred."  Id., subd. 4(c).  The prohibitions in subdivision 3 also do not apply to certain new large energy facilities which were proposed or applied for prior to April 1, 2007, and related power purchase agreements; certain contracts not subject to approval by the MPUC that were entered into prior to April 1, 2007, for the purchase of power from a new large energy facility; new large energy facilities or power purchase agreements that the MPUC has determined are "essential to ensure the long-term reliability of Minnesota's electric system, to allow electric service for increased industrial demand, or to avoid placing a substantial financial burden on Minnesota ratepayers"; and certain new large energy facilities with a combined electric generating capacity of less than 100 megawatts, and related power purchase agreements.  Id., subd. 7.

**Add. 9**

### C.     The Parties

Plaintiffs are the State of North Dakota, the Industrial Commission of North

Dakota, the Lignite Energy Council, Basin Electric Power Cooperative, the North

American Coal Corporation, Great Northern Properties Limited Partnership, Missouri

Basin Municipal Power Agency d/b/a Missouri River Energy Services, and Minnkota

Power Cooperative, Inc.  (Am. Compl. ¶¶ 12–19.)  Defendants are the Commissioners of

the Minnesota Public Utilities Commission and the Commissioner of the Minnesota

Department of Commerce, each in their official capacities.  (Id. ¶¶ 21–22.)  A more

detailed description of some of these entities and their operations is necessary.

### 1.     Minnesota Public Utilities Commission and Minnesota Department of Commerce

As discussed above, both the Minnesota Public Utilities Commission ("MPUC")

and the Minnesota Department of Commerce ("MDOC") are tasked with determining

whether an entity is in violation of Minn. Stat. § 216H.03.  Several matters involving this

statute have been brought before the MPUC, two of which involved the MDOC and are

particularly relevant to this lawsuit.  The first involves Dairyland Power Cooperative

("Dairyland") in Wisconsin.  The second involves Plaintiff Basin Electric Power

Cooperative and is discussed in Part I.C.2.

Dairyland provides electricity to electric cooperatives and municipal utilities.

(Boyd Decl., Ex. R (MPUC Order, In re Dairyland Power Coop.'s Integrated Res. Plan

for 2011–2026) [Doc. No. 138-1] at 2.)  It sells approximately 16% of its electricity

within Minnesota.  (Id.)  One of Dairyland's sources of electricity is a coal-powered

**Add. 10**

generator in Wisconsin, called Weston Unit 4.  (Id. at 4, 7.)  Based on Dairyland's

reliance on Weston Unit 4, the issue of Dairyland's compliance with the NGEA was

discussed during proceedings relating to Dairyland's 2011–2026 resource plan.  (See id.,

Ex. O (MDOC Public Comments) at 21–29.)  The MDOC stated its belief that Weston

Unit 4 met the definition of "new large energy facility" and indicated that it would be

subject to the NGEA unless an exemption applied.  (See id. at 22–30.)  The MDOC

explained as follows:

> Dairyland has argued that, because MISO dispatches Dairyland's
> generation in order to efficiently meet the hourly needs of all MISO load,
> Dairyland does not import power from Weston for its Minnesota load.
> Presumably, Dairyland would also argue that none of its generation is
> dispatched for any of its load in Minnesota.   This interpretation is
> inappropriate for the following reasons.
>
> First, as a generation-and-transmission cooperative, Dairyland clearly has
> the responsibility to ensure that it has adequate resources to meet the needs
> of its member-distribution cooperatives.  In fact, a main subject of this
> proceeding is whether Dairyland has obtained adequate resources to meet
> the needs of its member cooperatives.   That responsibility does not
> disappear simply due to the existence of MISO.   Likewise, the
> responsibility to comply with Minnesota statutes does not fall to MISO;
> that is Dairyland's responsibility.
>
> Second, under the MISO energy market, Dairyland must bid in all of its
> load and all of its resources.  That is, even though MISO dispatches all
> generation resources within its regions and subregions, starting with least-
> cost to the highest cost resources to meet the needs, Dairyland must still bid
> into the MISO market all of its generation resources to meet all of its load.
> Dairyland may not withhold from the market any available generation
> resources since such actions would constitute economic withholding
> (unduly bidding up market energy prices) and would be subject to action by
> the Independent Market Monitor.   Thus, barring any transmission
> constraints, all of Dairyland's resources are available to meet the needs of
> all of Dairyland's load.

**Add. 11**

Third, all of Dairyland's generation resources are located in Wisconsin. Thus, Dairyland clearly imports power from Wisconsin to meet the needs of its members in Minnesota.

Fourth, Dairyland's argument that no generation dispatched by MISO can be assigned to any utility specific load is not entirely accurate. It is true that electrons can and do travel in many different directions under different physical circumstances, such that it is impossible to determine which electrons from which generation units reached which end-use customers. Likewise, it is impossible to determine that no electrons from a generation unit reach a particular end-use customer, unless the generation resource and end-use customer are completely disconnected from each other physically. However, within the MISO energy market, each utility's resources are offset against load so a utility's total supply of power is compared to the total demand for power. Any utility that does not have sufficient resources to meet the demand for power on its system must purchase more energy from the market to meet the needs of the load fully. <u>Thus, all of a utility's resources are matched to all of a utility's load, regardless of state boundaries.</u> Any surplus energy is sold to other entities while any shortage results in the utility purchasing energy from the market at the prevailing price.

Fifth, . . . Dairyland's [integrated resource plan] relies on the full use of Weston 4 generation to meet all of Dairyland's members' demand for power, regardless of where the members are located.

In sum, Dairyland must meet the resource needs of its system as [a] whole. Regardless of whether that analysis takes into account MISO purchases, sales, dispatch, or constraints, Dairyland does not separately plan for its Minnesota and Wisconsin load. Thus, 1) all of Dairyland's generation is dispatched for the benefit of Dairyland's entire membership, 2) all members will share in the benefits of any MISO energy sales, and 3) all members will bear responsibility for any MISO purchases. In other words, all of Dairyland's members are part of the same system.

As a member of MISO, Dairyland is required to meet its planning reserve requirement based on the demand requirements of its load, including its Minnesota load. In technical terms, in order to meet its planning reserve requirements, Dairyland has registered its share of Weston 4 in MISO's Module E. Weston 4 is not physically separate form Dairyland's members; in fact, Dairyland built Weston 4 to help meet the needs of its members.

. . . .

**Add. 12**

> Dairyland believes that Minn. Stat. §216H.03 is unconstitutional. The
> Department notes that whether a statute is constitutional is an issue to be
> determined by the courts, not an administrative agency. The Department
> notes that the constitutionality of Chapter 216H and, in particular, Minn.
> Stat. §216H.03, is the subject of a federal lawsuit. Thus, the Department
> does not address that issue in these comments.

(Id. at 27–29 (emphasis added).) The MPUC ultimately concluded that Weston 4 was

subject to an exemption under the NGEA. (Id., Ex. R at 6–7.) Thus, it did not address

these issues.

### 2.   Basin Electric Power Cooperative

Plaintiff Basin Electric Power Cooperative ("Basin Electric") is a North Dakota

nonprofit cooperative association engaged in the business of generating, acquiring, and

transmitting wholesale bulk electric power to its members. (Raatz Decl. [Doc. No. 140]

¶ 4.) Basic Electric has 135 rural electric system members located in nine states

(Minnesota, North Dakota, Montana, Wyoming, Colorado, New Mexico, Nebraska,

South Dakota, and Iowa). (Id.) As a cooperative, Basin Electric spreads the costs of

membership equally among its members; it does not have state-by-state rate setting

processes. (Id. ¶¶ 4, 27.) In order to serve its members, Basin Electric creates a resource

portfolio made up of generating assets and power purchase agreements for capacity from

generating assets owned by other entities. (Id. ¶ 6.) This planning process is done on a

region-wide basis and involves determining "the least cost resource alternatives available

to reliably serve its members," including, for example, wind, natural gas, coal, and power

purchase agreements. (Id. ¶¶ 6–7.)

**Add. 13**

Twelve of Basin Electric's members are located in Minnesota.  (Id. ¶ 5.)  Basin Electric supplies electricity to the majority of these members through MISO and the rest through the Integrated System ("IS").  (Id. ¶ 8.)  Although transactions in the IS generally can be traced from a particular generation source to a particular delivery point, (id. ¶ 10), Basin Electric is concerned about the NGEA's application to both its IS and MISO transactions, (id. ¶¶ 11–12).

