# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

STATE OF NORTH DAKOTA, *ET AL.*,

      Appellees/Cross-Appellants,

      v.

BEVERLY HEYDINGER, COMMISSIONER AND CHAIR, MINNESOTA PUBLIC UTILITIES COMMISSION, *ET AL.*,

      Appellants/Cross-Appellees.

Case Nos. 14-2156 & 14-2251

## MOTION OF ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL LAW & POLICY CENTER, NATURAL RESOURCES DEFENSE COUNCIL, AND SIERRA CLUB FOR LEAVE TO FILE AN *AMICUS CURIAE* BRIEF IN SUPPORT OF APPELLANTS

Pursuant to Federal Rule of Appellate Procedure 29(b), Environmental Defense Fund ("EDF"), Environmental Law and Policy Center ("ELPC"), Natural Resources Defense Council ("NRDC"), and Sierra Club (collectively, "Movants") respectfully request leave of the Court to file the accompanying *amicus curiae* brief in support of Appellants/Cross-Appellees Beverly Heydinger, *et al*. Movants have conferred with counsel for Appellants and Appellees, who indicated that they do not intend to oppose this motion.

## I. Movants' Interest in this Proceeding

Movants are nonpartisan, nonprofit organizations that have done extensive work in Minnesota, North Dakota, and across the country to promote renewable energy sources, reduce greenhouse gas pollution and other forms of air pollution, and to defend against legal challenges to policies advancing these goals. Movants believe that their expertise will be useful to the Court in considering this case.

Movants have significant interests that would be adversely affected if the Court were to affirm the decision of the district court. The district court enjoined the enforcement of provisions of Minnesota's Next Generation Energy Act ("NGEA") that encourage greater use of clean energy to supply Minnesota's electricity needs. Movants have an interest in maintaining the NGEA's role in promoting renewable energy generation and resultant decreases in greenhouse gases. Increased renewable energy generation will help advance new clean energy technologies and equipment, providing benefits for cost-effective renewable energy development nationwide. The district court's decision also removed an important incentive for coal-fired power plants to either capture or offset their carbon emissions. Movants have an interest in controlling carbon pollution from such plants, the nation's single largest source of greenhouse gas emissions.

Appellate Case: 14-2156     Page: 2     Date Filed: 11/10/2014 Entry ID: 4215230

Movants' interest in this controversy is long standing. One of the Movants, ELPC, advocated for passage of the NGEA. After their motion to intervene was denied below, all of the Movants participated in the district court proceedings as *amici curiae*.

## II. Movants Bring a Perspective and Depth of Expertise on the Relevant Issues that Should Aid the Court in its Consideration of this Case

Based on their experiences advocating for and defending the enactment and implementation of laws promoting renewable energy resources and reducing greenhouse gas pollution, Movants are knowledgeable about the purposes, design and implementation of state laws like Minnesota's NGEA. Moreover, Movants have significant experience litigating the dormant Commerce Clause and other legal issues presented by this case, and their perspective and expertise can help inform the Court's disposition of this case.

EDF, ELPC, NRDC and Sierra Club have litigated dormant Commerce Clause challenges to state environmental legislation, specifically state greenhouse gas reduction legislation. Together with the State of California, EDF, NRDC and Sierra Club successfully defended that state's Low Carbon Fuel Standard against a dormant Commerce Clause challenge in the Ninth Circuit. *See Rocky Mountain Farmer's Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013), *cert. denied* 134 S. Ct. 2875 (2014) ("*RMFU*"). As discussed in the district court's decision, Minn. Appx.

3

451–53, the *RMFU* case presented a legal issue similar to that presented in this case. Similarly, Sierra Club was a defendant-intervenor in the district court and is currently an appellee in the Tenth Circuit Court of Appeals in *Energy & Environment Legal Institute v. Epel*, 2014 U.S. Dist. LEXIS 64285 (D. Colo. May 1, 2014), 10th Cir. No. 14-1216, which, like this case, is a dormant Commerce Clause challenge to a state law promoting renewable energy.

In addition to the dormant Commerce Clause issues, Movants have significant expertise in the other legal and technical issues raised in this case. Movants have extensive knowledge of the electric sector, having engaged in scores of public utilities commission ("PUC") proceedings around the country related to proposed and existing power plants, transmission lines and related infrastructure, as well as utility planning and rate cases. For example, ELPC has engaged in many proceedings involving renewable energy issues, greenhouse gas pollution and ratemaking issues before several Midwest PUCs as well as before the Federal Energy Regulatory Commission ("FERC"). EDF, NRDC, and Sierra Club also have extensive experience before FERC and state PUCs in the Midwest and nationwide on a range of issues involving clean energy and greenhouse gas pollution.

Appellate Case: 14-2156    Page: 4    Date Filed: 11/10/2014 Entry ID: 4215230

Movants' proposed *amicus* brief provides important legal, technical, and factual information relevant to the Court's consideration of how the NGEA works, how a ruling might potentially affect other legislation and clean energy policies in Minnesota and around the country, and how this legislation should be evaluated under the governing constitutional and statutory law. Movants respectfully submit that consideration of the attached *amicus* brief will assist the Court in its consideration of this important case.

## CONCLUSION

Movants should be granted leave to submit an *amicus curiae* brief in support of Appellants.

Dated: November 10, 2014

Respectfully submitted,

/s/ Sean H. Donahue

Graham G. McCahan
Vickie L. Patton
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 447-7228
gmccahan@edf.org

*Counsel for Environmental
  Defense Fund*

Sean H. Donahue
Donahue & Goldberg, LLP
1130 Connecticut Ave., NW
Suite 950
Washington, DC 20036
(202) 277-7085
sean@donahuegoldberg.com

*Counsel for Environmental
  Defense Fund*

Appellate Case: 14-2156    Page: 5    Date Filed: 11/10/2014 Entry ID: 4215230

Joanne Spalding
Sierra Club
85 Second Street, Second Floor
San Francisco, CA  94105
(415) 977-5725
joanne.spalding@sierraclub.org

*Counsel for Sierra Club*

Howard A. Learner
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1300
Chicago, IL  60601-2110
(312) 673-6500
hlearner@elpc.org

*Counsel for Environmental Law &
   Policy Center*

Benjamin Longstreth
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC  20005
(202) 289-6868
blongstreth@nrdc.org

*Counsel for Natural Resources
   Defense Council*

Appellate Case: 14-2156    Page: 6    Date Filed: 11/10/2014 Entry ID: 4215230

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(c)(1), *amici curiae* provide the following corporate disclosure statement:

*Amici curiae* Environmental Defense Fund, Environmental Law and Policy Center, Natural Resources Defense Council, and Sierra Club state that they are nonprofit organizations focused on protection of public health and the environment, and that they have no outstanding shares or debt securities in the hands of the public, nor any parent, subsidiary or affiliate that has issued shares or debt securities to the public.

/s/ Sean H. Donahue

Joanne Spalding
Sierra Club
85 Second Street, Second Floor
San Francisco, CA  94105
(415) 977-5725
joanne.spalding@sierraclub.org

*Counsel for Sierra Club*

Howard A. Learner
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1300
Chicago, IL  60601-2110
(312) 673-6500
hlearner@elpc.org

*Counsel for Environmental Law &*
 *Policy Center*

Sean H. Donahue
Donahue & Goldberg, LLP
1130 Connecticut Ave., NW
Suite 950
Washington, DC 20036
(202) 277-7085
sean@donahuegoldberg.com

Graham G. McCahan
Vickie L. Patton
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 447-7228
gmccahan@edf.org

*Counsel for Environmental*
 *Defense Fund*

7

Benjamin Longstreth
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC  20005
(202) 289-6868
blongstreth@nrdc.org

*Counsel for Natural Resources
  Defense Council*

8

Nos. 14-2156 & 14-2251
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
_____

STATE OF NORTH DAKOTA, *ET AL.*,

Appellees/Cross-Appellants,

v.

