Nos. 14-2156 and 14-2251

# *In the*
# *United States Court of Appeals*
## *for the*
# *Eighth Circuit*

————————————

State of North Dakota, et al.,

Appellees/Cross-Appellants,

vs.

Beverly Heydinger, Commissioner and Chair, Minnesota Public Utilities Commission, et al.,

Appellants/Cross-Appellees.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
Civil File No. 11-3232 SRN/SER

————————————

**BRIEF OF MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY, FRESH ENERGY AND THE IZAAK WALTON LEAGUE OF AMERICA – MIDWEST OFFICE AS AMICI CURIAE SUPPORTING APPELLANTS/CROSS-APPELLEES**

Scott R. Strand (Atty # 0147151)
Minnesota Center for Environmental
Advocacy
26 East Exchange Street, Suite 206
St. Paul, MN. 55101
Telephone: (651) 223-5969

*Attorney for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

CORPORATE DISCLOSURE STATEMENT ..........................................v

INTERESTS OF THE AMICI CURIAE.....................................................1

STATEMENT ON AUTHORING AND FUNDING ...............................2

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT ......................................................................................3

  I.  BACKGROUND ........................................................................3

  II.  STATE STATUTES LIKE MINNESOTA'S NGEA ARE PRESUMED TO HAVE NO EXTRATERRITORIAL APPLICATION.....................................8

  III. THE PLAIN LANGUAGE OF THE NGEA SUPPORTS THE STATE'S INTERPRETATION OF THE STATUTE.....................................................13

  IV. TO THE EXTENT THE NGEA PROVISIONS UNDER ATTACK ARE AMBIGUOUS, THE OTHER CANONS OF CONSTRUCTION ALL SUPPORT THE STATE'S INTERPRETATION AS WELL.......................20

    A.  The court below improperly refused to defer to the statutory interpretation offered by the state administrative agencies with expertise on the subject…......................................................................20

    B.  The court below made no effort to construe the challenged statute so as to avoid constitutional questions. ................................................23

CONCLUSION ...................................................................................24

CERTIFICATE OF COMPLIANCE........................................................25

CERTIFICATE OF SERVICE .................................................................26

Appellate Case: 14-2156    Page: 2    Date Filed: 11/24/2014 Entry ID: 4219027

# TABLE OF AUTHORITIES

**State Cases**

*In re Cities of Annandale and Maple Lake NPDES/SDS Permit Issuance,* 731 N.W.2d 502 (Minn. 2007) ...................................................................20

*In re Excess Surplus Status of Blue Cross and Blue Shield of Minnesota,* 624 N.W.2d 264 (Minn. 2001) ........................................................... 20, 22

*In re Pratt,* 18 N.W.2d 147 (Minn. 1945) ..............................................10

*In re St. Paul & K.C. Green Co.,* 94 N.W. 218 (Minn. 1903) ................................10

*Reserve Mining Co. v. Herbst,* 256 N.W.2d 808 (Minn. 1977) ...............................20

*St. Otto's Home v. Minnesota Department of Human Services,* 437 N.W.2d 35 (Minn. 1989) .........................................................................20

**Federal Cases**

*America Cargo Transport, Inc. v. U.S.,* 625 F.3d 1176 (9th Cir. 2010) .................22

*Ammex, Inc. v. Cox,* 351 F.3d 697 (6th Cir. 2003) ...................................22

*Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288 (1936) ...................................23

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573 (1986) .........................................................................11

*Chevron USA Inc. v. Natural Resources Defense Council,* 467 U.S. 837 (1984)……........................................................................ 20, 21

*Coral Springs St. Sys., Inc. v. City of Sunrise,* 371 F.3d 1320 (11th Cir. 2004)…….…........................................................................22

*Cotto Waxo Co. v. Williams,* 46 F.3d 790 (8th Cir. 1995).............................12

*CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69 (1987) .....................................11

*Edgar v. MITE Corp.,* 457 U.S. 624 (1982) ..............................................11

*EEOC v. Arabian American Oil Co. (Aramco),* 499 U.S. 244 (1991) .....................9

*Foley Bros. v. Fillardo,* 336 U.S. 281 (1949) ...........................................10

Appellate Case: 14-2156     Page: 3     Date Filed: 11/24/2014 Entry ID: 4219027

*Healy v. Beer Inst., Inc.,* 491 U.S. 324 (1989)..........................................................11

*Kiobel v. Royal Dutch Petroleum Co.,* 133 S.Ct. 1659 (2013)............................9, 10

*Longaker v. Boston Scientific Corp.,* No. 12-185 AJM/JSM (D. Minn. May 23, 2012), *aff'd,* 715 F.3d 658 (8th Cir. 2013) ...........................................................10

*Lujan v. Defenders of Wildlife,* 524 U.S. 555 (1992) .............................................10

*Massachusetts v. EPA,* 549 U.S. 497 (2007) ............................................................5

*McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10 (1963)…...............................................................................................................10

*Morrison v. National Australia Bank Ltd.,* 130 S.Ct. 2869 (2010) ....................9, 10

*New York v. FERC,* 535 U.S. 1 (2002) ....................................................................19

*Ragsdale v. Turnock,* 841 F.2d 1358 (7th Cir. 1988) ..............................................22

*Rio Grande Silvery Minnow v. Bureau of Reclamation,* 601 F.3d 1096 (10th Cir. 2010) ....................................................................................................................22

*United Food & Commercial Workers Int'l Union v. IBP, Inc.,* 857 F.2d 422 (8th Cir. 1988)............................................................................................................ 21, 22

*United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366 (1909)....................................................................................................................23

## State Statutes

Minn. Stat. § 216B.1612 ............................................................................................4

Minn. Stat. § 216B.1691 ............................................................................................3

Minn. Stat. § 216B.24 ................................................................................................5

Minn. Stat. § 216B.241 ...........................................................................................3, 4

Minn. Stat. § 216B.2422 ............................................................................................5

Minn. Stat. § 216B.243 ..............................................................................................5

Minn. Stat. § 216H.02, subd. 1 .................................................................................3

Appellate Case: 14-2156    Page: 4    Date Filed: 11/24/2014 Entry ID: 4219027

Minn. Stat. § 216H.03 .................................................................. passim

Minn. Stat. § 216H.03, subd. 3 .................................................4

Minn. Stat. § 216H.03, subd. 3(2)............................................3

Minn. Stat. § 216H.03, subd. 3(3)............................................3

Minn. Stat. § 216H.03, subd. 4 .................................................5

Minn. Stat. § 216H.03, subd. 5 .................................................4

Minn. Stat. § 216H.03, subd. 6 .................................................4

Minn. Stat. § 216H.03, subd. 7(1)............................................4

Minn. Stat. § 216H.03, subd. 7(2)............................................4

Minn. Stat. § 363A.08, subd. 2 .................................................8

**Federal Statutes**

28 U.S.C. § 1350.......................................................................9

28 U.S.C. § 1664.......................................................................9

42 U.S.C. § 2000e-2(a)(1).........................................................8

**Federal Regulations**

79 Fed, Reg. 1430 (Jan. 8, 2014) ............................................7

79 Fed. Reg. 34829 (June 18, 2014) .......................................7

**Other Materials**

Jeffrey A. Meyer, "Extraterritorial Common Law: Does the Common Law Apply
    Abroad?" 102 Georgetown L.d. 301, 330 & n. 155 (2014) ................................11

Appellate Case: 14-2156    Page: 5    Date Filed: 11/24/2014 Entry ID: 4219027

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Minnesota Center for Environmental Advocacy, Fresh Energy, and the Izaak Walton League of America - Midwest Office state that they are not-for-profit organizations, that they do not issue stock, and that they do not have any parent companies.

Appellate Case: 14-2156     Page: 6     Date Filed: 11/24/2014 Entry ID: 4219027

## <u>INTERESTS OF THE AMICI CURIAE</u>

The Minnesota-based nonprofit environmental organizations ("the Minnesota NGOs") submitting this brief—the Minnesota Center for Environmental Advocacy ("MCEA"), Fresh Energy, and the Midwest office of the Izaak Walton League of America—were all directly involved in the development of the statute under attack in this case, the 2007 Minnesota Next Generation Energy Act ("NGEA"). They participated in the legislative debates, provided information and analysis to the relevant legislative committees, and responded to specific legislative language issues as they arose.

This legislative activity followed decades of advocacy by these organizations for cleaner energy for Minnesota, not just lobbying but years of intervenor participation in electric utility proceedings before the Minnesota Public Utilities Commission ("PUC"). Following passage of the NGEA in 2007, the Minnesota NGOs have participated, to the best of their knowledge, in every PUC docket where possible application of the NGEA has arisen. These organizations consist of lawyers, scientists, and policy experts with a deep background on electric utility law and policy, particularly as it has developed in Minnesota. That background and experience would be helpful to this Court as it determines whether the district court misconstrued the state law in question here.

Appellate Case: 14-2156    Page: 7    Date Filed: 11/24/2014 Entry ID: 4219027

## STATEMENT ON AUTHORING AND FUNDING

Minnesota Center for Environmental Advocacy, Fresh Energy, and the Izaak Walton League of America - Midwest Office (collectively "Minnesota NGO's") has been authorized to file this brief by their respective boards of directors. No party, counsel for any party, or anyone aside from the Minnesota NGO's either authored any part, or contributed any money toward the preparation or submission of this brief.

