# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT
_____

**STATE OF NORTH DAKOTA, *et al.*,**

Appellees/Cross-Appellants,

*v.*

**BEVERLY HEYDINGER, COMMISSIONER AND CHAIR,
MINNESOTA PUBLIC UTILITIES COMMISSION, *et al.*,**

Appellants/Cross-Appellees.

_____

On Appeal from the United States District Court for the
District of Minnesota
_____

**Brief of Steven Gaw and Steven Weissman as Amici Curiae
Supporting Appellants and Reversal**

Mark N. Templeton
Abrams Environmental Law Clinic
University of Chicago Law School
6020 S. University Avenue
Chicago, Illinois 60637
(773) 702-6998 | Phone
(773) 702-2063 | Fax
templeton@uchicago.edu

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

INTEREST OF AMICI CURIAE .............................................................................1

ARGUMENT ..........................................................................................................2

I.     Each State Has the Authority to Regulate the Procurement Decisions
       of the Public Utilities that Serve Its Citizens.......................................................3

II.    With the Next Generation Energy Act, Minnesota Placed Appropriate
       Restrictions on the Generation Resources that Utilities May Rely upon
       in Meeting Local Demand ................................................................................8

III.   Because Minnesota's Statute Regulates the Procurement of Power for
       Minnesota Ratepayers, the District Court Erred in Declaring the NGEA
       "Extraterritorial Regulation" under the Dormant Commerce Clause ..............11

       A.     The NGEA's "Import" Provisions Target Actions Taken by
              Minnesota Utilities—Not the Ungovernable Flow of Electricity
              on the Region's Grid ..............................................................................11

       B.     Public Utilities Do Not Risk Inadvertent Power "Imports" Through
              MISO's Wholesale Electricity Market......................................................15

CONCLUSION.......................................................................................................16

CERTIFICATE OF COMPLIANCE.........................................................................17

i

# TABLE OF AUTHORITIES

## Cases

New York v. FERC, 535 U.S. 1 (2002) ........................................................................8

North Dakota v. Heydinger, No. 11-CV-3232, 2014 WL 1612331 (D. Minn. Apr. 18, 2014) .......................................................................... 2, 11-16

PPL Energyplus, LLC v. Solomon, 766 F.3d 241 (3d. Cir. 2014) ...........................8

## Statutes

16 U.S.C. § 824 .........................................................................................................7

Minn. Stat. § 216B.01 ...............................................................................................5

Minn. Stat. § 216B.02, Subd. 4 .................................................................................3

Minn. Stat. § 216B.03 ................................................................................................4

Minn. Stat. § 216B.09, Subd. 2 ............................................................................... 4-5

Minn. Stat. § 216B.16, Subd. 6 .............................................................................4, 10

Minn. Stat. §§ 216B.37-40 .........................................................................................5

Minn. Stat. § 216B.105 ............................................................................................10

Minn. Stat. § 216B.1691 ............................................................................................7

Minn. Stat. § 216B.2422 ..................................................................................... 4, 5, 6-7

Minn. Stat. § 216H.03 ...........................................................................................9, 10

Minn. Stat. § 216H.03, Subd. 1 .................................................................................9

Minn. Stat. § 216H.03, Subd. 2 ........................................................................9, 13, 14

Minn. Stat. § 216H.03, Subd. 3 ...................................................................9, 11, 12, 13, 14

Appellate Case: 14-2156     Page: 3     Date Filed: 11/24/2014 Entry ID: 4219037

Minn. Stat. § 216H.03, Subds. 4-7 ..........................................................9

Minn. Stat. § 216H.03, Subd. 7 ......................................................10, 13

## Other Authorities

Fed. R. App. P. 29(b) ..........................................................................2

Cal. Pub. Utils. Comm'n, 134 FERC ¶ 61,044 (Jan. 20, 2011) ................................7

In re Midwest Power Sys., Inc., 78 FERC ¶ 61,067 (Jan. 29, 1997) ....................7-8

