# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

State of North Dakota, et al.

                Appellees,

v.

Beverly Heydinger, Commissioner and Chair,
Minnesota Public Utilities Commission, et
al.,

                Appellants.

Appeal Nos. 14-2156 & 14-2251

ON APPEAL FROM
UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No.: 11-cv-03232-SRN
The Honorable Susan R. Nelson

## APPELLEES/CROSS-APPELLANTS' BRIEF

NORTH DAKOTA ATTORNEY
GENERAL
AND
WINTHROP & WEINSTINE, P.A.
Thomas H. Boyd (200517)
Brent A. Lorentz (0386865)
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402-4629
(612) 604-6400
tboyd@winthrop.com
blorentz@winthrop.com
*Attorneys for Appellees/Cross-Appellants
State of North Dakota, Industrial
Commission of North Dakota, Lignite
Energy Council, Basin Electric Power*

OFFICE OF MINNESOTA
ATTORNEY GENERAL
Alethea M. Huyser
Michael Everson
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
(651) 757-1243
*Attorneys for Appellants/Cross-
Appellees Beverly Heydinger,
Commissioner and Chair, Minnesota
Public Utilities Commission, David
C. Boyd, Commissioner, Minnesota
Public Utilities Commission, Nancy
Lange, Commissioner and Vice
Chair, Minnesota Public Utilities*

*Cooperative, The North American Coal Corporation, Great Northern Properties Limited Partnership, Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services, Minnkota Power Cooperative, Inc.*

*Commission, Dan M. Lipschultz, Commissioner, Minnesota Public Utilities Commission, Betsy Wergin, Commissioner, Minnesota Public Utilities Commission, and Mike Rothman, Commissioner, Minnesota Department of Commerce, each in his or her official capacity*

Claire M. Olson
Casey Jacobson
Basin Electric Power Cooperative
Office of General Counsel
1717 East Interstate Avenue
Bismarck, ND 58503-0564
Phone: (701) 557-5317

*Attorneys for Basin Electric Power Cooperative*

William Taylor
Woods, Fuller, Shultz and Smith
300 S. Phillips Ave., Suite 300
P.O. Box 5027
Sioux Falls, SD 57117-5027
Phone: (605) 336-3890

*Attorneys for Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services*

Wyatt Hogan
Great Northern Properties L.P.
601 Jefferson Street
Suite 3600
Houston, TX 77002
Phone: (713) 751-7500

*Attorney for Great Northern Properties Limited Partnership*

John Neumann
The North American Coal Corporation
5340 Legacy Drive, Building 1
Suite 300
Plano, TX 75024
Phone: (972) 448-5400

*Attorneys for The North American Coal Corporation*

Gerad C. Paul
Minnkota Power Cooperative, Inc.
P.O. Box 13200
Grand Forks, ND 58208-3200
Phone: (701) 795-4210

*Attorney for Minnkota Power Cooperative, Inc.*

Paul Forster
Brian Bjella
Crowley Fleck PLLP
400 East Broadway, Suite 600
P.O. Box 2798
Bismarck, ND 58502
Phone: (701) 223-6585

*Attorneys for Lignite Energy Council*

# SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

Minnesota Statutes 216H.03, subdivisions 3(2) and 3(3) of Minnesota's Next Generation Energy Act unconstitutionally imposes Minnesota's policies on the generation of power in neighboring states and interferes with the interstate transmission and wholesale marketing of electric power in the integrated interstate region. The District Court correctly held that this provision of the NGEA violates the Dormant Commerce Clause.

The District Court could also have applied the Supremacy Clause to hold these two subdivisions are preempted by the Federal Power Act and Federal Energy Regulatory Commission regulations that have developed free and open integrated regional transmission systems and electric power markets, as well as by the Clean Air Act which recognizes the limits of state authority and provides federal procedures by which states like Minnesota raise concerns regarding air quality.

Appellees believe the Court would benefit from oral argument and request that each side be permitted 20 minutes.

Appellate Case: 14-2156   Page: 3   Date Filed: 01/21/2015 Entry ID: 4236351

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule of Appellate Procedure 26.1A, Appellees state that there are no nongovernmental corporate appellees with either a parent corporation or a publicly held corporation owning 10% or more of its stock, except for the following:  North American Coal Corporation is a wholly-owned subsidiary of NACCO Industries, Inc. (NYSE:NC).

Appellate Case: 14-2156    Page: 4    Date Filed: 01/21/2015 Entry ID: 4236351

# TABLE OF CONTENTS

Page

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT .................... i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF AUTHORITIES ..................................................... vi

STATEMENT OF ISSUES FOR REVIEW ....................................... 1

STATEMENT OF THE CASE .................................................. 3

    A.    REGIONAL, INTERCONNECTED ELECTRIC SYSTEMS. ............ 5

    B.    RTOs AND ITOs ..................................................... 7

    C.    MISO. ............................................................... 8

    D.    216H.03, SUBDS. 3(2)-(3) REGULATE NON-MINNESOTA ENTITIES AND OUT-OF-STATE ACTIVITIES. ........................... 10

    E.    TRANSACTION "PROPONENTS" MUST SUBMIT TO MINNESOTA REGULATION FOR ILLUSORY "OFFSET" EXCEPTIONS. ..................................................... 13

    F.    216H.03, SUBDS. 3(2)-(3) APPLICATION TO BASIN, MINNKOTA, AND MRES ............................................. 14

        1.    Basin. ...................................................... 17

        2.    Minnkota. .................................................. 19

        3.    MRES. ..................................................... 20

    G.    APPELLANTS' PRIOR INTERPRETATIONS OF 216H.03, SUBDS. 3(2)-(3). ................................................... 21

        1.    Dairyland/Weston-4. ....................................... 21

        2.    GRE/Spiritwood. ........................................... 23

ARGUMENT SUMMARY ..................................................... 26

Appellate Case: 14-2156    Page: 5    Date Filed: 01/21/2015 Entry ID: 4236351

ARGUMENT ..........................................................................................27

I.    APPELLEES HAVE STANDING AND THEIR CHALLENGE IS
      RIPE FOR ADJUDICATION. ......................................................27

      A.    Appellees Have Standing To Challenge 216H.03,
            Subds. 3(2)-(3)...............................................................27

      B.    Appellees' Claims Are Ripe For Adjudication. .................32

II.   THE DISTRICT COURT PROPERLY EXERCISED ITS
      DISCRETION IN DECLINING ABSTENTION. .......................34

III.  216H.03, SUBDS. 3(2)-(3) VIOLATES THE DORMANT
      COMMERCE CLAUSE.................................................................38

      A.    The District Court Correctly Held 216H.03, subds. 3(2)-(3)
            Violates The Extraterritoriality Doctrine. ...........................38

            1.    Extraterritoriality Doctrine.....................................38

            2.    216H.03, Subds. 3(2)-(3) Regulates Non-Minnesota
                  Entities And Out-Of-State Activities......................41

            3.    216H.03 Requires Non-Minnesota Entities To Seek
                  Regulatory Approval From Minnesota.....................46

            4.    216H.03, Subds. 3(2)-(3) Is Not An Extension Of
                  Minnesota's Traditional Regulatory Authority. ......47

      B.    Appellants' Evolving Interpretations Of 216H.03,
            Subds. 3(2)-(3)...............................................................50

      C.    216H.03, Subds. 3(2)-(3) Discriminates Against Interstate
            Commerce. ...................................................................53

      D.    216H.03, Subds. 3(2)-(3) Fails the *Pike* Balancing Test ...................56

            1.    216H.03 Does Not Effectuate A Legitimate Local
                  Purpose.....................................................................56

            2.    216H.03 Effects On Interstate Commerce Are Not
                  Incidental..................................................................58

iv

IV.    THE NGEA IS PREEMPTED BY THE FEDERAL POWER ACT ............60

     A.     FERC Has Exclusive Jurisdiction Over Transmission of Electric Energy In Interstate Commerce and The Sale of Such Energy At Wholesale..............................................................................60

     B.     § 216H.03, Subds. 3(2)-(3) Regulates Wholesale Transactions. ........62

     C.     216H.03 Regulates Transmission In Interstate Commerce................63

     D.     216H.03 Subd. 3(2)-(3) Exceeds Traditional State Authority. ..........65

         1.     216H.03 Subd. 3(2)-(3) Are Not Within "Prudency Review" Or Other Retail Rate Authority..................................65

         2.     216H.03 Subd. 3(2)-(3) Regulates Regional Generation Sources. .....................................................................................67

         3.     216H.03 Subd. 3(2)-(3) Do Not Fall Within PURPA Authority .............................................................................68

V.     THE NGEA IS PREEMPTED BY THE CLEAN AIR ACT.......................70

VI.    DISTRICT COURT NARROWLY TAILORED THE RELIEF GRANTED IN THIS CASE...........................................................................73

VII.   CROSS-APPELLANTS ARE ENTITLED TO REASONABLE ATTORNEYS' FEES AND NONTAXABLE COSTS. ..............................74

CONCLUSION .................................................................................................76

CERTIFICATE OF COMPLIANCE....................................................................81

SUPPLEMENTAL ADDENDUM

Appellate Case: 14-2156     Page: 7     Date Filed: 01/21/2015 Entry ID: 4236351

# TABLE OF AUTHORITIES

Page No.

**Cases**:

*ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters,*
645 F.3d 954 (8th Cir. 2011) .........................................................................31

*Alliance for Clean Coal v. Miller,*
44 F.3d 591 (7th Cir. 1995) ...........................................................................54

*Alliant Energy Corp. v. Bie,*
330 F.3d 904 (7th Cir. 2003) .........................................................................51

*Alliant Energy Corp. v. Bie,*
277 F.3d 916 (7th Cir. 2002) ................................................................... 27-28

*Am. Beverage Ass'n v. Snyder,*
700 F.3d 796 (6th Cir. 2012),
*cert. denied*, 2013 WL 1935301 (S.Ct. Oct. 7, 2013) ...................................40

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003) ...................................................................... 43-44

*Am. Charities for Reasonable Fundraising Regulation, Inc. v. Shiffrin,*
46 F.Supp.2d 143 (D. Conn. 1999) ...............................................................35

*Am. Elec. Power Co. v. Conn.,*
131 S.Ct. 2527 (2011)................................................................................2, 71

*Am. Libraries Ass'n v. Pataki,*
969 F.Supp. 160 (S.D.N.Y. 1997) .............................................................1, 39

*Babbit v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979)........................................................................................32

*Bacchus Imports, Ltd. v. Dias,*
468 U.S. 263 (1984)........................................................................................55

vi

*Baldwin v. G.A.F. Seelig, Inc.,*
    294 U.S. 511 (1935)...................................................................1, 40, 41, 51

*Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty., Tex.,*
    57 F.3d 436 (5th Cir. 1995) .......................................................36

*Bibb v. Navajo Freight Lines, Inc.,*
    359 U.S. 520 (1959)...................................................................39

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996)...................................................................39, 41

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*
    476 U.S. 573 (1986)...................................................................40, 47

*C&A Carbone, Inc. v. Town of Clarkstown, N.Y.,*
    511 U.S. 383 (1994)........................................................ 1, 39-40, 41, 53

*Cal. Pub. Util. Comm'n,*
    134 FERC ¶61044 (2011)...........................................................69

*Cal. Pub. Util. Comm'n,*
    132 FERC ¶61047 (2010)...........................................................69

*Charvat v. Mut. First Fed. Credit Union,*
    725 F.3d 819 (8th Cir. 2013) .....................................................31

*Chem. Waste Mgt., Inc. v. Hunt,*
    504 U.S. 334 (1992)...................................................................51

*City of Houston, Texas v. Hill,*
    482 U.S. 451 (1987)...................................................................36

*City of Jefferson City, Mo. v. Cingular Wireless, LLC,*
    531 F.3d 595 (8th Cir. 2008) .....................................................1, 35

*Clapper v. Amnesty Int'l USA,*
    133 S.Ct. 1138 (2013)................................................................31

vii

*Clean Air Mkts. Grp. v. Pataki,*
    338 F.3d 82 (2d Cir. 2003) ......................................................1, 2, 39, 70, 72

*Clinton v. City of New York,*
    524 U.S. 417 (1998).............................................................................27

*Colo. River Water Conservations Dist. v. United States,*
    424 U.S. 800 (1976).............................................................................36

*Conn. Dep't of Pub. Util. Control v. FERC,*
    569 F.3d 477 (D.C. Cir. 2009)..............................................................48

*Cotto Waxo Co. v. Williams,*
    46 F.3d 790 (8th Cir. 1995) .................................................................40

*Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.,*
    159 F.3d 129 (3d Cir. 1998) .................................................................69

*CSX Transp., Inc. v. Easterwood,*
    507 U.S. 658 (1993).............................................................................60

*De Jesus Nazario v. Morris Rodriguez,*
    554 F.3d 196 (1st Cir. 2009)................................................................75

*Dennis v. Higgins,*
    498 U.S. 439 (1991).................................................................2, 74, 75

*Edgar v. MITE Corp.,*
    457 U.S. 624 (1982).....................................................................39, 40

*Energy & Envtl. Legal Inst. v. Epel,*
    2014 WL 1874977 (D. Colo. May 9, 2014) .........................................49

*Fed. Power Comm'n v. S. Cal. Edison Co.,*
    376 U.S. 205 (1964).......................................................................7, 66

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Resources,*
    504 U.S. 353 (1992).............................................................................42

Appellate Case: 14-2156    Page: 10    Date Filed: 01/21/2015   Entry ID: 4236351

*Gray v. City of Valley Park, Mo.,*
    567 F.3d 976 (8th Cir. 2009) ....................................................................1, 29

*Greater N.Y. Metro. Food Council v. McGuire,*
    6 F.3d 75 (2d Cir. 1993) ...........................................................................35

*Harmon v. City of Kansas City, Missouri,*
    197 F.3d 321 (8th Cir. 1999) .....................................................................30

*Harris v. Mexican Specialty Foods, Inc.,*
    564 F.3d 1301 (11th Cir. 2009) .................................................................32

*Haw. Hous. Auth. v. Midkiff,*
    467 U.S. 229 (1984) ........................................................................1, 35, 36

*Healy v. Beer Inst.,*
    491 U.S. 324 (1989) ...........................................................38, 39, 40, 43, 55

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ................................................................................75

*Hughes v. Oklahoma,*
    441 U.S. 322 (1979) ................................................................................58

*Ill. Commerce Comm'n v. FERC,*
    721 F.3d 764 (7th Cir. 2013) .....................................................................49

*Ill. Natural Gas Co. v. Cent. Ill. Pub. Serv. Co.,*
    314 U.S. 498 (1942) ............................................................................ 62, 66

