# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

| | |
|---|---|
| State of North Dakota, et al., | Case Nos. 14-2156 and 14-2251 |
| Appellees, | **MOTION OF THE AMERICAN PUBLIC POWER ASSOCIATION, NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION, AND MISSOURI JOINT MUNICIPAL ELECTRIC UTILITY COMMISSION FOR LEAVE TO PARTICIPATE AS AMICI** |
| v. | |
| Beverly Heydinger, et al., | |
| Appellants. | |

The American Public Power Association ("APPA"), National Rural Electric Cooperative Association ("NRECA"), Missouri Joint Municipal Electric Utility Commission ("MJMEUC") seek leave to file an amicus brief in support of Appellees in defending the judgment in their favor on their dormant commerce clause claim. The proposed amicus brief is attached hereto as an exhibit. The APPA and the NRECA participated as amici in the district court, filing an amicus brief that the district court quoted with approval on a critical issue. As the grounds for their motion for leave to file an amicus brief, APPA, NRECA, and MJMEUC state:

APPA is the service organization representing the interests of not-for-profit, publicly-owned electric utilities throughout the United States. More than 2,000 public power utilities, doing business in every state except Hawaii, own about 10

percent of the nation's electric generating capacity, but purchase nearly 70 percent of the power they use to serve their customers and provide electric service to approximately 46 million consumers, or about 15% of the nation's electric customers. Of the 2,000-plus public power utilities in the U.S., 565 are in the seven Eighth Circuit states. APPA's members participate in wholesale power markets as buyers and sellers. Accordingly, APPA seeks to ensure that its utility members, which are all load-serving entities ("LSEs"), have every option available to achieve their primary goal—providing customers in the communities they serve with reliable electric power at the lowest reasonable cost, consistent with good environmental stewardship.

The National Rural Electric Cooperative Association ("NRECA") is the national service organization for more than 900 not-for-profit rural electric cooperatives and public power districts that provide electric service to approximately 42 million consumers in 47 states. Rural electric cooperatives serve 19 million businesses, homes, schools, farms, irrigation systems, and other establishments in 2,500 of the nation's 3,142 counties. Collectively, rural electric cooperatives own and maintain 2.5 million miles, or 42%, of the nation's electric distribution lines, covering three quarters of the U.S. landmass and serving 13% of the nation's electric customers. In addition to providing electric services, rural

Appellate Case: 14-2156    Page: 2    Date Filed: 01/28/2015 Entry ID: 4238732

electric cooperatives also provide critical jobs and tax revenue in rural areas, employing over 70,000 people and paying $1.4 billion in state and local taxes.

The Missouri Joint Municipal Electric Utility Commission ("MJMEUC") is a state-wide Joint Action Agency specifically authorized by Missouri law to operate as an electric utility for the benefit of the combined requirements of the members. Established by six charter members, the Commission has grown to a membership of 71 municipally-owned retail electric systems ranging in size from approximately 225 to approximately 111,000 electricity meters. These municipal and cooperative electric systems serve approximately retail customers. MJMEUC may construct, operate and maintain jointly owned generation and transmission facilities for the benefit of members. The Commission may also enter into contracts for power supply, transmission service, and other services necessary for the operation of an electric utility.

The members of APPA, NRECA, and MJMEUC participate in wholesale power markets as buyers and sellers. They appear as amici in cases presenting issues of great importance to the electric industry and the U.S. economy. This is such a case.

APPA, NRECA, and MJMEUC seek to address only the legal question of whether Minn. Stat. § 216H.03 violates the dormant commerce clause through its

Appellate Case: 14-2156    Page: 3    Date Filed: 01/28/2015 Entry ID: 4238732

restrictions on construction of new large energy facilities, including restrictions on the ability to import power generated outside of Minnesota.

APPA, NRECA, and MJMEUC wish to help the Court better understand and appreciate the widespread implications of the legal issues raised in this matter. The extraterritorial and discriminatory state legislation in question imposes a special burden on customers of non-profit community-owned utilities and rural cooperatives. The proliferation of such regulations will impose additional costs that non-profit utilities or cooperatives can only pass on to their customers.

APPA's, NRECA's, and MJMEUC's members are purchasers and sellers of power in wholesale electric markets. If states are allowed to burden wholesale transactions in electric power through state laws that limit the options of buyers and sellers in those markets (which are regional, and sometimes even interregional in nature), the ability of APPA, NRECA, and MJMEUC members to access the broadest array of power supply options will be substantially and adversely impacted. Hence, APPA, NRECA, and MJMEUC seek to be heard on the national implications of the Minnesota legislature's attempt to limit the importation of power from certain out-of-state sources.

For the foregoing reasons, APPA, NRECA, and MJMEUC believe that an amicus brief would be helpful to the Court and respectfully request that the Court grant it permission to file the brief submitted herewith.

Appellate Case: 14-2156   Page: 4   Date Filed: 01/28/2015 Entry ID: 4238732

Dated:  January 28, 2015

**GREENE ESPEL PLLP**

s/ John M. Baker
John M. Baker, Reg. No. 174403
Erin Sindberg Porter, Reg. No. 388345
Karl C. Procaccini, Reg. No. 391369
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
jbaker@greeneespel.com
esindbergporter@greeneespel.com
kprocaccini@greeneespel.com
(612) 373-0830

*Attorneys for American Public Power
Association, and National Rural Electric
Cooperative Association*

**HEALY LAW OFFICES, LLC**

 s/ Douglas L. Healy
Douglas L. Healy, MO Bar No. 51630
3010 East Battlefield, Suite A
Springfield, MO 65804
doug@healylawoffices.com
(417) 864-7018

*Attorneys for Missouri Joint Municipal
Electric Utility Commission*

5

# EXHIBIT A

# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

### State of North Dakota, et al.,

*Appellees,*

v.