According to Basin Electric's Vice President of Cooperative Planning, the NGEA "would limit Basin Electric[]'s ability to transmit power and enter into purchase agreements necessary to serve load growth occurring entirely outside Minnesota."  (Id. ¶¶ 1, 19.)  For example, to help serve increased demand in North Dakota, Basin Electric moved power from its Dry Fork Station (a coal-fired facility in Wyoming) located in the Western Interconnection into the Eastern Interconnection.  (Id. ¶¶ 6, 20.)  Based on its concern that the NGEA would be interpreted to prohibit this transfer because Minnesota is also within the Eastern Interconnection, Basin Electric filed with the MPUC a Notification of Changed Circumstances relating to its resource plan.  (Id. ¶ 21 & Ex. A.)  In response, the MDOC recommended that the MPUC require Basin Electric to provide further analysis of whether the transfer of power to the Eastern Interconnection (and, therefore, MISO) violated the NGEA.  (Id. ¶ 21 & Ex. B.)  Basin Electric submitted the information but suggested that the issue be deferred pending the outcome of this litigation.  (Id. ¶ 22 & Ex. C.)  After receiving Basin Electric's analysis, the MDOC stated that it would be necessary for Basin Electric to provide additional information regarding operation of the Dry Fork Station and the IS in order to determine whether

14

**Add. 14**

Basin Electric was in violation of Minn. Stat. § 216H.03. (Boyd Supp. Decl. [Doc. No. 172], Ex. AA.) Basin Electric responded, (id., Ex. BB), but neither the MDOC nor the MPUC has confirmed whether there has been a violation, and Basin Electric remains concerned that it will be determined to be in violation of the NGEA by virtue of the manner in which it is serving its North Dakota load, (Raatz Decl. ¶ 23). As another example, Basin Electric recently received numerous offers for long-term power purchase agreements through a request for proposal process. (Id. ¶ 25.) These agreements were meant to serve increased load in North Dakota, South Dakota, and Montana, but Basin Electric is concerned about entering into such transactions due to the NGEA. (Id.) A final example is Basin Electric's inability to accurately evaluate the costs associated with a new coal-fired generation plant in South Dakota, in which it has already made initial investments, and a potential additional unit at its Dry Fork Station. (Id. ¶ 26.)

### 3.    Missouri River Energy Services

Plaintiff Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services ("MRES") engages in the generation and transmission of electric energy and is responsible for serving approximately 60 member municipalities in Minnesota, North Dakota, South Dakota, and Iowa. (Wahle Decl. [Doc. No. 143] ¶ 3.) MRES provides power to its members pursuant to power sale agreements. (Id. ¶ 4.) It is contractually obligated through 2046 to charge all of its members a uniform rate. (Id. ¶ 26.)

Twenty-four of MRES's members are located in Minnesota, and twenty of those members are located within the MISO operating area. (Id. ¶¶ 5–6.) Thus, MRES participates in the MISO markets and must be able to demonstrate that it has sufficient

**Add. 15**

Appellate Case: 14-2156   Page: 17   Date Filed: 11/04/2014 Entry ID: 4213079

generating capacity to support its load.  (Id. ¶¶ 6–7.)  MRES satisfies its capacity

obligations through power purchase agreements; it has no generating assets of its own.

(Id. ¶ 8.)

According to MRES's Director of Power Supply and Operations, MRES has

considered several projects during its resource planning that were affected by the NGEA.

(Id. ¶¶ 1, 21.)  One of these projects was MRES's potential purchase of capacity from a

coal-fired facility in Wisconsin through a long-term power purchase agreement in order

to meet its MISO capacity obligations.  (Id. ¶ 23.)  The transaction ultimately did not

close, in part because MRES determined that the transaction would have been viewed as

a violation of the NGEA and would have resulted in legal action by the State of

Minnesota.  (Id.)

### 4.     Minnkota Power Cooperative, Inc.

Plaintiff Minnkota Power Cooperative, Inc. ("Minnkota") is a Minnesota nonprofit

generation and transmission cooperative that serves 11 member-owned distribution

cooperatives.  (Am. Compl. ¶ 19; Tschepen Decl. [Doc. No. 142] ¶ 4.)  Minnkota's

service territory includes many rural and poverty-stricken areas within eastern North

Dakota and northwestern Minnesota.  (Tschepen Decl. ¶¶ 4–5.)  Like Basin Electric,

Minnkota has a common rate structure applicable to all of its members.  (Id. ¶ 16.)  Thus,

losses are also shared by all members.  (Id.)

Minnkota's primary source of electrical generation is the Milton R. Young Station,

a lignite-fueled power plant located in North Dakota and partially owned by Minnkota.

(Id. ¶¶ 5–6.)  Minnkota purchases by contract output from the portion of Young Station

Appellate Case: 14-2156     Page: 18     Date Filed: 11/04/2014 Entry ID: 4213079

that is not owned by Minnkota.  (Id. ¶¶ 6–7.)  As of 2026, Minnkota will have the rights

to all available capacity from Young Station.  (Id. ¶ 7.)  Therefore, its surplus of capacity

from Young Station (which is currently at 25%) will continue to increase, providing

Minnkota with opportunities to sell energy and capacity for its members' benefit.  (Id.

¶ 11.)  However, according to Minnkota's Vice President of Planning and Energy Supply,

Minnkota is concerned that the NGEA will be enforced against Minnkota in connection

with sales of this surplus energy in light of the position taken by the MDOC in the MPUC

proceedings discussed above.  (Id. ¶¶ 1, 12.)  In addition, two Minnesota utilities have

told Minnkota that they "likely cannot consider" long-term transactions for power,

thereby devaluing Minnkota's surplus.  (Id. ¶ 13.)

### D.    This Lawsuit

Plaintiffs filed an Amended Complaint [Doc. No. 9] on December 1, 2011,

alleging that Minn. Stat. § 216H.03 violates the Commerce Clause of the U.S.

Constitution (Count I), the Supremacy Clause of the U.S. Constitution because the statute

is preempted by the Clean Air Act and the Federal Power Act (Counts II and III,

respectively), the Privileges and Immunities Clause of the U.S. Constitution (Count IV),

and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution

(Count VI).  Plaintiffs also seek a declaratory judgment that the Federal Power Act

preempts Minn. Stat. § 216H.03, subd. 3 (Count V).  Plaintiffs request an order declaring

Minn. Stat. § 216H.03, subd. 3(2)–(3), unconstitutional and unenforceable; an order

enjoining enforcement of Minn. Stat. § 216H.03, subd. 3; and an award of costs and

Appellate Case: 14-2156    Page: 19    Date Filed: 11/04/2014 Entry ID: 4213079

expenses incurred in the litigation, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b).

On December 7, 2011, Defendants filed an Answer to the Amended Complaint [Doc. No. 10] and a Motion for Partial Judgment on the Pleadings [Doc. No. 11] on Counts II through VI of Plaintiffs' Amended Complaint.  Following supplemental briefing, the Court denied Defendants' Motion as to Counts II, III, and V, and granted it as to Counts IV and VI.[5]  (Mem. Opinion and Order dated September 30, 2012, at 40 [Doc. No. 32].)

Defendants and Plaintiffs now bring cross-motions for summary judgment on all of the remaining claims.  In addition to the parties' full briefing on the motions [Doc. Nos. 128–44, 166–69, 171–77, 186–88], several amici were permitted to file briefs.  The Minnesota Center for Environmental Advocacy, the Environmental Law & Policy Center, the Environmental Defense Fund, the Sierra Club, the Natural Resources Defense Council, Fresh Energy, and the Izaak Walton League of America (collectively, the "Environmental Group Amici") submitted a brief in support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment [Doc. No. 159].  The American Public Power Association and the National Rural Electric Cooperative Association (collectively, the "Electric Service Amici") submitted a brief in support of Plaintiffs' Motion for Summary Judgment [Doc. No. 185].  And, the Minnesota Chamber of Commerce and the National Mining Association submitted a brief

---

[5]     The Court also granted dismissal of Minnesota's Attorney General, who was originally a named plaintiff in this lawsuit.

**Add. 18**

in support of Plaintiffs' Motion for Summary Judgment [Doc. No. 184].  In addition to

their summary judgment motion, Defendants also seek to strike Plaintiffs' demand for a

jury trial, amend the scheduling order, and set the case for a trial to the Court.

## II.     CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.     Legal Standard

"Summary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'" Celotex

Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary

judgment is proper if there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp., 477

U.S. at 322–23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986).  The

party moving for summary judgment bears the burden of showing that the material facts

in the case are undisputed, Celotex Corp., 477 U.S. at 323, and the record is to be viewed

in the light most favorable to the nonmoving party, UniGroup, Inc. v. O'Rourke Storage

& Transfer Co., 980 F.2d 1217, 1219–20 (8th Cir. 1992).  However, "a party opposing a

properly supported motion for summary judgment may not rest upon mere allegation or

denials of his pleading, but must set forth specific facts showing that there is a genuine

issue for trial." Anderson, 477 U.S. at 256.  "Only disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." Id. at 248.

**Add. 19**

Appellate Case: 14-2156    Page: 21    Date Filed: 11/04/2014 Entry ID: 4213079

### B.      Preliminary Issues

### 1.      Standing/Ripeness

The Court will first address Defendants' argument that Plaintiffs lack standing to bring their claims[6] and that the claims are not ripe for adjudication.  See Gray v. City of Valley Park, 567 F.3d 976, 983 (8th Cir. 2009) (citation omitted) (stating that both standing and ripeness must be satisfied before a court can reach the merits of a claim).  A plaintiff must show the following to demonstrate standing:

> (1) there must be "injury in fact" or the threat of "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to defendant's challenged action; and (3) it must be likely (as opposed to merely speculative) that a favorable judicial decision will prevent or redress the injury.