BEVERLY HEYDINGER, COMMISSIONER AND CHAIR,
MINNESOTA PUBLIC UTILITIES COMMISSION, *ET AL.*,

Appellants/Cross-Appellees.
_____

On Appeal from the United States District Court
for the District of Minnesota
_____

**BRIEF OF *AMICI CURIAE* ENVIRONMENTAL DEFENSE FUND,
ENVIRONMENTAL LAW AND POLICY CENTER, NATURAL
RESOURCES DEFENSE COUNCIL, AND SIERRA CLUB IN SUPPORT
OF APPELLANTS/CROSS-APPELLEES**

Joanne Spalding
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
(415) 977-5725
joanne.spalding@sierraclub.org

*Counsel for Sierra Club*

Sean H. Donahue
Donahue & Goldberg, LLP
1130 Connecticut Ave., NW
Suite 950
Washington, DC 20036
(202) 277-7085
sean@donahuegoldberg.com

*Counsel for Environmental Defense
Fund*

*Additional Counsel Listed Inside the Cover*

Howard A. Learner
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1300
Chicago, IL  60601-2110
(312) 673-6500
hlearner@elpc.org

*Counsel for Environmental Law &*
  *Policy Center*

Benjamin Longstreth
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC  20005
(202) 289-6868
blongstreth@nrdc.org

*Counsel for Natural Resources*
  *Defense Council*

Graham G. McCahan
Vickie L. Patton
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 447-7228
gmccahan@edf.org

*Counsel for Environmental*
  *Defense Fund*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(c)(1), *amici curiae* provide the following corporate disclosure statement:

*Amici curiae* Environmental Defense Fund, Environmental Law and Policy Center, Natural Resources Defense Council, and Sierra Club state that they are nonprofit organizations focused on protection of public health and the environment, and that they have no outstanding shares or debt securities in the hands of the public, nor any parent, subsidiary or affiliate that has issued shares or debt securities to the public.

/s/ Sean H. Donahue

Joanne Spalding
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
(415) 977-5725
joanne.spalding@sierraclub.org

*Counsel for Sierra Club*

Howard A. Learner
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1300
Chicago, IL 60601-2110
(312) 673-6500
hlearner@elpc.org

*Counsel for Environmental Law &
Policy Center*

Sean H. Donahue
Donahue & Goldberg, LLP
1130 Connecticut Ave., NW
Suite 950
Washington, DC 20036
(202) 277-7085
sean@donahuegoldberg.com

Graham G. McCahan
Vickie L. Patton
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 447-7228
gmccahan@edf.org

*Counsel for Environmental
Defense Fund*

i

Benjamin Longstreth
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC  20005
(202) 289-6868
blongstreth@nrdc.org

*Counsel for Natural Resources*
  *Defense Council*

ii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ...............................................................................v

INTEREST OF THE *AMICI CURIAE* ..................................................................1

BACKGROUND ..............................................................................................1

SUMMARY OF ARGUMENT .............................................................................2

ARGUMENT ...................................................................................................4

I.      PLAINTIFFS LACK ARTICLE III STANDING...........................................4

    A.   Plaintiffs Do Not Have Standing to Challenge the New Plant Provision.....4

        *1. The Dry Fork Plant.* ...............................................................4
        *2.  The Selby Plant.* ..................................................................9
        *3.  The CTL Plant.* ...................................................................10
        *4.  South Heart.* .....................................................................12
        *5.  Sutherland 4.* .....................................................................13

    B.   Plaintiffs Do Not Have Standing to Challenge the PPA Provision. ...........15

II.     THE DISTRICT COURT IMPROPERLY ISSUED AN INJUNCTION
        IN A FACIAL CHALLENGE...................................................................16

III.    THE NGEA DOES NOT VIOLATE THE DORMANT COMMERCE
        CLAUSE EXTRATERRITORIALITY DOCTRINE. ...................................18

    A.  The District Court's Extraterritoriality Ruling Was the Result of the
        Court's Erroneous and Extreme Reading of the NGEA...............................18

    B.  Properly Construed, the NGEA Does Not Violate the Extraterritoriality
        Doctrine. .....................................................................................20

IV.     THE NGEA DOES NOT DISCRIMINATE AGAINST INTERSTATE
        COMMERCE. ...............................................................................24

Appellate Case: 14-2156     Page: 13     Date Filed: 11/10/2014 Entry ID: 4215230

V.     THE FEDERAL POWER ACT DOES NOT PREEMPT THE NGEA........26

VI.    THE CLEAN AIR ACT DOES NOT PREEMPT THE NGEA. ..................28

CONCLUSION .....................................................................................................31

CERTIFICATE OF COMPLIANCE.......................................................................32

Appellate Case: 14-2156    Page: 14    Date Filed: 11/10/2014 Entry ID: 4215230

# TABLE OF AUTHORITIES

**Cases**

*1-800-411-Pain Referral Service LLC v. Otto*,
   744 F.3d 1045 (8th Cir. 2014) ...............................................................17

*Am. Elec. Power Co. v. Connecticut*,
   131 S. Ct. 2527 (2011) ........................................................................29

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
   729 F.3d 937 (9th Cir. 2013) ...............................................................24

*Barrett v. Claycomb*,
   705 F.3d 315 (8th Cir. 2013) ...............................................................17

*Cotto Waxo Co. v. Williams*,
   46 F.3d 790 (8th Cir. 1995) ............................................. 18, 20, 21, 24

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008).............................................................................4

*Eckles v. City of Corydon*,
   341 F.3d 762 (8th Cir. 2003) .................................................................9

*Energy and Env't Legal Inst. v. Epel*,
   2014 U.S. Dist. LEXIS 64285 (D. Colo. May 12, 2014) ............................ 22, 23

*Exxon Corp. v. Governor of Maryland*,
   437 U.S. 117 (1978)...........................................................................25

*Hall v. LHACO, Inc.*,
   140 F.3d 1190 (8th Cir. 1998) .............................................................10

*Hampton Feedlot, Inc. v. Nixon*,
   249 F.3d 814 (8th Cir. 2001) ...............................................................21

*Healy v. Beer Inst.*,
   491 U.S. 324 (1989)...........................................................................20

*In re Cal. PUC*,
   134 FERC ¶ 61,044 (2011) .................................................................27

v

Appellate Case: 14-2156   Page: 15   Date Filed: 11/10/2014 Entry ID: 4215230

*In re Midwest Power Sys., Inc.*,
78 FERC ¶ 61,067 (1997) ...................................................................27

*In re S. Cal. Edison Co.*,
70 FERC ¶ 61,215 (1995) ...................................................................27

*In re S. Cal. Edison Co.*,
71 FERC ¶ 61,269 (1995) ...................................................................27

*Int'l Truck & Engine Corp. v. Bray*,
372 F.3d 717 (5th Cir. 2004) ...............................................................26

*Iowa Right to Life Committee v. Tooker*,
717 F.3d 576 (8th Cir. 2013) .................................................................8