Appellate Case: 14-2156    Page: 8    Date Filed: 11/24/2014 Entry ID: 4219027

The court below concluded that, on their face, two specific provisions in NGEA, Minn. Stat. § 216H.03, subds. 3(2) & 3(3) violated the Dormant Commerce Clause because those provisions could apply to transactions occurring entirely outside Minnesota. On that basic *state* law question, the district court got it wrong. The plain language of the statute, the legislative intent, the history of electric utility regulation in Minnesota, and all the canons of statutory construction point to an interpretation limiting the statute's application to the procurement of electricity for Minnesota retail customers. The NGEA does *not* apply to wholly out-of-state transactions, and therefore cannot, under any set of facts, be unconstitutional under the "extraterritoriality" doctrine.

## ARGUMENT

## I.    BACKGROUND

This is a facial constitutional challenge to two specific provisions in the 2007 NGEA. The NGEA was a package of energy law reforms that passed with bipartisan support and were signed into law by Gov. Tim Pawlenty seven years ago. The statute set greenhouse gas emission reduction goals for the state, Minn. Stat. § 216H.02, subd. 1, established renewable energy standards, Minn. Stat. § 216B.1691, set statewide energy conservation goals, Minn. Stat. § 216B.241, and

3

created new incentives for community-based energy development. Minn. Stat. § 216B.1612.

The provisions under attack in this case are in Minn. Stat. § 216H.03, subd. 3. That subdivision says that, after August 1, 2009, but only until a comprehensive state law or rule reducing greenhouse gas emissions goes into effect, no person shall:

(1) construct within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions;

(2) import or commit to import from outside the state power from a large energy facility that would contribute to statewide power sector carbon dioxide emissions; or

(3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions.

Those limitations were subject to a long list of exceptions. Any proposal far enough along to be before the PUC before April 1, 2007 (or any contract not requiring PUC approval entered into before that date) was grandfathered in. *Id.,* subd. 7(1) & (2). Steel and iron nugget production facilities were exempted. *Id.,* subds. 5 & 6. The PUC was given the authority to exempt any facility or agreement that was "essential" to reliability, to meet increased demand, or to avoid substantial adverse rate effects. *Id.,* subd. 7(3). And the statute provided a safe

4

harbor to anyone who could offset additional carbon emissions through reductions at existing facilities or by purchasing carbon allowances from states with carbon markets. *Id.,* subd. 4.

The NGEA was adopted just after the U.S. Supreme Court had decided in *Massachusetts v. EPA,* 549 U.S. 497 (2007) that carbon dioxide was a "pollutant" subject to federal Environmental Protection Agency ("EPA") regulation under the Clean Air Act. The Minnesota statute was also passed at a time when federal legislation concerning greenhouse gas emissions was gaining momentum. *E.g.*, America's Climate Security Act of 2007, S. 2191; Global Warming Pollution Reduction Act of 2007, S. 309.

The NGEA followed several decades of state regulation of electrical power generation in Minnesota. Since 1974, Minnesota law has regulated which power plants could be built and where they could be sited. Minn. Stat. § 216B.24, Minn. Stat. § 216B.243. And for nearly 20 years, Minnesota had been requiring those who sold electricity to Minnesota retail customers to get regulatory approval for "integrated resource plans," which detail how retailers intend to meet projected demand, whether from their own power plants (wherever they might be located), from purchases from other utilities, or from "demand-side" conservation efforts, Minn. Stat. § 216B.2422. Minnesota, like most states, had long regulated where Minnesota sellers got their power from and under what conditions.

5

The specific provisions challenged in this case had a simple goal—to reduce or at least stop increasing the amount of carbon dioxide emissions resulting from Minnesota Consumers' consumption of electricity. At that time, over half of Minnesota's electricity came from coal-fired power plants, and state policymakers were concerned about that for three reasons. First, the likelihood of imminent comprehensive federal regulation, and the strong possibility that substantial new regulatory costs would be pushed down to ratepayers, made long-term dependence on coal a poor choice for Minnesota consumers. Second, coal-fired power plants were (and are) the single largest source of carbon dioxide emissions in the state. Third, those plants were major sources of other air pollutants like nitrogen oxide and fine particulates, which are also dangerous to public health.

At that time, there were two major coal projects in the regulatory pipeline. One was the "Mesaba" plant proposed to be built on Minnesota's Iron Range. The other was the "Big Stone II" project, a 450-megawatt coal-fired power plant that Ottertail Power and a consortium of other utilities were planning to build in Milbank, SD., just across the Minnesota border. More than half of the capacity of Big Stone II was intended to serve Minnesota customers, the rest to customers in other states in the region.