In re S. Cal. Edison Co., 70 FERC ¶ 61,215 (Feb. 23, 1995) ..................................8

FERC Order No. 1000, 76 Fed. Reg. 49,842 (Aug. 11, 2011) ..................................8

Rules, Regulations & Policies for Renewable Energy, Database of State
    Incentives for Renewables & Efficiency, U.S. Dep't of Energy .........................6

Ari Peskoe, A Challenge for Federalism: Achieving National Goals in the
    Electricity Industry, 18 Mo. Envtl. L. & Pol'y Rev. 209 (2011) .........................3

Rachel Wilson and Bruce Biewald, Best Practices in Electric Utility Integrated
    Resource Planning, Synapse Energy Economics (June 2013) .........................5-6

Appellate Case: 14-2156    Page: 4    Date Filed: 11/24/2014 Entry ID: 4219037

## INTEREST OF AMICI CURIAE

Due to their extensive experience with state public utility commissions, amici have a strong interest in the question of state regulatory authority at issue in this case.

Steven Gaw, an attorney, was a Commissioner of the Missouri Public Service Commission from 2007 to 2011, and served as its Chairman from 2003 to 2005. Mr. Gaw was a founding board member of both the Organization of MISO States, where he served as President, and the Southwest Power Pool Regional State Committee. Mr. Gaw was also a member of the National Association of Regulatory Utility Commissioners and its Electricity Committee. Mr. Gaw presently works as a consultant for organizations that support renewable energy.

Steven Weissman served as an attorney, advisor, and administrative law judge at the California Public Utilities Commission for thirty years. During this time, Mr. Weissman represented the Commission as a member of three regulatory coordinating bodies: the Electricity Committee of the National Association of Regulatory Utility Commissioners; the Committee for Regional Energy Policy Cooperation; and the Western Electricity Coordinating Council. In 2006, Mr. Weissman began teaching energy law at the University of California Berkeley School of Law. He became Director of the Energy Program at Berkeley's Center for Law, Energy and the Environment in 2008.

Appellate Case: 14-2156     Page: 5     Date Filed: 11/24/2014 Entry ID: 4219037

No party's counsel authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person, other than amici and their counsel, contributed money that was intended to fund preparing or submitting this brief. Amici moved for leave to file this brief pursuant to Federal Rule of Appellate Procedure 29(b).

## ARGUMENT

The provision of retail electric service is fundamentally a function regulated within the various states. Although the electricity industry has changed over time, states have rightfully retained and exercised their legal authority to decide what mix of generation resources should be procured by local utilities; what rates may be charged to the states' customers; what rate of return may be earned by utilities; what role environmental values should play in the utilities' regulated business; and what infrastructure should be developed.

The Next Generation Energy Act ("NGEA") is an appropriate exercise of Minnesota's long-standing authority over the procurement decisions of local utilities. In concluding, instead, that Minnesota's law is an "extraterritorial regulation" at odds with the Dormant Commerce Clause, North Dakota v. Heydinger, No. 11-CV-3232, 2014 WL 1612331, at *21 (D. Minn. Apr. 18, 2014) ("D. Ct. Op."), the district court misunderstood the nature of the electricity procurement process and how it is regulated under the NGEA. When read in light

2

of industry practice and the regulatory framework governing public utilities,

Minnesota's statute can be seen for what it is: a lawful exercise of traditional state

authority. This Court should accordingly reverse the decision of the district

court—and thereby affirm the authority of individual states to determine the mix of

resources that utilities may rely upon in meeting the demand of local ratepayers.

## I. Each State Has the Authority to Regulate the Procurement Decisions of the Public Utilities that Serve Its Citizens

States have long held the authority to regulate the procurement of electricity

by public utilities. See generally Ari Peskoe, A Challenge for Federalism:

Achieving National Goals in the Electricity Industry, 18 Mo. Envtl. L. & Pol'y

Rev. 209, 212-16 (2011) (describing the development of public service

commissions in the states and the scope of and rationale for their authority).