*Indep. Energy Producers v. Cal. Pub. Utils. Comm'n,*
    36 F.3d 848 (9th Cir. 1994) .......................................................................69

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) ................................................................................73

*Iowa League of Cities v. EPA,*
    711 F.3d 844 (8th Cir. 2013) ..................................................................1, 34

**Appellate Case: 14-2156     Page: 11     Date Filed: 01/21/2015 Entry ID: 4236351**

*Jones v. Gale,*
    470 F.3d 1261 (8th Cir. 2006) ...................................................1, 27

*Kansas City S. Ry. v. Kaw Valley Drainage Dist.,*
    233 U.S. 75 (1914) ...........................................................................60

*KCCP Trust v. City of North Kansas City,*
    432 F.3d 897 (8th Cir. 2005) .........................................................33

*Keller v. City of Fremont,*
    719 F.3d 931 (8th Cir. 2013),
    *cert. denied*, 134 S.Ct. 2140 (2014) .............................................29

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton,*
    422 F.3d 490 (7th Cir. 2005) .........................................................27

*Lead Indus. Ass'n, Inc. v. EPA,*
    647 F.2d 1130 (D.C. Cir. 1980) .....................................................72

*Lindsey v. Normet,*
    405 U.S. 56 (1972) ...........................................................................36

*Maine v. Taylor,*
    477 U.S. 131 (1986) .........................................................................57

*Maryland v. Louisiana,*
    451 U.S. 725 (1981) .........................................................................66

*Mazanec v. N. Judson-San Pierre Sch. Corp.,*
    763 F.2d 845 (7th Cir. 1985) .........................................................36

*Minn. Citizens Concerned for Life v. Fed. Election Comm'n,*
    113 F.3d 129 (8th Cir. 1997) .........................................................29

*Miss. Power & Light Co. v. Miss. ex rel. Moore,*
    487 U.S. 354 (1988) ....................................................................1, 61

*N. Natural Gas Co. v. Iowa Utils. Bd.,*
    377 F.3d 817 (8th Cir. 2004) .........................................................60

Appellate Case: 14-2156     Page: 12     Date Filed: 01/21/2015 Entry ID: 4236351

*N. Natural Gas Co. v. State Corp. Comm'n,*
  372 U.S. 84 (1963)........................................................................66

*N. States Power Co. v. MPUC,*
  344 N.W.2d 374 (Minn. 1984) ....................................................63

*N.C. ex rel Cooper v. Tenn. Valley Auth.,*
  615 F.3d 291 (4th Cir. 2010) ...................................................2, 72

*N.J. Bd. of Pub. Utils. v. FERC,*
  744 F.3d 74 (3d Cir. 2014) ...........................................................7

*N.Y. Life Ins. Co. v. Head,*
  234 U.S. 149 (1914)......................................................................41

*Nat'l City Lines, Inc. v. LLC Corp.,*
  687 F.2d 1122 (8th Cir. 1982)....................................................1, 36

*Nat'l Elect. Mfrs. Ass'n v. Sorrell,*
  272 F.3d 104 (2d Cir. 2001) .........................................................44

*Nat'l Foreign Trade Council v. Natsios,*
  181 F.3d 38 (1st Cir. 1999)...........................................................43

*Nat'l Solid Waste Mgmt. Ass'n v. Meyer,*
  165 F.3d 1151 (7th Cir. 1999)...........................................39, 42, 43

*Nat'l Solid Waste Mgmt. Ass'n v. Meyer,*
  63 F.3d 652 (7th Cir. 1995)........................................................1, 42

*Natural Res. Def. Council, Inc. v. Watkins,*
  954 F.2d 974 (4th Cir. 1992) ........................................................31

*Neb. Pub. Power Dist. v. MidAm. Energy Co.,*
  234 F.3d 1032 (8th Cir. 2000)......................................................34

*New England Power Co. v. New Hampshire,*
  455 U.S. 331 (1982)...................................................................1, 61

Appellate Case: 14-2156    Page: 13    Date Filed: 01/21/2015 Entry ID: 4236351

*New State Ice Co. v. Liebmann,*
    285 U.S. 262 (1932)......................................................................42

*New York v. FERC,*
    535 U.S. 1 (2002)...........................................................................6

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas,*
    489 U.S. 493 (1989)......................................................................66

*Or. Waste Sys. v. Dep't of Envtl. Quality,*
    511 U.S. 93 (1994)........................................................................53

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
    461 U.S. 190 (1983)......................................................................34

*Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n,*
    332 U.S. 507 (1947).......................................................................7

*Pharm. Research Mfrs. of Am. v. Walsh,*
    538 U.S. 644 (2003)......................................................................39

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970)......................................................................56

*Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.,*
    268 F.3d 255 (4th Cir. 2001) ................................................. 30-31

*Pioneer Military Lending, Inc. v. Manning,*
    2 F.3d 280 (8th Cir. 1993) ...........................................................75

*Potrero Hills Landfill, Inc. v. Cnty. of Solano,*
    657 F.3d 876 (9th Cir. 2011) .......................................................35

*Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex.,*
    422 F.3d 231 (5th Cir. 2005) .......................................................69

*PPL EnergyPlus, LLC v. Nazarian,*
    753 F.3d 467 (4th Cir. 2014) .............................................*passim*

Appellate Case: 14-2156      Page: 14      Date Filed: 01/21/2015 Entry ID: 4236351

*PPL EnergyPlus, LLC v. Solomon,*
    766 F.3d 241 (3d Cir. 2014) ................................................................*passim*

*Pub. Utils. Comm'n v. Attleboro Steam & Elec. Co.,*
    273 U.S. 83 (1927)....................................................................................60

*Pub. Utils. Comm'n v. FERC,*
    900 F.2d 269 (D.C. Cir. 1990).................................................................62

*Pub. Water Supply Dist. No. 10 of Cass Cnty., Mo. v. City of Peculiar, Mo.,*
    345 F.3d 570 (8th Cir. 2003) ..................................................................32

*R.R. Comm'n of Tx. v. Pullman Co.,*
    312 U.S. 496 (1941)................................................................................35

*Rocky Mountain Farmers' Union v. Corey,*
    740 F.3d 507 (9th Cir. 2014) ..................................................................45

*Rocky Mountain Farmers' Union v. Corey,*
    730 F.3d 1070 (9th Cir. 2013) ................................................................45

*Russell v. Burris,*
    146 F.3d 563 (8th Cir. 1998) ..................................................................29

*S. Pac. Co. v. Ariz. ex rel. Sullivan,*
    325 U.S. 761 (1945)....................................................................39, 56, 59

*S. Union Co. v. Mo. Public Serv. Comm'n,*
    289 F.3d 503 (8th Cir. 2002) ..................................................................41

*Schneidewind v. ANR Pipeline Co.,*
    485 U.S. 293 (1988)................................................................................62

*Sierra Club v. United States Army Corps of Eng'rs,*
    645 F.3d 978 (8th Cir. 2011) ..................................................................32

*S.D. Farm Bureau v. Hazeltine,*
    340 F.3d 583 (8th Cir. 2003) ..............................................................1, 27

Appellate Case: 14-2156    Page: 15    Date Filed: 01/21/2015 Entry ID: 4236351

*S.D. Mining Ass'n, Inc. v. Lawrence Cnty.,*
    155 F.3d 1005 (8th Cir. 1998) ................................................................. 33-34

*SPGGC, LLC. v. Blumenthal,*
    505 F.3d 183 (2d Cir. 2007) ...................................................................44

*Texas v. United States,*
    523 U.S. 296 (1998)..............................................................................32, 33

*United Food & Commercial Workers Int'l Union, AFL-CIO,*
    *CLC v. IBP, Inc.,*
    857 F.2d 422 (8th Cir. 1988) ...................................................................30

*United States v. Locke,*
    529 U.S. 89 (2000)...................................................................................62

*United States v. Pub. Util. Comm'n of Cal.,*
    345 U.S. 295 (1953)................................................................................61

*W. Lynn Creamery, Inc. v. Healy,*
    512 U.S. 186 (1994)................................................................................58

*Wash. Envtl. Council v. Bellon,*
    732 F.3d 1131 (9th Cir. 2013) ................................................................57

*Waste Sys. Corp. v. Martin Cnty.,*
    985 F.2d 1381 (8th Cir. 1993) ............................................................ 74-75

## **Constitutions**:

U.S. Const., art. I, § 8, cl. 3.................................................................................1

U.S. Const., art. IV, § 2.............................................................................1, 2, 60

## **Statutes**:

16 U.S.C. § 824(a) ...............................................................................6, 61
16 U.S.C. § 824(b)(1)............................................................................7, 61
16 U.S.C. § 824a-3(f)...............................................................................69

Appellate Case: 14-2156    Page: 16    Date Filed: 01/21/2015 Entry ID: 4236351

42 U.S.C. § 1988 ..................................................................2
42 U.S.C. § 7407 ..................................................................2
42 U.S.C. § 7407(a) .............................................................71
42 U.S.C. § 7410 ..................................................................2
42 U.S.C. § 7410(a)(1) .........................................................71
42 U.S.C. § 7410(a)(2)(D)(i) .................................................71
42 U.S.C. § 7420 ..................................................................2
42 U.S.C. § 7420(a)(1)(B)(i) .................................................71
42 U.S.C. § 7426 ..................................................................2
42 U.S.C. § 7426(a)(1)(b) .....................................................71
42 U.S.C. § 7426(b) .............................................................71

Minn. Stat. § 216B.02, subd. 4 ...........................................48
Minn. Stat. § 216B.025 ........................................................48
Minn. Stat. § 216B.026 ........................................................48
Minn. Stat. § 216B.03 ..........................................................48
Minn. Stat. § 216B.16 ..........................................................48
Minn. Stat. § 216B.243 ........................................................48
Minn. Stat. § 216B.2421 ......................................................64
Minn. Stat. § 216B.2422, subd. 2 ........................................48
Minn. Stat. § 216B.2421, subd. 2(1) ....................................13
Minn. Stat. § 216B.2422, subd. 2b ......................................48

Minn. Stat. § 216H.01, subd. 2 ...........................................57
Minn. Stat. § 216H.02, subd. 1 .......................................57, 59
Minn. Stat. § 216H.02, subd. 2 ...........................................57
Minn. Stat. § 216H.03, subd. 1 .......................................13, 64
Minn. Stat. § 216H.03, subd. 2 .....................................*passim*
Minn. Stat. § 216H.03, subd. 3 .....................................*passim*
Minn. Stat. § 216H.03, subd. 3(2) .................................*passim*
Minn. Stat. § 216H.03, subds. 3(2)-(3) ..........................*passim*
Minn. Stat. § 216H.03, subd. 4(a) ........................................46
Minn. Stat. § 216H.03, subd. 4(c) ....................................14, 46
Minn. Stat. § 216H.10, subd. 5 ...........................................57

Minn. H.J., 87th Leg., 4971 (2011) ......................................11
Minn. S.J., 87th Leg., 3048c (2011) .....................................11

Appellate Case: 14-2156    Page: 17    Date Filed: 01/21/2015 Entry ID: 4236351

**Other:**

Adler, *Climate Balkanization: Dormant Commerce
    and the Limits of State Energy Policy,*
    3 LSU J. of Energy L. & Resources 153 (2014) ....................................49, 57

Appellate Case: 14-2156     Page: 18     Date Filed: 01/21/2015 Entry ID: 4236351

# STATEMENT OF ISSUES FOR REVIEW

I.    Whether one or more Appellees have standing and presented a ripe case or controversy?

*Gray v. City of Valley Park, Mo.*, 567 F.3d 976 (8th Cir. 2009)
*Jones v. Gale*, 470 F.3d 1261 (8th Cir. 2006)
*S.D. Farm Bureau v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003)
*Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013)

II.    Whether the District Court abused its discretion in declining to abstain?

*Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984)
*City of Jefferson City v. Cingular Wireless*, 531 F.3d 595 (8th Cir. 2008)
*Nat'l City Lines, Inc. v. LLC Corp.*, 687 F.2d 1122 (8th Cir. 1982)

III.    Whether Minnesota Statutes section 216H.03, subdivisions 3(2) and 3(3) ("216H.03, subds. 3(2)-(3)") violates the Dormant Commerce Clause of the United States Constitution?

*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935)
*C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383 (1994)
*Nat'l Solid Waste Mgmt. Ass'n v. Meyer*, 63 F.3d 652 (7th Cir. 1995)
*Am. Libraries Ass'n v. Pataki*, 969 F.Supp. 160 (S.D.N.Y. 1997)
U.S. Constitution, Art. I, § 8, cl. 3

IV.    Whether 216H.03, subds. 3(2)-(3) is preempted by the Federal Power Act ("FPA")?

*Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354 (1988)
*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982)
*PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014)
*PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014)
U.S. Constitution, Art. IV, § 2
16 U.S.C. §§ 824(a) & (b)(1)

Appellate Case: 14-2156    Page: 19    Date Filed: 01/21/2015 Entry ID: 4236351

V.      Whether 216H.03, subds. 3(2)-(3) is preempted by the Clean Air Act
        ("CAA")?

*Am. Elec. Power Co. v. Conn.*, 131 S.Ct. 2527 (2011)
*Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82 (2d Cir. 2003)
*N.C. ex rel Cooper v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010)
U.S. Constitution, Art. IV, § 2
42 U.S.C. §§ 7407, 7410, 7420, 7426

VI.     Whether Appellees/Cross-Appellants may be awarded their
        reasonable attorneys' fees and nontaxable costs?

*Dennis v. Higgins*, 498 U.S. 439 (1991)
42 U.S.C. § 1988

2

## STATEMENT OF THE CASE

Many rural cooperatives and smaller municipalities in Minnesota pool their resources with similar cooperatives and municipalities located outside Minnesota through not-for-profit member-owned entities such as Basin Electric Power Cooperative ("Basin"), Minnkota Power Cooperative, Inc. ("Minnkota"), and Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services ("MRES"). This is how these small load-serving entities ("LSEs") provide affordable and reliable retail electric power to their customers.

Basin, Minnkota, and MRES are all based outside Minnesota. They assemble resource portfolios to satisfy the aggregate needs of their respective multi-state memberships, often through wholesale transactions with third-parties taking place entirely outside of Minnesota.

Basin, Minnkota, and MRES have standard long-term agreements with each member and charge each member uniform rates for the wholesale power obtained on behalf of the membership. Basin, Minnkota, and MRES act for the collective benefit of their respective multi-state memberships to obtain the most affordable and reliable resources available.