### Beverly Heydinger, et al.,

*Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
District Court Civil No. 11-cv-3232 (SRN/SER)

**BRIEF OF AMERICAN PUBLIC POWER ASSOCIATION, NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION AND MISSOURI JOINT MUNICIPAL ELECTRIC UTILITY COMMISSION AS AMICI CURIAE**

**GREENE ESPEL PLLP**
John M. Baker, Reg. No. 174403
Erin Sindberg Porter, Reg. No. 388345
Karl C. Procaccini, Reg. No. 391369
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
jbaker@greeneespel.com
esindbergporter@greeneespel.com
kprocaccini@greeneespel.com
(612) 373-0830

*Attorneys for American Public Power Association and National Rural Electric Cooperative Association as Amici Curiae*

**HEALY LAW OFFICES, LLC**
Douglas L. Healy, MO Bar No. 51630
3010 East Battlefield, Suite A
Springfield, MO 65804
doug@healylawoffices.com
(417) 864-7018

*Attorneys for Missouri Joint Municipal Electric Utility Commission as Amicus Curiae*

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................ iv

CORPORATE DISCLOSURE STATEMENT ...................................................... 1

STATEMENT OF INTEREST ............................................................................. 1

ARGUMENT ....................................................................................................... 4

I.    APPELLANTS' INTERPRETATIONS OF § 216H.03 ARE NOT SAVING CONSTRUCTIONS. .......................................................................... 4

    A.    Despite Appellants' continually evolving interpretations, § 216H.03, subd. 3(2) is clear and unambiguous. ...................................................... 4

        1.    Appellants' attempts at saving constructions fail. .......................... 6

II.    CLAUSE 2 IS AN UNCONSTITUTIONAL EXTERRITORIAL REGULATION. ........................................................................................ 10

    A.    A state may not dictate how electricity is generated in other states. .... 11

    B.    The extraterritorial doctrine prohibits the projection of one state's regulatory regime into the jurisdiction of another state. ...................... 13

    C.    Clause 2 "projects" Minnesota's regulations into other states, clearly violating the extraterritorial doctrine..................................................... 15

        1.    Clause 2 impermissibly regulates out-of-state participants in an interstate network. ........................................................................ 15

            a.    Appellants' arguments regarding MISO ignore the fact that it is a market maker *and* an interstate electrical network. ........15

            b.    The MISO electrical network is an "internet" of electrons spanning 16 states, and state attempts to regulate such a network run afoul of the extraterritorial doctrine. .................17

        2.    The risk of inconsistent and conflicting regulations is real. ......... 21

Appellate Case: 14-2156    Page: 8    Date Filed: 01/28/2015 Entry ID: 4238732

III. SECTION 216H.03 IS UNCONSTITUTIONAL UNDER THE DORMANT COMMERCE CLAUSE BECAUSE IT FAILS THE *PIKE* BALANCING TEST. ...................................................................................... 22

    A. Section 216H.03 imposes significant, excessive burdens on interstate commerce. ............................................................................ 23

        1. Clause 3's prohibitions on certain long-term PPAs adversely impact regional markets. ................................................. 24

        2. If several jurisdictions imposed similar statutes, the burden would be unmanageable. .......................................................... 27

    B. Any local benefits resulting from § 216H.03's restrictions are de minimis compared with the significant, excessive burdens imposed on interstate commerce. ............................................................... 28

    C. The putative local interests are addressed already by laws with lesser impact on interstate activities. ................................................. 29

CONCLUSION .................................................................................. 30

CERTIFICATE OF COMPLIANCE ...................................................... 32

Appellate Case: 14-2156    Page: 9    Date Filed: 01/28/2015 Entry ID: 4238732

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aaron v. SEC*,
446 U.S. 680 (1980)......................................................................................7

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) .......................................................18, 19, 20, 21

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
476 U.S. 573 (1986)................................................................................14, 18

*Constr. Materials Recycling Ass'n. Issues & Educ. Fund, Inc. v.*
*Burack*,
686 F. Supp. 2d 162 (D.N.H. 2010) ............................................................28

*Cotto Waxo Co. v. Williams*,
46 F.3d 790 (8th Cir. 1995) ................................................................*passim*

*Fulton Corp. v. Faulkner*,
516 U.S. 325 (1996)....................................................................................22

*Grand River Enters. Six Nations, Ltd. v. Beebe*,
574 F.3d 929 (8th Cir. 2009) ......................................................................14

*Healy v. Beer Inst.*,
491 U.S. 324 (1989)............................................................................*passim*

*Ill. Commerce Comm'n v. Fed. Energy Regulatory Comm'n*,
721 F.3d 764 (7th Cir. 2013) ......................................................................21

*Metro Produce Distrib., Inc. v. City of Minneapolis*,
473 F. Supp. 2d 955 (D. Minn. 2007) .........................................................24

*New England Power Co. v. New Hampshire*,
455 U.S. 331 (1982)....................................................................................11

*Okla. Tax. Comm'n v. Jefferson Lines, Inc.*,
514 U.S. 175 (1995)....................................................................................22

iv

*Pharmaceutical Research & Mfrs. of Am. v. Walsh*,
    538 U.S. 644 (2003)............................................................13, 14, 15

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)..................................................................*passim*

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ...............................................18, 19

*R&M Oil & Supply, Inc. v. Saunders*,
    307 F. 3d 731 (8th Cir. 2002) .......................................4, 22, 27, 29

*S.D. Farm Bureau Inc. v. Hazeltine*,
    340 F.3d 583 (8th Cir. 2003) ........................................................22

*Southern Union Co. v. Missouri Pub. Serv. Comm'n*,
    289 F.3d 503 (8th Cir. 2002) ........................................................16

*SPGGC, LLC v. Blumenthal*,
    505 F.3d 183 (2d Cir. 2007) .........................................................20

**State Cases**

*State v. Loge*,
    608 N.W.2d 152 (Minn. 2000) .......................................................8

*In re Welfare of C.R.M.*,
    611 N.W.2d 802 (Minn. 2000) .......................................................8

**Constitutional Provisions**

U.S. Const. Article I, § 8, cl. 3..............................................................4

**State Statutes**

Minn. Stat. § 115A.02, subd. (a)..........................................................12

Minn. Stat. § 216B.1691, subd. 2a(a) ..........................................26, 30

Minn. Stat. § 216B.1694 ......................................................................30

Minn. Stat. § 216B.2411, subd. 2(c)(5)–(7) .......................................26

Minn. Stat. § 216B.2423 ......................................................................30

v

Minn. Stat. § 216H.03...................................................................*passim*

Minn. Stat. § 216H.03, subd. 2 ...................................................10, 25

Minn. Stat. § 216H.03, subd. 3(2) ............................................*passim*

Minn. Stat. § 216H.03, subd. 3(3) ..................................24, 25, 26, 27

Minn. Stat. § 645.16..........................................................................7

**Rules**

Fed. R. App. P. 29(c)(1)....................................................................1

Fed. R. App. P. 29(c)(5)....................................................................3

**Other Authorities**

APPA, *Power Plants Are Not Built on Spec: 2014 Update* 2
    (2014), http://appanet.files.cms-
    plus.com/PDFs/94_2014_Power_Plant_Study.pdf ......................................25

EPA Landfill Methane Outreach Program, Basic Information,
    http://www.epa.gov/lmop/basic-info/index.html (last visited
    Jan. 21, 2015)..................................................................................8

Appellate Case: 14-2156     Page: 12     Date Filed: 01/28/2015 Entry ID: 4238732

## CORPORATE DISCLOSURE STATEMENT

None of these amicus curiae are corporations, so under Fed. R. App. P. 29(c)(1), no further disclosure is required.