Id. at 984 (citations omitted).  Similarly,

> [r]ipeness is demonstrated by a showing that a live controversy exists such that the plaintiffs will sustain immediate injury from the operation of the challenged provisions, and that the injury would be redressed by the relief requested.  In other words, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."

Emp'rs Ass'n v. United Steelworkers of Am., 32 F.3d 1297, 1299 (8th Cir. 1994) (internal citations omitted).  Thus, while "'[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all,'" Minn. Pub. Utils. Comm'n v. FCC, 483 F.3d 570, 582 (8th Cir. 2007) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)), "'[o]ne does not have to await the

---

[6]      "If a plaintiff lacks standing, a court is without subject matter jurisdiction." S.D. Farm Bureau, Inc. v. Hazeltine, 340 F.3d 583, 591 (8th Cir. 2003) (citation omitted). Therefore, the issue may be raised at any time. Id. (citation omitted).

**Add. 20**

consummation of threatened injury to obtain preventive relief,'" <u>Emp'rs Ass'n</u>, 32 F.3d at 1299 (quoting <u>Babbitt v. United Farm Workers Nat'l Union</u>, 442 U.S. 289, 298 (1979)). Rather, "'[i]f the injury is certainly impending that is enough.'"  <u>Id.</u> (quoting <u>Babbitt</u>, 442 U.S. at 298).  As noted by the Eighth Circuit, the ripeness doctrine exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  <u>Minn. Pub. Utils. Comm'n</u>, 483 F.3d at 582 (citation and internal quotation marks omitted).

Defendants argue that Plaintiffs cannot satisfy these jurisdictional requirements because they have not suffered an injury-in-fact.  (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. [Doc. No. 130] ("Defs.' Mem.") at 14–16.)  Defendants point to Plaintiffs' assertion during discovery that they are not aware of any long-term power purchase agreements that they did not enter into because of Minn. Stat. § 216H.03, and Defendants argue that Plaintiffs' claims of inhibited business operations and a fear of lessened demand are based on "speculation and contingent future events" and are insufficient to demonstrate standing or ripeness.  (<u>Id.</u> at 15.)

Contrary to Defendants' arguments, "plaintiffs have standing to challenge the constitutionality of a law that has a direct negative effect on their borrowing power, financial strength, and fiscal planning."  <u>Jones v. Gale</u>, 470 F.3d 1261, 1267 (8th Cir. 2006) (citations and internal quotation marks omitted).  Likewise, an "imminent loss" of business resulting from a statute's enforcement constitutes an injury-in-fact.  <u>See</u> <u>S.D.</u>

**Add. 21**

Farm Bureau, Inc. v. Hazeltine, 340 F.3d 583, 592 (8th Cir. 2003) (citing Clinton v. City of New York, 524 U.S. 417, 431 (1998)) (finding that third parties who did "substantial business" with out-of-state entities that were affected by the challenged law had standing based upon the "imminent loss of that business").  It is not necessary that the plaintiff have an actual contract in place.  Jones, 470 F.3d at 1267 (finding that a plaintiff had standing to challenge the constitutionality of a law because, although he did not have an actual contract that was affected, he explained how the law had negatively affected his ability to earn income, borrow, and plan for his financial future).

Here, Basin Electric has explained its concern that transferring power from its Dry Forks facility to service its North Dakota load will constitute a violation of Minn. Stat. § 216H.03 and, in fact, that transfer has been questioned by the MDOC.[7]  It is also apprehensive about entering into long-term power purchase agreements to serve its

---

[7]      Counsel for the Environmental Group Amici stated during oral argument that "Defendants have now confirmed that the statute does not apply to Minnesota purchases from MISO."  (Tr. of Oct. 17, 2013, Hr'g on Cross-Mots. for Summ. J. [Doc. No. 204] ("Tr.") 83:23-24.)  Even if this were true, it would not eliminate Plaintiffs' standing. Rather, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." United Food & Commercial Workers Int'l Union v. IBP, Inc., 857 F.2d 422, 429 (8th Cir. 1988) (citing City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)) (finding that the plaintiffs had standing even though the defendants submitted affidavits from officials who stated they had no "present plan" to enforce the challenged law). Similarly, "[w]here a plaintiff alleges an intention to engage in a course of conduct that is clearly proscribed by statute, courts have found standing to challenge the statute, even absent a specific threat of enforcement."  Gray, 567 F.3d at 985 (citations omitted).  Here, as discussed more fully in Part II.C.1., the conduct in which Plaintiffs seek to engage—or are engaging—violates the plain terms of the statute.  Even if Defendants stated a present intent not to enforce the statute in a certain manner, there is nothing to stop them from doing so in the future.  Therefore, this Court is not deprived of its power to determine the legality of the statute.

Appellate Case: 14-2156    Page: 24    Date Filed: 11/04/2014 Entry ID: 4213079

increased load in states other than Minnesota, and it is unable to accurately evaluate the costs associated with a new coal-fired generation plant in South Dakota in which it has already made initial investments.  MRES has explained that it declined to purchase an interest in a coal-fired facility in Wisconsin that would have allowed MRES to meet its MISO capacity obligations because MRES was concerned that the transaction would have been viewed as a violation of Minn. Stat. § 216H.03.  And, Minnkota has explained its concern that sales of its surplus energy will implicate Minn. Stat. § 216H.03 and that its surplus has been devalued because utilities are refusing to enter into long-term agreements with Minnkota.  These are not speculative or contingent future events.  Rather, these are instances in which the challenged provisions of the NGEA (Minn. Stat. § 216H.03, subd. 3(2)–(3)) have already had—or, if enforced, will imminently have—a direct negative effect on Plaintiffs' financial strength, fiscal planning, and business prospects.  Plaintiffs' concerns are based not only on the statutory language, but also on the position that the MDOC—an entity tasked with reporting violations of Minn. Stat. § 216H.03 to the Attorney General—has taken in the MPUC proceedings discussed above.  Thus, to the extent that injuries in this case have not already occurred, they are "certainly impending."  Therefore, the Court finds that these Plaintiffs[8] are properly before the Court and that their claims are ripe for review.

---

[8]     Because Basin Electric, MRES, and Minnkota have demonstrated standing, the Court need not analyze whether the other Plaintiffs have standing.  See Jones, 470 F.3d at 1265 (stating that "'where one plaintiff establishes standing to sue, the standing of other plaintiffs is immaterial' to jurisdiction") (citation omitted).  "[O]nly one plaintiff need show standing to support . . . subject matter jurisdiction . . . ."  Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 986 (8th Cir. 2011) (citations omitted).

**Add. 23**

### 2.    Abstention

In addition to supporting Defendants' arguments regarding standing, the

Environmental Group Amici ask the Court to abstain, under Railroad Commission of

Texas v. Pullman Co., 312 U.S. 496 (1941), from deciding Plaintiffs' claims.  (Br. of

Amici Minn. Ctr. for Envtl. Advocacy et al. [Doc. No. 159] ("Env. Groups' Br.") at 11.)

Notably, Defendants did not raise this issue, and the Court need not entertain an issue

raised only by amici.  See Cont'l Ins. Cos. v. Ne. Pharm. & Chem. Co., 842 F.2d 977,

984 (8th Cir. 1988) ("Ordinarily, we consider only issues argued in the briefs filed by the

parties and not those argued in the briefs filed by interested nonparties.").  However, the

Court will briefly address the Environmental Group Amici's arguments.

According to the U.S. Supreme Court, "'[a]bstention from the exercise of federal

jurisdiction is the exception, not the rule.'"  Moe v. Brookings Cty., 659 F.2d 880, 883

(8th Cir. 1981) (quoting Colo. River Water Conservation Dist. v. United States, 424 U.S.

800, 813 (1976)).  "Pullman abstention presupposes two conditions:  (1) there must be an

unsettled issue of state law, and (2) there must be a possibility that the state law

determination will moot the federal constitutional question raised."  Nat'l City Lines, Inc.

v. LLC Corp., 687 F.2d 1122, 1126 (8th Cir. 1982) (citations omitted).  Thus, "'[w]here

there is no ambiguity in the state statute, the federal court should not abstain but should

proceed to decide the federal constitutional claim.'"  Moe, 659 F.2d at 883 (quoting

Wisconsin v. Constantineau, 400 U.S. 433, 439 (1971)).

The Environmental Group Amici argue that the Court should abstain from

exercising its jurisdiction until the MPUC and Minnesota courts have determined how

**Add. 24**

Appellate Case: 14-2156   Page: 26   Date Filed: 11/04/2014 Entry ID: 4213079

Minn. Stat. § 216H.03's "new coal plant provision" applies to MISO transactions and what the statutory term "increase" means in the "[power purchase agreement] provision." (Env. Groups' Br. at 11.)  According to the Environmental Group Amici, Minn. Stat. § 216H.03 is "sufficiently ambiguous" to warrant abstention.  (Id. at 12.)  In support of their argument, they point to Basin Electric's description of the term "increase" as a "problem[]" because it is not clear how to determine whether an increase has occurred. (Id.)  They argue that an MPUC ruling will substantially modify the issues before the Court.  (Id.)