*Lane v. Holder*,
703 F.3d 668 (4th Cir. 2012) ...............................................................14

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) .................................................................7

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ...........................................................................10

*Minnesota v. Clover Leaf Creamery Co.*,
449 U.S. 456 (1981) ..................................................................... 24, 25

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) ................................................................21

*Norfolk S. Corp. v. Oberly*,
822 F.2d 388 (3d Cir. 1987) ................................................................25

*Nw. Century Pipeline Corp. v. State Corp. Comm'n of Kan.*,
489 U.S. 493 (1989) ...........................................................................26

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*,
511 U.S. 93 (1994) .............................................................................24

*Pharmaceutical Research and Manufacturers of America v. Walsh*,
538 U.S. 644 (2003) ..................................................................... 21, 22

*Rocky Mountain Farmers Union v. Corey*,
730 F.3d 1070 (9th Cir. 2013) ....................................... 21, 22, 23

vi

*S.C. Pub. Serv. Auth. v. FERC,*
   762 F.3d 41 (D.C. Cir. 2014) ............................................................28

*SPGGC, LLC v. Blumenthal,*
   505 F.3d 183 (2d Cir. 2007) ...........................................................24

*United States v. Salerno,*
   481 U.S. 739 (1987) ....................................................................3, 16

*Younger v. Harris,*
   401 U.S. 37 (1971) ...........................................................................8

## Federal Statutes

16 U.S.C. § 824(b) ...............................................................................26

42 U.S.C. § 7416 ..................................................................................29

42 U.S.C. § 7543(a) ..............................................................................30

## State Statutes

Minn. Stat. § 216H.03, Subd. 1 ..............................................................1

Minn. Stat. § 216H.03, Subd. 3(2) ..........................................................1

Minn. Stat. § 216H.03, Subd. 3(3) .......................................................1, 2

Minn. Stat. § 216H.03, Subd. 8 ..............................................................9

Minn. Stat. § 216H.03, Subds. 5–7 .......................................................25

## Federal Register

75 Fed. Reg. 80,488 (December 22, 2010) .............................................10

FERC Order 888, 61 Fed. Reg. 21,540 (May 10, 1996) ..........................27

Appellate Case: 14-2156    Page: 17    Date Filed: 11/10/2014 Entry ID: 4215230

FERC Order No. 1000 ¶ 484, 76 Fed. Reg. 49,842 (August 11, 2011) ..................28

## Other Authorities

*Incorporating Energy Efficiency/Renewable Energy in State and Tribal Implementation Plans*, http://www.epa.gov/airquality/eere/ ...............................29

Lignite Vision 21 Program, *Great Northern Project Development—South Heart*, http://www.lignitevision21.com /currentprojects/greatnorthernpower. html (last visited Nov. 7, 2014)............................................................................13

Regional Greenhouse Gas Initiative, State Statutes and Regulations (available at https://www.rggi.org/design/regulations) (last visited Nov. 10, 2014) ..........29

*Roadmap for Incorporating Energy Efficiency/Renewable Energy Policies and Programs into State and Tribal Implementation Plans*, http://www.epa.gov/airquality/eere/pdfs/ EEREmanual.pdf (last visited Nov. 10, 2014).............................................................................................29

U.S. Department of Energy, *Hydrogen from Coal*, http://energy.gov/fe/science-innovation/clean-coal-research/hydrogen-coal (last visited Nov. 7, 2014).........12

U.S. EPA, *Renewable Portfolio Standards*, http://www.epa.gov/agstar/tools/ funding/renewable.html (last visited Nov. 7, 2014) ...........................................27

Appellate Case: 14-2156    Page: 18    Date Filed: 11/10/2014 Entry ID: 4215230

# INTEREST OF THE *AMICI CURIAE*

*Amici curiae* Environmental Defense Fund, Environmental Law and Policy Center, Natural Resources Defense Council, and Sierra Club (the "Environmental Groups") are national and regional, nonpartisan, nonprofit organizations that work to promote renewable energy sources and reduce greenhouse gas pollution. *Amici* have separately moved for leave to file this brief pursuant to Fed. R. App. P. 29(b).

No party, counsel for any party, or anyone aside from the Environmental Groups, either authored any part of or contributed any money toward the preparation or submission of this brief.

# BACKGROUND

The two provisions of Minnesota's Next Generation Energy Act ("NGEA"; Minn. Stat. § 216H.03, Subds. 3(2)–3(3)) at issue state that "no person shall":

> (2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions [the "New Plant Provision"]; or

> (3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions. For purposes of this section, a long-term power purchase agreement means an agreement to purchase 50 megawatts of capacity or more for a term exceeding five years [the "PPA Provision"].

The NGEA defines "new large energy facility" in relevant part as a coal-fired power plant that began operation after January 1, 2007. Minn. Stat. § 216H.03, Subd. 1. The New Plant Provision (Subd. 3(2)) does not allow anyone to "import"

1

or "commit to import" power into Minnesota from a new out-of-state coal-fired power plant unless the carbon dioxide resulting from that power generation is offset. In contrast, the PPA Provision (Subd. 3(3)) applies to only the specific contractual arrangement known as a "power purchase agreement" ("PPA"), and to only a limited set of those (PPAs for 50 megawatts or more, and for a term of more than 5 years). The PPA Provision applies to PPAs with existing, as opposed to new, plants. (The New Plant Provision already bars all transactions—including PPAs—with new plants.) Finally, while the New Plant Provision applies to any emissions that "contribute" to Minnesota carbon dioxide emissions, the PPA Provision only applies to emissions that would "increase" Minnesota carbon dioxide emissions.

## SUMMARY OF ARGUMENT

Neither on their face, nor under any reasonable interpretation, could these provisions be deemed to apply to transactions taking place entirely outside of Minnesota and thereby run afoul of the dormant Commerce Clause. Neither of the two administering agencies—the Minnesota Public Utilities Commission ("PUC") and the Minnesota Department of Commerce ("MDOC")—so interpret the NGEA. To the contrary, they have interpreted it to not apply to those transactions, they have never attempted to enforce it against those transactions, and they expressly disavowed any ability or intention to do so. As Minnesota explains, Br. 34–43,

2

neither of these provisions applies to power sales to or from the regional Midcontinent Independent System Operator ("MISO"). The PPA Provision, on its face, only applies to the power purchase agreements specified therein. Both the PPA Provision and the New Plant Provision, as interpreted by all three of the relevant state agencies (the PUC, MDOC and the Attorney General), apply only to Minnesota retail utilities' ownership of, or a PPA with, a power plant for purposes of serving Minnesota retail consumers.

The district court's conclusion that the NGEA applies extraterritorially thus lacks the necessary foundation. Moreover, no plaintiff has standing, because none has been injured or could reasonably anticipate future injury when the state has never applied it to such transactions and categorically insists it cannot do so.

The court's decision to enjoin these provisions in their entirety also violates the doctrine that in a facial challenge—as here—a court may not enjoin a statute unless "no set of circumstances exists under which [it] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Holding only that these provisions violated the dormant Commerce Clause if applied to wholly out-of-state transactions, the court nevertheless enjoined them as applied to transactions where one or both parties are within Minnesota, where the extraterritoriality doctrine does not apply.

3

As to the merits issues that the district court did not reach, neither of these provisions violates the other dormant Commerce Clause doctrines, nor are they preempted by the Federal Power Act or the Clean Air Act.