Given that context, the legislature addressed the problem in three ways. First, it simply declared that no new power plant, like Mesaba, could be

6

constructed in Minnesota after January 1, 2009 unless the generators captured or offset the carbon emissions the plant would emit. Second, to avoid the problem of "leakage," i.e., just moving the problem across the border, the law prohibited Minnesota utilities from importing electricity from plants outside of Minnesota, like Big Stone II, without a carbon offset.[1] .And finally, it prohibited any new large, long-term power purchase agreements with existing coal plants, again without a carbon offset.[2]

Once the NGEA was adopted, external circumstances turned Minn. Stat. § 216H.03 into virtually a dead letter almost immediately. The economic collapse of 2008 reduced demand for electricity substantially. The "fracking" explosion and the resulting major decline in natural gas prices made coal much less competitive. Clean Air Act regulations from the EPA governing greenhouse gas emissions from new electric power plants make construction of new coal plants even less likely.[3] Consequently, any plans for new coal plants to serve Minnesota customers at the time the bill passed have evaporated, and, today, no new coal plants are on the horizon.

---

[1] In other words, the NGEA treats in-state and out-of-state generation exactly the same. It does not discriminate in favor of Minnesota generators.

[2] Mesaba and Big Stone II were prominent in the NGEA debate, but ultimately both projects were "grandfathered in" in the final bill.

[3] Standards of Performance for Greenhouse Gas Emissions from New Stationary Sources: Electric Utility Generating Units, 79 Fed, Reg. 1430 (Jan. 8, 2014). *See also* Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 34829 (June 18, 2014). See 79 Fed. Reg. 1430, 1443 (Jan. 8, 2014) for discussion of trends in utility power sector.

7

## II.    STATE STATUTES LIKE MINNESOTA'S NGEA ARE PRESUMED TO HAVE NO EXTRATERRITORIAL APPLICATION.

The court below held that, because the NGEA's carbon offset provisions applied to any "person," the Minnesota legislature intended the law to apply to any person "regardless of their location."

That holding ignores the fundamental canon of statutory construction that "[a] statute presumptively has no extraterritorial application."  Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 268 (2012).  Legislatures are not required to qualify every statute by saying "within the territorial jurisdiction of the state," because "[t]hat is how statutes have always been interpreted."  *Id.*

Most statutes, of course, do not expressly define their geographic reach.  For example, Title VII of the Civil Rights Act says "it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, otherwise to discriminate against any individual . . . because of such individual's race, color, sex, religion, or national origin."  42 U.S.C. § 2000e-2(a)(1).  By its terms, using the district court's language, it seems to apply to all employers and individuals "regardless of their location," whether they be in the United States or not.  Likewise, the Minnesota Human Rights Act, Minn. Stat. § 363A.08, subd. 2, makes it "an unfair employment practice" for "an employer" to discriminate against individuals in protected classes, and nowhere requires a Minnesota nexus.

8

Nevertheless, no court has concluded that either of those statutes or any other similarly-worded statutes can be read to have extraterritorial effect. The long-established rule is that, unless a statute *clearly* indicates that it is intended to apply extraterritorially, it does not.

The U.S. Supreme Court has long recognized this presumption against extraterritoriality. Most recently, in *Kiobel v. Royal Dutch Petroleum Co.,* 133 S.Ct. 1659 (2013), the Court rejected a claim under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS") because the alleged torts all occurred outside the United States. The ATS, by its terms, applies to "*any* civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States," and contains no express requirement that the alleged tortious conduct occur in the U.S. Nevertheless, the Court interpreted the provision to apply only to torts occurring in this country. The Court concluded that the "presumption against extraterritorial application" controlled, because "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 1664, *quoting Morrison v. National Australia Bank Ltd.,* 130 S.Ct. 2869, 2878 (2010).[4] That

---

[4] The Court has been consistent in applying the presumption against extraterritorial application. *Morrison* (section 10(b) of the Securities Exchange Act and Rule 10b-5 do not apply to foreign securities transactions, even though the rule makes it unlawful for "*any* person" "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon *any* person, in connection with the purchase or sale of *any* security."); *EEOC v. Arabian American Oil Co. (Aramco),* 499 U.S. 244 (1991)(Title VII only governs domestic employment, does not cover discrimination by

9

presumption can only be overcome by an "affirmative intention" "clearly expressed." *Id.* at 2877. And, it is "well-established" that generic terms like "any" and "every" do not rebut the presumption. *Kiobel,* 133 S.Ct. at 1665. If a statute is silent about its geographic reach, then it does *not* apply extraterritorially. The district court in this case got the rule exactly backwards.