This power is part of the states' broader control over the "load-serving entities"

that are given the opportunity and obligation to satisfy all customer demand, or

"load," within their designated service territories.[1] For example, state public utility

commissions review the rates that load-serving entities propose for each class of

---

[1] In some states, such as Minnesota, public utility commissions have been granted less authority over rural electric cooperatives and municipal utilities than for-profit load-serving entities. See, e.g., Minn. Stat. § 216B.02, Subd. 4 (excluding from the definition of "public utility" any "municipality or … cooperative electric association … producing or furnishing natural, manufactured, or mixed gas or electric service"). However, states have the authority to regulate these non-profit entities if they choose.

3

consumer to ensure that the rates are "just and reasonable." See, e.g., Minn. Stat. § 216B.03 ("Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable."); Minn. Stat. § 216B.16, Subd. 6 (noting the state commission's "powers … to determine just and reasonable rates for public utilities"). State commissions also determine a load-serving entity's "revenue requirement"—that is, the amount of revenue needed to provide the utility with a reasonable opportunity to earn a fair rate of return on its investment. See, e.g., Minn. Stat. § 216B.16, Subd. 6 (directing the state commission to "give due consideration … to the need of the public utility for revenue sufficient … to earn a fair and reasonable return"). Commissions further require load-serving entities to prove that they have secured enough "energy" and generation "capacity" to meet the needs of their customers—either by operating their own generation facilities or entering contracts with other generators.[2] See, e.g., Minn. Stat. § 216B.2422, Subds. 1(d), 2 (requiring a utility to submit a resource plan establishing "a set of resource options that [the] utility could use to meet the service needs of its customers"). Finally, state commissions determine the terms on which service is offered, and produce service-quality indices to measure a utility's performance and to penalize it financially if service falls below

---

[2] Under a contract for "capacity," the purchasing utility acquires the right to call for a specific amount of energy from a specific generator during a specific period of time. See Appellents' Appendix ("Appx.") Vol. 2 at 331 (Hempling Report ¶¶ 12-15) (explaining the distinction between "capacity" and "energy").

4

accepted standards.  See, e.g., Minn. Stat. § 216B.09, Subd. 2 (authorizing "standards for the measurement of the quantity, quality, pressure, initial voltage, or other condition pertaining to the supply of the service").

This system of state regulation stems from important public-policy considerations.  In the states that have not deregulated their electricity sector—including Minnesota and most others—load-serving entities operate as regulated monopolies within their respective service territories.  See, e.g., Minn. Stat. §§ 216B.37-40 (providing each electric utility with the "exclusive right" to provide service in "its assigned service area").  States accordingly regulate load-serving entities to ensure that they do not abuse their monopoly status by charging ratepayers too much; by wasting ratepayer dollars; or by compromising the adequacy of electrical service.  See, e.g., Minn. Stat. § 216B.01 (articulating the public interests served by utility regulation).

In furtherance of these objectives, many states—including Minnesota—have required load-serving entities to fulfill numerous resource-planning and procurement requirements.  See, e.g., Minn. Stat. § 216B.2422, Subds. 1(d), 2 (resource planning); id., Subd. 2 (directing the state commission to "approve, reject, or modify the plan of a public utility … consistent with the public interest"). In a majority of states, load-serving entities are required to develop integrated resource plans, long-term procurement plans, or similar analyses that take into

5

account specific policy goals and procurement practices.  See Rachel Wilson and

Bruce Biewald, Best Practices in Electric Utility Integrated Resource Planning,

Synapse Energy Economics, 5 (June 2013), available at www.raponline.org/

document/download/id/6608.  These planning requirements, some dating back to

the 1980s, are used to determine how utilities will satisfy their state-law

obligations to meet the demand of all retail customers within their service

territories.  See id. at 3-5.  Integrated resource plans, in particular, require load-

serving entities to consider environmental factors, alternatives to additional

generation, and the risks posed by different investment portfolios.  Id.; see also,

e.g., Minn. Stat. § 216B.2422, Subd. 3(a) (providing for the consideration of

"environmental costs" in resource plans).