Appellate Case: 14-2156    Page: 21    Date Filed: 01/21/2015 Entry ID: 4236351

The challenged provision of the Next Generation Energy Act ("NGEA")—namely, 216H.03, subds. 3(2)-(3)—broadly regulates any "person"[1] engaged in generation, transmission, and wholesale transactions involving coal-generated electricity purportedly "consumed" in Minnesota. Yet the parties agree it is impossible to determine where electricity is actually consumed within the regional, integrated transmission and market systems. Federally approved and regulated operators determine which generation sources operate on any given day in these regional systems, and the laws of physics determine where the power is ultimately consumed. At any given instant, wind-generators, coal-generators, nuclear-generators, hydroelectric-generators, solar-generators, and other types of generation may provide power to the electrical grid. This power cannot be directed to particular consumers based on the method of generation.

The statute traces "consumption" of prohibited power to Minnesota LSEs using a "contract path" method which connects those LSEs to any upstream transactions prohibited by 216H.03, subds. 3(2)-(3). For example, if a non-Minnesota entity such Basin, Minnkota, or MRES enters into a statutorily prohibited transaction with a third-party outside of Minnesota, that transaction triggers the offset requirements imposed by 216H.03, subd. 4—regardless of

_____

[1]     Appellees' supplemental addendum contains an overview of "persons" in the electricity industry subject to 216H.03 that Appellees provided to the District Court. (SupAdd1-SupAdd14)

4

whether any of the power associated with that transaction will actually be consumed in Minnesota. The "contract path" method requires a pro-rated portion of the capacity or power associated with that transaction to be allocated to Basin's, Minnkota's, and MRES' members that are Minnesota LSEs.

Consequently, when assembling their resource portfolios to serve their entire multi-state membership, Basin, Minnkota, and MRES must either forego NGEA-prohibited transactions altogether or satisfy Minnesota regulators that they can comply with the statutory offset requirements. And since it is not possible to determine in advance either the prospects or the costs of satisfying the offset requirements, they must forego prohibited transactions that would otherwise benefit their entire multi-state membership.

The District Court correctly ruled that 216H.03, subds. 3(2)-(3) violates the Extraterritoriality Doctrine by regulating non-Minnesota entities and transactions that occur entirely outside of Minnesota.

## A.     REGIONAL, INTERCONNECTED ELECTRIC SYSTEMS.

"Electric energy generation and transmission occur in a complex regulatory environment populated with multiple private and public actors operating under the supervision of both state and federal agencies." *PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241, 246 (3d Cir. 2014).

5

"For much of the 20th century, the energy market was dominated by vertically integrated firms that produced, transmitted, and delivered power to end-use customers." *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 471 (4th Cir. 2014). "These firms were subject to extensive local regulation, though state power in this respect was limited by the strictures of the dormant Commerce Clause." *Id.* at 471. "Federal regulation has become increasingly prominent as the energy market has shifted away from local monopolies to a system of interstate competition." *Id.* at 472.

The Federal Power Act was enacted in 1935 to, *inter alia,* fill the regulatory gap that existed in the "then-nascent field of interstate electricity sales." *Id.* at 472. "Through the [FPA], Congress exercised its Commerce Clause prerogative to regulate matters of interstate commerce that the states could not." *Solomon*, 766 F.3d at 246. "Congress placed 'the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce' under federal control." *Id.* (quoting 16 U.S.C. § 824(a)). "And Congress further **extended federal authority** to those **electric energy matters indirectly related to interstate commerce that had previously been subject to state regulation**." *Id.* (citing *New York v. FERC,* 535 U.S. 1, 6 (2002))(emphasis added).

"What Congress did was to adopt the test developed in the *Attleboro* line which **denied state power to regulate a sale 'at wholesale to local distributing**

6

*companies'* and ***allowed state regulation of a sale at 'local retail rates to ultimate consumers*.'"  *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 214 (1964)("*FPC*")(quoting *Ill. Natural Gas Co. v. Cent. Ill. Pub. Serv. Co.*, 314 U.S. 498, 504 (1942))(emphasis added).  "***It cut sharply and cleanly between sales for resale and direct sales for consumptive uses***."  *Id.* (quoting *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n*, 332 U.S. 507, 517 (1947))(emphasis added).

The Federal Energy Regulatory Commission ("FERC") has exclusive authority over "transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce." *Nazarian*, 753 F.3d at 472 (quoting 16 U.S.C. § 824(b)(1)); *see Solomon*, 766 F.3d at 247.  "Rather than ensuring the reasonableness of interstate transactions by directly setting rates, FERC has chosen instead to achieve its regulatory aims indirectly by protecting 'the integrity of the interstate energy markets.'"  *Nazarian,* 753 F.3d at 472 (quoting *N.J. Bd. of Pub. Utils. v. FERC,* 744 F.3d 74, 81 (3d Cir. 2014)).

**B.    RTOs AND ITOs.**

"FERC…authorized the creation of 'regional transmission organizations' ["RTOs"] to oversee…multistate markets." *Nazarian,* 753 F.3d at 472.  Although utilities still own transmission lines, RTOs exercise independent control over the transmission system to ensure sufficient power to meet customer demand from day-to-day and hour-to-hour.  (Appx266)  RTOs generally dictate what power gets

7

transmitted on the regionally-connected grids, and on what terms. (Appx267) Placing the "scheduling and dispatch" function into the hands of third-party RTOs has resulted in a more open, transparent and competition-friendly system. (Appx269)

FERC also facilitated the creation of independent system operators ("ISOs")—nonprofit organizations that combine transmission facilities from several transmission owners into a single system to move energy over long distances at a single lower price (rather than an accumulation of separate charges imposed by transmission owners located between buyers and sellers). (Appx270) Nine ISOs operate in North America (five of which are RTOs) and collectively serve two-thirds of United States' consumers, and over half the population of Canada. (*Id.*)

### C. MISO.

Virtually all of Minnesota's electrical service area falls within the Midcontinent Independent System Operator, Inc. ("MISO") footprint. MISO was established in 1998 as an ISO and was approved as the Nation's first RTO by FERC in 2001. (Appx271) MISO is an independent, member-based, nonprofit organization whose members include over 30 transmission owners (including investor-owned utilities, public power utilities, independent power producers, and cooperatives) with more than $17-billion in transmission assets. (Appx272)

8

MISO provides open-access transmission service and monitors the high voltage transmission system throughout the Midwest United States—including Minnesota—and Manitoba, Canada. (Appx271) MISO also operates one of the world's largest "real-time" energy markets which include a Financial Transmission Rights Market, a Day-Ahead Market, a Real-Time Market, and a market for operating reserves and regulation (collectively, "MISO Markets"). (Appx271&Appx273) The vast majority of energy purchases and sales within MISO's footprint occur through the MISO Markets. (Appx273)

MISO's purpose is to ensure reliable and "least-cost delivered energy" is available to all consumers within the MISO footprint. (Appx271) Generators selling through the MISO Markets "bid in" their respective generation sources at a certain price per megawatt-hour. (Appx273) MISO then compares demand from distributors with generation sources available, and reports the market price for electricity at that particular point in time. (*Id.*)

To ensure reliability, MISO controls which generation facilities are operated and used to dispatch power to meet the total needs of the grid. (*Id.*) After generators bid their input into the grid, MISO—not individual utilities—decides which generators will run. (Appx273-Appx274) In the event demand exceeds what is initially expected, MISO—not individual utilities—decides which additional resources will operate. (*Id.*)

9

Before the MISO Markets, self-generation and bilateral purchase agreements were the traditional methods through which distributors obtained wholesale energy. (Appx275-Appx276) In traditional bilateral purchase agreements, a distributor would contractually agree to purchase a certain energy amounts from a generator at a certain rate. (*Id.*) The parties would then "schedule" the purchased energy through the grid to serve the distributor's needs, thereby creating a "contract path." (*Id.*)

There is no "contract path" in the MISO Markets. (Appx277) MISO does not match buyers to sellers; and, given the physical nature of electricity, the generation source for the buyer's energy is unknown and irrelevant. (*Id.*) The electricity that is sold—whether coal, wind, nuclear, hydro—is not differentiated in the market; electricity is a commodity that is the same regardless of how it is generated. (*Id.*) The buyer does not know what "type" of electricity it is actually receiving, nor would it care but for 216H.03, subds. 3(2)-(3). (*Id.*)

## D.   216H.03, SUBDS. 3(2)-(3) REGULATE NON-MINNESOTA ENTITIES AND OUT-OF-STATE ACTIVITIES.

Governor Tim Pawlenty expressed serious concerns and reservations regarding the challenged section of the NGEA prior to its enactment.[2] (SA98-SA99) The Minnesota Legislature subsequently repealed the unconstitutional

---

[2]   Some 50 members of the Minnesota House of Representatives voted to delete this provision. (SA13-SA31)

10

provision in 2011. Minn. S.J., 87th Leg., 3048c (2011); Minn. H.J., 87th Leg., 4971 (2011). Regrettably, Governor Mark Dayton vetoed the repeal.

Minn. Stat. §§216H.03 subds. 3(2)-(3) states that "***no person shall***":

> (2) ***import or commit to import from outside the state power*** from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or

> (3) ***enter into a new long-term power purchase agreement*** that would increase statewide power sector carbon dioxide emissions. For purposes of this section, a long-term power purchase agreement means an agreement to purchase 50 megawatts of capacity or more for a term exceeding five years.

*Id.* § 216H.03, subd. 3 (emphasis added). "[S]tatewide power sector carbon dioxide emissions" include:

> emissions of carbon dioxide from generation of electricity within the state and ***all emissions of carbon dioxide from the generation of electricity imported from outside the state*** and consumed in Minnesota. Emissions of carbon dioxide associated with transmission and distribution line losses are included in this definition.

*Id.* § 216H.03, subd. 2 (emphasis added).

Subds. 3(2)-(3) necessarily regulates wholesale transactions because "imports" and "long-term power purchase agreements" only occur in the wholesale context. Retail consumers neither "import" nor enter into "long-term power purchase agreements."

Appellants acknowledge 216H.03 is "a resource elimination statute" and "it's obvious that its goal is against coal." (SA399&SA402) Minnesota has no coal, so the statute expressly targets and "eliminates" out-of-state electricity

Appellate Case: 14-2156     Page: 29     Date Filed: 01/21/2015 Entry ID: 4236351

sources.[3]  Moreover, the statute is not limited to transactions in which Minnesota LSEs secure capacity or energy directly from a generation source—rather the statute applies to regulate upstream parties and transactions entirely outside Minnesota.

On its face, subd. 3(2) regulates out-of-state power generation using coal and creating carbon dioxide emissions.  This subdivision expressly provides that "no person shall...***import or commit to import***" any power associated with "emissions of carbon dioxide from the ***generation of electricity imported from outside the state*** and consumed in Minnesota."  The carbon dioxide emissions associated with the generation of such power occurs entirely outside Minnesota and is therefore subject to regulation by the state where the generation and emissions occur.

Subd. 3(3) likewise regulates based on the generation of carbon dioxide emissions outside Minnesota, and does so while favoring in-state generation.  Subd. 3(3) prohibits any "new long-term power purchase agreement that would ***<u>increase</u> statewide power sector carbon dioxide emissions*."  Minn. Stat. § 216H.03, subd. 3 (emphasis added).  New long-term power purchase agreements with existing in-state generators will not "increase statewide power sector carbon dioxide emissions" because emissions from those sources are already counted in "the total annual emissions of carbon dioxide from the generation of electricity

---

[3]     Indeed, lignite is mined out-of-state and conversion facilities must be located near the "mine-mouth."  (EnvtlAppx11-EnvtlAppx12)

within the state." *Id.* In contrast, subd. 3(3) prohibits "***all emissions of carbon dioxide*** from the generation of electricity ***imported from outside the state*.*"* Minn. Stat. §216H.03, subd. 2 (emphasis added). Thus, subd. 3(3) ***does not*** prohibit new long-term power purchase agreements with ***in-state sources*** (*see, e.g.*, SA343-SA350), but ***does*** prohibit all new long-term power purchase agreements with ***out-of-state sources***.

Finally, both subds. 3(2) and 3(3) regulate transmission. The definition of "statewide power sector carbon dioxide emissions" includes "[e]missions of carbon dioxide associated with transmission and distribution line losses." Minn. Stat. § 216H.03, subd. 2. These are emissions necessarily associated with the transmission of power rather than the consumption of power. (Appx278)[4]

### E. TRANSACTION "PROPONENTS" MUST SUBMIT TO MINNESOTA REGULATION FOR ILLUSORY "OFFSET" EXCEPTIONS.

A "proponent" of a transaction prohibited by 216H.03, subds. 3(2)-3(3) must establish "to the *[Minnesota] Public Utilities Commission's satisfaction* that it will ***offset the new contribution*** to statewide power sector carbon dioxide emissions with a carbon dioxide reduction project" by either (1) ***reducing an existing facility's carbon dioxide emissions*** or (2) ***purchasing carbon dioxide***

_____

[4] The statute also defines "new large energy facilit[ies]" to include transmission lines. Minn. Stat. §216H.03, subd. 1 (citing Minn. Stat. § 216B.2421, subd. 2(1)(emphasis added).

13

*allowances from a state operated carbon dioxide cap and trade system*.  *Id.*
§§ 216H.03, subds. 4(a)&(b)(emphasis added).  Both options are illusory.

The first method for establishing "offsets" is no option at all, at least at this
point in time, because carbon capture and sequestration technology is not currently
commercially available for power plants.  (Appx278)  Moreover, it makes no
business sense to add one new resource at the cost of eliminating a corresponding
resource and thereby gain no additional capacity.  Likewise, the second method for
establishing "offsets" is not viable since neither Minnesota nor any other state in
this region has established a carbon dioxide cap and trade system.  (Appx278)

Even if either option was viable, the MPUC "shall not find that a proposed
carbon dioxide reduction project...acceptably offsets a new contribution to
statewide power sector carbon dioxide emissions unless the proposed offsets are
***permanent, quantifiable, verifiable, enforceable, and would not have otherwise
occurred.***"  Minn. Stat. § 216H.03, subd. 4(c)(emphasis added).

In short, the "offset" options are illusory and provide no reliable way to
project costs of such "offsets."  (Appx278, SA103-SA104, SA136, SA145-SA146)

### F.   216H.03, SUBDS. 3(2)-(3) APPLICATION TO BASIN, MINNKOTA, AND MRES.

Basin, Minnkota, and MRES are not-for-profit, member-owned entities that
exist for their members to pool resources and obtain low-cost and reliable power.
Basin, Minnkota, and MRES enter into long-term agreements with their LSE

14

members across multi-state service areas to supply those members' wholesale power requirements. (SA101, SA133, SA142-SA143) They undertake resource planning activities on a regional basis to serve all members across all states in the most reliable and cost-effective manner. (SA101, SA132-SA133, SA141-SA142) Members are charged uniform rates. (*Id.*)

Basin, Minnkota, and MRES—not their individual members—are legally and financially responsible for deciding whether to purchase or develop particular generation assets, and whether to enter into particular power purchase agreements. (SA102, SA134, SA143) The individual members generally do not otherwise enter into wholesale transactions on their own. Thus, Basin, Minnkota, and MRES—not their individual members—enter into the transactions proscribed by 216H.03.