## STATEMENT OF INTEREST

The American Public Power Association ("APPA") is the service organization representing the interests of not-for-profit, publicly-owned electric utilities throughout the United States. More than 2,000 public power utilities, doing business in every state except Hawaii, own about 10 percent of the nation's electric generating capacity, but purchase nearly 70 percent of the power they use to serve their customers and provide electric service to approximately 46 million consumers, or about 15% of the nation's electric customers. Of the 2,000-plus public power utilities in the U.S., 565 are in the seven Eighth Circuit states.

APPA's members participate in wholesale power markets as buyers and sellers. Accordingly, APPA seeks to ensure that its utility members, which are all load-serving entities ("LSEs"), have every option available to achieve their primary goal—providing customers in the communities they serve with reliable electric power at the lowest reasonable cost, consistent with good environmental stewardship.

The National Rural Electric Cooperative Association ("NRECA") is the service organization for more than 900 not-for-profit rural electric cooperatives

and public power districts that provide electric service to approximately 42 million consumers in 47 states. Rural electric cooperatives serve 19 million businesses, homes, schools, farms, irrigation systems, and other establishments in 2,500 of the nation's 3,142 counties. Collectively, rural electric cooperatives own and maintain 2.5 million miles, or 42%, of the nation's electric distribution lines, covering three quarters of the U.S. landmass and serving 13% of the nation's electric customers. Rural electric cooperatives also provide critical jobs and tax revenue in rural areas, employing over 70,000 people and paying $1.4 billion in state and local taxes.

Rural electric service is provided through a network of 841 rural electric distribution cooperatives. NRECA has 216 distribution cooperative members within the seven Eighth Circuit states:



2

Seven NRECA member cooperatives are headquartered outside of the Eighth Circuit but provide electric distribution service within one of the Eighth Circuit states. Distribution cooperatives provide retail electric service to end users. The 216 NRECA members service over 2.8 million power customers and over 600,000 miles of power lines.

The Missouri Joint Municipal Electric Utility Commission ("MJMEUC") is a state-wide joint action agency specifically authorized by Missouri law to operate as an electric utility for the benefit of the combined requirements of the members. Established by six charter members, the Commission's membership has grown to 71 municipally-owned retail electric systems located in Missouri, ranging in size from approximately 225 to over 111,000 electricity meters. These municipal and cooperative electric systems serve approximately 505,000 retail customers. MJMEUC may construct, operate, and maintain jointly-owned generation and transmission facilities for its members' benefit. The Commission may also contract for power supply, transmission service, and other services necessary to operate an electric utility.[1]

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), no party's counsel authored the brief in whole or in part. No party or party's counsel contributed money intended to fund the brief's preparation or submission. No person – other than the amici, their members, or their counsel – contributed money intended to fund the brief's preparation or submission.

Appellate Case: 14-2156    Page: 15    Date Filed: 01/28/2015 Entry ID: 4238732

# ARGUMENT

The Commerce Clause of the United States Constitution grants Congress the authority to regulate interstate commerce. U.S. Const. art I, § 8, cl. 3. The dormant Commerce Clause is the negative implication of that authority. Under the dormant Commerce Clause doctrine, states may not enact laws that seek to regulate commerce outside a regulating state's borders, or that discriminate against or unduly burden interstate commerce. *R&M Oil & Supply, Inc. v. Saunders*, 307 F. 3d 731, 734 (8th Cir. 2002); *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995). Because Minnesota's Next Generation Energy Act ("NGEA"), Minn. Stat. § 216H.03, regulates behavior of actors outside of Minnesota's borders and unduly burdens interstate commerce, it is unconstitutional.

## I.   APPELLANTS' INTERPRETATIONS OF § 216H.03 ARE NOT SAVING CONSTRUCTIONS.

### A.   Despite Appellants' continually evolving interpretations, § 216H.03, subd. 3(2) is clear and unambiguous.

Appellants' construction of the NGEA has been a moving target before and during litigation.  By contrast, the most critical words in the statute are clear and unchanged: Clause 2 states simply: "no person shall . . . import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions." Minn. Stat. § 216H.03, subd. 3(2).

4

Before this Court, Appellants have reinvented their strained interpretation of Clause 2 to read words and meaning into what is a rather simple prohibition. Now they state that Clause 2 "clearly applies to electricity that is acquired for use by Minnesota consumers, which is effectuated through a contract between a utility that serves Minnesota and a generating facility." (Appellants' Br. 36.) Appellants further argue that Clause 2 "applies to contracts or other commitments to import electricity in the future, not the physical flow of electrons." (Appellants' Br. 39.) In other words, Appellants now assert that "no person" means only "no Minnesota utility" and "import" means only "contract for."

Amici in support of Appellants adopt interpretations with even less grounding in the statute's plain language. One set of amici state that "import" means "an LSE owning or purchasing capacity located outside Minnesota to serve its Minnesota retail customers." (Amicus Br. of Minnesota Ctr. for Envtl. Advocacy, et al. 18.) Other Amici state that the NGEA's "scope is limited to *contracts* that involve at least one in-state entity." (Amicus Br. of Am. Wind Energy Assoc. and Solar Energy Indus. Assoc. 22–23 (emphasis added).) Finally, a third set of amici state that "[p]ower is . . . 'imported' into Minnesota only when a Minnesota utility has invested in out-of-state generation (either contractually, with bilateral capacity and energy contracts, or through the acquisition of a facility) in

5

order to fulfill its legal obligation to meet its Minnesota load." (Amicus Br. of Steven Gaw and Steven Weissman 14.)

### 1. Appellants' attempts at saving constructions fail.

Appellants' proposed interpretations fail as saving constructions for several reasons. As the District Court observed, this Court has previously held that Minnesota may not offer a saving construction of a law alleged to violate the dormant Commerce Clause if the statutory language in question is plain and unambiguous. (Add. 29–30, citing *Cotto Waxo Co.*, 46 F.3d at 792.)