The Court disagrees with the Environmental Group Amici.  First, as discussed in more detail below, the statutory provisions at issue in this case are not sufficiently ambiguous to warrant abstention.  Rather, the plain language (e.g., "no person shall . . . import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions [or] enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions") is broad and, on its face, does apply to MISO transactions.  In fact, as discussed above, the MDOC has already expressed its opinion in the Dairyland proceedings that these provisions apply to MISO transactions.  Second, the statutory term "increase" has a plain meaning that this Court can ascertain without resort to the MPUC. Third, even if it is unclear exactly how an entity can determine whether an "increase" has occurred, clarification of that matter would not render moot the issues before the Court— i.e., whether Minnesota has the power to enforce a statute that affects out-of-state entities' out-of-state transactions when it determines that the statewide power sector

**Add. 25**

Appellate Case: 14-2156   Page: 27   Date Filed: 11/04/2014 Entry ID: 4213079

carbon dioxide emissions have been increased.  Accordingly, because Minn. Stat.

§ 216H.03 is not sufficiently ambiguous, and because there is no possibility that the state

law determination will moot the federal constitutional question raised, this Court declines

to abstain from resolving the issues before it.

### C.    The Merits

Having determined that Plaintiffs and their claims are properly before this Court

and that there is no reason for this Court to abstain from hearing this matter, the Court

will address the merits of the parties' cross-motions for summary judgment.  Neither the

parties, nor this Court, dispute that carbon dioxide emissions are a problem that this

country needs to address.  The question here is not the environmental issue.  The question

is whether the Minnesota Legislature has the power, under the U.S. Constitution, to

address that issue through the means articulated in Minn. Stat. § 216H.03.  Because the

Court finds that Minn. Stat. § 216H.03, subd. 3(2)–(3), violates the dormant Commerce

Clause, the answer to that question is "no."

In their motion for summary judgment, Plaintiffs argue that Minn. Stat.

§ 216H.03, subd. 3, violates the dormant Commerce Clause and is preempted by both the

Federal Power Act and the Clean Air Act.  Plaintiffs seek an order declaring Minn. Stat.

§ 216H.03, subd. 3(2)–(3), unconstitutional and enjoining Defendants and their

successors in office from enforcing those provisions.  Defendants, in their motion papers,

argue that Minn. Stat. § 216H.03 does not violate the dormant Commerce Clause and is

not preempted by federal law.  Defendants seek an order dismissing Plaintiffs' Amended

Complaint in its entirety.

The Court finds that Minn. Stat. § 216H.03, subd. 3(2)–(3), violates the dormant Commerce Clause and that summary judgment is properly granted in favor of Plaintiffs, and denied as to Defendants, on Count I of Plaintiffs' Amended Complaint.  Therefore, the Court need not address the parties' federal preemption arguments,[9] and summary judgment is denied as moot on Counts II, III, and V as to Plaintiffs and Defendants.

### 1.    Scope of Minn. Stat. § 216H.03

Intertwined with their constitutional challenges to Minn. Stat. § 216H.03 are the parties' disputes regarding the scope of the statute.  Their arguments primarily implicate the following phrases:  "no person shall," "import or commit to import," and "new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions."  Because the constitutional claims are based at least in part on this language, the Court will first address the scope of Minn. Stat. § 216H.03, subd. 3.  See Cotto Waxo Co. v. Williams, 46 F.3d 790, 792 (8th Cir. 1995) (determining the scope of the statutory language at issue prior to resolving the dormant Commerce Clause challenge); Am. Booksellers Found. v. Dean, 342 F.3d 96, 100–01 (2d Cir. 2003) (determining the "proper construction" of a statute prior to addressing the dormant Commerce Clause issue because the appellants' arguments were based on a narrow construction of the statute).

---

[9]    See New Eng. Power Co. v. New Hampshire, 455 U.S. 331, 343 n.10 (1982) (declining to decide whether a state regulation conflicted with the Federal Power Act in light of its holding that the regulation violated the Commerce Clause); Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n, 772 F.2d 404, 411 (8th Cir. 1985) (choosing not to address preemption issues "because the case can be disposed of under well-settled commerce clause principles").

**Add. 27**

Appellate Case: 14-2156     Page: 29     Date Filed: 11/04/2014 Entry ID: 4213079

Defendants devote several pages of their briefing to a discussion of individual states' long history of utility regulation and the argument that Minn. Stat. § 216H.03, subd. 3, falls under that traditional state authority because it merely regulates the sources of power that Minnesota utilities can rely upon to meet the needs of their customers. (See, e.g., Defs.' Mem. at 2–12.)  In addition, Defendants argue that a buyer in the MISO market purchases electricity without knowing its physical source and, therefore, cannot "import or commit to import" power from a new large energy facility through MISO. (Defs.' Mem. of Law in Opp. to Pls.' Mot. for Summ. J. [Doc. No. 166] ("Defs.' Opp.") at 7–8.)  In fact, Defendants claim that "[i]t would be impossible to apply [subdivision 3(2)] to the MISO energy market."  (Id. at 8.)  Rather, according to Defendants, the "import or commit to import" provision "applies to the agreement that the Minnesota entity makes outside of the MISO market regarding the relevant power," (id. at 8 (emphases added)), and it does not apply to the transmission of electricity through MISO that is not consumed in Minnesota, (see Tr. 61:21–62:15; Defs.' Opp. at 7).  As for subdivision 3(3), Defendants argue that sales in the MISO market are for short-term energy and so do not implicate the long-term power purchase agreement provision. (Defs.' Opp. at 7.)

On the other hand, Plaintiffs argue that Minn. Stat. § 216H.03's "no person shall" language contains no qualifications or limitations and so is not limited only to persons located or operating in Minnesota.  (Pls.' Mem. at 3–4.)  They also assert that Defendants' arguments as to § 216H.03, subd. 3(2)–(3), fail because there is no knowledge requirement in the "import or commit to import" provision, and the

Appellate Case: 14-2156   Page: 30   Date Filed: 11/04/2014 Entry ID: 4213079

"capacity" that is the subject of long-term power purchase agreements cannot "increase statewide power sector carbon dioxide emissions" until it is converted into power, which happens when the capacity is offered into the MISO market and ultimately dispatched by MISO.  (Pls.' Reply to Defs.' Opp. [Doc. No. 187] ("Pls.' Reply") at 5–6.)  Thus, Plaintiffs state:

> [b]y definition, importing or committing to import from outside the state power from a new large energy facility are activities that necessarily occur on a regional basis and involve parties in different states; and entering into new long-term power purchase agreements frequently contemplate the generation and transmission of electricity from outside of Minnesota and commonly involve parties who are operating in different states.

(Pls.' Mem. at 4.)

The Court declines to adopt Defendants' narrow constructions of the statutory language at issue.  "Under Minnesota law, a statute's plain meaning is not to be disregarded if the language is clear and unambiguous."  Cotto Waxo Co., 46 F.3d at 792 (citing Minn. Stat. Ann. § 645.16).  For example, in Cotto Waxo Co. v. Williams, the Eighth Circuit analyzed the following statutory language:  "'A person may not offer for sale or sell any sweeping compound product that the person knows contains petroleum oil.'"  Id. at 792 n.1 (quoting Minn. Stat. Ann. § 325E.40, subd. 1).  While the district court held that the language "forbids all sales of petroleum-based sweeping compounds in Minnesota," the Commissioner of the Minnesota Pollution Control Agency argued that the language "should be construed more narrowly, reaching only sales for use in Minnesota."  Id. at 792.  According to the Commissioner, the court was required to interpret the statute in a manner that would uphold its constitutionality.  Id.  However,

**Add. 29**

Appellate Case: 14-2156     Page: 31     Date Filed: 11/04/2014 Entry ID: 4213079

the Eighth Circuit found that the statute's plain meaning was "clear and unambiguous"—the statute made no reference to the location in which the products would be used, thus prohibiting all Minnesota sales of the petroleum-based compounds—and declined to impose a narrowing construction.  Id.

Similar to the Commissioner in Cotto Waxo, the Environmental Group Amici here argue that the statute must be upheld if there is any possible constitutional reading of the statutory language.  (Tr. 80:24–81:2.)  However, as noted by the Eighth Circuit, where statutory language is unambiguous, the Court is not permitted to disregard its plain meaning in order to render it constitutional.  And, here, the statutory language is unambiguous.  Like the statutory provision at issue in Cotto Waxo, the "no person shall" language in Minn. Stat. § 216H.03, subd. 3, is not subject to any qualifications regarding location.  Rather than applying only to Minnesota utilities, it plainly applies to "all persons" regardless of their location or corporate form.  Likewise, there is no knowledge requirement in the "import or commit to import" provision; that provision expressly states that it applies to the importation of power rather than to agreements regarding that power, and transmissions through the MISO grid are not exempt.  Thus, Minn. Stat. § 216H.03, subd. 3(2), plainly applies to any "import[ation] or commit[ment] to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions."  Finally, the "long-term power purchase agreement" provision expressly deals with agreements for capacity, not energy, and such agreements for the purchase of capacity that is ultimately bid into the MISO market are not exempt.  Based on Minn. Stat. § 216H.03's clear and unambiguous

**Add. 30**

language, the Court declines to impose the narrowing constructions proposed by Defendants and the Environmental Group Amici.