## ARGUMENT

## I.    PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs must separately establish standing as to both the New Plant Provision and the PPA Provision: "'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

### A.    Plaintiffs Do Not Have Standing to Challenge the New Plant Provision.

The district court discussed only two plants that would be subject to the New Plant Provision, Minn. Appx. 434–35, and neither supports plaintiffs' standing.

*1. The Dry Fork Plant.* Plaintiffs' professed "injury" related to Basin Electric's Dry Fork plant is that because MDOC "has indicated" that Dry Fork's power "triggers the NGEA," Basin has "serious concerns . . . about its future use of Dry Fork," that  MDOC's position "also raises concerns about the possible development of future projects" (Plaintiffs' Memo. of Law in Support of Motion for Summary Judgment 11, Dist. Ct. Doc. 137 (filed September 5, 2013) ("Pl. SJ

4

Br.")), and that "Basin Electric undertakes actions on a daily basis that might be construed to be violations of [the New Plant Provision] given the expansive interpretations of this provision offered by [MDOC] in the Dairyland and Basin Electric dockets." Minn. Appx. 302.

These facts do not establish a valid injury. The PUC opened the Basin Electric docket after Basin filed a notice stating that its new Dry Fork Station ("DFS") in Wyoming would soon begin operating, and that power transfers from DFS into the Eastern Interconnection will occur to serve increased load in northwestern North Dakota. Minn. Appx. 398. "As a result of these transfers," Basin asserted, "it is possible to argue that *theoretically*, a portion of DFS power delivered to the Eastern Interconnection to serve the new load in North Dakota, might end up serving Basin Electric's members in Minnesota," and thus the NGEA "could be interpreted to condition or prohibit the above described transfers necessary for Basin Electric to serve its customers." *Id.* (emphasis added).

MDOC responded by recommending that the PUC ask Basin to provide "Basin's legal interpretation as to whether the provision of power to MISO was a violation of Minnesota Statutes 216H.03." Minn. Appx. 403. Even plaintiffs concede that all MDOC did was ask for Basin's interpretation of whether the NGEA applied to MISO sales: "MDOC recommended that the [PUC] require

5

Basin Electric to submit an analysis as to 'whether the provision of power to MISO'" violated the NGEA.  Pl. SJ Br. 19.

The PUC asked Basin to provide this analysis, and Basin did so.  MDOC responded that while Basin's submission was "helpful," it was "not yet possible to draw conclusions as to whether the operation of the Cooperative's Dry Fork Station violates Minn. Stat. §216H.03," and requested "additional information regarding the operation of Dry Fork Station."  Envtl. Appx. 18–19 (MDOC Comments, February 21, 2012).  Basin provided the requested follow-up information, Minn. Appx. 408–10, and that was the end of the matter.  No further documents were filed, and the PUC issued an order—which made no mention of this issue—closing the docket without requiring action by any party.  Envtl. Appx. 23 (PUC Order, December 19, 2012).

Despite the PUC's and MDOC's acceptance of Basin's conclusion that the New Plant Provision did not apply to Dry Fork's transactions, Appellees claim that "the [PUC] has since been silent on the issue," Pl. SJ Br. 19, and, as a result, "Basin Electric remains concerned and faces continuing uncertainty and apprehension about whether the MPUC and MDOC contend that Basin Electric is violating the NGEA."  Minn. Appx. 293.

This is pure bootstrapping.  The PUC was not "silent;" it closed the Basin docket without saying anything further about this issue, which is precisely what

6

Basin asked the PUC to do. As the district court recognized, "Basin Electric submitted the information but suggested that the issue be deferred pending the outcome of this litigation." Minn. Appx. 426. Basin cannot rest its standing on "theoretical" "concerns" and "apprehension" about the PUC's silence *when the PUC has been silent at Basin's own request*.

More importantly, "plaintiffs' claims of future harm lack credibility when . . . the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs." *Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010) (emphasis added):

> [W]e have held that plaintiffs did not demonstrate the necessary injury in fact *where the enforcing authority expressly interpreted the challenged law as not applying to the plaintiffs' activities*. Thus, a group of school teachers did not have standing to challenge an Oregon textbook selection statute when both the Oregon Attorney General and the school district's lawyer "disavowed any interpretation of [the statute] that would make it applicable in any way to teachers."

*Id.* at 788, *quoting Johnson v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983). Here, all three of the relevant state agencies—the PUC, MDOC, and the Attorney General— have expressly said that the New Plant Provision does not apply to MISO transactions in general, or to Dry Fork's sales in particular, and that they have no intention of ever enforcing the NGEA as to those transactions. Thus, it is impossible for plaintiffs to show a "credible threat" of enforcement.

Moreover, even if MDOC had not affirmatively stated that the New Plant Provision does not apply to Dry Fork's transactions, MDOC's *questions* in the

Appellate Case: 14-2156    Page: 25    Date Filed: 11/10/2014 Entry ID: 4215230

Basin Docket simply cannot rise to the required level of a "credible threat" of enforcement. *See Younger v. Harris*, 401 U.S. 37, 42 (1971) (plaintiffs' mere claim that they "feel inhibited" by prospect of enforcement was insufficient to support Article III jurisdiction).

This Court has specifically held that—like here—an agency merely posing questions and saying it needed more information does not create a credible threat of enforcement. In *Iowa Right to Life Committee v. Tooker*, 717 F.3d 576 (8th Cir. 2013), the district court held that IRTL lacked standing to challenge statutory definitions of "political committee" and "permanent organization" after the Iowa Supreme Court (on certified questions) held that IRTL was neither of those because its "major purpose" was not express advocacy for specific candidates. IRTL claimed, however, that it remained at risk of being classified as either a "political committee" or a "permanent organization" because "Iowa has never admitted IRTL's major purpose is *not* express advocacy," and had questioned IRTL's position in hearing testimony and a State ethics board's advisory opinion. *Id.* at 585 (emphasis in original). This Court was unmoved: "IRTL's evidence that Iowa will deem it a PAC or permanent organization 'is unpersuasive and, at best, amounts to evidence of a conjectural or hypothetical injury.'" *Id.* at 587 (quoting *Nat'l Right to Life Political Action Comm. v Connor*, 323 F.3d 684, 690 (8th Cir. 2003)).

8

Finally, this Court has held that there is no credible threat of enforcement if the defendant lacks authority to enforce the statute. The NGEA provides only that: "Whenever the [PUC] or the Department of Commerce determines that any person is violating or about to violate this section, it may refer the matter to the attorney general who shall take appropriate legal action." Minn. Stat. § 216H.03, Subd. 8. In *Eckles v. City of Corydon*, 341 F.3d 762, 765–66 (8th Cir. 2003), lawyers for the Wayne County Board of Review sent the plaintiff two letters threatening legal action to enforce various ordinances. This Court held that "these two letters are insufficient to establish that Eckles was threatened with harm by the County," because—just as is the case with the PUC and MDOC—there is "no evidence that the County or Board of Review possessed the authority to enforce the City or State ordinances mentioned in its letters." *Id*. at 769.

It is clear that Basin does not face any "credible threat" of the New Plant Provision being enforced against Dry Fork.[1]

2. *The Selby Plant.* The district court also relied on Basin being "unable to accurately evaluate the costs associated with a new coal-fired generation plant in South Dakota." Minn. Appx. 435. While Basin testified that it "has considered

---

[1] Defendants have made it clear both in the Dry Fork PUC docket and in this litigation that Dry Fork faces no risk of enforcement. Accordingly, plaintiffs' allegations that an MDOC statement in a previous, unrelated PUC docket (Dairyland) dealing with a different power plant creates a "credible threat" of enforcement against Dry Fork are unpersuasive.