Minnesota recognizes the same presumption against extraterritorial application when interpreting Minnesota statutes. *E.g. Longaker v. Boston Scientific Corp.,* No. 12-185 AJM/JSM (D. Minn. May 23, 2012) (Minnesota Human Rights Act does not apply outside Minnesota), *aff'd,* 715 F.3d 658 (8th Cir. 2013), *citing In re Pratt,* 18 N.W.2d 147, 153 (Minn. 1945) ("The laws of one state of their own vigor have no extraterritorial effect."); *In re St. Paul & K.C. Green Co.,* 94 N.W. 218, 225 (Minn. 1903)("Statutes of a state have no effect ex proprio vigore beyond its own limits, and, even if a legislature should intend its laws to apply to persons and property in other states, its enactments in that direction would be wholly inoperative and void.") Other states likewise presume the application of

U.S. employer against U.S. citizen employees overseas); *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 83 S.Ct. 671 (1963)(National Labor Relations Act does not apply overseas); *Foley Bros. v. Fillardo,* 336 U.S. 281 (1949)(federal Eight Hour law did not require a government contractor to pay U.S. citizens employed abroad time and a half for overtime). *See also Lujan v. Defenders of Wildlife,* 524 U.S. 555, 585-89 (1992) (Stevens, J., concurring)(court would have held Endangered Species Act had no extraterritorial application, had it not concluded plaintiffs did not have standing).

their statutes does not extend beyond their borders.[5]  Therefore, contrary to the court below, the "no person" language in the NGEA does not clearly and unambiguously demonstrate an intent to regulate extraterritorially.   Since the statute is silent on the topic, the presumption against extraterritoriality applies, and the law should have been construed to apply only to Minnesota "persons," and not to transactions occurring wholly outside the state.

The state statutes in question in the "extraterritoriality" dormant commerce clause cases the district court relied on all *expressly* stated their intent to regulate outside their state boundaries.  *Edgar v. MITE Corp.,* 457 U.S. 624 (1982)(required registration of any takeover offers of corporations in which Illinois citizens owned 10% of the shares); compare *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69 (1987)(upholding similar antitakeover statute limited to entities incorporated in Indiana); *Brown-Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573 (1986); *Healy v. Beer Inst., Inc.,* 491 U.S. 324 (1989)(invalidating laws requiring wholesalers of alcoholic beverages to file price schedules with state regulators and sell their products in other states no cheaper than the prices declared on their schedules). There is no such express declaration of intent to apply to transactions in other states in Minnesota's NGEA.

---

[5] *See*, Jeffrey A. Meyer, "Extraterritorial Common Law: Does the Common Law Apply Abroad?" 102 Georgetown L.d. 301, 330 & n. 155 (2014)(list of state cases stating presumption against extraterritorial application of statutes).

11

The district court's reliance on *Cotto Waxo Co. v. Williams,* 46 F.3d 790 (8th Cir. 1995) is misplaced. In that case, this court considered a dormant commerce clause challenge to a Minnesota statute that said "[a] person may not offer for sale or sell any sweeping compound product that the person knows contains petroleum oil." No one—neither the plaintiff nor the defendant—even suggested that that statute applied to sales outside Minnesota. The only statutory interpretation question was whether to adopt an even narrower construction that would reduce the application of the statute to Minnesota sales for *use* in Minnesota. This court declined to adopt that further narrowing of the statute, and did not need to, because it concluded that even with the "broader" construction, there was no constitutional violation.

Nowhere in *Cotto Waxo* did this court question the presumption that state laws do not have extraterritorial effect. It may have declined to adopt a separate "use in Minnesota" limitation, but it never questioned the assumption that the law's prohibition on sales of a product only applied to sales in Minnesota. *Cotto Waxo* therefore provides no support for the lower court's conclusion that statutory phrases like "no person" without further qualification mean a statute is intended to have extraterritorial effect.

Appellate Case: 14-2156    Page: 18    Date Filed: 11/24/2014 Entry ID: 4219027

## III. THE PLAIN LANGUAGE OF THE NGEA SUPPORTS THE STATE'S INTERPRETATION OF THE STATUTE.

The canon against extraterritorial application means that the Minnesota Legislature presumptively intended that "no person" in the NGEA meant "no person in Minnesota." The district court's contrary state-law interpretation—that "no person" meant "no person anywhere"—was clearly mistaken.

Equally mistaken was the district court's conclusion that the NGEA had to be read to apply whenever a utility located anywhere "injects electricity into the grid." Appellants Addendum, p. 44. According to the district court, if a Wyoming utility put power on the grid to serve Wyoming customers, Minnesota's carbon offset requirement would clearly apply. The court's rationale was that, in that case, some of those Wyoming electrons might end up in Minnesota due to the interconnected nature of the regional "grid." Therefore, anytime a utility puts power in the grid, no matter where they are or who they intend to or are contracted to serve, that utility is "importing" power into Minnesota.

That interpretation does not make sense. Physically, it does not make sense to refer to "imports" or "exports" on a regional grid. Every generator puts its power on the shared grid, every consumer takes its power off the same shared grid. Electrons cannot be tagged, nor can their sources be traced.

But *financially*, electrons can be traced, through power contracts and ownership arrangements. If a Minnesota utility selling to retail customers buys an

13

ownership stake in, or contracts with, a coal plant in South Dakota, its portion of that plant's power can and should be treated as "imported."