State requirements regarding the appropriate mix of generation resources

constitute a typical component of utilities' plans.  For example, a majority of

states, including Minnesota, have enacted "renewable portfolio standards."  See

Rules, Regulations & Policies for Renewable Energy, Database of State Incentives

for Renewables & Efficiency, U.S. Dep't of Energy, available at

www.dsireusa.org/summarytables/rrpre.cfm (last visited Nov. 12, 2014).  Through

these standards, states prescribe the type of generation that utilities must rely upon

in meeting a specific amount of customer load within the state.  See, e.g., Minn.

Stat. § 216B.2422, Subd. 2 (requiring utilities' resource plans to include, among

6

other things, "the least cost plan for meeting 50 and 75 percent of all new and refurbished capacity needs through a combination of conservation and renewable energy resources"); id., Subd. 4 (prohibiting the state commission from approving "a new or refurbished nonrenewable energy facility in an integrated resource plan … unless the utility has demonstrated that a renewable energy facility is not in the public interest"). Renewable portfolio standards require public utilities either to acquire a given amount of renewable capacity in serving load within the state or to purchase a given amount of "renewable energy credits"—credits that stem from the generation of qualifying, renewable energy. See, e.g., Minn. Stat. § 216B.1691, Subd. 4(a) (directing the state commission to establish "a program for tradable renewable energy credits for electricity generated by eligible energy technology").

Both the relevant federal administrative authority and the courts have recognized that each state has power over the types of generation relied upon by local utilities. Indeed, the Federal Energy Regulatory Commission ("FERC")—to which the Federal Power Act has given authority over the "transmission of electric energy in interstate commerce and … the sale of electric energy at wholesale in interstate commerce," 16 U.S.C. § 824(b)(1)—has repeatedly affirmed that "states have the authority to dictate the generation resources from which utilities may procure electric energy." Cal. Pub. Utils. Comm'n, 134 FERC ¶ 61,044, 61,160 (Jan. 20, 2011); see also In re Midwest Power Sys., Inc., 78 FERC ¶ 61,067,

7

61,246 (Jan. 29, 1997) ("[W]e find that the Iowa statute … [is] consistent with federal law to the extent that [it] require[s] electric utilities located in Iowa to purchase from certain types of generating facilities."); In re S. Cal. Edison Co., 70 FERC ¶ 61,215, 61,676 (Feb. 23, 1995) (because "resource planning and resource decisions are the prerogative of state commissions[,]" a state "may choose to require a utility to construct generation capacity of a preferred technology or to purchase power from the supplier of a particular type of resource"); FERC Order No. 1000 ¶¶ 107, 156, 76 Fed. Reg. 49,842, 49,861, 49,869 (Aug. 11, 2011) (noting that "integrated resource planning" is among the "specific substantive matters traditionally reserved to the states").[3]

## II. With the Next Generation Energy Act, Minnesota Placed Appropriate Restrictions on the Generation Resources that Utilities May Rely upon in Meeting Local Demand

Like integrated resource planning requirements, renewable portfolio standards, and similar state obligations, Minnesota's Next Generation Energy Act

_____

[3] The fact that the Federal Power Act grants FERC the authority to regulate the wholesale price of electricity does not preempt state procurement requirements that may have incidental effects on the wholesale market.  See, e.g., PPL Energyplus, LLC v. Solomon, 766 F.3d 241, 255 (3d. Cir. 2014) ("The states may select the type of generation to be built—wind or solar, gas or coal—and where to build the facility. … The states' regulatory choices accumulate into the available supply transacted through the interstate market. … FERC's authority over interstate rates does not carry with it exclusive control over any and every force that influences interstate rates."); cf. New York v. FERC, 535 U.S. 1, 23 (2002) ("Because federal authority has been asserted only over unbundled transmissions, New York retains jurisdiction of the ultimate sale of the energy." (emphasis in original)).