Given the structure of these multistate entities and the electric transmission system, it is impossible to segregate or reroute "prohibited" power away from Minnesota LSEs, or procure special "Minnesota-approved" power for Minnesota LSEs. Minnesota members cannot be charged a higher rate for the costs to comply with 216H.03 because the membership agreements require uniform rates. (SA135, SA144)

It would not be legally or practically feasible for individual Minnesota members to abandon Basin, Minnkota, or MRES and start negotiating individual wholesale transactions directly. As noted, the individual members have long-term

15

contractual relationships with Basin, Minnkota, and MRES. (SA101, SA133, SA142-SA143) The expense of breaching the contract and acquiring power directly would be cost-prohibitive. Even if they could afford it, forcing the Minnesota members to "go it alone" would radically increase rates and diminish reliability of power delivered to those LSEs' retail customers.

Appellees established the severe and direct obstacles 216H.03 poses to transactions Basin, Minnkota, and MRES might otherwise engage in to serve their respective memberships—obstacles to developing opportunities, finding partners, negotiating terms, obtaining financing, evaluating risks, calculating and projecting costs, determining return on investment, and a host of other factors critical to assembling resource portfolios.[5] (SA100-SA146) Basin, Minnkota, and MRES must either forego those NGEA-prohibited transactions altogether or satisfy Minnesota regulators that they can comply with illusory offset requirements. And since it is not possible to determine in advance the prospects or the costs of satisfying the offset requirements, they must forego prohibited transactions. The

_____

[5] Appellees submitted the only evidence from individuals with personal knowledge of these material facts. (SA400) Appellees' evidence included declarations from four electrical engineers directly responsible for Basin's, Minnkota's, and MRES' operations and financial performance. (Appx263-Appx326, SA100-SA146) Appellees also submitted a report by a licensed professional engineer who is an expert in electric transmission planning and systems, generation interconnection, resource planning, and distribution planning. (Appx263-Appx283) In contrast, Appellants and Amici rely on theoretical assertions by a lawyer and an economist. (SA401, Appx327-Appx382)

16

mere existence of 216H.03 is a "deal-killer" for certain transactions. (SA102-SA104, SA135-SA136, SA144-SA146)

### 1. Basin.

Basin is a member-owned nonprofit cooperative association headquartered in Bismarck, North Dakota. (Appx286) Basin is a regional generation and transmission cooperative ("G&T")—its core business is generating, acquiring, and transmitting wholesale electric power to its 135-member rural electric systems in Minnesota, North Dakota, Montana, Wyoming, Colorado, New Mexico, Nebraska, South Dakota and Iowa. (*Id.*) Basin engages in comprehensive planning to provide reliable, low-cost power on behalf of all its members pursuant to long-term membership agreements under which it must charge all members uniform rates. (Appx286-Appx287) The NGEA is harming Basin in at least three concrete ways.

First, Basin's Dry Fork Station in Gillette, Wyoming, constitutes a "new large energy facility." Basin began transferring up to 130MW of power generated by Dry Fork from the Western Interconnection into the Eastern Interconnection to satisfy increased load obligations in northwestern North Dakota. (SupAdd10, Appx292) These transfers had nothing to do with demand in Minnesota. (Appx292-Appx294) However, because Dry Fork is a "new large energy facility," Basin filed a Notification of Changed Circumstances for the Integrated Resource Plan it previously submitted to the MPUC. (Appx292, Appx394-Appx399) The

17

MDOC advocated that Basin submit an analysis of "whether the provision of power to MISO was a violation of Minnesota Statutes 216H.03." (Appx400-Appx405) Basin advised the MPUC that "Basin Electric believes [it is] highly unlikely that the physical power generated in Wyoming ends up in Minnesota and thus, there would be no violation of Minnesota Statutes 216H.03." (Appx408-Appx412) Appellants were not satisfied. The MDOC demanded more information (SA351-SA357), and the MPUC went silent on whether Basin's transfers from Dry Fork triggered the statutory offset requirements. (Appx293, EnvtlAppx22-EnvtlAppx23)

Second, 216H.03 interferes with Basin's future projects, including a second generation unit at Dry Fork Station; and a new facility in Selby, South Dakota, that would utilize new clean coal technologies. (Appx294-Appx295) Continued use of Dry Fork or the development of additional facilities would violate 216H.03 even if these units were developed and used to serve only Basin's members in North Dakota because some of Basin's members are Minnesota LSEs. (Appx292-Appx295)

Third, Basin's planning has been impeded by 216H.03, subd. 3(3)'s prohibition on "new long-term power purchase agreements" *regardless* of whether those emissions are generated from a new large energy facility and *regardless* of

18

whether those emissions occur from natural gas, diesel, or biomass generation. (SA144-SA145)

### 2. Minnkota.

Minnkota is a regional G&T based in Grand Forks, North Dakota, and owned by distribution coops located in North Dakota and Minnesota. (Appx306-Appx307) Minnkota serves some of the poorest areas in Minnesota, including Clearwater and Beltrami counties, and various Indian reservations, where even modest rate increases can cause excessive strain on limited resident incomes. (Appx312) Minnkota provides comprehensive planning and acquisition of reliable, low cost power on behalf of all of its members pursuant to long-term agreements at a uniform rate. (Appx311-Appx312) 216H.03, subds. 3(2)-(3) present the same kinds of hardships and difficulties on Minnkota as Basin in terms of planning and acquisition. (*Id.*)

Additionally, Minnkota has substantial, growing surplus capacity from the Milton R. Young unit 2 coal-fired plant in North Dakota, and Minnkota has already experienced a devaluation of that asset as a result of the NGEA. (Appx310-Appx311) The value of this surplus capacity is far greater if Minnkota can sell through long-term power purchase agreements of 10 to 20 years. (*Id.*) However, its natural customers—utilities serving load in Minnesota—have declined to enter into purchase agreements beyond 5 years because of 216H.03, subd. 3(3). (*Id.*)

19

### 3. MRES.

MRES is located in South Dakota and provides wholesale power to more than 60 municipalities located in Minnesota and three other states at a common rate. MRES has a long-term contractual relationship with Western Minnesota Municipal Power Agency ("WMMPA") and other entities throughout the region for wholesale energy and capacity. (Appx316-Appx317)

MRES and WMMPA have regularly considered purchasing new assets and/or entering into long-term power purchase agreements involving new large energy facilities. (Appx322-Appx325, SA210-SA213) MRES did not close on these transactions, which was fortunate because at least two of them would have triggered the NGEA as illustrated by the *Dairyland* proceedings detailed below. (Appx323-Appx325)

The District Court correctly held 216H.03, subds. 3(2)-(3) applied extraterritorially to non-Minnesota entities like Basin, Minnkota, and MRES by prohibiting them from importing or committing to import certain power, or entering into certain long-term power purchase agreements, because power associated with those transactions may be "consumed" in Minnesota. 15 F.Supp.3d at 907-19.[6]

_____

[6] Appellees include other parties that have been adversely affected by 216H.03, subds. 3(2)-(3), including North Dakota and its Industrial Commission which oversee tax revenue generated from the extraction of coal used for power

Appellate Case: 14-2156    Page: 38    Date Filed: 01/21/2015 Entry ID: 4236351

### G. APPELLANTS' PRIOR INTERPRETATIONS OF 216H.03, SUBDS. 3(2)-(3).

The District Court analyzed the statute based on its plain meaning—which is exactly how Appellants and Amici interpreted 216H.03 in MPUC proceedings involving Dairyland Power Cooperative's Weston-4 generation facility in Wisconsin and Great River Energy's Spiritwood facility in North Dakota.

#### 1. Dairyland/Weston-4.

Dairyland is a regional G&T serving members in Minnesota, Wisconsin, Iowa, and Illinois using both traditional and renewable energy resources including coal, natural gas, water, landfill gas, wind, and animal waste resources. Dairyland owns 30% of the Weston-4 Coal-Fired Power Plant ("Weston-4") located in Wausau, Wisconsin. (SA284) Electricity from Dairyland's generation sources, including Weston-4, is transmitted through the MISO transmission system and dispatched by MISO. (SA287) Thus, Dairyland cannot control where energy generated by Weston-4 is consumed. (SA287-SA288)

Dairyland has power plants substantially closer to Minnesota than Weston-4. Because of this, and given that most Dairyland members are in Wisconsin and

---

generation; North American Coal, one of the country's largest coal producers; Great Northern Properties, which seeks to develop its coal reserves; and the Lignite Energy Council, whose membership includes the various individuals and entities involved in the lignite industry. (ECF 17, pp. 5-9, SA147-SA152)

21

Weston-4 is located in central Wisconsin, it is unlikely any energy generated by Weston-4 is ever physically imported into Minnesota. (SA284-SA288)

Yet, because Dairyland has members in Minnesota, and because Dairyland has the Weston-4 resource available to serve its members, the MDOC and various environmental groups asserted 216H.03 restricted Dairyland's ability to rely upon this resource to serve any of its members. (SA306-SA340, SA284-SA299) The MDOC asserted that unless Dairyland could qualify for an exemption, Dairyland must comply with 216H.03's offset requirements for the energy generated by Weston-4 even though the facility does not generate electricity intended for consumption in Minnesota. (SA333-SA334, SA288-SA299)

The MDOC observed that, "under the MISO energy market, Dairyland must bid in all of its load and all of its resources." (SA333) Because "all of Dairyland's resources are available to meet the needs of all of Dairyland's load," and because "all of Dairyland's generation resources are located in Wisconsin," the MDOC concluded "Dairyland clearly imports power from Wisconsin to meet the needs of its members in Minnesota." (SA334)

> …within the MISO energy market, each utility's resources are offset against load so a utility's total supply of power is compared to the total demand for power. Any utility that does not have sufficient resources to meet the demand for power on its system must purchase more energy from the market to meet the needs of the load fully. Thus, all of a utility's resources are matched to all of a utility's load, regardless of state boundaries.

Appellate Case: 14-2156   Page: 40   Date Filed: 01/21/2015 Entry ID: 4236351

(*Id.*)  The MDOC asserted all of Dairyland's "members will share in the benefits of any MISO energy sales," and "all [of Dairyland's] members will bear responsibility for any MISO purchases."  (*Id.*)  "In other words, all of Dairyland's members are part of the same system."  (*Id.*)  Accordingly, Dairyland's entire membership—including members outside Minnesota—would bear the costs imposed by 216H.03, subd. 3(2), even though the energy generated by Weston-4 was not necessary to serve, nor likely be consumed in, Minnesota.

After more than a year of proceedings regarding the applicability of 216H.03 to Weston-4, the MPUC ultimately concluded Dairyland's Weston-4 fortuitously fell within an exemption.  (SA341-SA342, Appx385-Appx393)  Dairyland would otherwise have either needed to comply with the NGEA offset requirements, or stop using Weston-4 to serve its membership.

### 2.    GRE/Spiritwood.

GRE is a nonprofit G&T based in Minnesota.  It is Minnesota's second largest electric utility based on generating capacity, and the fifth largest generation and transmission cooperative in the United States in terms of assets.  GRE constructed Spiritwood Station in Jamestown, North Dakota, which can generate up to 99MW of electricity for the regional energy market.  (SupAdd11, SA215-SA216)  Spiritwood uses state-of-the-art technologies that make it one of the cleanest coal-based power plants in the world.  (SA215-SA216)

Appellate Case: 14-2156    Page: 41    Date Filed: 01/21/2015 Entry ID: 4236351

When GRE filed its 2008 Resource Plan with the MPUC, it mentioned Spiritwood Station in only four of the more than 200 pages filed. (SA217-SA221) However, the MPUC proceedings regarding GRE's Resource Plan devolved into a three-year referendum on the NGEA's applicability to Spiritwood. (SA222-SA253) Several environmental organizations persuaded the MPUC to commence a contested case hearing on the issue. (SA254-SA262) This occurred notwithstanding the fact that the Spiritwood Station is located *outside Minnesota*, and the generation of the electricity would occur entirely *outside Minnesota*.

In late 2010, the MPUC approved GRE's 2008 Resource Plan, but opened a new docket to consider Spiritwood's compliance with the NGEA. (SA261-SA262) On this new docket, numerous environmental organizations continued to object to proposed energy imports from Spiritwood. Moreover, the environmental organizations argued the MPUC should not allow GRE to claim projects voluntarily undertaken to reduce carbon dioxide emissions as "offsets" because the statute requires offsets that "would not have otherwise occurred." The Spiritwood Station project was tied up before Minnesota's Office of Administrative Hearings until May 2011, when the Minnesota Legislature enacted an exemption to the NGEA for Spiritwood. (Appx383-Appx393, SA263-SA272)

The *Dairyland* and *GRE* proceedings illustrate the daunting regulatory process imposed by 216H.03, subds. 3(2)-(3) to determine whether the offset

24

requirements in subd. 4 are required or satisfied. There is no way Basin, Minnkota, and MRES could successfully negotiate transactions subject to these kinds of prolonged public hearings, with environmental groups and other intervening parties challenging and picking apart every aspect of the proposed transactions. (SA102-SA104, SA135-SA136, SA144-SA145)

Appellate Case: 14-2156    Page: 43    Date Filed: 01/21/2015 Entry ID: 4236351

## ARGUMENT SUMMARY

The District Court correctly held that 216H.03, subds. 3(2)-(3) unconstitutionally regulate non-Minnesota entities and activities that occur entirely outside Minnesota. Furthermore, these provisions directly interfere with the interstate transmission and wholesale market systems without advancing any legitimate local interest. Accordingly, these two subdivisions of the NGEA are unconstitutional violations of the Dormant Commerce Clause.

Furthermore, 216H.03, subds. 3(2)-(3) is preempted by the Federal Power Act. The United States Supreme Court recognized long ago that individual states cannot impose their laws on the interstate transmission and wholesale marketing of electric power. Under Congressional authority, FERC developed interstate transmission systems and markets intended to promote reliable and low-cost power without interference by individual states like that imposed by 216H.03, subds. 3(2)-(3).

Finally, 216H.03, subds. 3(2)-(3) is preempted by the Clean Air Act. Minnesota's Governor declared that these provisions are essential to protect Minnesota's citizens from "toxic emissions" that may be blown into Minnesota from North Dakota by "[p]revailing winds." (SA403) This exceeds Minnesota's authority and is entirely unnecessary because the CAA provides a process to address air-quality concerns in neighboring states.