Appellants attempt to stretch the plain and unambiguous words "import" and "no person" to quite a different meaning. In support of this reinterpretation of the word "import" to mean "contract for," Appellants cite to the following dictionary definition: "[t]o bring or carry[] in from an outside source." (Appellants' Br. 36.) Neither Clause 2 itself nor the definition cited by Appellants contains the word "contract" or connotes a purchase of any kind. Instead, Clause 2 uses the word "import," which, according to Appellants' own dictionary definition ("to bring in or carry"), clearly contemplates a *physical* movement of something across a border. Yet Appellants persist in insisting that generating electricity outside of Minnesota and moving that electricity into Minnesota through electrical lines does not constitute "importing" under Clause 2. This Court, like the District Court, cannot simply ignore the plain meaning of "import" and re-write Clause 2 to say

6

something entirely different. The words "no person" are likewise plain and unambiguous, and therefore cannot be narrowed to mean only "no Minnesota utility," as Appellants and amici urge. As the District Court observed, this Court rejected a similar attempt to read limiting language into the "clear and unambiguous" statute at issue in *Cotto Waxo*. (Add. 30); *see* Minn. Stat. § 645.16 ("When the words of a law . . . are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit.").

Appellants also read a "knowledge" requirement in Clause 2 where none exists. For example, Appellants argue that the untraceable nature of purchases through the Midcontinent Independent System Operator ("MISO") means that "a person could not *knowingly* purchase electrons from a new large energy facility in the MISO short-term markets[.]" (Appellants' Br. 38 (emphasis added).) But the plain and ordinary meaning of Clause 2 contains no "knowledge" (scienter) requirement. The statute simply states that "no person shall . . . import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions." Minn. Stat. § 216H.03, subd. 3(2). Amici cannot assume that a Minnesota court or agency hearing a state enforcement action will read a scienter requirement into a business-regulation statute before that statute could serve as a basis for injunctive relief. *See, e.g.*, *Aaron v. SEC*, 446 U.S. 680, 700 (1980) (refusing to read scienter

7

requirements into certain federal securities statutes). Even in a criminal context, the Minnesota Supreme Court has held that the phrase "no person shall" in the state traffic code has "never been understood to require a showing of intent to prove a violation of the statute." *State v. Loge*, 608 N.W.2d 152, 157 (Minn. 2000); *see also In re Welfare of C.R.M.*, 611 N.W.2d 802, 806 (Minn. 2000) (regulatory offenses are "not subject to a presumption requiring proof of a mens rea to establish liability").

Due to the very nature of MISO's energy markets, the generating capacity secured by MISO members in purchase agreements likely will not produce the specific electrons of energy that MISO members ultimately purchase and consume. (*See* Add. 6, 44–46.) A purchase agreement with an out-of-state energy producer does not change a Minnesota MISO member's lack of knowledge about the source of energy that it actually purchases and uses from the MISO market. A Minnesota MISO member that enters into a purchase agreement with an Iowa power plant fueled by landfill gas[2] is no more likely to *purchase* or *consume* the power actually

---

[2] APPA, NRECA, and MJMEUC use this example intentionally. While much briefing in this case focuses on coal power plants, § 216H.03 reaches certain forms of biomass energy generation, including landfill gas power plants, which produce power by burning gases already produced by the nation's refuse. *See, infra,* Section III.A.1. The U.S. Environmental Protection Agency refers to this energy source as a "win/win opportunity," which decreases methane gas emissions and helps "offset the use of non-renewable resources such as coal, natural gas, and oil." EPA Landfill Methane Outreach Program, Basic Information, http://www.epa.gov/lmop/basic-info/index.html (last visited Jan. 21, 2015).

8

generated by that plant than a Minnesota MISO member that has no contractual relationship with the plant. Both utilities are consuming energy from the very same pool of electrons. Nonetheless, Appellants now argue that the MISO member with the contract is somehow "importing" energy from a particular source, while a member without the contract is not. No language in § 216H.03 can justify this construction. The logic of Appellants' interpretation of Clause 2 collapses upon itself.

Moreover, a saving construction offered in response to lawsuit seeking invalidation does not solve the practical problems that § 216H.03 creates for APPA, NRECA, and MJMEUC members. Those members must make investment and pricing decisions that inevitably rest on premises about whether the NGEA means what it says. A tactical concession in a brief is an insecure basis upon which to borrow millions for generation facilities, propose rates for customers, or commit to the kinds of long-term contracts and commercial relationships to which § 216H.03 facially applies.

Because Appellants' evolving interpretations of § 216H.03 do not moot or otherwise avoid the questions before the Court, it remains necessary to explain why Appellants' original formulation of § 216H.03—the formulation based on the plain language of the statute and confirmed by the District Court—is unconstitutional.

9

## II. CLAUSE 2 IS AN UNCONSTITUTIONAL EXTERRITORIAL REGULATION.

The effect, if not the purpose, of Clause 2 is to change the way energy is generated, or at least to change the behavior of those who generate it, by forcing them to create offsets in response to the Minnesota statute. A qualified ban on the generation of energy from new facilities in Minnesota, *and on the importation of energy from new facilities elsewhere*, is the state's chosen mechanism to accomplish this. Because much of the energy used in Minnesota is generated outside of Minnesota, the statute's primary impact falls on generators beyond Minnesota's borders.

At the outset, APPA, NRECA, and MJMEUC emphasize that their objection to the Minnesota law does not turn on whether regulated power plants outside of Minnesota's borders are powered by coal instead of other sources of power. While much briefing in this case has focused on coal power and the coal industry, the statute itself makes no reference to coal. The statute touches renewable energy sources outside of Minnesota, including plants powered by landfill gas, sewage, mixed municipal waste, and fuels derived from such waste. Minn. Stat. § 216H.03, subd. 2 (excepting certain types of biomass—but not all—from energy sources considered to contribute to statewide carbon dioxide emissions).

10

**A.     A state may not dictate how electricity is generated in other states.**

Section 216H.03's constitutional flaws are fundamental. Electric power has long been considered an article of interstate commerce. *See, e.g.*, *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339 (1982). In accordance with established Supreme Court precedent, this Court has explained that, "[u]nder the Commerce Clause, a state regulation is per se invalid when it has an 'extraterritorial reach,' that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state." *Cotto Waxo*, 46 F.3d at 793 (citing *Healy v. Beer Inst.,* 491 U.S. 324, 336 (1989)). "Extraterritorial reach invalidates a state statute when the statute requires people or businesses to conduct their out-of-state commerce in a certain way." *Cotto Waxo*, 46 F.3d at 793. Put another way, this Court has held that "a statute has extraterritorial reach when it necessarily requires out-of-state commerce to be conducted according to in-state terms." *Id.* at 794.

Protection against extraterritorial state regulation of energy generation is vital to the increasingly-interconnected energy markets in which APPA, NRECA, and MJMEUC members buy and sell power. If states are allowed to dictate how power is generated outside of their borders, multiple states are likely to enact conflicting regulations potentially affecting the same generation facilities, but striking different balances among various objectives. States seeking more

11

affordable and reliable electricity would adopt laws making it more attractive to build generation facilities using the lowest cost or most-widely available fuel. Other states could elevate different policy priorities. Inconsistent and conflicting regulations from state to state could render regional power markets ever more impractical to administer, increasing the costs faced by APPA, NRECA, and MJMEUC members (and thus by their customers). These associations are concerned, for example, that affirming the legality of Minnesota's law could pave the way for coal-producing states—which have obvious interests in promoting the use of that power source—to limit the development of renewable power sources in neighboring states.