### 2.    Dormant Commerce Clause

Plaintiffs and Defendants each move for summary judgment on Plaintiffs' Commerce Clause claim.  "The Commerce Clause . . . grants Congress the authority to regulate interstate commerce."  Hazeltine, 340 F.3d at 592 (citing U.S. Const. art. I, § 8, cl. 3).  "The dormant Commerce Clause is the negative implication of the Commerce Clause:  states may not enact laws that discriminate against or unduly burden interstate commerce."  Id. (citing Quill Corp. v. North Dakota, 504 U.S. 298, 312 (1992)).  There are three levels of analysis under the dormant Commerce Clause.  See Grand River Enters. Six Nations, Ltd. v. Beebe, 574 F.3d 929, 942 (8th Cir. 2009); Cotto Waxo Co., 46 F.3d at 793.  First, a state statute that has "an 'extraterritorial reach,' that is, . . . the statute has the practical effect of controlling conduct beyond the boundaries of the state," is per se invalid.  Cotto Waxo Co., 46 F.3d at 793 (citing Healy v. Beer Inst., Inc., 491 U.S. 324, 336 (1989)).  Second, a state statute that is discriminatory on its face, in practical effect, or in purpose is subject to strict scrutiny.  Id. (citations omitted).  Third, a state statute that is not discriminatory, but indirectly burdens interstate commerce, is evaluated under the balancing test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).  Id.

Plaintiffs argue that Minn. Stat. § 216H.03 fails all three tests.  (See Pls.' Mem. at 24–34.)  First, Plaintiffs assert that Minn. Stat. § 216H.03 violates the extraterritoriality doctrine because the practical effect of the statute is to control conduct that occurs wholly

**Add. 31**

NaN

outside of Minnesota.  (Id. at 24–25.)  Second, Plaintiffs argue that Minn. Stat. § 216H.03 discriminates against interstate commerce in purpose, on its face, and in effect because it disproportionately favors in-state interests.  (See id. at 29.)  Third, Plaintiffs contend that Minn. Stat. § 216H.03 fails the Pike test because it does not regulate evenhandedly, affect a legitimate local interest, or only incidentally burden interstate commerce.  (Id. at 32.)

Defendants, on the other hand, argue that Minn. Stat. § 216H.03 passes all three tests.  (See Defs.' Mem. at 16–29.)  First, Defendants argue that § 216H.03 does not overtly discriminate against interstate commerce either facially, in purpose, or in effect because it does not discriminate against out-of-state actors to the benefit of in-state interests.  (Id. at 17–20.)  Second, Defendants assert that Minn. Stat. § 216H.03 is not an extraterritorial regulation because it does not directly control commerce that occurs entirely outside of Minnesota.  (Id. at 21.)  Third, Defendants contend that Minn. Stat. § 216H.03 survives a Pike analysis because it does not favor in-state interests, it serves legitimate local interests relating to economic and resource certainty and encourages the use of clean energy, and it imposes little or no burden on interstate commerce.  (See id. at 23–26.)

The Court finds that Minn. Stat. § 216H.03, subd. 3(2)–(3), violates the extraterritoriality doctrine and is per se invalid and, therefore, the Court need not address whether the statute is discriminatory or fails a Pike analysis.  Under the extraterritoriality doctrine, "[t]he Commerce Clause precludes application of a state statute to commerce that takes place wholly outside of the state's borders."  Cotto Waxo Co., 46 F.3d at 793 (citing Healy, 491 U.S. at 336).  In other words, a state statute is invalid "when the statute

32

**Add. 32**

requires people or businesses to conduct their out-of-state commerce in a certain way."
Id.  This is true regardless of whether the commerce has effects within the state, Edgar v.
MITE Corp., 457 U.S. 624, 642–43 (1982),[10] and regardless of whether the legislature
intended for the statute to have an extraterritorial effect, Healy, 491 U.S. at 336.  "The
critical inquiry is whether the practical effect of the regulation is to control conduct
beyond the boundaries of the State."  Id. (emphasis added) (citing Brown-Forman
Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579 (1986)).

The practical effect of a statute is evaluated by looking not only at "the
consequences of the statute itself," but also at "how the challenged statute may interact
with the legitimate regulatory regimes of other States and what effect would arise if not
one, but many or every, State adopted similar legislation."  Id.  As noted by the U.S.
Supreme Court, "[g]enerally speaking, the Commerce Clause protects against
inconsistent legislation arising from the projection of one state regulatory regime into the
jurisdiction of another State."  Id. at 336–37 (citation omitted).  Thus, for example, "no
State may force an out-of-state merchant to seek regulatory approval in one State before
undertaking a transaction in another."  Id. at 337 (citing Brown-Forman, 476 U.S. at 582).
The rationale is that "any attempt directly to assert extraterritorial jurisdiction over
persons or property would offend sister States and exceed the inherent limits of the
State's power."  Edgar, 457 U.S. at 643 (citation and internal quotation marks omitted).

---

[10]    The portion of the opinion in Edgar v. MITE Corp. that discusses extraterritoriality
was supported by a plurality of the Court.

**Add. 33**

The Court will first address Defendants' and the Environmental Group Amici's assertion that the U.S. Supreme Court has only applied the extraterritoriality doctrine to price control laws.[11]  (See Defs.' Opp. at 25; Env. Groups' Br. at 13.)  Contrary to their argument, the Supreme Court has applied this doctrine in a non-price control case.  In Edgar v. MITE Corp., the Court considered a Commerce Clause challenge to the Illinois Business Take-Over Act, which required that any takeover offer for the shares of an Illinois company with its executive offices in Illinois be registered with the Illinois Secretary of State.  457 U.S. at 626–27, 642.  The Court found that the statute could prevent an out-of-state offeror from engaging in interstate transactions not only with Illinois residents, but also with non-Illinois residents, and that the statute could be applied in situations in which no Illinois residents were involved.  Id. at 642.  Thus, the Court invalidated the statute, finding that it "purport[ed] to regulate directly and to interdict interstate commerce, including commerce wholly outside the State" and that it had a "sweeping extraterritorial effect."  Id. at 642–43.  The Court later described its opinion in

---

[11]     Defendants also claim that the continued validity of the extraterritoriality doctrine is in question, pointing to a concurrence in American Beverage Ass'n v. Snyder, 700 F.3d 796, 810–15 (6th Cir. 2012), that suggested the doctrine is outdated.  (Defs.' Mem. at 20 n.33.)  (That opinion was amended by 735 F.3d 362 (6th Cir. 2013).)  Defendants note that the defendants in that case filed a Petition for a Writ of Certiorari presenting the question of whether the doctrine should be abolished.  (Id. (citing Snyder v. Am. Beverage Ass'n, 2013 WL 1452895 (Apr. 8, 2013)).)  However, that petition was denied, see 134 S. Ct. 61 (2013), and Defendants point to no other authority suggesting that the extraterritoriality doctrine is no longer valid.

**Add. 34**

Appellate Case: 14-2156    Page: 36    Date Filed: 11/04/2014 Entry ID: 4213079

Edgar as an "extraterritorial decision" that "significantly illuminates the contours of the constitutional prohibition on extraterritorial legislation."  Healy, 491 U.S. at 333 n.9.[12]

Likewise, the Eighth Circuit has applied the extraterritoriality doctrine to statutes other than price control laws.  For example, in Cotto Waxo Co., the court considered the extraterritorial effect of a Minnesota statute prohibiting the sale of petroleum-based sweeping compounds.  46 F.3d at 793–94.  Although the Eighth Circuit did not ultimately invalidate the statute on extraterritoriality grounds, it did not limit application of that doctrine to price control statutes.  See id.  Rather, the court concluded as follows:

> The Act does not, either by its terms or in practical effect, necessarily affect out-of-state commerce.  The Act does not require Cotto Waxo to conduct its commerce according to Minnesota's terms.  Clearly, the Act has affected Cotto Waxo's participation in interstate commerce.  Nevertheless, the Act itself is indifferent to sales occurring out-of-state.  Cotto Waxo is able to sell to out-of-state purchasers regardless of Cotto Waxo's relationship to Minnesota.

Id. at 794 (emphases added).  In another Eighth Circuit case, Southern Union Co. v. Missouri Public Service Commission, the court analyzed a Missouri statute that required public utilities conducting business in Missouri to obtain approval from the Missouri Public Service Commission prior to purchasing securities issued by another utility,

_____

[12]    While Defendants and the Environmental Group Amici cite to the Supreme Court's opinion in Pharmaceutical Research & Manufacturers of America v. Walsh to support their argument that the Court has declined to extend the extraterritoriality doctrine beyond price control laws, that case neither overruled nor questioned the continued validity of Edgar.  See 538 U.S. 644, 669 (2003).  Rather, the Court simply compared the statute at issue, which required drug manufacturers selling drugs in Maine to enter into a rebate agreement with the State Commissioner of Human Services, to price control statutes at issue in prior Supreme Court cases.  Id. at 654, 669.  The fact that the Court limited its comparisons to prior price control statute cases does not mean that its other extraterritoriality cases are no longer valid.

whether or not the other utility operated in Missouri.  289 F.3d 503, 505 (8th Cir. 2002).