9

constructing" a plant in Selby, South Dakota, Minn. Appx. 294–95, in 2010 Basin notified the Department of Energy that it was "suspending further action" on the Selby plant, 75 Fed. Reg. 80,488 (December 22, 2010). Basin did not disclose this fact to the district court. Given that Basin stopped work on this project four years ago and provided no evidence of any intention of reviving it, plaintiffs thus fail to satisfy Article III's requirement of "actual" or "imminent" injury: "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) (emphasis in original). (To the extent plaintiffs rely on the Selby plant for purely *past* injury, that does not provide standing in a case seeking injunctive relief. *See Hall v. LHACO, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998).)

In addition to these two plants that the district court discussed, plaintiffs also claimed injury as to three other proposed projects. None provide a basis for standing because these plants will never be constructed for reasons unrelated to the NGEA.

*3. The CTL Plant.* Plaintiffs claim that the New Plant Provision "adversely affects" marketing of power from a proposed Coal-to-Liquids Plant ("CTL Plant"), owned by a subsidiary of plaintiff North American Coal Company ("NACCO"). Pl. SJ. Br. 13. Plaintiffs' only evidence about this project is a classic "someday"

10

declaration stating that NACCO is "seeking to develop" this plant.  Envtl. Appx. 25–26 (Dewing Decl. ¶ 5).

In fact, the CTL Plant was abandoned almost immediately after being announced as a proposed joint venture of NACCO, Great River Energy, and Headwaters, Inc.  After noting in its 2008 SEC Form 10-K, Envtl. Appx. 4, that "we believe that high capital costs necessitate government support for coal-to-liquids projects," Headwaters never again mentioned it in its SEC filings, even though the CTL Plant was supposed to be operating by "2012–2013," Envtl. Appx. 5 (Lignite Vision 21 Program Phase V Report).  The need for "government support" is understandable because of the CTL Plant's $4 billion price tag, and that only one such CTL facility exists anywhere in the world.  Envtl. Appx. 6 (World Coal Association webpage).  NACCO never even mentioned a word about the CTL Plant in any of it SEC filings.

Even more telling, in 2006 plaintiff Industrial Commission of North Dakota ("NDIC") advanced $1.7 million for "preliminary studies" for the project, Envtl. Appx. 8 (Project Summary), and set an April 2007 deadline for NACCO to either start on the initial, 3-year, $50 million "front end engineering and design process" study, Envtl. Appx. 9 (Status Report), or pay back the loan.  NDIC has since postponed that deadline six times, most recently to December 31, 2014.  Envtl.

11

Appx. 33 (*Power Engineering*, December 31, 2013). There is simply no evidence that the CTL Plant will ever be built.

*4. South Heart.* Plaintiffs' entire support for injury based on Great Northern Properties' South Heart plant is one sentence: That "[i]n the event that the Next Generation [sic] were repealed or held unconstitutional, I believe the South Heart Project could be operational within four years," Envtl. Appx. 29 (Kerr Decl. ¶ 5), *i.e.*, by 2017.

Not so. In 2003 Great Northern proposed South Heart Version 1 as a conventional coal-fired plant, Envtl. Appx. 11 (South Heart Grant Application), but in 2006 scrapped that in favor of Version 2, a coal gasification plant, *id*. at 13. In 2009, Great Northern ditched Version 2 for the current Version 3, a 175 megawatt coal-to-hydrogen facility, Envtl. Appx. 13 (Letter of Intent, December 13, 2010), that would be *the world's first such plant*: "there currently are no commercial demonstrations of these joint power and hydrogen plants," only "[c]onceptual plants [that] have been simulated using computer models to estimate technical and economic performance." U.S. Department of Energy, *Hydrogen from Coal*, http://energy.gov/fe/science-innovation/clean-coal-research/hydrogen-coal (last visited Nov. 7, 2014).

In 2009, when applying for federal support for this $2.2 billion project (which was denied), Great Northern said that Version 3 would be completed by

12

September 2016. Envtl. Appx. 10. In 2010, Great Northern told the North Dakota Public Service Commission ("PSC") that construction would not begin before July 2013, and would take 4 years. Envtl. Appx. 14. But, plaintiffs' counsel confirmed that Version 3 will "likely" not start construction until after 2015, Envtl. Appx. 16, and Great Northern has still not filed applications for required permits, Envtl. Appx. 31 (North Dakota PSC 2011–2013 Biennial Report). Moreover, on July 9, 2012, the PSC found—for the second time—that South Heart's application to develop the adjacent coal mine (the plant's fuel source) was technically deficient, and 18 months later was still waiting for Great Northern's response. Envtl. Appx. 32 (PSC Biennial Report). Plaintiff NDIC (which also provided funding for South Heart) says on its website that "[a] projected 36–42 month construction/startup period is currently slated to begin in late 2011/early 2012." Lignite Vision 21 Program, *Great Northern Project Development—South Heart*, http://www.lignitevision21.com/currentprojects/greatnorthernpower.html (last visited Nov. 7, 2014).

Like the CTL Plant, there is no evidence that South Heart will ever be built.

*5. Sutherland 4.* Plaintiff MRES has considered "transactions that would involve . . . the development of generation sources that would be considered new large energy facilities," Pl. SJ Br. 13, and claims injury because it "devoted significant resources towards evaluating the impact of the NGEA on the viability

13

and feasibility of the project," Minn. Appx. 323. To begin with, "MRES eventually abandoned the project after Alliant Energy dropped out of the project." *Id*. Because Sutherland 4 was never built (for reasons completely unrelated to the NGEA, Envtl. Appx. 1 (Alliant Energy Press Release, March 5, 2009)) there is no possible redress in this action for any injury to MRES stemming from its cancellation, and thus no standing. Moreover, MRES did not even suffer a cognizable past injury, because evaluating the applicability of a statute to one's conduct does not create Article III injury-in-fact. Such a rule would allow literally everyone to challenge every statute: "To determine that an organization that decides to spend its money on . . . undertaking litigation in response to legislation suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'" *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

In short, plaintiffs allege that the New Plant Provision would adversely affect five projects. Two (Selby and Sutherland 4) were never built for reasons unrelated to the NGEA. Even if the NGEA were somehow implicated in their demise—for which there is no evidence—enjoining the statute would not redress any alleged injury. Two others (the CTL Plant and South Heart) will never be built, again for reasons unrelated to the NGEA. Only one—Dry Fork—was ever

14

built, and the responsible state agencies have never enforced the NGEA against it, repeatedly affirming that they do not even have the ability to do so. Plaintiffs thus do not have sufficient, real injury to justify their standing to challenge the New Plant Provision.

## B. Plaintiffs Do Not Have Standing to Challenge the PPA Provision.

The district court cited injuries to three plaintiffs from this provision. MRES' injuries were that "it declined to purchase an interest in a coal-fired facility in Wisconsin [Edgewater 5] . . . because MRES was concerned that the transaction would have been viewed as a violation of Minn. Stat. § 216H.03;" Minnkota's interest was its concern "that sales of its surplus energy [from the Milton Young plant] will implicate Minn. Stat. § 216H.03 and that its surplus has been devalued because utilities are refusing to enter into long-term agreements with Minnkota;" and Basin is just generally "apprehensive about entering into long-term power purchase agreements to serve its increased load in states other than Minnesota." Minn. Appx. 434–35.