That is the interpretation adopted by both the Minnesota Department of Commerce and the Minnesota Public Utilities Commission, and that is the interpretation the plain language of NGEA supports. Although neither the Minnesota PUC nor Minnesota's courts have had an opportunity to apply the law to an actual case, the way the statute would work is straightforward. The trigger for application of the statute would not be any "injection into the grid," as the district court concluded, but rather the decision of a retail utility in Minnesota to procure power from out-of-state, either through contract or an ownership interest in an out-of-state coal-fired power plant.

Consider three hypotheticals, based on real-world situations.

1.  Utility builds new coal plant in North Dakota to serve Minnesota customers only.

This is Great River Energy's Spiritwood Station coal-fired power plant, built just east of Jamestown, North Dakota, originally designed to supply electricity to Minnesota electrical cooperatives serving Minnesota customers. That plant had been mothballed until recently, and was exempted from the NGEA. If, however, the law did apply and GRE was generating 100 megawatt hours a year for those Minnesota coops and their customers, Minnesota utility regulators would apply a formula to determine how much additional carbon that generation would

14

contribute. That would then be the amount of carbon that would need to be offset to avoid the NGEA's prohibition. The responsible parties would be the coops who own GRE and the Spiritwood Station. The nexus to Minnesota would be the retail sales by Minnesota coops to their Minnesota members.

2. Utility builds new coal plant in South Dakota to serve customers in Minnesota and in other states.

This is what was planned for the Big Stone II project, which was front and center in legislators' minds in 2007. If Big Stone II had been built (and not exempted from the NGEA), Minnesota utility regulators would again have had to calculate how much electricity each "load serving entity" ("LSE"), i.e. seller of electricity to Minnesota retail customers, had "imported" into Minnesota from the new plant over the course of a year or some other period of time.[6] Again, it would be a simple formula: the total amount of electricity produced by the plant times the Minnesota percentage of total electricity purchases from the plant.

The "Minnesota percentage" would be based initially on what share of the cost of building the plant was going to be borne by Minnesota ratepayers, but then adjusted to account for actual demand from those Minnesota consumers. Each LSE in Minnesota who purchased capacity from Big Stone II's owners, or acquired

---

[6] Details like how often utilities would need to report, how to "true up" estimates based on purchase agreements with actual demand, or what would count as a legitimate carbon offset would have been adjudicated by the Minnesota PUC in individual "dockets." Minnesota's PUC generally makes policy by adjudication, not by rulemaking.

15

that capacity through their own ownership interest, would then be held accountable for their pro rata share of the "Minnesota percentage." For example, if Big Stone II had generated 400 megawatt hours in a year, with half of that accounted for by demand from Minnesota consumers, then the Minnesota LSE's who purchased capacity from Big Stone II would each be responsible for their fair share of 200 MWH. Again, the nexus to Minnesota would be the purchases of electricity by Minnesota retail customers.

Then, carbon emissions from that Minnesota share of the new plant's production would be calculated to determine what contribution to statewide carbon emissions had occurred. That would then be the amount of carbon that would have to be offset. The responsible parties again would be the LSE's selling the electricity to Minnesota consumers. The calculations would be more complex just because of multiple ownership of the plant and multiple contracts between other Minnesota retail utilities with those owners to purchase capacity from Big Stone II.

3.  Utility builds new coal plant in Wyoming to serve non-Minnesota customers only.

If the utility does not seek to justify its new Wyoming coal plant with Minnesota demand, and, accordingly, does not seek to allocate any percentage of the costs of building the plant to Minnesota ratepayers, then there would be no "imports" of electricity into Minnesota from that coal plant and the NGEA prohibition would not apply.

16

At no point in any of the above hypotheticals would MISO, the Midcontinent Independent System Operator, the regional transmission organization ("RTO") that runs the so-called "grid" and daily and hourly "spot" electricity markets in this region, have come into the calculation. Each day, LSE's in the MISO region tell MISO how much electricity they need the next day and the generators submit bids stating a price for the amount of electricity they hope to put on the grid the next day. MISO then arranges for the lower-bid electricity to be dispatched first, followed by electricity from the higher bidders.

The statute does not refer to MISO; it does not refer to "regional-transmission organizations," indeed, it is safe to say that there is *no* evidence of legislative intent to affect a process that is invisible to ordinary citizens (and ordinary legislators). MISO only comes into play because of the unique operation of our electric generation and transmission system. If, say, a Minnesota consumer receives electric power from Xcel Energy in Xcel's exclusive service territory and pays Xcel the rates set by the Minnesota PUC, that does not mean that consumer necessarily got his or her actual electrons from Xcel. Instead, what happens is that Xcel and all the other utilities supply the electricity necessary to serve all of their customers to the grid, but the electrons consumers actually consume could be coming from any of them.

Mr. Hempling's affidavit in the district court proceedings explained it well:

Appellate Case: 14-2156    Page: 23    Date Filed: 11/24/2014 Entry ID: 4219027

In an integrated transmission network like MISO's, when a buyer and seller of electricity enter into a contract, neither the contract nor the party causes the seller's electrons to flow along some path from the contractual origin to the contractual destination. That is why we call that path the "fictional contract path." A retail utility does not physically "import" electricity from out of state like a local coffee shop imports coffee beans from Columbia.