Appellate Case: 14-2156    Page: 12    Date Filed: 11/24/2014 Entry ID: 4219037

governs the mix of generation resources that public utilities may rely upon in meeting the demand of local ratepayers. See Minn. Stat. § 216H.03. Each of the Act's relevant restrictions is directed at Minnesota's "statewide power sector carbon dioxide emissions," which include emissions from both "the generation of electricity within the state" and "the generation of electricity imported from outside the state and consumed in Minnesota." Id., Subd. 2. Under the challenged provision of the NGEA, "no person" is allowed (in the absence of an exception) to:

> (1) construct within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions;
>
> (2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or
>
> (3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions.

Id., Subd. 3; see also id., Subds. 4-7 (establishing exceptions to the statute's prohibitions on construction, importation, and long-term power purchase agreements).

Given that the NGEA's definition of "new large energy facility" is effectively limited to coal-fired power plants, see id., Subd. 1(1), the basic purpose of the statute is plain: restricting Minnesota utilities' reliance on a particular form of generation in meeting the demand of Minnesota's ratepayers. This purpose—

9

and the mechanisms used to advance it—fall well within Minnesota's traditional

authority over the procurement decisions of local load-serving entities.  See

Section I, supra.

In addition to advancing Minnesota's environmental policies, the NGEA

offers financial protections to local ratepayers—another common function of state

utility regulations.  The NGEA requires utilities to move ratepayer dollars away

from generation resources with significant carbon-dioxide emissions.  See Minn.

Stat. § 216H.03.  As a result, the statute reduces the likelihood that Minnesota

ratepayers will have to cover the costs of power plants subject to carbon-dioxide

regulations—including plants that cease operation before they are fully depreciated

(so-called "stranded assets").  Cf. Minn. Stat. § 216B.105 (recognizing ratepayers'

liability for a "utility's capital and operating costs to control mercury emissions to

the atmosphere").  The NGEA is accordingly consistent with Minnesota's policy of

securing reasonable utility rates for Minnesota ratepayers.  See Minn. Stat. §

216B.16, Subd. 6 (directing Minnesota's commission to set utility rates with "due

consideration to the public need for adequate, efficient, and reasonable service");

see also Minn. Stat. § 216H.03, Subd. 7(3) (exempting facilities and agreements

from the NGEA whenever the state commission determines they are "essential …

to avoid placing a substantial financial burden on Minnesota ratepayers").

Appellate Case: 14-2156    Page: 14    Date Filed: 11/24/2014 Entry ID: 4219037

Notably, the NGEA does not attempt to preclude a utility—even a Minnesota utility—from constructing or operating a "new large energy facility" in another state and selling its capacity and energy into the wholesale market (which is discussed in Section III.B, infra).  See Minn. Stat. § 216H.03, Subd. 3.  Rather, the statute merely prohibits utilities from relying on such facilities for the purpose of meeting the power needs of Minnesota ratepayers.  See id.  As a result, the NGEA is an appropriate exercise of Minnesota's long-held authority over local power procurement.  The district court was wrong in concluding otherwise.

## III. Because Minnesota's Statute Regulates the Procurement of Power for Minnesota Ratepayers, the District Court Erred in Declaring the NGEA "Extraterritorial Regulation" under the Dormant Commerce Clause

In holding that the NGEA "is a classic example of extraterritorial regulation because of the manner in which the electricity industry operates," D. Ct. Op. at *21, the district court mischaracterized both the reach of the statute and the operation of the electricity industry.  Because Minnesota's law targets the actions taken by Minnesota public utilities in procuring power for Minnesota ratepayers, this Court should reverse the decision below.