26

# ARGUMENT

## I. APPELLEES HAVE STANDING AND THEIR CHALLENGE IS RIPE FOR ADJUDICATION.

### A. Appellees Have Standing To Challenge 216H.03, Subds. 3(2)-(3).

The most noteworthy aspect of Appellants' arguments regarding standing and ripeness is the conspicuous absence of the Eighth Circuit's decisions in *Jones v. Gale*, 470 F.3d 1261 (8th Cir. 2006) and *South Dakota Farm Bureau v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003)—the cases the District Court relied upon in applying the Eighth Circuit's well-established rule that "plaintiffs have standing to challenge the constitutionality of a law that has a ***direct negative effect on their borrowing power, financial strength, and fiscal planning.***"  15 F.Supp.3d at 905 (emphasis added)

This rule is consistent with so-called "competitor standing" cases, a plaintiff suffers an injury-in-fact when the government acts in a way that increases competition or changes market conditions.  *See, e.g., Clinton v. City of New York*, 524 U.S. 417, 433 (1998)("probable economic injury resulting from governmental actions that alter competitive conditions…satisfy the Article III 'injury-in-fact' requirement"); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 499-500 (7th Cir. 2005)(injury-in-fact where a plaintiff's borrowing power, financial strength are implicated); *Alliant Energy Corp. v. Bie*,

Appellate Case: 14-2156     Page: 45     Date Filed: 01/21/2015 Entry ID: 4236351

277 F.3d 916, 921 (7th Cir. 2002)(pre-enforcement injury-in-fact and standing for "a firm hamstrung by laws cutting off its opportunities").

Appellees submitted unrebutted evidence from Basin, Minnkota, and MRES establishing how 216H.03, subds. 3(2)-(3) prevents them from engaging in certain transactions and how the offset "options" are illusory and infeasible. Appellants and Amici claim that Appellees have suffered no harm. However, they are not the people who actually run the business.

Basin, Minnkota, and MRES must actually comply with the law, negotiate terms, obtain financing, and deal with the constant changes in market forces. The very existence of 216H.03, subds. 3(2)-(3) forecloses their ability to engage in the prohibited transactions. Basin, Minnkota, and MRES cannot carve out separate resource portfolios for their Minnesota members. (SA134-SA135, SA143-SA144) And even if they could, 216H.03 makes it impossible as a practical matter to negotiate and finalize the terms of otherwise prohibited transactions. (SA103-SA104, SA135-SA136, SA144-SA145) These are not "hypothetical" harms as Appellants and Amici suggest. These are very real problems that businesses like Basin, Minnkota, and MRES must address.

Basin has already been confronted with threatened enforcement of 216H.03 for transfers from its Dry Fork facility in Wyoming to serve load in North Dakota. (Appx292-Appx294, Appx302-Appx303, Appx394-Appx412, SA351-SA357)

28

Further, Basin, MRES, and Minnkota have each identified potential transactions with which 216H.03 has interfered. (Appx294-Appx295, Appx302-Appx303, Appx310-Appx312, Appx323-Appx325)

Even absent a specific threat of enforcement, parties have standing to assert a facial challenge to regulations or statutes where (1) the party expresses its intention to engage in a course of conduct clearly proscribed by regulation and (2) the court need not speculate or anticipate whether the plaintiff falls within the purview of the regulation. *Gray v. City of Valley Park, Mo.,* 567 F.3d 976, 986 (8th Cir. 2009)(standing to challenge ordinance prohibiting employment of certain "unlawful" workers because employer might recruit and employ such workers); *see also Keller v. City of Fremont*, 719 F.3d 931, 947-48 (8th Cir. 2013), *cert. denied* 134 S.Ct. 2140 (2014)("When government action...is challenged by a party who is a target or object of that action...*there is ordinarily little question that the action...has caused him injury*…." (quoting *Minn. Citizens Concerned for Life v. Fed. Election Comm'n,* 113 F.3d 129, 131 (8th Cir. 1997))(emphasis added)); *Russell v. Burris,* 146 F.3d 563, 566–67 (8th Cir. 1998)("[W]here plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest which is clearly proscribed by statute, courts have found standing to challenge the statute, even absent a specific threat of enforcement.") In such cases, the mere "presence" of the regulation "is threat enough." *Gray*, 567

29

F.3d at 984 (quoting *United Food & Commercial Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc.,* 857 F.2d 422, 428 (8th Cir. 1988)).

Appellants erroneously rely on *Harmon v. City of Kansas City, Missouri,* 197 F.3d 321 (8th Cir. 1999), to argue Appellees lack standing because there is no currently pending threat of enforcement. (Appellants' Br. 19) In fact, in *Harmon,* this Court actually held plaintiff had standing to challenge the constitutionality of a municipal ordinance despite defendant's disavowal of enforcement. *Harmon,* 197 F.3d at 326-27; *see also United Food,* 857 F.2d at 429 (plaintiffs had standing in pre-enforcement challenge of state statute even where officials submitted affidavits asserting they would not enforce statute against plaintiffs).

Appellants argue that Appellees' harms and injuries are not traceable to the challenged provisions of 216H.03, subds. 3(2)-(3), but are instead due to potential federal regulation. (Appellants' Br. 20-23) This argument lacks evidentiary support and ignores the evidence in the record. Basin, Minnkota, and MRES have submitted unrebutted evidence that proposed federal regulations are significantly less problematic than the restrictions imposed by the NGEA. (Appx295-Appx296, Appx312-Appx313, Appx325-Appx326)

In any event, "[t]raceability 'does not mean that plaintiffs must show to a scientific certainty that defendant's [action]…caused the precise harm suffered by the plaintiffs.'" *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.,* 268

30

F.3d 255, 263-64 (4th Cir. 2001)(quoting *Natural Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992)). Standing does not require the elimination of all other causes or potential causes of the injury or harm, so long as there is evidence that the challenged statute "contributes to the kinds of injuries alleged." *Id; see also Charvat v. Mut. First Fed. Credit Union*, 725 F.3d 819, 825 (8th Cir. 2013)("Not every infirmity in the causal chain deprives a plaintiff of standing." (quoting *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 961 (8th Cir. 2011))).

Appellants' reliance on *Clapper v. Amnesty International USA*, 133 S.Ct. 1138 (2013) is misplaced. The statute at issue in *Clapper* expressly provided that the parties challenging the law *could not be targeted under that law* and plaintiffs had merely alleged a "speculative chain of possibilities" involving a sequence of at least five separate steps that the government would have to take—none of which were actually or likely to be taken based on the evidence. *Id.* at 1148-50.

In contrast, Basin, Minnkota, and MRES provided actual evidence demonstrating the very existence of 216H.03, subds. 3(2)-(3) has harmed and threatened to continually harm their respective business operations, and how Appellants' prior interpretations of these provisions have verified this threat. It is well settled that establishing standing for at least one plaintiff satisfies the

31

requirement for standing as to all plaintiffs. *Sierra Club v. United States Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011).

Appellees plainly have standing based on the applicable law and undisputed facts.

## B.  Appellees' Claims Are Ripe For Adjudication.

Ripeness determinations focus on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Texas v. United States,* 523 U.S. 296, 300–01 (1998). "[O]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Babbit v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979)). "[A] case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities." *Pub. Water Supply Dist. No. 10 of Cass Cnty., Mo. v. City of Peculiar, Mo.,* 345 F.3d 570, 573 (8th Cir. 2003). *See also Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009)("[A] purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record.").

This case presents straightforward legal questions, and no further record development is needed for the Court to decide the legal questions of whether 216H.03, subds. 3(2)-(3) violate the U.S. Constitution. Accordingly, there is no reason to delay resolution of the constitutional questions.

Appellants incorrectly rely on *Texas v. United States* to argue Appellees' claims are not ripe until there is more certainty regarding how an "implementing authority would apply [216H.03, subds. 3(2)-(3)] in particular circumstances." (Appellants' Br. 28) Texas challenged a determination by the U.S. Attorney General that a state statute *could violate* the Voting Rights Act *if implemented* in a certain manner. *Id.* at 300-01. In contrast, the instant case involves a facial challenge, not merely an as-applied challenge. The plain language of 216H.03 prevents Basin, Minnkota, and MRES from engaging in the prohibited transactions and activities without any further acts of state officials.

Appellants also erroneously rely on *KCCP Trust v. City of North Kansas City*, 432 F.3d 897, 899 (8th Cir. 2005) to contend Appellees' claims are "dependent on a number of contingencies." (Appellants' Br. 30) In *KCCP*, Time Warner Cable's challenge of a municipal decision to build a fiber optic line was not yet ripe because there were no plans to fully connect the fiber optic network to a cable provider. 432 F.3d at 899-900. This Court contrasted *KCCP* to *South Dakota Mining Ass'n, Inc. v. Lawrence County*, 155 F.3d 1005, 1008–09 (8th Cir. 1998), in which a facial challenge to an ordinance was held to be ripe even though the ordinance had not yet been enforced. *KCCP*, 432 F.3d at 900. Similarly, Appellees have standing because they want to engage in the very activities 216H.03, subds. 3(2)-(3) prohibits and facially threatens. *S.D. Mining*, 155 F.3d at

33

1008 (waiting would be exercise in futility when challengers' intended activity was plainly prohibited).

Appellees should not be forced to continue living with the existence of 216H.03, subds. 3(2)-(3) prohibitions and the uncertainty they create. *Iowa League of Cities v. EPA*, 711 F.3d 844, 868 (8th Cir. 2013)(plaintiffs faced hardship from "an expensive game of Russian roulette" arising from uncertainty over their obligations)(citing *Neb. Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000)("Delayed judicial resolution would only increase the parties' uncertainty, and would require [petitioners] to gamble millions of dollars on an uncertain legal foundation.")); *see also Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201–02 (1983)(challenge to unimplemented statute was ripe because "requir[ing] the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable hardship").

## II. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN DECLINING ABSTENTION.

Appellants never requested abstention in the District Court. Instead, they actively litigated the Appellees' claims on the merits. Appellants unsuccessfully sought judgment on Appellees' preemption claims. (ECF 11-32) Appellants supported the environmental groups who sought to intervene. (ECF 37-39, 43, 50-55, 57, 63, 70, 79) When Appellees sought an early motion for summary

34

judgment, Appellants urged delay to bring their own cross-motion for summary judgment on the merits. (ECF 83-87, 128-134, 186, 210)

The environmental groups first raised abstention after the parties' cross-motions for summary judgment were filed. 15 F.Supp.3d at 906. Now that the District Court has ruled against them on the merits, Appellants argue for abstention under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). (Appellants' Br. 32)

The District Court properly declined abstention. (2014 WL 1612331, *12) District court decisions regarding abstention—including *Pullman* abstention—are reviewed for abuse of discretion. *City of Jefferson City, Mo. v. Cingular Wireless, LLC,* 531 F.3d 595, 599 (8th Cir. 2008); *Potrero Hills Landfill, Inc. v. Cnty. of Solano,* 657 F.3d 876, 890 (9th Cir. 2011).

"[A]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Haw. Hous. Auth. v. Midkiff,* 467 U.S. 229, 236 (1984)). "*Pullman* abstention, in particular, is a narrowly limited doctrine." *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Shiffrin,* 46 F.Supp.2d 143, 157 (D. Conn. 1999). "Federal district courts have an 'unflagging duty to adjudicate matters properly within their jurisdiction,' and may not decline jurisdiction 'simply because the issues presented may be decided in another forum.'" *Id.* (quoting *Greater N.Y. Metro. Food Council v. McGuire,* 6 F.3d 75, 76 (2d Cir. 1993)); *see*

35

Appellate Case: 14-2156     Page: 53     Date Filed: 01/21/2015 Entry ID: 4236351

*also Colo. River Water Conservations Dist. v. United States,* 424 U.S. 800, 817 (1976).

*Pullman* abstention is inappropriate where challenged provisions of a state statute are clear on their face and cannot fairly be interpreted consistent with the Constitution. *Haw. Hous. Auth.,* 467 U.S. at 236-37; *Nat'l City Lines, Inc. v. LLC Corp.,* 687 F.2d 1122, 1126 (8th Cir. 1982). "If the statute is not obviously susceptible of a limiting construction, then even if the statute has never [been] interpreted by a state tribunal...it is the duty of the federal court to exercise its properly invoked jurisdiction." *City of Houston, Tex. v. Hill,* 482 U.S. 451, 468 (1987).

Courts "assess the totality of the circumstances presented by a particular case, considering the rights at stake and the costs of delay pending state court adjudication." *Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty., Tex.*, 57 F.3d 436, 442 (5th Cir. 1995). Long delays weigh against abstention. *See Mazanec v. N. Judson-San Pierre Sch. Corp.,* 763 F.2d 845, 846-47 (7th Cir. 1985)(reversing abstention order). The absence of concurrent state proceedings and the prior resolution of the matter on the merits also weigh against abstention. *Lindsey v. Normet,* 405 U.S. 56, 62 n.5 (1972)(district court correctly declined abstention where "[n]o state administrative process is involved" and "[t]he case has been thoroughly briefed and argued on the merits"). If this Court abstained, the

Appellate Case: 14-2156    Page: 54    Date Filed: 01/21/2015 Entry ID: 4236351

parties would have to start all over again with a new case, and resolution of this matter would be significantly delayed. Moreover, the fact that Appellants fully briefed and argued this matter in the proceedings below without ever requesting abstention, sought affirmative relief from the District Court on their own dispositive motions, and received District Court rulings on the merits further militates against abstention.

Finally, it bears noting that Appellants argue they took no action on the Dry Fork situation because Basin proposed the MPUC wait until the court had ruled on whether 216H.03, subds. 3(2)-(3) is unconstitutional. (Appellants' Br. 26) If that was the MPUC's reasoning, it not only demonstrates that Basin has standing and its claims are ripe, but also that abstention would be inappropriate because the MPUC made the decision in the Basin proceedings to await the final decision in this case.

The District Court correctly held the statute is facially invalid and Appellants provided no interpretation that could save 216H.03, subds. 3(2)-(3). 15 F.Supp.3d at 907. Abstention for the sake of awaiting some future proceeding would be pointless, and would only serve to impose further harm and injury to Appellees and others who are similarly situated. Accordingly, the District Court did not abuse its discretion in declining abstention.