The laws of other states that would conflict with § 216H.03 could also reflect states striking different balances *between* competing environmental objectives. For example, the solid waste management laws and policies of many states favor recovering energy from waste and reducing dependence on land disposal of waste.[3] If Chicago built a new garbage incinerator to reduce its citizens' dependence on the environmentally-inferior option of landfills, Minnesota's

---

[3] Indeed, the statutory goals of Minnesota's own solid waste management policy include recovering energy from waste and reducing indiscriminate dependence on land disposal of waste, Minn. Stat. § 115A.02, subd. (a). Resource recovery through incineration ranks higher on Minnesota's waste management hierarchy than land disposal. *Id.,* subd. (b). Land disposal is particularly discouraged if it does *not* involve the retrieval of landfill gas "as a fuel for the production of energy to be used on site or for sale." *Id.*

Appellate Case: 14-2156    Page: 24    Date Filed: 01/28/2015 Entry ID: 4238732

market of energy distributors and users would effectively be closed to energy generated by Chicago's plant unless the project satisfied Minnesota's highly-restrictive offset requirements. A state prioritizing the goal of slowing land consumption for waste disposal over the goal of reducing greenhouse gases would regulate this technology contrary to § 216H.03.

### B. The extraterritorial doctrine prohibits the projection of one state's regulatory regime into the jurisdiction of another state.

While Appellants and their amici have backed away from one mistakenly narrow view of the extraterritorial doctrine, they have adopted different but equally erroneous views on appeal. Appellants contend that the extraterritorial doctrine merely forbids a state from enacting "laws that regulate transactions having absolutely no connection to [the] state." (Appellants' Br. 44.) The idea that, to be unconstitutionally extraterritorial, the law in question must regulate transactions with "absolutely no connection" to the regulating state is simply incorrect. What courts have said is that states may not regulate activities that take place "wholly outside of the state's borders." *See, e.g.*, *Cotto Waxo*, 46 F.3d at 793. Of course, such activities may have *some* connection to the state seeking to regulate them.

Certain amici also contend that only price control laws can violate the extraterritoriality doctrine. (*See e.g.,* Amicus Br. of Envtl. Def. Fund, et. al 21–22 (citing *Pharmaceutical Research & Mfrs. of Am. v. Walsh,* 538 U.S. 644, 669–70 (2003))). But, as the Supreme Court explained in *Healy*, a case cited with approval

13

in *Walsh*, "[g]enerally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state *regulatory regime* into the jurisdiction of another State." 491 U.S. at 336–37 (emphasis added). The Court further explained that the extraterritorial doctrine "dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another." *Id.* at 337 (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582 (1986)). Explaining the standard for evaluating state regulations under the extraterritorial doctrine, the Court said, "[t]he critical inquiry is whether the *practical effect* of the regulation is to control conduct beyond the boundaries of the State." *Id.* at 336 (emphasis added).[4]

*Walsh* did not overrule these principles. In *Walsh*, the plaintiffs alleged that a Maine statute was akin to the price control statute addressed in *Healy*. *See Walsh*, 538 U.S. at 669. The Court explained that it was not persuaded that the Maine statute acted extraterritorially and that the rule from *Healy* was not applicable. *Id.* But the Court announced no new rule. *See id.*; *see also Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 943 (8th Cir. 2009) (reciting *Healy's*

---

[4] *Healy's* articulation of "the critical inquiry' also demonstrates why Amici American Wind Energy Association and Solar Energy Industries Association are mistaken in asserting that "the extraterritoriality doctrine has only been used to invalidate statutes that have shown economic protectionism." (Amicus Br. of Am. Wind Energy Assoc. and Solar Energy Indus. Assoc. 19.)

14

"practical effect" test six years after *Walsh*). As Appellees here have noted, many courts have applied *Healy*'s formulation of the extraterritorial doctrine in a myriad of cases *not* involving price control laws, both before and after *Walsh*. (Appellees' Br. 39 n.7). It is beyond question that the Supreme Court did not so severely narrow the standard clearly set forth in *Healy* or eliminate an established doctrinal standard while, in the same breath, citing *Healy* itself.

### C. Clause 2 "projects" Minnesota's regulations into other states, clearly violating the extraterritorial doctrine.

The District Court correctly concluded that Clause 2 is a rare instance of one state impermissibly attempting to regulate outside its borders. By effectively requiring compliance by any power generator connected to the MISO network, Clause 2 is an impermissible "projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 337.

#### 1. Clause 2 impermissibly regulates out-of-state participants in an interstate network.

##### a. Appellants' arguments regarding MISO ignore the fact that it is a market maker *and* an interstate electrical network.

The District Court's analysis is clear and takes into account MISO's dual roles as a spot market and as an electrical network. In the MISO electrical network, electrons flow freely and without regard to state borders. Any power generator plugged into that network could be responsible for generating electricity that flows to Minnesota, and such power generators have no ability to prevent such a flow,

Appellate Case: 14-2156    Page: 27    Date Filed: 01/28/2015 Entry ID: 4238732

short of disconnecting from the MISO network. Likewise, because of the operation of MISO's day-ahead and real-time spot markets for electric energy, which dispatch the lowest price electricity to meet consumers' demand, consumers on the MISO network have no control over which power generators will provide the electricity they pay for and consume.[5] Interstate power lines "bring or carry" electricity from other states to Minnesota.[6] The across-border movement of electrons constitutes an "import[ation]" of electricity into Minnesota, triggering Clause 2. The parties responsible for bringing the electricity into Minnesota would thus be liable for impermissibly importing such power unless the out-of-state MISO power generators comport with Minnesota's stringent regulations.

While Appellants initially acknowledge that MISO plays dual roles as both a physical interstate electrical network and a spot market, they now focus exclusively on MISO's role as a market. (*Compare* Appellants' Br. 9–10

---

[5] As one Amicus writing in support of Appellants correctly states: "[T]he electrons that an Xcel Energy customer actually uses might technically come from anyone in MISO. . . ." (Amicus Br. of Minnesota Ctr. for Envtl. Advocacy, et al. 18.)