The court found that "[a] public utility's investments in other companies can affect its

regulated rate of return," id. at 507, and that the statute regulated "a local public utility

for the protection of local Missouri ratepayers," id. at 508.  Because there was no dispute

that the statute was "part of [the Commission's] rate regulation responsibilities," the court

rejected the plaintiff's extraterritorial regulation argument.  Id.

    Other Circuits have similarly applied the extraterritoriality doctrine to non-price

control statutes.  In National Solid Wastes Management Ass'n v. Meyer, the Seventh

Circuit analyzed a Wisconsin statute stating that "no person may" dispose of certain

materials in Wisconsin's landfills unless the waste was generated in a region that had an

"effective recycling program" as detailed under the statute.  63 F.3d 652, 653–54 & n.1

(7th Cir. 1995).  Relying on the extraterritoriality principles set forth in Healy and Edgar,

the Seventh Circuit found that the statute was unconstitutional:

> Wisconsin's solid waste legislation conditions the use of Wisconsin
> landfills by non-Wisconsin waste generators on their home communities'
> adoption and enforcement of Wisconsin recycling standards; all persons in
> that non-Wisconsin community must adhere to the Wisconsin standards
> whether or not they dump their waste in Wisconsin.  If the out-of-state
> community does not conform to the Wisconsin way of doing things, no
> waste generator in that community may utilize a Wisconsin disposal site.
> The practical impact of the Wisconsin statute on economic activity
> completely outside the State reveals its basic infirmity:  It essentially
> controls the conduct of those engaged in commerce occurring wholly
> outside the State of Wisconsin and therefore directly regulates interstate
> commerce.
>
> . . . .
>
> The Wisconsin statute reaches across the Wisconsin state line and regulates
> commerce occurring wholly outside Wisconsin.  As a price for access to the

**Add. 36**

Wisconsin market, it attempts to assume control of the integrity of the product that is moving in interstate commerce. Wisconsin's approach to sound solid waste management, and no one else's, must govern, even when the product will never cross its borders. The Commerce Clause contemplates a very different market among the states of the Union.

Id. at 658, 661 (internal citation omitted).

The Sixth Circuit, in American Beverage Ass'n v. Snyder, considered Michigan's "unique-mark" law, which required manufacturers to place a mark on containers for certain brands of beverages that would allow a reverse vending machine to determine if the container was returnable. 735 F.3d 362, 367 (6th Cir. 2013), cert. denied, 134 S. Ct. 61 (2013). The statute further required that the mark be unique to Michigan and that the mark could only be used in Michigan or other states with similar laws. Id. In determining that the statute violated the dormant Commerce Clause, the court concluded:

> . . . Michigan's unique-mark requirement not only requires beverage companies to package a product unique to Michigan but also allows Michigan to dictate where the product can be sold. . . . Plaintiff must comply with the statute now or face criminal sanctions. In addition, other states must react today to Michigan's unique-mark requirement or also face legal consequences. Thus, Michigan is forcing states to comply with its legislation in order to conduct business within its state, which creates an impermissible extraterritorial effect and is in violation of the Supreme Court's precedent stated in Brown-Forman and Healy.

Id. at 376.

The parties in this case point to two Second Circuit decisions involving the extraterritoriality doctrine. In the first case, American Booksellers Foundation v. Dean, the Second Circuit analyzed a Vermont statute stating that "[n]o person may, . . . with actual knowledge that the recipient is a minor," disseminate through the internet material that is harmful to minors. 342 F.3d at 100. After determining that the statute could be

**Add. 37**

read to apply to material posted on a website or shared in an email or discussion group, the court evaluated the statute's extraterritorial effects and found that it violated the dormant Commerce Clause.  Id. at 100, 103–04.  The court explained its reasoning as follows:

> Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without "project[ing] its legislation into other States."
>
> A person outside Vermont who posts information on a website or on an electronic discussion group cannot prevent people in Vermont from accessing the material.  If someone in Connecticut posts material for the intended benefit of other people in Connecticut, that person must assume that someone from Vermont may also view the material.  This means that those outside Vermont must comply with [the statute] or risk prosecution by Vermont.  Vermont has "project[ed]" [the statute] onto the rest of the nation.
>
> Once again appellants defend [the statute] by arguing that, under their narrow interpretation of the statute, it only regulates material sent directly to a minor in Vermont and does not regulate out-of-state internet activities or websites that are visited by Vermont minors.  With our rejection of this narrow interpretation of [the statute], this argument fails.  Although Vermont aims to protect only Vermont minors, the rest of the nation is forced to comply with its regulation or risk prosecution.
>
> We do note, however, that the extraterritorial effects of internet regulations differ from extraterritorial-regulation cases like Healy and Brown-Forman. In Healy, for example, Connecticut sought to prevent distributors from selling beer in-state for more than the price at which they sold it in neighboring states. . . . Thus, Connecticut's regulation was projected onto purely intrastate beer sales in the neighboring state.
>
> In contrast, the internet's boundary-less nature means that internet commerce does not quite "occur[] wholly outside [Vermont's] borders." Even if a website is never visited by people in Vermont, it is available to them in a way that a beer purchase in New York or Massachusetts is plainly not.  Vermont's interest in out-of-state internet activity is thus more significant than a state's interest in the price of out-of-state beer sales. However, internet regulation of the sort at issue here still runs afoul of the

dormant Commerce Clause because the Clause "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." Thus, at the same time that the internet's geographic reach increases Vermont's interest in regulating out-of-state conduct, it makes state regulation impracticable. . . .

[W]e agree with the district court that [the statute] presents a <u>per se</u> violation of the dormant Commerce Clause. In practical effect, Vermont "has 'projected its legislation' into other States, and <u>directly regulated</u> commerce therein," in violation of the dormant Commerce Clause. . . .

<u>Id.</u> at 103–04 (internal citations omitted).

In the second case, <u>National Electrical Manufacturers Ass'n v. Sorrell</u>, the court considered a dormant Commerce Clause challenge to a Vermont statute that required manufacturers of mercury-containing light bulbs sold within the state, or for use within the state, to include a label on those products that informed consumers that the bulbs contained mercury. 272 F.3d 104, 107–08 (2d Cir. 2001). The court determined that the plaintiff's extraterritoriality argument failed because the statute did not "require manufacturers to label all lamps wherever distributed." <u>Id.</u> at 110. To the contrary, the court determined, the statute was "indifferent" to whether lamps sold elsewhere were labeled, and manufacturers could modify their production and distribution systems to differentiate between products destined for Vermont and those destined elsewhere. <u>Id.</u> Thus, the court concluded that the plaintiff had not demonstrated a likelihood of success on the merits of its Commerce Clause claim. (<u>Id.</u> at 108.)

As a final example of an extraterritoriality analysis of a non-price control statute, the Ninth Circuit recently considered California's Low Carbon Fuel Standard ("Fuel Standard") statute in <u>Rocky Mountain Farmers Union v. Corey</u>, 730 F.3d 1070 (9th Cir.

**Add. 39**

2013), reh'g denied, 740 F.3d 507 (9th Cir. 2014).  The Fuel Standard applies to transportation fuels consumed in California and requires a fuel blender to keep the average carbon intensity of its fuel below a specified annual limit.  Id. at 1080.  The carbon intensity of a particular fuel is determined by a "lifecycle analysis" in which emissions related to production, refining, and transportation are accounted for.  Id. at 1080–81.  Depending upon whether the fuel's carbon intensity is higher or lower than the annual cap, a credit or deficit is generated.  Id. at 1080.  Credits may then be used to offset deficits, sold to other blenders to offset their deficits, or carried forward.  Id.  In addition, fuel blenders must report certain "material changes" in their processes prior to obtaining credits.  Id. at 1104.

At issue in Rocky Mountain was the Fuel Standard's regulation of the production and sale of ethanol, a fuel that is shipped to California on ocean tankers, trains, and trucks, or passed through pipelines.  See id. at 1082–83 & n.5.  After summarizing the Supreme Court's extraterritoriality precedent, including Healy and Edgar, as well as the Seventh Circuit's decision in National Solid Waste Management, the Ninth Circuit found that "[t]he Fuel Standard impose[d] no analogous conditions on the importation of ethanol" warranting its invalidation under the extraterritoriality doctrine.  Id. at 1101–02.  Among other things, the court noted that the Fuel Standard imposed no penalties on non-compliant, wholly out-of-state transactions.  Id. at 1103.  Rather, the statute applied only to fuel blenders in California and the producers who contracted with them.  Id. (citation omitted).  The court noted that, "[w]hen presented with similar rules in the past, [it has] distinguished statutes 'that regulate out-of-state parties directly' from those that

40

**Add. 40**

'regulate[] contractual relationships in which at least one party is located in [the

regulating state].'" Id. (citation omitted) (emphasis added).

The Ninth Circuit also found that the reporting requirement was permissible under

the extraterritoriality doctrine because it did not require a merchant to seek regulatory

approval in one state before conducting business in another; instead, it required fuel

distributors to seek regulatory approval in California before conducting business in

California. Id. at 1104. Finally, the court determined that there was no risk of

balkanization through the adoption of similar legislation by other states because the Fuel

Standard regulated only fuel consumed in California. Id. at 1105. Under Fuel Standard-

like laws, "[n]o form of fuel would be excluded from . . . any state's market, [and] no

state would attempt to control which fuels were available in other states." Id.