Plaintiffs' "concerns" and "apprehension" about the PPA Provision are yet further bootstrapping: They are based purely on their own interpretation of the PPA Provision, *because neither the MDOC nor PUC have ever applied or even interpreted it in any context prior to this litigation*. And, just as they did with

15

respect to the New Plant Provision, both agencies state unequivocally that the PPA Provision does not apply to MISO transactions.

Plaintiffs' "concerns" become even less persuasive given what their statutory interpretation is: not only do they read it to apply to MISO transactions, they also read it to bar PPAs "that would result in *any* carbon dioxide emissions." Pl. SJ Br. 12 (emphasis added). But that is not what the statute says. It only applies to PPAs that would "increase" Minnesota carbon dioxide emissions. And, as plaintiffs elsewhere concede, "[i]t is unclear how one determines whether any particular import or transaction actually increases statewide power sector carbon dioxide emissions" until the PUC determines what "increase" means. Minn. Appx. 290–91. Thus, plaintiffs' real complaint is that the PPA Provision is ambiguous, not that it is illegal. However, in the seven years since the NGEA was enacted, no plaintiff has asked the PUC to interpret what "increase" means.[2]

## II. THE DISTRICT COURT IMPROPERLY ISSUED AN INJUNCTION IN A FACIAL CHALLENGE.

Plaintiffs' facial challenges to these provisions fail because plaintiffs did not—and cannot—prove "that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. at 745. Having found only

---

[2] *Amici* agree with, but do not separately address, Minnesota's demonstrations that the plaintiffs' claims are not ripe, and that, at a minimum, the district court should have abstained before imposing on the statute an interpretation wildly at variance from that of the administering state officials. *See* Minn. Br. 31–34.

Appellate Case: 14-2156     Page: 34     Date Filed: 11/10/2014 Entry ID: 4215230

that the two provisions could apply to MISO transactions and thus inadvertently to entirely out-of-state power sales, the district court enjoined these provisions in their entirety. The district court expressly did not rule on claims that the New Plant or PPA Provisions were illegal when applied to out-of-state plants entering into contracts with Minnesota utilities. The injunction even bars applying the PPA Provision to PPAs *between Minnesota plants and Minnesota utilities*, which are transactions that even the plaintiffs do not challenge under the Commerce Clause. *See* Pl. SJ Br. 3 (complaining that NGEA is not limited to "only those persons or entities who are actually located in Minnesota," "Minnesota utilities that sell electricity directly to Minnesota consumers," or "transactions that occur within Minnesota's borders"). Such an injunction cannot be sustained under this Court's precedent:

> We reject the argument that Subdivisions 6(d)(2) and (3) are so unduly burdensome and unjustified that in no conceivable instance would such provisions ever be constitutional. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs have not shown, as they must, that the disclosure requirements are unconstitutional in all cases.

*1-800-411-Pain Referral Service LLC v. Otto*, 744 F.3d 1045, 1060 (8th Cir. 2014) (parallel citations omitted); *accord Barrett v. Claycomb*, 705 F.3d 315, 321 (8th Cir. 2013) ("[I]f Linn State's mandatory drug-testing policy 'could conceivably' be

17

implemented in such a way as to comply with the Fourth Amendment, Appellees' facial challenge must fail.")

## III. THE NGEA DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE EXTRATERRITORIALITY DOCTRINE.

The district court's sole basis for striking down the NGEA was its conclusion that the statute "violates the extraterritoriality doctrine." Minn. Appx. 444. The extraterritoriality doctrine "invalidates a state statute when the statute requires people or businesses to conduct their out-of-state commerce in a certain way." *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995).

The district court's ruling turned entirely upon a profound misunderstanding of the NGEA's application and operation. As Minnesota demonstrates, Minn. Br. 34–40, the district court imposed a far-fetched interpretation of the statute that overrides the NGEA's "unambiguous" meaning. The district court bypassed fundamental doctrines of judicial restraint. Properly construed as limited to transactions that serve Minnesota's retail electricity market, the NGEA is easily consistent with the dormant Commerce Clause.

### A. The District Court's Extraterritoriality Ruling Was the Result of the Court's Erroneous and Extreme Reading of the NGEA.

The district court concluded that any out-of-state entity that "injects electricity into the grid" is regulated by the NGEA, because that entity "cannot ensure that the electricity will not travel to and be removed in—in other words, be

18

imported to and contribute to statewide power sector carbon dioxide emissions in—Minnesota," Minn. Appx. 456, and that any non-Minnesota entity entering into a PPA with a non-Minnesota utility to satisfy its non-Minnesota load "cannot ensure that the electricity, when bid into the MISO market and dispatched, will not travel to and be removed in—in other words, increase statewide power sector carbon dioxide emissions in—Minnesota," Minn. Appx. 456–57.

The district court thus read the NGEA to apply to all entities providing power to the MISO grid, regardless of their location and despite the absence of any contractual relationship with Minnesota retail power providers. On this reading, the NGEA somehow represented an extraordinarily aggressive effort by Minnesota to regulate all power generating facilities in the entire 14-state MISO region regardless of whether they chose to transact business with Minnesota entities.[3] The actual NGEA, however, differs vastly from the regime that the district court described.

As the State explains: an entity selling or transferring power to parties outside of Minnesota, or selling power in Minnesota to serve load in other states, is not subject to the New Plant Provision because, under the plain language of the statute, such a party is not "importing" power into Minnesota that would

_____

[3] Indeed, *amici* noted below that this sweeping reading of the NGEA's scope would represent the "'paradigm'" of extraterritorial legislation. Minn. Appx. 458 (quoting oral argument).

19

"contribute to" Minnesota emissions. *See* Minn. Br. 36–40. Similarly, the PPA Provision only applies to Minnesota retail electricity providers that enter into long-term contracts for capacity to serve their Minnesota retail customers. *See id.* 40–43.

### B. Properly Construed, the NGEA Does Not Violate the Extraterritoriality Doctrine.

A proper understanding of the statute's operation is fatal to plaintiffs' extraterritoriality arguments. In all cases, the NGEA is limited to transactions in which at least one party is a Minnesota retail electricity provider, and thus does not "directly control commerce occurring wholly outside the boundaries" of Minnesota. *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). It imposes no restrictions on commerce between out-of-state entities and *non-Minnesota* entities with whom they may wish to do business: any electricity generator outside Minnesota can sell as much electricity, under whatever terms it chooses, to any customer outside Minnesota.

In *Cotto Waxo*, 46 F.3d 790, this Court rejected an out-of-state firm's extraterritoriality challenge to a Minnesota statute that prohibits sales in Minnesota of petroleum-based sweeping compounds. This Court noted that, despite having an obvious and significant impact on out-of-state firms (by banning them from selling their product in Minnesota), the statute did not violate the extraterritoriality

20

doctrine because it "is indifferent to sales occurring out-of-state. Cotto Waxo is able to sell to out-of-state purchasers regardless of Cotto Waxo's relationship to Minnesota." 46 F.3d at 794; *see Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 819 (8th Cir. 2001) (upholding Missouri statute requiring packers who bought livestock in Missouri to disclose prices, because statute was "indifferent to sales occurring out of state") (citing *Cotto Waxo*, 46 F.3d at 794).[4]

The Supreme Court has recently refused to extend the extraterritoriality doctrine where plaintiffs urged the Court to invalidate laws that do not directly regulate—but have effects on—out-of-state activity. In *Pharmaceutical Research and Manufacturers of America v. Walsh* ("*PhRMA*"), its only decision on the extraterritoriality doctrine in the last quarter-century, the Court strongly rejected an expansive conception of the doctrine akin to plaintiffs' position here. 538 U.S. 644, 668–69 (2003). Despite claims that the Maine drug rebate statute effectively regulated out-of-state commerce, *id.* at 650, the Supreme Court concluded that the statute did not have any impermissible effects under *Baldwin v. G.A.F. Seelig, Inc.*,

---

[4] *See also, e.g.*, *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1102–03 (9th Cir. 2013) ("*RMFU*") (holding that a California regulation of the full life-cycle carbon intensity of ethanol sold in California "says nothing at all about ethanol produced, sold, and used outside California," and "imposes no civil or criminal penalties on non-compliant transactions completed wholly out of state"), *cert. denied*, 134 S. Ct. 2875 (June 30, 2014); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001) (Vermont labeling law not extraterritorial, despite costs for manufacturers, because it did not regulate their sales elsewhere).