Instead, as Mr. Hempling explains:

[T]he retail utility, to comply with its obligations to . . . have sufficient capacity to cover its load plus reserves, must either own capacity or buy a contractual right to capacity. Since "import" in this context cannot mean "physically bring the product from contractual source to contractual destination," the term must refer to a utility making this financial commitment, through ownership or contract, to a facility outside its service territory. By financially committing to capacity, the LSE-as-"importer" has established that sufficient capacity will be available to serve its customers' demand at any point in time. And by financially committing to this capacity, the LSE has made it possible for that capacity to generate electricity, thereby, "contribut[ing] to statewide power sector carbon dioxide emissions."

"Import," according to Hempling, the State of Minnesota, and, for that matter, the Minnesota NGO's submitting this brief, therefore means an LSE owning or purchasing capacity located outside Minnesota to serve its Minnesota retail customers.

As the State explains, even though the electrons that an Xcel Energy customer actually uses might technically come from anyone in MISO, it is the contractual relationship between Xcel and its retail customers that triggers the State's regulatory concern. And so when the Minnesota PUC stipulates what mix of renewables and fossil fuels Xcel may use for those retail customers, it is

18

referring to Xcel's ownership or purchase of power, not the actual flow of electrons through the grid, which may come from other utilities with whom Xcel has no ownership or contractual relationship.

So, for its retail sales to Minnesota customers, the state may require a Minnesota utility to get some percentage of its electricity from renewable sources, whether through its own generation or contracts with others. Likewise, it can prohibit a Minnesota utility making retail sales to Minnesota customers from relying too heavily on fossil fuel sources, again whether from its own generation or contracts with others, no matter where they might be located. As the state argues, it does not make sense to interpret the state law as regulating MISO transactions themselves. What makes sense is to interpret the state law the way state utility regulation has operated throughout the modern era—regulating in-state generation, and regulating contractual relationships between utilities and their retail customers, and regulating where and from whom the utilities are procuring the electricity for those customers. Neither state utility regulators nor the legislature care where or how the electrons actually flow.[7]

---

[7] The division between federal and state authority over the electric power industry reflects that understanding. States regulate generation, retail sales and transmission siting; the federal government (through the Federal Energy Regulatory Commission) regulates wholesale pricing and transmission. *New York v. FERC,* 535 U.S. 1 (2002). The Minnesota legislature can be presumed to understand the regulatory context in which it was operating, and understand that its regulatory authority is over retail sales.

19

Appellate Case: 14-2156    Page: 25    Date Filed: 11/24/2014 Entry ID: 4219027

**IV. TO THE EXTENT THE NGEA PROVISIONS UNDER ATTACK ARE AMBIGUOUS, THE OTHER CANONS OF CONSTRUCTION ALL SUPPORT THE STATE'S INTERPRETATION AS WELL.**

**A. The court below improperly refused to defer to the statutory interpretation offered by the state administrative agencies with expertise on the subject.**

The court below made a special point of rejecting the interpretation of the NGEA offered by the Minnesota Department of Commerce and the PUC in the Attorney General's briefing and at oral argument. In so doing, however, the court ignored the requirement in both federal and Minnesota law that courts defer to agency interpretations of the statutes they are charged with administering:

> The agency decision-maker is presumed to have the expertise to decide technical matters within the scope of the agency's authority, and judicial deference, rooted in the separation of powers doctrine, is extended to an agency decision-maker in the interpretation of statutes *that the agency is charged with administering and enforcing.*

*In re Excess Surplus Status of Blue Cross and Blue Shield of Minnesota,* 624 N.W.2d 264 (Minn. 2001) (emphasis in original); *see also St. Otto's Home v. Minnesota Department of Human Services,* 437 N.W.2d 35 (Minn. 1989)(deference to agency interpretations of rules); *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808 (Minn. 1977)(deference to agency contested case decisions). *Accord In re Cities of Annandale and Maple Lake NPDES/SDS Permit Issuance,* 731 N.W.2d 502 (Minn. 2007). *Compare Chevron USA Inc. v. Natural Resources*

Appellate Case: 14-2156    Page: 26    Date Filed: 11/24/2014 Entry ID: 4219027

*Defense Council,* 467 U.S. 837 (1984)(narrower federal standard for deferring to agency interpretations).

The court below justified its refusal to defer on "positions taken" by the Minnesota Department of Commerce in "certain MPUC proceedings." All the record shows is a request to Basin to comment on whether its participation in MISO could trigger the statute. Basin said it did not, Commerce did not dispute that, and the Minnesota PUC ultimately decided that Basin was exempt anyway under another provision in the NGEA. And, as explained above, the Department of Commerce and PUC concluded that the NGEA does not reach MISO transactions.