### A. The NGEA's "Import" Provisions Target Actions Taken by Minnesota Utilities—Not the Ungovernable Flow of Electricity on the Region's Grid

Rather than discussing Minnesota's power to regulate the procurement decisions of local utilities, the district court rested its Dormant Commerce Clause

11

Appellate Case: 14-2156     Page: 15     Date Filed: 11/24/2014 Entry ID: 4219037

analysis on the NGEA's supposed application "to power and capacity transactions occurring wholly outside of Minnesota's borders." Id. at *22. According to the court, "when a non-Minnesota entity injects electricity into the grid to satisfy its obligations to a non-Minnesota member, it cannot ensure that the electricity will not travel to and be removed in—in other words, be imported to and contribute to statewide power sector carbon dioxide emissions in—Minnesota." Id.; see also id. at *23 (reasoning that any out-of-state electricity capable of "travel[ing] to and be[ing] removed in" Minnesota risks "increas[ing] statewide power sector carbon dioxide emissions in" Minnesota). As a result, the court concluded, the NGEA leaves out-of-state generators to decide whether they will "comply … or risk legal action." Id. at *23.

The district court's reading of Minnesota's statute is flawed. First, in concluding that the NGEA attempts to regulate conduct "occurring wholly outside of Minnesota's borders[,]" D. Ct. Op. at *22-23, the district court disregarded the statute's design. As previously explained, the NGEA limits the resources available to Minnesota utilities when they procure power for Minnesota ratepayers. See Section II, supra. Rather than targeting out-of-state generators who export power to Minnesota, for example, the NGEA regulates those who "import or commit to import [power] from outside the state[.]" Minn. Stat. § 216H.03, Subd. 3(2) (emphasis added). And rather than targeting generators who enter agreements to

Appellate Case: 14-2156    Page: 16    Date Filed: 11/24/2014 Entry ID: 4219037

sell their generation capacity, the NGEA regulates those who enter a long-term "agreement to purchase" capacity.  Id., Subd. 3(3) (emphasis added).[4]  The exceptions established under the statute further confirm its focus on the procurement actions taken by local utilities in serving Minnesota load.  See, e.g., id., Subd. 7(2) (establishing an exemption for a qualifying "contract … to purchase power from a new large energy facility that was approved by … another state"); id., Subd. 7(3) (establishing an exemption for a qualifying "power purchase agreement between a Minnesota utility and a new large energy facility located outside Minnesota").  Given the limited reach of Minnesota's statute, the district court erred in reading the NGEA as an unlawful attempt at "extraterritorial regulation."  See D. Ct. Op. at *21.

Second, in focusing on the fate of individual electrons, the district court's decision obscured the distinction between a utility's (regulated) action in "import[ing]" power, Minn. Stat. § 216H.03, Subds. 2, 3(2)-(3), and the (uncontrollable) movement of electricity "inject[ed] … into the grid," D. Ct. Op. at *22-23.  Due to the interconnected structure of the region's electrical-transmission network, it is impossible for energy to be physically imported from one particular

---

[4] While it has not been challenged in this case, the first of the NGEA's prohibitions—which targets the construction of new generators—is similarly limited to Minnesota.  See Minn. Stat. § 216H.03, Subd. 3(1) (providing that "no person shall … construct within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions").

13

point on the grid to another.  See Appx. Vol. 2 at 354 (Hempling Report ¶ 64) ("A retail utility does not physically 'import' electricity from out of state like a local coffee shop imports coffee beans from Colombia.").[5]  As a result, the NGEA's restrictions on power "imports" are properly understood—consistent with industry usage, see id. at 353-55 (Hempling Report ¶¶ 62-67)—in financial terms.  See Minn. Stat. § 216H.03, Subds. 2, 3(2)-(3).  Power is accordingly "imported" into Minnesota only when a Minnesota utility has invested in out-of-state generation (either contractually, with bilateral capacity and energy contracts, or through the acquisition of a facility) in order to fulfill its legal obligation to meet its Minnesota load.  See id.  Utilities "import" power, in other words, through their procurement decisions—decisions that have long been subject to state control.  See Section I, supra.