37

## III. 216H.03, SUBDS. 3(2)-(3) VIOLATES THE DORMANT COMMERCE CLAUSE.

The Commerce Clause ensures each state can export their goods and services to, and import goods and services from, other states. The Dormant Commerce Clause, including the Extraterritoriality Doctrine, prevents individual states from walling themselves off from interstate commerce or dictating how interstate commerce shall be conducted. The District Court correctly held that the plain language and practical effects of 216H.03, subds. 3(2)-(3) violate the Extraterritoriality Doctrine. These provisions directly and unduly interfere with interstate commerce in violation of the Dormant Commerce Clause. Even if evaluated under *Pike*, the statute does not serve any legitimate local state interest.

### A. The District Court Correctly Held 216H.03, subds. 3(2)-(3) Violates The Extraterritoriality Doctrine.

The District Court held "the practical effect of Minn. Stat. § 216H.03, subd. 3(2)-(3) is to control non-Minnesota entities' conduct occurring wholly outside Minnesota." 15 F.Supp.3d at 917. "[T]his is the 'paradigm' of extraterritorial legislation." *Id.* at 918.

#### 1. Extraterritoriality Doctrine.

A state statute "that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). If a state law

38

attempts to regulate beyond that state's jurisdiction and "control conduct beyond the boundaries of the State," then the law is invalid. *Id.* at 336-37.

"No state has the authority to tell other polities what laws they must enact or how affairs must be conducted outside its borders." *Nat'l Solid Waste Mgmt. Ass'n v. Meyer*, 165 F.3d 1151, 1153 (7th Cir. 1999)("*Meyer II*"); *see also, e.g., BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996)("A State may not impose economic sanctions on violators of its laws with the intent of changing…lawful conduct in other States."); *Healy*, 491 U.S. 324, 343 (invalidating Connecticut statute requiring shippers to affirm prices in Connecticut were not higher than prices in bordering states); *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982)(invalidating Illinois anti-corporate takeover statute that could have stifled transactions that occurred wholly outside the state); *S. Pac. Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 783-84 (1945)(invalidating Arizona statute limiting length of trains within the state); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529-30 (1959)(invalidating Illinois statute requiring certain type of mudguards on semis); *Am. Libraries Ass'n v. Pataki*, 969 F.Supp. 160, 183-84 (S.D.N.Y. 1997)(invalidating New York statute regulating the Internet). [7]

---

[7]     Amici rely on *Pharmaceutical Research Manufacturers of America v. Walsh*, 538 U.S. 644, 669 (2003) to argue the extraterritoriality doctrine only applies to price control laws. This characterization of the holding is plainly incorrect, as the Supreme Court has applied the doctrine to other types of regulations. *See C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383,

Appellate Case: 14-2156     Page: 57     Date Filed: 01/21/2015 Entry ID: 4236351

"The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336 (citing *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986)). The practical effect of a statute is "evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.*

In *Cotto Waxo Co. v. Williams*, 46 F.3d 790 (8th Cir. 1995), the Eighth Circuit confirmed "[t]he Commerce Clause precludes application of a state statute to commerce that takes place wholly outside of the state's borders," and reiterated that "[u]nder the Commerce Clause, a state regulation is *per se* invalid when it has an 'extraterritorial reach,' that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state." 46 F.3d at 793 (citing *Healy*, 491 U.S. at 336).[8]

---

393 (1994)(citing *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935)(striking down waste flow control ordinance)); *Edgar*, 457 U.S. at 642-43 (striking down Illinois blue-sky law on extraterritoriality grounds)(plurality opinion). The Supreme Court also denied certiorari in *American Beverage Ass'n v. Snyder*, 700 F.3d 796 (6th Cir. 2012), *cert. denied*, 2013 WL 1935301 (S.Ct. Oct. 7, 2013), which applied the extraterritoriality doctrine beyond the price-affirmation context.

[8] The statute in *Cotto Waxo* did not violate the extraterritoriality doctrine because the plaintiff was "able to sell to out-of-state purchasers regardless of [its] relationship to Minnesota." *Id.* at 794. As such, that statute differed from the

Appellate Case: 14-2156     Page: 58     Date Filed: 01/21/2015 Entry ID: 4236351

### 2. 216H.03, Subds. 3(2)-(3) Regulates Non-Minnesota Entities And Out-Of-State Activities.

The "practical effect" of 216H.03 is to regulate non-Minnesota entities and activities occurring wholly outside Minnesota. 15 F.Supp.3d at 911 & 917-918. 216H.03, subds. 3(2)-(3) prohibits non-Minnesota entities such as Basin, Minnkota, and MRES from entering into "long-term purchase agreements" and importing or committing to import any power from "new large energy facilities" based on carbon emissions that occur entirely outside of Minnesota.

Minnesota does not have authority to prohibit transactions involving goods produced in another state simply because it disapproves of how those goods are produced. *See C&A Carbone*, 511 U.S. at 393 ("States and localities may not attach restrictions to exports or imports in order to control commerce in other States."). Individual states cannot impose their socioeconomic policies on their neighbors. *Baldwin*, 294 U.S. at 524. Regardless of how well-intentioned they may be, a state may not impose penalties "on violators of its laws with the intent of changing [parties'] lawful conduct in other States." *BMW*, 517 U.S. at 572; *see also N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914)(recognizing

---

practical effects of Minn. Stat. § 216H.03 because Basin, Minnkota, and MRES cannot supply their out-of-state members with a resource portfolio including certain generation sources because of the "relationship to Minnesota." Likewise, the statute analyzed in *Southern Union Co. v. Missouri Public Serv. Comm'n*, 289 F.3d 503 (8th Cir. 2002), is distinguishable from § 216H.03 because that Missouri law only applied to "public utilities" serving retail consumers in Missouri. *Id.* at 507-508.

"constitutional barriers by which all States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends").

Extraterritorial regulation by a state is not permitted simply because it even-handedly applies within the state. *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Resources*, 504 U.S. 353, 361-62 (1992). While a state might serve as a "laboratory" for itself, it may do so only when its "experiments" are "without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 387 (1932)(Brandeis, J., dissenting).

In *National Solid Waste Mgmt. Ass'n v. Meyer*, 63 F.3d 652 (7th Cir. 1995)("*Meyer I*") and 165 F.3d 1151 (7th Cir. 1999)("*Meyer II*"), the Seventh Circuit struck down two different versions of a Wisconsin statute that prohibited disposing waste in Wisconsin unless the community that generated the waste adopted Wisconsin-approved recycling specifications. *Meyer I*, 63 F.3d at 657-61; *Meyer II*, 165 F.3d at 1152-54. These statutes were unconstitutional under the Dormant Commerce Clause for at least three independent reasons: (1) they "required municipalities outside Wisconsin's borders to enact ordinances favoring Wisconsin's system and thus had extraterritorial application"; (2) "the prospect of conflict (if other states required municipalities to enact different kinds of ordinances) invited balkanization"; and (3) "the law made interstate commerce in

42

waste more costly than intrastate commerce in that commodity." *Meyer II*, 165 F.3d at 1152 (citing *Meyer I*).

Similarly, 216H.03, subds. 3(2)-(3) requires entities outside Minnesota to comply with Minnesota law before electricity generated from "new large energy facilities" may be "consumed" in Minnesota. Thus, 216H.03, subds. 3(2)-(3) clearly has extraterritorial application. *See Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999)(striking down law that penalized state contract bidders based on out-of-state conduct).

The prospect of conflict if other states passed their own statutes favoring or disfavoring certain generation sources invites balkanization. *See Healy*, 491 U.S. at 336 (Court must "consider[] how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation") & 337 ("practical effect of" unconstitutional state law in conjunction with other "laws that have been *or might be enacted* throughout the country is to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude")(emphasis added). This concern is heightened given the regional manner in which such facilities typically supply multiple jurisdictions.

The parallel the District Court drew with statutes purportedly regulating internet use is right on point. 15 F.Supp.3d at 913-914 & 917 (citing *Am.*

43

*Booksellers Found. v. Dean*, 342 F.3d 96, 100&103-104 (2d Cir. 2003). "Like the transmission of information over the internet, the transmission of electricity over the MISO grid does not recognize state boundaries. Therefore, when a non-Minnesota entity injects electricity into the grid to satisfy its obligations to a non-Minnesota member, it cannot ensure that the electricity will not travel to and be removed in—in other words, be imported to and contribute to statewide power sector carbon dioxide emissions in—Minnesota." *Id.* at 917.

Appellants' attempt to distinguish the District Court's reasoning based on *SPGGC, LLC. v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007) is unavailing. (*See* Appellants' Br. 46) *SPGGC* involved a Connecticut statute that regulated prepaid gift cards, including those sold on the internet. 505 F.3d at 195. The Court rejected the extraterritoriality challenge because there was a readily available means to direct and track particular gift cards to the purchasers' credit card billing addresses. *Id.*[9]

The electricity that Basin, Minnkota, and MRES obtains for their members cannot be directed or tracked. There is no way for Basin, Minnkota, or MRES to trace the actual supply and consumption of power generated in a particular manner.

---

[9] The same was true in *Nat'l Elect. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), which involved a statute requiring labels to be placed on lamps sold in Vermont. (Appellants' Br. 44) Out-of-state manufacturers were able to control where these lamps ultimately went and therefore could direct the labeled and unlabeled lamps accordingly. *Sorrell*, 272 F.3d at 110.

Appellate Case: 14-2156    Page: 62    Date Filed: 01/21/2015 Entry ID: 4236351

Consequently, to comply with subds. 3(2)-(3), Basin, Minnkota, and MRES must entirely forego prohibited transactions even when the purpose of the transaction is to address the needs of their non-Minnesota members.

Amici cite to the Ninth Circuit's split decision[10] in *Rocky Mountain Farmers' Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) to argue that 216H.03, subds. 3(2)-(3) do not violate the Extraterritoriality Doctrine. The District Court correctly held *Rocky Mountain* is inapplicable for numerous, independent reasons. 15 F.Supp.3d at 915 & 917-918. Most notably, the statute in *Rocky Mountain* regulated goods whose flow through interstate commerce can be traced and controlled. Manufacturers and suppliers, as well as purchasers, can track and control consumption of ethanol fuel. The same cannot be said for electricity. Whereas ethanol is physically transported by trucks and boats, electricity is injected into a regionally interconnected system and thereafter cannot be controlled or traced to ensure it is consumed (or not consumed) in a particular state. Thus, the only way entities such as Basin, Minnkota, and MRES can make sure that none of the "prohibited" electricity is "consumed" in Minnesota is by not engaging in any of the prohibited transactions altogether.[11]

---

[10] This was a 2-to-1 panel decision, 730 F.3d at 1107-1110; and 6 judges disagreed with the denial of en banc review. *Rocky Mountain*, 740 F.3d 507, 512-519 (9th Cir. 2014).

[11] The statute in *Rocky Mountain* is also distinguishable because it did not prohibit sales of any particular fuel or blend of fuel, whereas 216H.03, subds. 3(2)-

45

### 3. 216H.03 Requires Non-Minnesota Entities To Seek Regulatory Approval From Minnesota.

The District Court also correctly held that, "[i]n addition to regulating wholly out-of-state transactions, which is itself a violation of the extraterritoriality doctrine, Minn. Stat. § 216H.03, subds. 3(2)-(3), also improperly requires non-Minnesota merchants to seek regulatory approval before undertaking transactions with other non-Minnesota entities." 15 F.Supp.3d at 918.

Under 216H.03, capacity and electricity generated out-of-state in a manner deemed to contribute to "statewide power sector carbon dioxide emissions" can only be imported and consumed in Minnesota "if the project proponent demonstrates to the [MPUC's] satisfaction that it will offset the new contribution to statewide power sector carbon dioxide emissions with a carbon dioxide reduction project…." Minn. Stat. § 216H.03, subd. 4(a). The offset requirements are "illusory," *see supra* E; and are wholly impractical from a business standpoint. *See supra* F. & I.A. Moreover, these offset requirements unconstitutionally "force a merchant to seek regulatory approval in one State before undertaking a

---

(3) categorically prohibits certain categories of transactions and activities altogether. The California statute also contemplated certain offset requirements from an existing cap and trade market. Minnesota has not established a cap and trade market, nor could a proponent satisfy the offset requirement through existing cap and trade markets because "the proposed offsets are [to be] permanent, quantifiable, verifiable, enforceable, and would not have otherwise occurred." Minn. Stat. § 216H.03, subd. 4(c). Finally, the Ninth Circuit relied heavily on the fact that Congress has exempted California from restrictions imposed on individual states (including Minnesota) with respect to regulating emissions.

Appellate Case: 14-2156    Page: 64    Date Filed: 01/21/2015 Entry ID: 4236351

transaction in another," so as to "directly regulate[] interstate commerce." *Brown-Forman,* 476 U.S. at 582.

### 4. 216H.03, Subds. 3(2)-(3) Is Not An Extension Of Minnesota's Traditional Regulatory Authority.

Appellants argue 216H.03, subds. 3(2)-(3) is intended to limit Minnesota utilities from investing and committing to purchase electricity for use in Minnesota from generation resources that emit carbon dioxide. (Appellants' Br. 36&41) However, the individual cooperatives that make up Basin's and Minnkota's respective membership and the individual municipalities that make up MRES's membership generally do not directly invest in generation sources. Instead, the individual cooperatives enter into long term agreements with member-owned entities like Basin, Minnkota, and MRES. The member owned entities then invest in generation sources and assemble resource portfolios to secure low cost, reliable power to satisfy all of the members' collective load serving needs, for which the members are charged uniform rates. Thus, the practical effect of 216H.03, subds. 3(2)-(3) is to control the investments that out-of-state entities like Basin, Minnkota, and MRES make when assembling their resource portfolios for their multi-state membership.

216H.03, subds. 3(2)-(3) goes far beyond any authority Minnesota has traditionally exercised. Minnesota, like other individual states, has traditionally exercised control only over the siting, construction, and operation of generators

47

*within its own borders*.  Minn. Stat. § 216B.243.  But Minnesota is not authorized to control generation sources on a regional basis.  "[S]tates may select the type of generation to be built—wind or solar, gas or coal—and where to build the facility." *Solomon*, 766 F.3d at 255.  "Or states may elect to build no electric generation facilities at all."  *Id.* (*citing Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009)).  "The states regulatory choices accumulate into the available supply transacted through the interstate market."  *Id.*

Minnesota has traditionally exercised control over retail rates charged to consumers by "public utilities," which are the vertically integrated investor-owned utilities ("IOUs").[12]  *Id.* §§ 216B.02, subd. 4, 216B.03, 216B.16.  Minnesota's definition of "public utilities" expressly excludes cooperatives and municipalities. Minn. Stat. § 216B.02, subd. 4.  Appellants' own expert acknowledged that state regulatory authority over retail rates has not traditionally extended to cooperatives and municipalities.  (SA154, ECF 188, Ex. CC, 150)  In Minnesota, these LSE's are generally self-regulated—except where they voluntarily submit to MPUC regulation.  Minn. Stat. §§ 216B.025, 216B.026.