[6] The inherently interstate nature of this system sharply distinguishes this case from those in which Courts have preserved state regulation of the *local distribution* of natural gas and electricity, which is a purpose of Federal regulatory regimes. *See, e.g.*, *Southern Union Co. v. Missouri Pub. Serv. Comm'n*, 289 F.3d 503, 507 (8th Cir. 2002). The logic of *Southern Union Co.* is inapplicable here because, as this court explained, the statute in question there was not impermissibly extraterritorial because both parties agreed that the statue was part of the state's local rate regulation responsibilities. *Id.* at 508. (*See* Add. 35–36.) Here, the statute at issue is not alleged to regulate local rates or distribution.

Appellate Case: 14-2156    Page: 28    Date Filed: 01/28/2015 Entry ID: 4238732

(acknowledging MISO is a "transmission system") *with* Appellants' Br. 34–43 (focusing only on "the MISO short-term market").) By focusing on MISO's market-making function, and ignoring or misunderstanding the interstate transmission of electricity across the MISO electrical network, Appellants cannot surmount the fundamentally extraterritorial character of Clause 2.

The MISO short-term market determines how much electricity should be generated, by whom, and for what price. This market-making function partly explains why individual generators cannot trace the electricity they produce to particular consumers and why consumers cannot likewise trace the source of the electricity they consume. But MISO's market-making function was not the basis of the District Court's ruling that Clause 2 regulates out-of-state activities. Instead, much more important is the interconnected physical network of power transmission lines that actually move electricity across state borders every second of every day. State attempts to regulate such an interconnected network lead to obvious violations of the extraterritorial doctrine.

> **b.    The MISO electrical network is an "internet" of electrons spanning 16 states, and state attempts to regulate such a network run afoul of the extraterritorial doctrine.**

Despite Appellants' new arguments to the contrary, cases striking down state regulation of internet publications are compellingly analogous to this dispute. Courts have consistently struck down state efforts to regulate materials published

Appellate Case: 14-2156    Page: 29    Date Filed: 01/28/2015 Entry ID: 4238732

on the internet on the grounds that internet publishers cannot control the states in which their publications are directed and, therefore, state efforts to regulate internet publications result in impermissible extraterritorial regulation. *See, e.g.*, *PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103-104 (2d Cir. 2003).

The District Court correctly noted that the facts of *American Booksellers* have strong parallels here. (Add. 37–39, 43.) There, the Second Circuit examined a Vermont law which prohibited transfer of sexually explicit material deemed "harmful to minors" via the internet. While the law did "not discriminate against interstate commerce on its face," the court concluded that the law "present[ed] a *per se* violation of the dormant Commerce Clause" because Vermont had "'projected its legislation' into other States, and *directly regulated* commerce therein." *Am. Booksellers*, 342 F.3d at 104 (quoting *Brown-Forman*, 476 U.S. at 584). In reaching this conclusion, the court noted that "[b]ecause the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without 'project[ing] its legislation into other States.'" *Id.* at 103 (quoting *Healy*, 491 U.S. at 334). The court rejected Vermont's arguments that its law could be limited only to transmissions to Vermonters, concluding that—due to the inherently cross-border nature of the internet—"the rest of the nation [would be] forced to comply with [Vermont's] regulation." *Id.*

Appellate Case: 14-2156     Page: 30     Date Filed: 01/28/2015 Entry ID: 4238732

The court therefore concluded that state-by-state regulation of an interstate network was "impracticable." *Id.* at 104; *see also PSINet, Inc. v. Chapman*, 362 F.3d at 240 ("The content of the Internet is analogous to the content of the night sky. One state simply cannot block a constellation from the view of its own citizens without blocking or affecting the view of the citizens of other states.").

As the District Court recognized, modern regional electrical power grids and markets (like MISO) bear striking similarities to the internet. Users in states geographically far from Minnesota are "connected" to Minnesota in much the same way that internet users in far-flung states are "connected" to Vermont. Power generated in one state may be consumed by users in another state. The nature of the network is such that power producers do not know and cannot control who consumes the energy that they generate. *Cf. Am. Booksellers*, 342 F.3d at 103 ("A person outside Vermont who posts information on a website or on an electronic discussion group cannot prevent people in Vermont from accessing the material."). And power consumers on the network are likewise unable to know the source of the power they "bring or carry" into their state and consume. (*See* Appellants' Br. 36.) As Appellants themselves have noted, such a regulation would be impossible to execute because "[i]t is not possible to control or trade the flow of electrons in the MISO short-term energy markets." (Appellants' Br. 38.)

Appellate Case: 14-2156    Page: 31    Date Filed: 01/28/2015 Entry ID: 4238732

While Appellants urge that cases striking down state regulation of internet publications are inapposite, the only case they cite in support of their position actually confirms the District Court's conclusion that § 216H.03 is an impermissible attempt to regulate out-of-state activities. In *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 193-95 (2d Cir. 2007), the court examined a Connecticut statute affecting gift-card sellers. The appellant there argued that the statute regulated out-of-state commerce. The court discerned a crucial difference between the facts in *SPGGC* and those in *American Booksellers*: Unlike internet publishers, who cannot trace where their content is consumed, gift-card sellers have "a near-perfect means of distinguishing between online consumers of [gift cards] who reside in Connecticut and those who reside elsewhere." *SPGGC*, 505 F.3d at 195. The court explained that since the sellers would know where their buyers resided (through credit card billing addresses), the sellers could easily identify Connecticut residents, and apply the statute only to those customers. *Id.* On the MISO grid, however, there is no equivalent mechanism to trace the transmission of electrons. Just like an internet *publisher* (as opposed to an internet *seller*), a power plant outside of Minnesota that sends electricity to the MISO grid has no way to know or control whether its electricity will be transmitted to Minnesota or another of the 15 other states on the MISO grid.

20

## 2. The risk of inconsistent and conflicting regulations is real.

By attempting to regulate the sources of electrons that come across the interconnected electrical grid from remote states, Minnesota is "project[ing] its legislation" into those other states. *Healy*, 491 U.S. at 334. As state regulations proliferate, the resulting patchwork of conflicting rules will become "impracticable." *Am. Booksellers*, 342 F.3d at 104. The threat of increasingly impracticable regulations is not merely theoretical. In 2008, Michigan—another state connected to MISO's regional market—enacted a statute requiring utilities in that state to "obtain at least 10 percent of their electrical power needs from renewable sources by 2015" while also "forbid[ding] Michigan utilities [from] count[ing] renewable energy generated outside the state toward satisfying the requirement." *See Ill. Commerce Comm'n v. Fed. Energy Regulatory Comm'n*, 721 F.3d 764, 775-76 (7th Cir. 2013) (noting in dicta that Michigan's statute itself likely violates the dormant Commerce Clause).