Plaintiffs in this case make four main arguments in support of their claim that

Minn. Stat. § 216H.03 regulates commerce occurring entirely outside of Minnesota.

First, Plaintiffs argue that the practical effect of the statute is to control conduct outside of

Minnesota as evidenced by the statute's objective of reducing carbon dioxide emissions

regardless of where they occur. (Pls.' Mem. at 25.) Second, Plaintiffs argue that the

statute's offset exemption forces merchants to seek regulatory approval in Minnesota

before undertaking transactions in other states. (Id. at 26.) Third, Plaintiffs contend that

other states could enact conflicting legislation, leading to balkanization. (Id. at 27–28.)

Finally, Plaintiffs argue that Minn. Stat. § 216H.03 unconstitutionally regulates

transactions occurring between out-of-state entities because it is not limited to Minnesota

distribution utilities; it applies even when the prohibited electricity is not intended to be

**Add. 41**

Appellate Case: 14-2156   Page: 43   Date Filed: 11/04/2014 Entry ID: 4213079

or is actually consumed in Minnesota; and multi-state entities with Minnesota members have no practical means of avoiding the statute when engaging in commerce wholly outside of the state.  (Pls.' Reply at 11–13.)  As described by Plaintiffs:

> Minn. Stat. §216H.03 is unconstitutional because, as a practical matter, parties such as Basin [Electric], Minnkota, and MRES are forced to abide by Minnesota's regulation even when selling electricity to South Dakota or Iowa, or providing wholesale power to their North Dakota members.  This is because there is simply no certain, predictable, and reliable way to segregate electricity that will be "consumed" in Minnesota from electricity that will not be "consumed" in Minnesota.

(Id. at 13.)

Defendants, on the other hand, argue that Minn. Stat. § 216H.03 regulates in-state entities and activities and imposes no direct limitations on out-of-state generation of electricity sold to out-of-state consumers or out-of-state energy or capacity transactions. (Defs.' Mem. at 21; Defs.' Reply at 6.)  According to Defendants, the statute "regulates only the manner in which Minnesota meets its energy demands," (Defs.' Reply at 6), and "only limits reliance on carbon-emitting power generation by in-state utilities that serve Minnesota individuals and businesses," (Defs.' Mem. at 21).  Defendants claim that Minn. Stat. § 216H.03 is only concerned with electricity that is to be consumed in Minnesota and that "[o]ut-of-state entities can sell electricity to other out-of-state entities without regard for the NGEA."  (Defs.' Opp. at 26–27.)

This Court is not persuaded by Defendants' arguments.  Rather, based on the U.S. Supreme Court and Circuit Court precedent discussed above, the Court finds that Minn. Stat. § 216H.03, subd. 3(2)–(3), is a classic example of extraterritorial regulation because

**Add. 42**

Appellate Case: 14-2156    Page: 44    Date Filed: 11/04/2014 Entry ID: 4213079

of the manner in which the electricity industry operates.  Counsel for the Environmental

Group Amici acknowledged as much during oral argument:

> Plaintiffs do say that, in fact, this law will operate to apply—like the Basin
> claim that there will be a seller in one non-Minnesota state trying to reach a
> buyer in another and Minnesota's law will reach out and regulate and
> interfere with that.  <u>That is a cognizable claim under the extraterritoriality
> [sic].  That is the paradigm.</u>

(Tr. 96:18-23 (emphasis added).)  In fact, the only problem he identified with Plaintiffs'

claim is that there is no reason to believe that the law will be applied in that manner.  (<u>Id.</u>

96:23–97:1.)  However, as discussed above, contrary to Defendants' narrow construction

of Minn. Stat. § 216H.03, subd. 3, that provision plainly encompasses such an

application.  Thus, the statute also requires out-of-state entities to seek regulatory

approval in Minnesota before undertaking transactions in other states.  This statute

overreaches and, if other states adopt similar legislation, it could lead to balkanization.

### a. Regulation of transactions occurring outside of Minnesota between non-Minnesota entities

Minn. Stat. § 216H.03, subd. 3(2)–(3), violates the extraterritoriality doctrine

because its plain language applies to power and capacity transactions occurring wholly

outside of Minnesota's borders.  While the statute draws strong parallels to those at issue

in all of the cases discussed above in which the courts found a violation of the

extraterritoriality doctrine, it is most directly analogous to the internet use regulation

found to violate the dormant Commerce Clause in <u>American Booksellers</u>.  Like the

Vermont statute at issue in that case, which—by its plain language—regulated non-

Vermont residents' internet use outside of Vermont's borders, the practical effect of

43

**Add. 43**

Minn. Stat. § 216H.03, subd. 3(2)–(3), is to control non-Minnesota entities' conduct

occurring wholly outside of Minnesota.

As discussed above, MISO is the RTO responsible for operating and controlling

the transmission of electricity in and among several states, including Minnesota.  Like the

transmission of information over the internet, the transmission of electricity over the

MISO grid does not recognize state boundaries.  Therefore, when a non-Minnesota entity

injects electricity into the grid to satisfy its obligations to a non-Minnesota member, it

cannot ensure that the electricity will not travel to and be removed in—in other words, be

imported to and contribute to statewide power sector carbon dioxide emissions in—

Minnesota.  The Electric Service Amici aptly summarized the comparison of the

electricity grid and the internet as follows:

> Modern regional electrical power grids and markets (such as MISO) share
> striking similarities to the internet.  Users in states geographically far from
> Minnesota are "connected" to Minnesota in much the same way that
> internet users in far-flung states and countries are connected to Vermont.
> Power generated in one state may be consumed by users in another state.
> The nature of the network is such that power producers do not know and
> cannot control who consumes the energy that they generate, and consumers
> are likewise unable to know the source of the power that they consume.  As
> Defendants themselves note, such knowledge would be "impossible" to
> prove because "[i]n the MISO energy markets, a buyer is simply purchasing
> electricity from a pool of electrons in the transmission system" and, as a
> result, "does not know the source of electrons purchased."

(Mem. of Am. Public Power Ass'n & Nat'l Rural Electric Coop. Ass'n as Amici Curiae

in Supp. of Pls. [Doc. No. 185] at 12 (citing Defs.' Opp. at 7–8).)  Likewise, non-

Minnesota entities that enter into long-term power purchase agreements for capacity to

satisfy their non-Minnesota load cannot ensure that the electricity, when bid into the

**Add. 44**

MISO market and dispatched, will not travel to and be removed in—in other words, increase statewide power sector carbon dioxide emissions in—Minnesota.  The MDOC has already verified as much in the Dairyland proceedings:  "all of a utility's resources are matched to all of a utility's load, regardless of state boundaries."  And, this means that those entities, although located outside of Minnesota and attempting to engage in commerce with other non-Minnesota entities, must comply with Minn. Stat. § 216H.03, subd. 3(2)–(3), or risk legal action.

Because of the boundary-less nature of the electricity grid, the effect of Minn. Stat. § 216H.03's regulatory scheme on interstate commerce is much different than that of the statutes at issue in Cotto Waxo Co., National Electrical Manufacturers Ass'n, and Rocky Mountain, where the Circuit Courts declined to invalidate the regulations on extraterritoriality grounds.[13]  Those cases dealt with the regulation of tangible products (sweeping compounds, light bulbs, and ethanol, respectively) that could be shipped directly from point A to point B.  Therefore, in each of those cases, the courts found that the statute at issue did not require out-of-state parties to transact out-of-state business according to the regulating state's terms because the manufacturers could simply avoid engaging in the prohibited conduct when transacting out-of-state business.  As noted by the court in National Electrical Manufacturers Ass'n, light bulb manufacturers could continue selling mercury-containing light bulbs outside of Vermont simply by modifying

---

[13]     Minn. Stat. § 216H.03 is also distinguishable from Southern Union Co. because the Eighth Circuit found—and the parties did not dispute—that the statute at issue in that case was part of the Missouri Public Service Commission's responsibility to regulate local, retail rates.

**Add. 45**

their production and distribution systems.  Unlike those tangible products, however, electricity cannot be shipped directly from Point A to Point B.  MISO does not match buyers to sellers, and once electricity enters the grid, it is indistinguishable from the rest of the electricity in the grid.  Therefore, a North Dakota generation-and-transmission cooperative cannot ensure that the coal-generated electricity that it injects into the MISO grid is used only to serve its North Dakota members and not its Minnesota members.  Consequentially, in order to ensure compliance with Minn. Stat. § 216H.03, subd. 3(2)–(3), out-of-state parties must conduct their out-of-state business according to Minnesota's terms—i.e., engaging in no transactions involving power or capacity that would contribute to or increase Minnesota's statewide power sector carbon dioxide emissions.  As noted by the Environmental Group Amici, this is the "paradigm" of extraterritorial legislation.