21

294 U.S. 511 (1935), or *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994),

because it did not control prices for out-of-state transactions. 538 U.S. at 669–70.[5]

*See RMFU*, 730 F.3d at 1103 (noting that the *PhRMA* Court "declined to extend

the [extraterritoriality] doctrine").

Plaintiffs also asserted more far-reaching arguments that the NGEA should

be regarded as extraterritorial simply because "electricity is electricity," and the

NGEA impermissibly regulates "how the goods were manufactured, not the quality

or character of the goods themselves." Pl. SJ Br. 25.

The district court did not reach these claims, which are equally meritless. In

*Energy and Env't Legal Inst. v. Epel*, 2014 U.S. Dist. LEXIS 64285 (D. Colo. May

12, 2014), *appeal docketed,* No. 14-1216 (10th Cir. June 2, 2014), the court

rejected just such an extraterritoriality challenge to a law that restricted the type of

electricity that may be sold based on the carbon dioxide emitted during its

generation:

> If a Wyoming coal company generates electricity and sells it to a
> South Dakota business, the Colorado Renewables Quota does not
> impact that transaction in any way. . . . Because the Renewables
> Quota does not affect commerce unless and until an out-of-state

---

[5] The two Justices who did not join the Court's opinion rejected that extraterritoriality claim based on the more categorical grounds that there is no constitutional basis for the "dormant" Commerce Clause. *PhRMA*, 538 U.S. at 674–75 (Scalia, J., concurring in the judgment) and *id.* at 683 (Thomas, J., concurring in the judgment).

Appellate Case: 14-2156    Page: 40    Date Filed: 11/10/2014 Entry ID: 4215230

electricity generator freely chooses to do business with a Colorado utility, it does not impermissibly control wholly out-of-state commerce.

2014 U.S. Dist. LEXIS 64285, at *19-20. The same analysis applies here.

Electricity is indeed electricity, but there is no constitutional rule that prohibits states from regulating their local utilities' procurement practices simply because different forms of power generation do not result in physical differences in the electricity produced. Such a rule would render unconstitutional core state PUC authority as it has existed for decades. *See*, *infra*, p. 27. In upholding a regulation predicated upon a characteristic (carbon intensity) that is not manifest in the fuel itself, the Ninth Circuit in *RMFU* specifically rejected the argument that state regulations cannot distinguish between physically identical products, noting that the challengers had "pointed to no extraterritoriality cases where differences in the physical structure of a product was a prerequisite to regulation." 730 F.3d at 1103–04.

The district court also erred in concluding that the NGEA was impermissible because "[i]f any or every state were to adopt similar legislation . . . the current marketplace for electricity would come to a grinding halt." Minn. Appx. 459. Not only was this conclusion premised on the serious misunderstanding that the NGEA regulates wholly out-of-state transactions, but courts have also resoundingly

23

rejected extraterritoriality challenges based on interactions with hypothetical, future regulations.[6]

## IV. THE NGEA DOES NOT DISCRIMINATE AGAINST INTERSTATE COMMERCE.

Plaintiffs alternatively claimed below that the NGEA "expressly discriminates against electricity generated by coal." Pl. SJ Br. 30. As Minnesota demonstrates in more detail, Br. 47–54, this type of alleged discrimination does not violate the dormant Commerce Clause.

The NGEA's restrictions apply "evenhandedly," *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471–72 (1981), "[r]egardless of the product's point of origin or point of destination," *Cotto Waxo*, 46 F.3d at 794. The Commerce Clause prohibits "differential treatment of in-state and out-of-state economic interests," not differential treatment of goods or services. *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.,* 511 U.S. 93, 99 (1994).

---

[6] *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 951 (9th Cir. 2013) ("[T]he [Supreme] Court has never invalidated a state or local law under the dormant Commerce Clause based upon mere speculation about the possibility of conflicting legislation.") (citation and internal quotation marks omitted), *cert. denied*, 2014 WL 5114098 (2014); *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 196 (2d Cir. 2007) ("There must be an actual conflict between the challenged regulation and those in place in other states.")

24

Plaintiffs claim that the NGEA "adversely affect[s] the demand and use of out-of-state coal to generate electricity." Pl. SJ Br. 30. But "nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry." *Clover Leaf Creamery*, 449 U.S. at 474; *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125 (1978) (rejecting discrimination challenge to statute requiring oil companies to divest of gas stations even though "the burden of the divestiture requirements falls solely on interstate companies"). Moreover, the NGEA creates opportunities for lower-carbon power providers, without regard to location.

Plaintiffs wrongly asserted below that the NGEA's exemptions discriminate against interstate commerce. The NGEA exempts five facilities, all but one of which had already begun construction or had vested interests in development before it was enacted, and two of which were located *outside* Minnesota. Minn. Stat. § 216H.03, Subds. 5–7. Courts have repeatedly noted that protecting "reliance interests" is a valid basis for legislative distinctions. *Clover Leaf Creamery*, 449 U.S. at 468; *see also Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 404 (3d Cir. 1987) ("Grandfather clauses which distinguish between new and preexisting operations are common vehicles for avoiding hardship to those who have invested in reliance upon the prior law.") These exemptions do not begin to

25

meet the high standard for proving discrimination through grandfathering. *See Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 727 (5th Cir. 2004) (a plaintiff "might succeed in raising an inference of discrimination, albeit a weak one, if it could show that [the statute] exempted all [in-state entities] but no out-of-state [entities]").

## V. THE FEDERAL POWER ACT DOES NOT PREEMPT THE NGEA.

The Federal Power Act ("FPA") grants the Federal Energy Regulatory Commission ("FERC") exclusive jurisdiction over wholesale electricity rates. *See* 16 U.S.C. § 824(b). Plaintiffs claim that the FPA preempts the NGEA because the NGEA supposedly "impos[es] restrictions and conditions upon the interstate transmission and sale of electricity at wholesale." Pl. SJ Br. 39.