For the court below, however, that earlier agency comment or question to the utility is the only interpretation entitled to any deference, relying on cases holding that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *United Food & Commercial Workers Int'l Union v. IBP, Inc.,* 857 F.2d 422, 429 (8th Cir. 1988). There are several responses to that argument. First, there is no law equating an agency staff presentation of a legal argument or question in an administrative proceeding and then a final agency action rejecting that argument later as "voluntary cessation of a challenged practice." *Blue Cross,* the leading Minnesota case on court deference to agency statutory interpretation, indeed was

21

just such a case, where agency staff took one position but the final decision maker took another. Not surprisingly, the Court held it was the final agency decision that was entitled to deference. Second, this is not a case like *United Food* where the defendant maintained its right to enforce the challenged law again in the future. Here the state defendants have definitively rejected the idea that this statute applies or could apply to MISO transactions, and there has been no reservation of authority to change that position back.

Finally third, even if courts are appropriately suspicious of defendants claiming voluntary cessation of illegal practices, that same distrust cannot and should not be extended to state government defendants. Federal courts can and should presume that the government is acting in good faith. *America Cargo Transport, Inc. v. U.S.,* 625 F.3d 1176, 1180 (9th Cir. 2010). The prevailing norm is that "[c]essation of the allegedly illegal conduct by government official has been treated with more solicitude by the courts than similar action by private parties." *Ragsdale v. Turnock,* 841 F.2d 1358, 1365 (7th Cir. 1988); *accord Rio Grande Silvery Minnow v. Bureau of Reclamation,* 601 F.3d 1096, 1117 (10th Cir. 2010)(requiring, to deny mootness, "clear showings" of governmental "desire to return to the old ways"); *Coral Springs St. Sys., Inc. v. City of Sunrise,* 371 F.3d 1320, 1328-29 (11th Cir. 2004); *Ammex, Inc. v. Cox,* 351 F.3d 697 (6th Cir. 2003). The Minnesota agencies involved here are entitled to that presumption of good

22

faith, and there is no evidence whatsoever of a "desire to return" to an interpretation of a statute that they are on record as saying makes no sense.

### B. The court below made no effort to construe the challenged statute so as to avoid constitutional questions.

It is, of course, hornbook law that a statute should be interpreted in a way that avoids placing its constitutionality in doubt. Scalia and Garner, at 247.

> [I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.

*Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 347 (1936)(Brandeis, J., concurring).

> [W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and, by the other, of which such questions are avoided, our duty is to adopt the latter.

*United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 408 (1909).

Here, the court below did the opposite of what these decisions teach. Instead of adopting a reasonable construction of the statute, like the interpretation the State adopted, and thereby avoid any constitutional issues, the court insisted on an interpretation so broad as to put the statute on the wrong side of the constitutional boundary. Under the lower court's interpretation, Minnesota's intent when adopting the NGEA was clearly and unambiguously to subject every utility injecting electricity into MISO to its carbon offset rule, whether or not their

23

activities had any nexus to Minnesota generation or Minnesota retail customers. That interpretation is not consistent with the presumption against extraterritoriality, it does not give appropriate deference to the technical experts in the agencies charged with administering the law, and it certainly does not avoid constitutional issues. Indeed, the lower court decision can fairly be characterized as reaching for a broad construction of a statute precisely to put its constitutionality into doubt. That is not what federal courts are supposed to do with state statutes.

## <u>CONCLUSION</u>

For the reasons stated above, the Minnesota NGO's respectfully request that the decision below be reversed and the case remanded to the district court for further proceedings.

Dated: November 10, 2014

/s/ Scott R. Strand
Scott R. Strand (Atty # 0147151)
Minnesota Center for Environmental
Advocacy
26 East Exchange Street, Suite 206
St. Paul, MN 55101
Telephone: (651) 223-5969
sstrand@mncenter.org

24

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,534 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

The full text of this brief has been scanned for viruses using AVG Internet Security Network Edition.

Dated: November 10, 2014

Respectfully submitted,

/s/ Scott R. Strand
Scott R. Strand (Atty # 0147151)
Minnesota Center for Environmental Advocacy
26 East Exchange Street, Suite 206
St. Paul, MN 55101
Telephone: (651) 223-5969

*Attorney for Minnesota Center for Environmental Advocacy, Fresh Energy and Izaak Walton League of America – Midwest Office*

Appellate Case: 14-2156     Page: 31     Date Filed: 11/24/2014 Entry ID: 4219027

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of November, 2014, I submitted the foregoing Brief of the Minnesota Center for Environmental Advocacy, Fresh Energy, and Izaak Walton League of America – Midwest Office The as Amici Curiae Supporting Appellants/Cross-Appellees, via electronic filing with the United State Court of Appeals for the Eighth Circuit.

/s/ Scott R. Strand
Scott R. Strand

26