By challenging the power of state commissions to regulate the local procurement decisions of public utilities, the district court's decision threatens a broad set of laws—including the integrated resource planning requirements and renewable portfolio standards that have been adopted in a majority of states.  Indeed, integrated resource planning statutes would be meaningless if utilities

---

[5] As Scott Hempling has explained, the physical movement of electricity on the grid can be compared to the flow of water within a reservoir.  Appx. Vol. 2 at 333 (Hempling Report ¶ 19).  "If I want to buy 10 buckets of water, my chosen seller would dump in 10 buckets at [its] location, and I would take out 10 buckets at my location.  The molecules I take out are not the ones my seller dumped in."  Id.

14

could circumvent them simply by importing power from another state. This Court should not sanction such a result.

### B. Public Utilities Do Not Risk Inadvertent Power "Imports" Through MISO's Wholesale Electricity Market

Finally, there is no merit to the district court's suggestion that a utility could inadvertently "import" power when making purchases through the hourly market organized by the Midcontinent Independent System Operator, or "MISO." See D. Ct. Op. at *23. Given the way in which MISO aggregates demand and supply, an energy purchase through MISO's wholesale market does not create a contractual relationship between a particular purchaser and a particular generator. Rather, each purchasing utility tells MISO how much power it will require during a particular period of time; MISO aggregates the demand from all purchasing utilities and requests offers from individual generators toward meeting the aggregate demand; MISO determines the price that will secure a sufficient supply of electricity to meet aggregate demand; MISO directs the winning suppliers to put a specific amount of energy onto the grid; and MISO collects payment from the utilities and divides it among the generators based on the share of the power they provided. See Appx. Vol. 2 at 345, 348, 350, 359 (Hempling Report ¶¶ 46, 53, 56, 79). MISO, therefore, does not establish financial connections between particular buyers and sellers. Nor does MISO attempt to trace the flow of electricity from its physical source to its physical destination—something that could not be done.

15

In short, and in industry usage, the term "import" does not refer to energy purchases made through organized markets, like MISO's, where there is no direct pairing of sellers and buyers. The district court's contrary reading of Minnesota's NGEA should be rejected by this Court.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the district court and thereby affirm the authority of every state to determine the mix of generation resources that a public utility may rely upon in meeting the demand of local ratepayers.

Respectfully submitted this 12th day of November, 2014.

_____s/ Mark N. Templeton_____
Mark N. Templeton
Abrams Environmental Law Clinic
University of Chicago Law School
6020 S. University Avenue
Chicago, Illinois 60637
(773) 702-6998 | Phone
(773) 702-2063 | Fax
templeton@uchicago.edu

*Counsel for Amici Curiae*

Appellate Case: 14-2156    Page: 20    Date Filed: 11/24/2014 Entry ID: 4219037

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B)(i) because this brief contains 3,748 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief bas been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman.

As required by Local Rule 28A(h)(2), this brief has also been scanned for viruses and is virus-free.

Dated: November 12, 2014


_____ s/ Mark N. Templeton _____
Mark N. Templeton
Abrams Environmental Law Clinic
University of Chicago Law School
6020 S. University Avenue
Chicago, Illinois 60637
(773) 702-6998 | Phone
(773) 702-2063 | Fax
templeton@uchicago.edu

*Counsel for Amici Curiae*

17

Appellate Case: 14-2156    Page: 21    Date Filed: 11/24/2014 Entry ID: 4219037

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25, I hereby certify that on this 12th day of November, 2014, I caused the foregoing motion and accompanying proposed amicus brief to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

       s/ Mark N. Templeton

Mark N. Templeton
Abrams Environmental Law Clinic
University of Chicago Law School
6020 S. University Avenue
Chicago, Illinois 60637
(773) 702-6998 | Phone
(773) 702-2063 | Fax
templeton@uchicago.edu

*Counsel for Amici Curiae*