Finally, while many cooperatives and municipalities voluntarily submit integrated resource plans to the MPUC, these are submitted solely on an "advisory" basis.  Minn. Stat. §§ 216B.2422, subds. 2&2b.

---

[12]  IOUs defined and illustrated at SubApp4 and SubApp12.

48

Appellants and Amici characterize "renewable portfolio standards" ("RPS") as part of the states' "traditional" regulatory authority, and attempt to draw similarities between RPSs and 216H.03. RPSs are not part of the "traditional" state regulatory authority. State RPS statutes have been the subject of ongoing challenges. Adler, *Climate Balkanization: Dormant Commerce and the Limits of State Energy Policy*, 3 LSU J. of Energy L. & Resources 153, 178-183 (2014); *Ill. Commerce Comm'n v. FERC,* 721 F.3d 764, 776 (7th Cir. 2013)(Michigan's RPS "trips over an insurmountable constitutional objection.") Moreover, RPSs and 216H.03 are materially different. RPSs are intended to expand and diversify available resources by encouraging the development and use of renewable sources—whereas 216H.03 categorically prohibits certain transactions and activities for the purpose of eliminating a particular resource.

Amici cite to Colorado's RPS statute which is the subject of an ongoing Dormant Commerce Clause challenge. *Energy & Envtl. Legal Inst. v. Epel*, 2014 WL 1874977 (D. Colo. May 9, 2014). Colorado's "Renewables Quotas" require Colorado retail utilities to each generate, or cause to be generated, renewable energy sources in specified minimum amounts. *Id. *2. The statute expressly limits its application to Colorado utilities. *Id.* at *7. In contrast, 216H.03 broadly states that "no person shall" engage in the prohibited activities and any "proponent" must satisfy the offset requirements. Additionally, under Colorado's

49

RPS statute, "Colorado energy companies are free to buy and sell electricity from any in-state or out-of-state generator. The [statute] does not limit these transactions, set minimum standards for out-of-state generators that wish to do business in Colorado, or attempt to control pricing of the electricity." *Epel*, 2014 WL 1874977, *6 (statute "does not impose conditions on the importation of electricity"). In contrast, 216H.03 categorically prohibits transactions and excludes the import of power that has been generated using coal.

## B. Appellants' Evolving Interpretations Of 216H.03, Subds. 3(2)-(3).

Appellants' interpretation of 216H.03, subds. 3(2)-(3) has been a moving target. Prior to this lawsuit, the MDOC consistently advocated a plain-terms meaning of the statute, asserting in MPUC proceedings that (1) Dairyland, a non-Minnesota entity, could not use Weston-4, a large new energy facility in Wisconsin, to serve its members in eastern Wisconsin unless it satisfied the statutory offset requirements; (2) Basin, a non-Minnesota entity, could not use Dry Fork, a new large energy facility in Wyoming, to serve its members in western North Dakota unless it satisfied the statutory offset requirements; and (3) GRE, a Minnesota entity, could not use a new large energy facility in North Dakota to serve its out-of-state members unless it satisfied the statutory offset requirements.

In this lawsuit, Appellants have asserted the statute only applies to Minnesota LSEs. However, Appellants have not gone so far as to argue 216H.03,

subds. 3(2)-(3) applies only to Minnesota LSEs that *directly* import or commit to import power from "new large energy facilities" or are *direct* parties to "new long-term power purchase agreements."[13] This is because municipal utilities and rural co-ops do not engage in these transactions. Instead, 216H.03 must apply to Basin, Minnkota, and MRES because they are the entities that actually engage in these transactions when assembling resource portfolios to satisfy the obligations they owe their respective memberships.

Finally, Appellants and Amici repeatedly assert in their briefs that Appellants have always taken the position that 216H.03, subds. 3(2)-(3) does not apply to transactions in the MISO energy markets. (Appellants' Br. 10, 19, 25, 31, 33, 39, 42; Environmental Groups' Br. 7, 15-16; Minnesota NGOs' Br. 14, 21-22) However, they provide **no citation to the record** to show when Appellants have taken this position. (*Id.*) In fact, as the District Court pointed out, Appellants took

---

[13] Even this "narrower" application violates the Dormant Commerce Clause as an unconstitutional embargo of goods. Once an item of commerce has been produced, Minnesota "may not prevent it from crossing state lines...no matter where it originates." *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 914 (7th Cir. 2003). This "is true of all items of commerce." *Id.* "No State may attempt to isolate itself from a problem common to the several states by raising barriers to the free flow of interstate trade." *Chem. Waste Mgt., Inc. v. Hunt*, 504 U.S. 334, 339-340 (1992). "It is one thing for a state to exact adherence by an importer to fitting standards" before a good "may be sold in its markets." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 528 (1935). It is altogether different to impose requirements on the manner in which that good is produced as a requirement for that good to qualify for importation. *Id.*; *see also id.* at 524 ("The next step would be to condition importation upon proof of a satisfactory wage scale in factory or shop, or even upon proof of the profits of the business.").

Appellate Case: 14-2156   Page: 69   Date Filed: 01/21/2015 Entry ID: 4236351

the opposite position in the *Dairyland* proceedings where the MDOC argued the statute applied to MISO members because, under MISO, "all of a utility's resources are matched to all of a utility's load, regardless of state boundaries." 15 F.Supp.3d at 917.

Appellants are taking this position now to argue the District Court erroneously held subdivisions 3(2)-(3) "apply to the MISO short-term markets." (Appellants' Br. 35&36) This argument mischaracterizes the District Court's ruling. The District Court held "the practical effect of Minn. Stat. § 216H.03, subd. 3(2)-3(3) is to control non-Minnesota entities' conduct occurring wholly outside Minnesota," including but not limited to non-Minnesota entities who are MISO members. 15 F.Supp.3d at 917.

Appellants assert that "[t]he MISO short-term markets merely establish the daily wholesale price for electricity." (Appellants' Br. 36) This understates the role of MISO. (Appellants' Br. 36) Appellants ignore the critical fact that MISO decides which generation resources actually operate and generate power on any given day. Moreover, Appellants' characterizations of the "MISO short-term markets"[14] ignore the way 216H.03 regulates participants in the MISO market by

---

[14] While some participants may be motivated by "short-term" needs, the MISO markets are not "short-term," just as the NYSE is not a "short-term" market. If Appellants mean to refer to those instances where entities might purchase power from the "market" in excess of their projected needs, those types of transactions

52

limiting the transactions in which those parties can engage if they have any wholesale obligations in Minnesota. If not invalidated, the only way non-Minnesota entities like Basin, Minnkota, and MRES could comply with 216H.03, subds. 3(2)-(3) would be to forego all transactions involving power from "new large energy facilities" or "new long-term power purchase agreements." This would clearly violate the Dormant Commerce Clause, including the Extraterritoriality Doctrine.

### C. 216H.03, Subds. 3(2)-(3) Discriminates Against Interstate Commerce.

While purporting to regulate evenhandedly, 216H.03 has the practical effect of discriminating against out-of-state coal interests and out-of-state electricity generation while favoring in-state interests. States may not "discriminate against an article of commerce by reason of its origin or destination out of State." *C&A Carbone,* 511 U.S. at 390. In this context "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994). "If a restriction on commerce is discriminatory, it is virtually per se invalid." *Id.*

---

would be subject to 216H.03, subd. 3(2) because some of that power at any given time is generated by "new large energy facilities." (Appx277-Appx278)

Appellate Case: 14-2156     Page: 71     Date Filed: 01/21/2015 Entry ID: 4236351

On its face, the NGEA clearly and expressly discriminates against electricity generated by coal. Minnesota does not produce any coal for electricity generation. (SA169) Thus, the adverse effects of the NGEA are felt solely by owners of coal reserves, coal suppliers, and coal producers in other states, such as North American Coal and Great Northern Properties that provide coal for electricity generation, as well as North Dakota and the Industrial Commission which assess and utilize severance tax revenue for the benefit of North Dakotans. *See Alliance for Clean Coal v. Miller*, 44 F.3d 591, 595-96 (7th Cir. 1995)(Illinois statute that discriminated against use of low-sulfur coal that could be supplied only from outside Illinois violated Commerce Clause).[15]

Additionally, as explained above, the prohibition on new long-term power purchase agreements imposed by 216H.03, subd. 3(3), disadvantages out-of-state generation sources more than in-state sources. *See supra*, D. & III.C. Subd. 3(3) prohibits new long-term power purchase agreements associated with ***all*** out-of-state generation sources because it applies to "all emissions of carbon dioxide from the generation of electricity imported from outside the state," while applying to ***no***

_____

[15] The Illinois statute held unconstitutional in *Alliance for Clean Coal* discriminated against use of low sulfur coal in the generation of electricity within the state by making it a less viable option for Illinois generating plants. *Id.* at 596. The Illinois statute was basically doing what 216H.03 seeks to do—discriminate against goods in interstate commerce in order to control the fuel used to generate electricity.

54

Appellate Case: 14-2156    Page: 72    Date Filed: 01/21/2015 Entry ID: 4236351

in-state generation sources unless they "increase statewide power sector carbon dioxide emissions." (SA343-SA350)

Finally, 216H.03 favors in-state interests in its exemptions, all of which were enacted to exempt projects either located in Minnesota or owned by Minnesota-based entities. Minn. Stat. § 216H.03, subds. 5-7. The United States Supreme Court has repeatedly held that using exemptions to favor in-state interests constitutes the very economic in-state favoritism that the Dormant Commerce Clause prohibits. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270-72 (1984)(statute imposing tax on liquor, but exempting liquor made from products indigenous to state, violated Commerce Clause); *see also W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 190-91&194 (1994)(state law that charged fee on all milk sold in the state and redistributed those fees to in-state milk producers was unconstitutional because it effectively exempted local producers at the expense of out-of-state producers)(citing *Bacchus* and the "other cases of this kind" which are "legion"). In contrast to those in-state interests favored by the statutory exemptions, nonexempt parties must demonstrate to the MPUC they will offset carbon emissions through the illusory offset options set forth in § 216H.03, subd. 4. (Appx278, SA103-SA104, SA135-SA136, SA144-SA145) Thus, these "offset" requirements further discriminate against out-of-state generation sources.

55

### D. 216H.03, Subds. 3(2)-(3) Fails the *Pike* Balancing Test

Even if 216H.03, subds. 3(2)-(3) was not unconstitutional on its face and in its practical effects, it could not pass the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). To survive under the *Pike* test, a statute that affects interstate commerce must: (1) regulate evenhandedly, (2) effectuate a legitimate local public interest, and (3) have only incidental effects on interstate commerce. *Id.* at 142. As previously discussed, the NGEA does not regulate evenhandedly. *See supra*, III.C. Additionally, it does not effectuate a legitimate local interest and its effects on interstate commerce are anything but incidental.

#### 1. 216H.03 Does Not Effectuate A Legitimate Local Purpose.

When a "matter[] of local concern is local in character and effect, and its impact on the national commerce does not seriously interfere with its operation, and the consequent incentive to deal with them nationally is slight, such regulation has been generally held to be within state authority." *S. Pac. Co.,* 325 U.S. at 767 (citations omitted). "But ever since *Gibbons v. Ogden,*...the states have not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." *Id.* (citations omitted).

56

By its very terms, the NGEA imposes Minnesota's policy judgments regarding "climate change" and "global warming," rather than addressing a unique local problem. The absence of a unique local purpose for the NGEA is facially confirmed by the statute itself. The Minnesota Legislature's stated purpose for enacting the NGEA was to reduce "greenhouse gas emissions" which it viewed as causally related to "climate change" and "global warming." *See, e.g.*, Minn. Stat. §§ 216H.01, subd. 2, 216H.02, subds. 1&2, 216H.10, subd. 5. Thus, the NGEA was not enacted to promote a "local purpose," but instead it was enacted to address global climate issues. *Contra Maine v. Taylor*, 477 U.S. 131, 141-43, 151-152 (1986).

Even if there could be a legitimate "local interest," Appellants provided no evidence to the District Court to prove 216H.03, subds. 3(2)-(3) could actually accomplish a "local benefit." Notably, Appellants confirmed that prior to and subsequent to the NGEA's enactment, Minnesota did nothing to determine any local benefits associated with 216H.03, subds. 3(2)-(3). (SA170-SA173) Nor is there any reason to believe state-level regulation of greenhouse gas emissions could confer any local benefits, *see* Adler, *supra*, at 156&160; *cf. Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141-47 (9th Cir. 2013)(causal chain between carbon emission activities and any localized environmental impact is "untenable"); and it could even increase GHG emissions. (SA157-SA158)

Appellate Case: 14-2156    Page: 75    Date Filed: 01/21/2015 Entry ID: 4236351

Appellants' contention that 216H.03, subds. 3(2)-(3) economically protects Minnesota consumers is belied by its practical effect of categorically eliminating access to what has historically been the most reliable and least-cost source of electricity. Rather than promoting reliability by enhancing diversification, these subdivisions are anti-diversification; and rather than reducing cost through the competition, 216H.03 is anti-competitive.

Finally, to the extent there is an appropriate local benefit, Minnesota has less restrictive means available through which to pursue its objectives. For instance, Minnesota could work cooperatively with its neighboring states—a process in which Minnesota had been engaged and then abandoned—to develop mutually acceptable and agreeable regional standards and targets. (SA358-SA397)

In short, the burdens posed by 216H.03, subds. 3(2)-(3) on interstate commerce are "clearly excessive in relation to the putative local benefits." *Hughes v. Oklahoma*, 441 U.S. 322, 331 (1979).

## 2. 216H.03 Effects On Interstate Commerce Are Not Incidental.

The express purpose of 216H.03, subds. 3(2)-3(3) is to prevent "statewide power sector carbon dioxide emissions" which expressly include emissions associated with the generation of electricity "outside the state." Minn. Stat. § 216H.03, subd. 2. The statute focuses on reducing carbon emissions that occur during the generation of electricity—including emissions occurring outside

58

Minnesota—rather than reducing retail consumption of electricity in Minnesota. Minn. Stat. § 216H.02, subd. 1. As the District Court recognized, to the extent carbon dioxide emissions occur, *they occur when energy is generated.* 15 F.Supp.3d at 895 & n.1. Thus, 216H.03, subds. 3(2)-(3) expressly burdens interstate commerce by prohibiting and regulating electricity flowing through interstate commerce based on how the electricity was generated, rather than based on the manner in which electricity is consumed in Minnesota.

The burdens that 216H.03, subds. 3(2)-(3) imposes on the regional, integrated electric power transmission systems and markets is not only analogous to the internet, 15 F.Supp.3d at 913-914 & 917, but is also similar to state-imposed restrictions attempted years ago on the interstate railway systems.