While the use of electricity in Minnesota may be the *context* for the state's regulation in this area, Minnesota is not attempting to modify energy-*user* behavior through § 216H.03. Nothing in § 216H.03 suggests it was intended to reduce the overall consumption of electricity in Minnesota, for example. Rather, the statute works by requiring "people or businesses to conduct their out-of-state commerce in a certain way, outside of Minnesota." *Cotto Waxo*, 46 F.3d at 793. Unlike

21

regulations that survive extraterritoriality review, changing commercial behavior occurring outside of the state's boundaries is not an incidental effect of the statute. Rather, controlling behavior outside of Minnesota is one of § 216H.03's principal objectives.

## III. SECTION 216H.03 IS UNCONSTITUTIONAL UNDER THE DORMANT COMMERCE CLAUSE BECAUSE IT FAILS THE *PIKE* BALANCING TEST.

To assess whether a state law unduly burdens interstate commerce, courts weigh the burden the law imposes on interstate commerce against the putative local benefit. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *R&M Oil & Supply*, 307 F.3d at 734. When the burden on interstate commerce is "clearly excessive in relation to the putative local benefits," the law violates the dormant Commerce Clause. *Pike*, 397 U.S. at 142. The significant burden § 216H.03 imposes upon interstate commerce outweighs any putative local benefit and is therefore unconstitutional.

As this Court has recognized, "the dormant Commerce Clause carries out 'the Framers' purpose to 'preven[t] a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole[.]'" *S.D. Farm Bureau Inc. v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003) (quoting *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330-31 (1996) (quoting in turn *Okla. Tax. Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995))). While § 216H.03's *goal* may be laudable,

Appellate Case: 14-2156    Page: 34    Date Filed: 01/28/2015 Entry ID: 4238732

its *means* will force Minnesota utilities to retreat into economic isolation. Specifically, the predominant regional marketplace for day-to-day energy needs does not allow Minnesota utilities to limit their purchases to energy produced by generation facilities that meet any particular state's test for appropriateness.

Applying the three-pronged *Pike* analysis to § 216H.03 makes plain that the statute unduly burdens interstate commerce.

### A. Section 216H.03 imposes significant, excessive burdens on interstate commerce.

The prohibitions in Subdivision 3 of § 216H.03 impose significant burdens on interstate commerce. As described above, MISO is an interstate marketplace and grid that does not—and cannot—track the origin of each electron. Even when purchasers enter into long-term power purchase agreements ("PPAs") with suppliers or generation unit ownership arrangements that conform to § 216H.03's requirements, the actual electrons purchasers obtain will be commingled with electrons from many other sources, including sources that might not comply with § 216H.03.

Against this background, § 216H.03 substantially constrains APPA, NRECA, and MJMEUC members and burdens interstate activities. They must limit their energy purchases and contracts based on whether the energy is produced at acceptable out-of-state facilities. To meet the stringent statutory requirements, they may have to accept higher prices or more limited supply options. Out-of-state

23

suppliers that cannot meet § 216H.03's requirements will see their markets shrink. Such constriction has a direct negative impact on interstate commerce.

### 1. Clause 3's prohibitions on certain long-term PPAs adversely impact regional markets.

The impermissible burdens imposed on interstate commerce derive in part from the burdens of prohibiting certain contracts. Clause 3 dictates that "no person shall . . . enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions." Minn. Stat. § 216H.03, subd. 3(3). A "long-term power purchase agreement" is defined as "an agreement to purchase 50 megawatts of capacity or more for a term exceeding five years." *Id.* The limitations in Clause 3 makes it more difficult for load-serving entities to manage risks, either through ownership of, or through contractual rights to a wide portfolio of power supply resources. The inevitable "ripple effects" of Clause 3 make the burden excessive. *Metro Produce Distrib., Inc. v. City of Minneapolis*, 473 F. Supp. 2d 955, 963–64 (D. Minn. 2007) (ordinance prohibiting refrigeration trucks from running during certain times necessarily altered other delivery schedules in other locations).

Appellants again attempt to avoid the unconstitutional impact of Clause 3 by arguing that it imposes no burden because it does not apply to MISO short-term markets, arguing that it "places no limitations on shorter-term contracts."

24

(Appellants' Br. 50–51.) [7] Appellants contend that lost profits or reduced demand is insufficient to establish a burden on interstate commerce. (*Id.* at 51.) But the limitation on long-term PPAs creates impermissible burdens on interstate commerce in several ways: (1) new plants that generate energy are less likely to be built; (2) load-serving entities, like APPA's and NRECA's members, are less able to hedge against risk and manage price, having fewer long-term purchase options to depend upon; and (3) compounding problems (1) and (2) leads to instability in the whole market.

First, limitations on who may contract long-term for the output of a plant producing a certain type of energy product makes it less likely such plants will be built at all. Investors generally require assurances of cost recovery before providing capital. Long-term PPAs provide such assurances.[8] And the burden the limitation in Clause 3 creates is far-reaching; it impacts a variety of different types of plants, including plants that might be built to process landfill gas or mixed municipal solid waste. *See* Minn. Stat. § 216H.03, subd. 2 ("statewide power sector

---

[7] As with Clause 2, Appellants' have offered a supposed saving interpretation of Clause 3 that rests on an unsupported but dramatic leap in logic: that "short-term" energy will never be the subject of Clause 3's described "agreement to purchase 50 megawatts of capacity or more for a term exceeding five years." Here, as in *Cotto Waxo*, Appellants cannot avoid the required constitutional analysis by proffering a new interpretation when that interpretation conflicts with the plain meaning of the statute.

[8] *See* APPA, *Power Plants Are Not Built on Spec: 2014 Update* 2 (2014), http://appanet.files.cms-plus.com/PDFs/94_2014_Power_Plant_Study.pdf.

Appellate Case: 14-2156     Page: 37     Date Filed: 01/28/2015 Entry ID: 4238732

carbon dioxide emissions" includes emissions resulting from combustion of landfill gas, sludge from sewage treatment plants, or mixed municipal solid waste, per Minn. Stat. § 216B.2411, subd. 2(c)(5)–(7)).

Further, Appellants' speculative assertion that Clause 3 "protects Minnesota customers from uncertain future costs" that result from long-term commitments ignores the true market impact. Restricting such commitments makes it difficult for load-serving entities like co-ops and municipalities to hedge their risks in short-term markets, such as the one MISO operates. (Appellants' Br. 53; *see also* Amicus Br. of Am. Wind Energy Assoc. and Solar Energy Indus. Assoc. 13-14 (explaining that Clause 3 is designed to protect ratepayers from paying for "new fossil powered large facilities which may become expensive or obsolete").) LSEs both within and outside of regional transmission organizations build plants or enter into long-term PPAs to fix the costs of a portion of their power supplies over longer time periods, minimizing exposure to significant volatility in spot markets. The restriction on long-term PPAs also causes LSEs difficulty in managing price risk. If LSEs can buy only energy produced from certain fuel sources, then they are significantly exposed to price volatility and availability issues associated with those fuels.