### b.      Regulatory approval

In addition to regulating wholly out-of-state transactions, which is itself a violation of the extraterritoriality doctrine, Minn. Stat. § 216H.03, subd. 3(2)–(3), also improperly requires non-Minnesota merchants to seek regulatory approval before undertaking transactions with other non-Minnesota entities.  Minn. Stat. § 216H.03, subd. 4, provides an exemption from the prohibitions in § 216H.03, subd. 3, if an entity can demonstrate to the MPUC's satisfaction that it will offset the prohibited carbon dioxide emissions.  Thus, only by undertaking a "carbon dioxide reduction project" approved by a Minnesota agency can, for example, a North Dakota generation-and-transmission cooperative inject coal-generated electricity into the MISO grid to serve its North Dakota members.

46

**Add. 46**

If any or every state were to adopt similar legislation (e.g., prohibiting the use of electricity generated by different fuels or requiring compliance with unique, statutorily-mandated exemption programs subject to state approval), the current marketplace for electricity would come to a grinding halt.  In an interconnected system like MISO, entities involved at each step of the process—generation, transmission, and distribution of electricity—would potentially be subject to multiple state laws regardless of whether they were transacting commerce outside of their home state.  Such a scenario is "just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." Healy, 491 U.S. at 337.

For these reasons, the Court finds that, while the State of Minnesota's goals in enacting Minn. Stat. § 216H.03 may have been admirable, Minnesota has projected its legislation into other states and directly regulated commerce therein.  Accordingly, Minn. Stat. § 216H.03, subd. 3(2)–(3), constitutes impermissible extraterritorial legislation and is a per se violation of the dormant Commerce Clause.

## D.    Attorneys' Fees

As noted above, Plaintiffs' Amended Complaint seeks an award of costs and expenses incurred in the litigation, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b).  Under that provision, in an action to enforce a provision of 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee."  42 U.S.C. § 1988(b).  Because Plaintiffs do not raise the issue of attorneys' fees in their summary judgment motion papers, the Court, in its discretion, declines to award Plaintiffs their attorneys' fees.

**Add. 47**

III.   **MOTION TO STRIKE**

In light of the Court's rulings in this Memorandum Opinion and Order, the Court

need not address Defendants' Motion to Strike.  That motion is denied as moot.

IV.   **ORDER**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Defendants' Motion for Summary Judgment [Doc. No. 128]  is **DENIED IN
    PART and DENIED AS MOOT IN PART**, as detailed herein;

2.  Plaintiffs' Motion for Summary Judgment [Doc. No. 135] is **GRANTED IN
    PART and DENIED AS MOOT IN PART**, as detailed herein;

3.  Defendants and their successors in office are hereby enjoined from enforcing
    Minn. Stat. § 216H.03, subd. 3(2)–(3);

4.  Plaintiffs are not awarded their attorneys' fees incurred in this action; and

5.  Defendants' Motion to Strike Plaintiffs' Demand for a Jury Trial, Amend the
    Scheduling Order, and Set the Case for a Trial to the Court [Doc. No. 123] is
    **DENIED AS MOOT**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  April 18, 2014                            s/Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge

Appellate Case: 14-2156   Page: 50   Date Filed: 11/04/2014 Entry ID: 4213079

## 216H.03 FAILURE TO ADOPT GREENHOUSE GAS CONTROL PLAN.

Subdivision 1. **Definition; new large energy facility.** For the purpose of this section, "new large energy facility" means a large energy facility, as defined in section 216B.2421, subdivision 2, clause (1), that is not in operation as of January 1, 2007, but does not include a facility that (1) uses natural gas as a primary fuel, (2) is designed to provide peaking, intermediate, emergency backup, or contingency services, (3) uses a simple cycle or combined cycle turbine technology, and (4) is capable of achieving full load operations within 45 minutes of startup for a simple cycle facility, or is capable of achieving minimum load operations within 185 minutes of startup for a combined cycle facility.

Subd. 2. **Definition; statewide power sector carbon dioxide emissions.** For the purpose of this section, "statewide power sector carbon dioxide emissions" means the total annual emissions of carbon dioxide from the generation of electricity within the state and all emissions of carbon dioxide from the generation of electricity imported from outside the state and consumed in Minnesota. Emissions of carbon dioxide associated with transmission and distribution line losses are included in this definition. Carbon dioxide that is injected into geological formations to prevent its release to the atmosphere in compliance with applicable laws, and emissions of carbon dioxide associated with the combustion of biomass, as defined in section 216B.2411, subdivision 2, paragraph (c), clauses (1) to (4), are not counted as contributing to statewide power sector carbon dioxide emissions.

Subd. 3. **Long-term increased emissions from power plants prohibited.** Unless preempted by federal law, until a comprehensive and enforceable state law or rule pertaining to greenhouse gases that directly limits and substantially reduces, over time, statewide power sector carbon dioxide emissions is enacted and in effect, and except as allowed in subdivisions 4 to 7, on and after August 1, 2009, no person shall:

(1) construct within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions;

(2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or

(3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions. For purposes of this section, a long-term power purchase agreement means an agreement to purchase 50 megawatts of capacity or more for a term exceeding five years.

Subd. 4. **Exception for facilities that offset emissions.** (a) The prohibitions in subdivision 3 do not apply if the project proponent demonstrates to the Public Utilities Commission's satisfaction that it will offset the new contribution to statewide power sector carbon dioxide emissions with a carbon dioxide reduction project identified in paragraph (b) and in compliance with paragraph (c).

(b) A project proponent may offset in an amount equal to or greater than the proposed new contribution to statewide power sector carbon dioxide emissions in either, or a combination of both, of the following ways:

(1) by reducing an existing facility's contribution to statewide power sector carbon dioxide emissions; or

(2) by purchasing carbon dioxide allowances from a state or group of states that has a carbon dioxide cap and trade system in place that produces verifiable emissions reductions.

(c) The Public Utilities Commission shall not find that a proposed carbon dioxide reduction project identified in paragraph (b) acceptably offsets a new contribution to statewide power sector carbon dioxide

Copyright © 2014 by the Revisor of Statutes, State of Minnesota. All Rights Reserved.

**Add. 49**

emissions unless the proposed offsets are permanent, quantifiable, verifiable, enforceable, and would not have otherwise occurred. This section does not exempt emissions that have been offset under this subdivision and emissions exempted under subdivisions 5 to 7 from a cap and trade system if adopted by the state.

Subd. 5. **Exception for new steel production facility.** The prohibitions in subdivision 3 do not apply to increases in statewide power sector carbon dioxide emissions from a new steel production project located in a taconite relief area that has filed an application for an air quality permit from the Pollution Control Agency prior to January 1, 2007.

Subd. 6. **Exception for iron nugget production facility.** The prohibitions in subdivision 3 do not apply to an iron nugget production facility that began construction prior to January 31, 2007, nor to associated mining activities and beneficiation facilities with a concentrate capacity of up to three million tons annually. For the purposes of this subdivision, "iron nugget" means a product with at least 90 percent iron content.

Subd. 7. **Other exemptions.** The prohibitions in subdivision 3 do not apply to:

(1) a new large energy facility under consideration by the Public Utilities Commission pursuant to proposals or applications filed with the Public Utilities Commission before April 1, 2007, or to any power purchase agreement related to a facility described in this clause. The exclusion of pending proposals and applications from the prohibitions in subdivision 3 does not limit the applicability of any other law and is not an expression of legislative intent regarding whether any pending proposal or application should be approved or denied;

(2) a contract not subject to commission approval that was entered into prior to April 1, 2007, to purchase power from a new large energy facility that was approved by a comparable authority in another state prior to that date, for which municipal or public power district bonds have been issued, and on which construction has begun;

(3) a new large energy facility or a power purchase agreement between a Minnesota utility and a new large energy facility located outside Minnesota that the Public Utilities Commission has determined is essential to ensure the long-term reliability of Minnesota's electric system, to allow electric service for increased industrial demand, or to avoid placing a substantial financial burden on Minnesota ratepayers. An order of the commission granting an exemption under this clause is stayed until the June 1 following the next regular or annual session of the legislature that begins after the date of the commission's final order; or

(4) a new large energy facility with a combined electric generating capacity of less than 100 megawatts, which did not require a Minnesota certificate of need, which received an air pollution control permit to construct from an adjoining state before January 1, 2008, and on which construction began before July 1, 2008, or to any power purchase agreement related to a facility described in this clause.

Subd. 8. **Enforcement.** Whenever the commission or the Department of Commerce determines that any person is violating or about to violate this section, it may refer the matter to the attorney general who shall take appropriate legal action. This section may be enforced by the attorney general on the same basis as a law listed in section 8.31, subdivision 1, except that the remedies provided by section 8.31, subdivision 3a, do not apply to a violation of this section.

**History:** *2007 c 136 art 5 s 3; 2011 c 97 s 30*

Copyright © 2014 by the Revisor of Statutes, State of Minnesota. All Rights Reserved.

**Add. 50**

# CERTIFICATE OF SERVICE

**Re:** ***State of North Dakota, et al. v. Beverly Heydinger, Commissioner and Chair, Minnesota Public Utilities Commission, et al.,***
**Eighth Circuit Case Nos. 14-2156 and 14-2251**

I hereby certify that on November 3, 2014, I electronically submitted the Addendum of Appellants/Cross-Appellees Beverly Heydinger, Commissioner and Chair, Minnesota Public Utilities Commission, et al., to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

s/Alethea M. Huyser