This argument fundamentally misunderstands the NGEA, which imposes "restrictions and conditions" only on electricity sold within Minnesota. And *that*—regardless of any indirect impacts on FERC's jurisdiction—is a proper exercise of traditional state PUC authority over electricity providers. A state law that "impacts on matters within FERC's control" is not preempted so long as "the State's purpose [is] to regulate . . . subjects of state jurisdiction, and the means chosen [are] at least plausibly . . . related to matters of legitimate state concern." *Nw. Century Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 518 (1989). FERC itself has repeatedly confirmed that it will not "encroach upon state

26

authority in such traditional areas as . . .  *authority over utility generation and resource portfolios.*"  FERC Order 888, 61 Fed. Reg. 21,540, 21,626, n.544 (May 10, 1996) (emphasis added).   The Commission has long affirmed that states may "favor particular generation technologies over others."  *In re S. Cal. Edison Co.*, 70 FERC ¶ 61,215, 61,676 (1995).  States have:

> broad powers under state law to direct the planning and resource decisions of utilities under their jurisdiction. States may, for example, order utilities to build renewable generators themselves, or deny certification of other types of facilities if state law so permits. They also, assuming state law permits, may order utilities to purchase renewable generation.

71 FERC ¶ 61,269, 62,080 (1995).  *See also* Minn. Br. 55–58.

State renewable energy portfolio standards ("RPS") are a classic example of this state authority.   More than 30 states, including Minnesota, have RPS programs.[7]  By requiring utilities to sell a designated amount of renewable (*e.g.*, solar, wind) power, an RPS explicitly limits the amount of fossil-fuel power the utility may sell.  FERC has approved such provisions: "We find that the Iowa [law] [is] consistent with federal law to the extent that [it] require[s] electric utilities located in Iowa to purchase from certain types of generating facilities."  *In re Midwest Power Sys., Inc.*, 78 FERC ¶ 61,067, 61,246 (1997); *see also In re Cal. PUC*, 134 FERC ¶ 61,044, 61,160 (2011) (acknowledging "the reality *that states*

---

[7] U.S. EPA, *Renewable Portfolio Standards*, http://www.epa.gov/agstar/tools/funding/renewable.html (last visited Nov. 7, 2014).

Appellate Case: 14-2156    Page: 45    Date Filed: 11/10/2014 Entry ID: 4215230

*have the authority to dictate the generation resources from which utilities may procure electric energy*") (emphasis added). Indeed, FERC has adopted significant policy reforms for the very purpose of accommodating "state resource policies, such as renewable portfolio standards." FERC Order No. 1000 ¶ 484, 76 Fed. Reg. 49,842, 49,919 (August 11, 2011); *see also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 66 (D.C. Cir. 2014) (observing that Order 1000 responded to "the failure of current transmission planning processes to account for transmission needs driven by public policy requirements (*e.g.,* State renewable energy standards)").

For purposes of FERC's jurisdiction, there is no functional difference between a renewable portfolio standard and the NGEA. Both limit the forms of electric generation that a state's utilities may use to serve the state's consumers. There is no logical distinction between a renewable portfolio standard that limits overall sales of fossil-fuel power and the NGEA's requirement limiting sales of certain specific types of that fossil-fuel power. The NGEA does not impinge upon FERC jurisdiction.

## VI. THE CLEAN AIR ACT DOES NOT PREEMPT THE NGEA.

The NGEA is entirely consistent with, and not preempted by, the Clean Air Act. Like other state laws throughout the country that direct utilities to procure renewable energy, *see supra*, p. 27, the NGEA seeks to reduce air pollution attributable to the state's electricity consumption. It reflects an exercise of states'

28

traditional power to regulate the procurement of electricity sold to their citizens and to protect public health, safety, and welfare. Plaintiffs have not—and cannot—identify any authority holding that any such law is preempted by the Clean Air Act. EPA encourages states to rely on renewable energy policies to meet air quality planning requirements under the Act.[8]

EPA has proposed regulations under 42 U.S.C. § 7411 addressing emissions from new, modified and existing power plants.[9] Nothing in those minimum standards, however, will preempt states from adopting clean energy or pollution control requirements beyond the federal minimum. The Act expressly gives states authority to exceed these floor requirements and impose more stringent standards. 42 U.S.C. § 7416 (providing that "nothing" in the Act preempts "any requirement

---

[8] *See Incorporating Energy Efficiency/Renewable Energy in State and Tribal Implementation Plans*, http://www.epa.gov/airquality/eere/; *Roadmap for Incorporating Energy Efficiency/Renewable Energy Policies and Programs into State and Tribal Implementation Plans*, http://www.epa.gov/airquality/eere/pdfs/ EEREmanual.pdf (both last visited Nov. 10, 2014).

[9] *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527 (2011), does not help plaintiffs. The issue there was whether EPA's authority to regulate carbon dioxide was sufficient to displace *federal common-law claims,* not to preempt state law. The Court emphasized this critical difference. *Id.* at 2537. In fact, numerous states have enacted statutes and regulations limiting carbon dioxide emissions from power plants, *e.g.*, Regional Greenhouse Gas Initiative, State Statutes and Regulations (available at https://www.rggi.org/design/regulations) (listing regulations of nine states). A law regulating in-state retail providers' power purchases may shift demand from one type of generation to another, but it is fundamentally different from a law directly regulating emissions.

29

respecting control or abatement of air pollution" unless state law is "less stringent" than standards set forth in the Act); *compare* 42 U.S.C. § 7543(a) (*express* preemption of certain *mobile* source standards). EPA's proposed regulations concerning carbon dioxide from existing power plants are designed to build upon states' diverse policy approaches, including states clean energy laws such as RPSs.[10]

---

[10] *See*, *e.g.*, 79 Fed. Reg. 34,830, 34,832 (June 18, 2014) ("The proposal provides flexibility for states to build upon their progress, and the progress of cities and towns, in addressing [greenhouse gases]"); *id.* at 34,892 (noting states' authority to impose standards "more stringent than" emission performance level set forth in proposed regulation).

Appellate Case: 14-2156    Page: 48    Date Filed: 11/10/2014 Entry ID: 4215230

# CONCLUSION

The district court's judgment should be reversed, and the case remanded with instructions to enter summary judgment for defendants.

Dated: November 10, 2014

Respectfully submitted,

/s/ Sean H. Donahue

Graham G. McCahan
Vickie L. Patton
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 447-7228
gmccahan@edf.org

Sean H. Donahue
Donahue & Goldberg, LLP
1130 Connecticut Ave., NW
Suite 950
Washington, DC 20036
(202) 277-7085
sean@donahuegoldberg.com

*Counsel for Environmental
  Defense Fund*

*Counsel for Environmental
  Defense Fund*

Joanne Spalding
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
(415) 977-5725
joanne.spalding@sierraclub.org

Benjamin Longstreth
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 289-6868
blongstreth@nrdc.org

*Counsel for Sierra Club*

*Counsel for Natural Resources
  Defense Council*

Howard A. Learner
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1300
Chicago, IL 60601-2110
(312) 673-6500
hlearner@elpc.org

*Counsel for Environmental Law &
  Policy Center*

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,992 words, excluding parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

Pursuant to 8th Cir. R. 28A(h)(2), the undersigned, on behalf of the party filing and serving this brief, certifies that the brief has been scanned for viruses and that the brief is virus free.

/s/ Sean H. Donahue

Sean H. Donahue
Donahue & Goldberg, LLP
1130 Connecticut Ave., NW
Suite 950
Washington, DC 20036
(202) 277-7085
sean@donahuegoldberg.com

Appellate Case: 14-2156    Page: 50    Date Filed: 11/10/2014 Entry ID: 4215230

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25, I hereby certify that, on November 10, 2014, I electronically filed the foregoing motion and accompanying proposed *amicus* brief with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Sean H. Donahue

Sean H. Donahue
Donahue & Goldberg, LLP
1130 Connecticut Ave., NW
Suite 950
Washington DC 20036
(202) 277-7085
sean@donahuegoldberg.com