In *Southern Pacific Co.,* the Supreme Court struck down a state law that made it unlawful to operate trains in the state with more than 14 passenger or 70 freight cars. 325 U.S. at 763. While it was enacted to address hazards created by over-length trains, the Supreme Court held the statute violated the Commerce Clause. *Id.* at 773. "The practical effect of such regulation is to control train operations beyond the boundaries of the state exacting it because of the necessity of breaking up and reassembling long trains at the nearest terminal points before entering and after leaving the regulating state." *Id.* at 775. "The principle that…a state may not regulate interstate commerce so as substantially to affect its flow or

deprive it of needed uniformity in its regulation is not to be avoided by 'simply invoking the convenient apologetics of the police power.'" *Id.* at 779-80 (quoting *Kansas City S. Ry. v. Kaw Valley Drainage Dist.*, 233 U.S. 75, 79 (1914)).

## IV. THE NGEA IS PREEMPTED BY THE FEDERAL POWER ACT.

Under the Supremacy Clause of the Constitution, Art. IV, cl. 2, state law will be preempted when it conflicts with or frustrates federal law. *N. Natural Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817, 820-21 (8th Cir. 2004)(*citing CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993)). Through the FPA, Congress demonstrated its intent to regulate the fields of interstate electricity transmission and the wholesale sales of electricity. Even if Congress did not fully regulate this field through the FPA, 216H.03, subds. 3(2)-(3) stands as an obstacle to the accomplishment of the full purposes and objectives of Congress as set forth in the FPA. Therefore, 216H.03, subds. 3(2)-(3) is invalid under both field preemption and conflict preemption.

### A. FERC Has Exclusive Jurisdiction Over Transmission of Electric Energy In Interstate Commerce and The Sale of Such Energy At Wholesale.

The United States Supreme Court long ago recognized that wholesale energy transactions are "fundamentally interstate from beginning to end" and any regulation requires "exercise of the power vested in Congress." *Attleboro*, 273 U.S. at 89-90. "Federal regulation has become increasingly prominent as the

Appellate Case: 14-2156    Page: 78    Date Filed: 01/21/2015 Entry ID: 4236351

energy market has shifted away from local monopolies to a system of interstate competition." *Nazarian*, 753 F.3d at 472.

Under the FPA, the United States expressly and exclusively regulates the transmission of electric energy in interstate commerce and the sale of such energy at wholesale. 16 U.S.C. §§ 824(a), 824(b)(1); *see Miss. Power & Light Co. v. Miss. ex rel. Moore,* 487 U.S. 354, 371 (1988)("MP&L"); *United States v. Pub. Util. Comm'n of Cal.*, 345 U.S. 295, 299-300 (1953). "Congress meant to draw a bright line easily ascertained between state and federal jurisdiction...by making FPC [FERC predecessor] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States." *FPC v. S. Cal. Edison Co.*, 376 U.S. 205, 215-16 (1964). This bright line plainly was intended to extend to "agreements that affect wholesale rates"—like wholesale power purchase agreements. *See MP&L,* 487 U.S. at 374.

FERC is authorized to implement the FPA and regulate the transmission and sale at wholesale of electricity in interstate commerce. *Solomon*, 766 F.3d at 247. FERC has "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce, without regard to the source of production." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982). "FERC is responsible for the economic regulation of the electric utility

61

industry, including financial transactions, wholesale rate regulation, transactions involving transmission of retail electricity, and insuring adequate and reliable service." (ECF 32, p. 14)

Under the FPA, states retain authority to regulate "sale at local retail rates to ultimate consumers" and any other exceptions Congress explicitly made subject to regulation by the states. *FPC*, 376 U.S. at 214, 216 (quoting *Ill. Natural Gas Co.*, 314 U.S. at 504). However, "[e]ven where state regulation operates within its own field, it may not intrude indirectly on areas of exclusive federal authority." *Nazarian*, 753 F.3d at 475-76 (quoting *Pub. Utils. Comm'n v. FERC*, 900 F.2d 269, 274 n.2 (D.C. Cir. 1990)). "[S]tates are barred from relying on mere formal distinctions in 'an attempt' to evade preemption and 'regulate matters within FERC's exclusive jurisdiction.'" *Id.* (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 308 (1988)).

The presumption against preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence" such as the regulation of electric power in interstate commerce. *Nazarian*, 753 F.3d at 477 (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)).

**B.  § 216H.03, Subds. 3(2)-(3) Regulates Wholesale Transactions.**

216H.03 expressly and directly regulates wholesale capacity and power transactions.

Appellate Case: 14-2156    Page: 80    Date Filed: 01/21/2015 Entry ID: 4236351

Subd. 3(2) states that "no person shall...import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions." Minn. Stat. § 216H.03, subd. 3(2). When Basin, Minnkota, and MRES "import or commit to import" power from a new large energy facility to satisfy the obligations they owe their members, these are wholesale transactions.

Subd. 3(3) prohibits any "new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions." Long-term power purchase agreements are, by definition, wholesale transactions. Basin, Minnkota, and MRES engage in these wholesale transactions in order to assemble capacity to be able to satisfy the obligations they owe their memberships.

Thus, 216H.03, subds. 3(2)-(3) interferes with the plenary federal authority over the terms and conditions of wholesale transactions. *MP&L*, 487 U.S. at 374; *N. States Power Co. v. MPUC*, 344 N.W.2d 374, 377 (Minn. 1984)(state utilities commissions "have no regulatory power over wholesale interstate transactions").

### C.    216H.03 Regulates Transmission In Interstate Commerce.

Section 216H.03 also regulates the transmission of power in several ways. First, § 216H.03, subd. 1, expressly defines "new large energy facilities" to include transmission lines by incorporating the definition set forth in Minn. Stat. § 216B.2421, i.e., "(1) any electric power generating plant or combination of plants

63

at a single site with a combined capacity of 50,000 kilowatts or more *and transmission lines directly associated with the plant that are necessary to interconnect the plant to the transmission system....*" Minn. Stat. §§ 216H.03, subd. 1, 216B.2421 (emphasis added).

Second, 216H.03, subd. 2, includes "transmission line losses" in its definition of "statewide power sector carbon dioxide emissions." (Appx278) Specifically, the statute defines "statewide power sector carbon dioxide emissions" to be "the total annual emissions of carbon dioxide from the generation of the electricity within the state and all emissions of carbon dioxide from the generation of electricity imported from outside the state and consumed in Minnesota. *Emissions of carbon dioxide associated with transmission and distribution line losses are included in this definition.*" Minn. Stat. § 216H.03, subd. 2 (emphasis added).

Third, 216H.03, subd. 3(2) necessarily applies to the transmission of power, and not merely the "capacity" to generate power, by using the terms "import" and "power." Specifically, the statute states that "no person shall...*import* or commit to *import* from outside the state *power* from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions." Minn. Stat. § 216H.03, subd. 3(2)(emphasis added). By definition, these terms involve transmission of electricity.

64

### D.  216H.03 Subd. 3(2)-(3) Exceeds Traditional State Authority.

Appellants exaggerate traditional state regulatory authority. (*See* Appellants' Br. 55-57)  Appellants' legal authority actually supports only three areas of state authority:  (1) "prudency reviews" undertaken in determining whether a "public utility" can pass through costs to retail ratepayers; (2) regulation of generation sources actually located within Minnesota's borders; and (3) regulatory and implementing authority Congress expressly reserved to states under the Public Utility Regulatory Policies Act of 1978 ("PURPA")—a statute having no application here.  216H.03 does not fall within any of these areas of state authority.

### 1.  216H.03 Subd. 3(2)-(3) Are Not Within "Prudency Review" Or Other Retail Rate Authority.

"Prudency reviews" permit states to evaluate whether a utility's purchases are prudently incurred expenses that can be passed through to retail rate payers. 216H.03, subds. 3(2)-(3) does the exact opposite.  Rather than evaluating the prudency of a given transaction in which a utility has engaged, 216H.03, subds. 3(2)-(3) categorically prohibits certain transactions altogether.  And, rather than reducing costs, 216H.03, subd. 4 increases costs by requiring "proponents" to incur the additional expense of establishing offsets to the MPUC's satisfaction.

A state's authority to conduct a prudency analysis in connection with setting retail rates *is not the same as the authority to regulate wholesale transactions.*

Appellate Case: 14-2156     Page: 83     Date Filed: 01/21/2015 Entry ID: 4236351

Courts—including the Supreme Court—have repeatedly rejected state efforts to regulate wholesale purchases as 216H.03 attempts here. *See MP&L*, 487 U.S. at 374 (federal jurisdiction extends to "agreements that affect wholesale rates"); *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 518 (1989)(noting that a state statute that regulated interstate pipeline "purchasing practices and pricing" would be preempted); *Maryland v. Louisiana*, 451 U.S. 725 (1981)(invalidating Louisiana tax on natural gas imports); *N. Natural Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 91 (1963)("The federal regulatory scheme leaves no room for direct state regulation of the prices of interstate wholesales of natural gas, [cite omitted] or for state regulations which would indirectly achieve the same results."); *Ill. Natural Gas Co.*, 314 U.S. at 509 (rejecting state order requiring natural gas distributor to supply gas to another local distributor because "proposed extension of appellant's facilities is so intimately associated with the commerce and would so affect its volume moving into the state and distribution among the states").[16]

---

[16]    The Supreme Court has held that Natural Gas Act cases are apposite precedent for FPA analyses given the common lineage and interstate subject matter. *Federal Power Comm'n*, 376 U.S. at 211-12; *Nazarian*, 753 F.3d at 475 n.2.

Appellate Case: 14-2156     Page: 84     Date Filed: 01/21/2015 Entry ID: 4236351

wholesale agreements with generation sources promoted by the state); *Solomon*, 766 F.3d at 252-254 (striking down state law providing guaranteed revenue to new generation sources supported by state). These state laws forced utilities to enter into wholesale contracts with the newly constructed facilities. *Solomon*, 766 F.3d at 248-49; *Nazarian*, 753 F.3d at 473. Both Courts considered and rejected many of the same arguments Appellants make here regarding "traditional state authority." *Nazarian*, 753 F.3d at 476-77; *Solomon*, 766 F.3d at 253-54. The Courts held these state actions presented direct impediments to the functioning of the federally regulated wholesale markets and therefore were "simply a bridge too far." *Nazarian*, 753 F.3d at 480.

The same is true of 216H.03, subds. 3(2)-3(3). Even if this statute could be shoehorned into some legitimate exercise of traditional state authority—which it cannot—it improperly interferes with the wholesale market and is therefore preempted. Subd. 3(2)-(3) does not merely have an indirect effect on the market like a prohibition on new coal plants in Minnesota might. It directly and explicitly prohibits certain wholesale transactions, and makes other transactions more expensive, both to the detriment of the regional market system.

### 3. 216H.03 Subd. 3(2)-(3) Do Not Fall Within PURPA Authority

Appellants and Amici cite many cases analyzing PURPA. These cases have no application to the analysis here because PURPA expressly reserved for the

68

states certain implementing and regulatory authority over "qualifying facilities" ("QFs"). *See* 16 U.S.C. §824a-3(f); *Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex.*, 422 F.3d 231, 236 (5th Cir. 2005)("[a] state has broad authority to implement PURPA with respect to the approval of purchase contracts between utilities and QFs."); *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 135 (3d Cir. 1998)(" PURPA…provides a substantial role to state agencies in regulating energy contracts between utilities and cogenerators"); *Indep. Energy Producers v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 856 (9th Cir. 1994)("the state's authority to implement [16 U.S.C. §824a-3] is admittedly broad")). Passing comments made in PURPA cases regarding state authority in the PURPA context are irrelevant to the FPA preemption analysis here.

By way of illustration, Appellants and Amici rely on this quote from a PURPA case: "[S]tates have the authority to dictate generation sources from which utilities may procure electric energy." (*See* Appellants' Br. at 56 (quoting *Cal. Pub. Util. Comm'n,* 134 FERC ¶61044, ¶61160 (2011)). The true meaning of this passing comment is revealed by an earlier FERC ruling in the same case which held the statute at issue would be preempted *unless* California could demonstrate it was a proper implementation of PURPA. *See* 132 FERC ¶61047, ¶61337-38 (2010). Thus, the quote cited by Appellants and Amici comes from the analysis of whether the statute at issue was, in fact, a proper implementation of PURPA.

Appellate Case: 14-2156    Page: 86    Date Filed: 01/21/2015 Entry ID: 4236351

216H.03 is not a PURPA implementation statute, so cases discussing state authority in the PURPA context cannot support 216H.03.

## V. THE NGEA IS PREEMPTED BY THE CLEAN AIR ACT.

When the District Court ruled 216H.03, subds. 3(2-(3) unconstitutional, Governor Mark Dayton vowed to appeal the decision to "defend the State of Minnesota's right to protect the quality of the air our citizens breathe." (SA403) Governor Dayton claimed that "North Dakota operators proposed to build new, coal-fired power-generating plants without offsetting emission reductions," and that "[p]revailing winds will carry those toxic emissions directly into Minnesota." (*Id.*) Governor Dayton's statements reflect Minnesota's intent to regulate regional air quality and thereby side-step the Clean Air Act.

Congress enacted the CAA and empowered the Environmental Protection Agency ("EPA") to create an overarching federal regime regarding air quality. The CAA recognizes the right of individual states to work cooperatively with the EPA to regulate emissions that *occur within its own borders*, but it does not permit states to regulate emissions that *occur in other states*. Individual states are preempted from taking matters into their own hands by imposing emissions policies and regulations for *emissions occurring entirely outside their borders*. *See Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82, 87 (2d Cir. 2003).

70

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C), the undersigned hereby certify, as counsel for Appellees/Cross-Appellants, that this Brief was prepared in Microsoft Word 2010, using 14-point Times New Roman proportionally-spaced font, and further certify this Brief complies with the type-volume limitation as there are 16,276 words in this Brief, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), according to Microsoft Word 2010's word count. The Brief of Appellants has been scanned for viruses in compliance with the Eighth Circuit Local Rule 28A and is virus free.

Dated: January 20, 2014

s/Thomas H. Boyd
John A. Knapp, #56789
Thomas H. Boyd, #200517
Brent A. Lorentz, #386865
Christina Rieck Loukas, #0388036
Benjamin R. Kwan, #0395481
Winthrop & Weinstine, P.A.
Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
612-604-6400
jknapp@winthrop.com
tboyd@winthrop.com
blorentz@winthrop.com
cloukas@winthrop.com
bkwan@winthrop.com

*Counsel of Record for Appellees/Cross-Appellants*

9779761v11

81