Finally, § 216H.03 imposes a significant burden by creating a barrier to certain resources, which in turn undermines the whole market. Once a plant is

26

constructed based on long-term arrangements, MISO will dispatch the plant to meet MISO demand if the plant clears in the MISO spot market. Contrary to the position of the American Wind Energy Association and Solar Energy Industries Association, the statute does not merely cause an end consumer to purchase one commodity instead of another, promoting one energy source over another. (Amicus Br. of Am. Wind Energy Assoc. and Solar Energy Indus. Assoc. 18.) Rather, because Clause 3 necessarily limits the generation capacity some MISO members can bid, Clause 3 impacts the entire MISO market. This is an additional burden on interstate commerce.

> ## 2. If several jurisdictions imposed similar statutes, the burden would be unmanageable.

When examining the cumulative effects of state laws challenged under the dormant Commerce Clause, courts also consider the interstate effect if several jurisdictions were to adopt similar statutes. *Healy*, 491 U.S. at 336; *R&M Oil & Supply, Inc*, 307 F.3d at 735 ("we would be turning a blind eye to reality if we did not acknowledge that such a situation could create a substantial burden on interstate commerce along the borders of the states throughout the country"). If multiple states devised their own regulatory schemes—predictably with variations among them that strike different balances between the values of environmental protection, reliability and low rates—the burden on utilities to purchase energy from certain types of plants for use in certain states could easily become

Appellate Case: 14-2156     Page: 39     Date Filed: 01/28/2015 Entry ID: 4238732

impossible, particularly in the MISO marketplace. Such variety between state regulatory schemes could easily lead to re-balkanization of the energy grid of the sort that federal efforts have endeavored to transcend.

### B. Any local benefits resulting from § 216H.03's restrictions are de minimis compared with the significant, excessive burdens imposed on interstate commerce.

As *Pike* makes clear, to pass the balancing test the burdens on interstate commerce must be counterbalanced by putative local benefits. The purported benefit of § 216H.03 is the reduction of greenhouse gases ("GHGs") into the atmosphere. But that benefit is unclear, since MISO directs the dispatch of the generation units in the region. (*See* Add. 46 (explaining "once electricity enters the grid, it is indistinguishable from the rest of the electricity in the grid").) Amici for the American Wind Energy Association and Solar Energy Industries Association argue that environmental protection is a legitimate local interest, citing to *Constr. Materials Recycling Ass'n. Issues & Educ. Fund, Inc. v. Burack*, 686 F. Supp. 2d 162, 167 (D.N.H. 2010). That case involved a ban on in-state incineration of construction and demolition debris, to maintain pure air statewide. *Id.* It is less clear that § 216H.03's purported benefit of reducing GHGs would have a measurable local impact.

When the benefit to be derived from a state statute is minimal compared with the excessive burdens imposed on interstate commerce, the statute is

unconstitutional. For example, in *R&M Oil & Supply*, 307 F.3d at 735, this Court agreed that a Missouri state law regulating the storage of propane was unconstitutional under the dormant Commerce Clause. The law required persons engaged in the bulk sale of propane at retail to maintain and operate a minimum storage capacity of 18,000 gallons in the state. Compliance with the statute came at a $25,000 price tag for retailers, including the purchase and installation of the storage tank, plus the market price for land upon which to store the tank and annual maintenance fees. *Id.* at 733–34. Missouri contended the statute constituted a health and safety regulation to protect those who rely on propane for heat in the wintertime from shortages. But where the law did not actually require distributors to keep propane in the storage tanks, this Court determined that the local benefit derived from the statute was minimal to nonexistent, since it did not appear that the statute would actually protect local citizens from propane shortages. *Id.* at 736. Minnesota's statute is likewise unlikely to achieve its intended benefits because of the difficulty an energy-using state will have in changing the behavior of nonresident electric generators.

## C. The putative local interests are addressed already by laws with lesser impact on interstate activities.

The final *Pike* factor is whether the state's interests could be promoted as well with a lesser burden on interstate commerce. The Minnesota Legislature has already instituted several measures intended to cut GHG emissions from electricity

29

generation. Minnesota has passed one of the strongest renewable energy standards nationwide, requiring at least 25% of Minnesota utilities' retail sales to electric customers to be generated from renewable sources by 2025. Minn. Stat. § 216B.1691, subd. 2a(a). The Legislature has also created programs to boost energy savings goals, develop local renewable projects, and cut GHGs by other methods. *See, e.g.*, Minn. Stat. §§ 216B.1694 (innovative energy project); 216B.2423 (wind power); 216B.2424 (biomass power). These laws address the same objective without the same impermissible impacts on interstate commerce imposed by § 216H.03. Because Minnesota has laws less burdensome on interstate commerce to promote the interests that may stem from § 216H.03, the statute fails the final element of the *Pike* test.

## CONCLUSION

For the foregoing reasons and those identified in Appellees' briefs, amici respectfully submit that § 216H.03 must be held unconstitutional.

30

Respectfully submitted,

**GREENE ESPEL PLLP**

 s/ John M. Baker
John M. Baker, Reg. No. 174403
Erin Sindberg Porter, Reg. No. 388345
Karl C. Procaccini, Reg. No. 391369
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
jbaker@greeneespel.com
esindbergporter@greeneespel.com
kprocaccini@greeneespel.com
(612) 373-0830

*Attorneys for American Public Power
Association and National Rural Electric
Cooperative Association as Amici Curiae*

**HEALY LAW OFFICES, LLC**

 s/ Douglas L. Healy
Douglas L. Healy, MO Bar No. 51630
3010 East Battlefield, Suite A
Springfield, MO 65804
doug@healylawoffices.com
(417) 864-7018

*Attorneys for Missouri Joint Municipal
Electric Utility Commission as Amicus
Curiae*

31

## CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(a)(7)(C) and 8TH CIR. L.R. 28A(c), the undersigned certifies that this brief complies with the type-volume limitations of FED. R. APP. P. 29(d). The brief was prepared using Microsoft Word 2010, which reports that the brief contains 6,824 words, excluding items listed in FED. R. APP. P. 32(a)(7)(B)(iii). The file containing the brief has been scanned for viruses and is virus free.

       s/ John M. Baker

Appellate Case: 14-2156    Page: 44    Date Filed: 01/28/2015 Entry ID: 4238732