Nos. 14-2156 & 14-2251

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

———————————

STATE OF NORTH DAKOTA, *et al.*,

*Appellees/Cross-Appellants*,

v.

BEVERLY HEYDINGER, COMMISSIONER AND CHAIR,
MINNESOTA PUBLIC UTILITIES COMMISSION, *et al.*,

*Appellants/Cross-Appellees.*

———————————

Appeal from the United States District Court
for the District of Minnesota (Nelson, J.)

———————————

## BRIEF OF *AMICI CURIAE* CHAMBER OF COMMERCE
## OF THE UNITED STATES OF AMERICA, THE MINNESOTA
## CHAMBER OF COMMERCE, THE NATIONAL ASSOCIATION
## OF MANUFACTURERS, AND THE AMERICAN FUEL AND
## PETROCHEMICAL MANUFACTURERS
## SUPPORTING APPELLEES AND AFFIRMANCE

———————————

Kate Comerford Todd
Sheldon Gilbert
U.S. CHAMBER
  LITIGATION CENTER
U.S. CHAMBER OF COMMERCE
1615 H Street, N.W.
Washington, DC 20062
(202) 463-5685

Roger R. Martella, Jr.
Eric D. McArthur
Joshua J. Fougere
Maureen B. Soles
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

*Counsel for U.S. Chamber
of Commerce*

*Counsel for Amici Curiae*

[Counsel For Additional *Amici Curiae* On Inside Cover]

Benjamin L. Gerber
MINNESOTA CHAMBER OF
  COMMERCE
400 Robert St. N.,
Suite #1500
St. Paul, MN 55101
(651) 292-4650

*Counsel for Minnesota
   Chamber of Commerce*


Richard Moskowitz
AMERICAN FUEL &
  PETROCHEMICAL
  MANUFACTURERS
1667 K Street, N.W.
Suite 700
Washington, D.C. 20006
(202) 457-0480

*Counsel for AFPM*

Linda E. Kelly
Quentin Riegel
NATIONAL ASSOCIATION
  OF MANUFACTURERS
MANUFACTURERS'
  CENTER FOR LEGAL
  ACTION
733 10th Street, NW,
Suite 700
Washington, DC  20001
(202) 637-3000

*Counsel for NAM*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Chamber of Commerce of the United States of America, the Minnesota Chamber of Commerce, the American Fuel & Petrochemical Manufacturers Association, and the National Association of Manufacturers respectfully submit this Corporate Disclosure Statement and state as follows:

The Chamber of Commerce of the United States of America (Chamber) is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber is the world's largest business federation, representing 300,000 direct members and indirectly representing an underlying membership of more than three million businesses and organizations of every size, in every industry sector, and from every region of the country. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

The Minnesota Chamber of Commerce (Minnesota Chamber) represents over 2,300 business locations throughout the state of Minnesota with a diverse range of energy usage levels. The Minnesota Chamber

has no parent corporation, and no publicly held company has 10% or greater ownership in the Minnesota Chamber.

American Fuel & Petrochemical Manufacturers Association (AFPM) is a national trade association of more than 400 companies. AFPM's members include virtually all U.S. refiners and petrochemical manufacturers. AFPM has no parent companies, and no publicly held company has a 10% or greater ownership interest in AFPM.

The National Association of Manufacturers (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. NAM has no parent corporation, and no publicly held company has 10% or greater ownership in NAM.

Appellate Case: 14-2156    Page: 4    Date Filed: 01/30/2015 Entry ID: 4239723

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES.....................................................v

INTEREST OF *AMICI CURIAE* ..............................................1

SUMMARY OF ARGUMENT....................................................4

ARGUMENT ...............................................................6

I.    The Commerce Clause Prevents States From Creating Barriers To The National Common Market Through Extraterritorial Regulation.................................................................6

II.   As Properly Construed By The District Court, The NGEA Impermissibly Regulates Commerce Occurring Wholly Outside Of Minnesota ...........................................................11

      A.    The NGEA regulates wholly out-of-state commerce ............11

      B.    By requiring out-of-state generators to comply with Minnesota law when servicing out-of-state customers, the NGEA violates the Commerce Clause ..............................20

III.  Even Under Appellants' Limiting Construction, The NGEA Violates The Extraterritoriality Doctrine By Restricting Imports In Order To Control Commerce In Other States................................22

      A.    States may not restrict imports in order to control commerce in other states.........................................23

      B.    The rule advanced by appellants and their *amici* would destroy the national common market ......................30

CONCLUSION ...........................................................36

Appellate Case: 14-2156    Page: 5    Date Filed: 01/30/2015 Entry ID: 4239723

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Appellate Case: 14-2156    Page: 6    Date Filed: 01/30/2015 Entry ID: 4239723

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003) ............................................................. 12, 22

*Am. Elec. Power Co. v. Connecticut,*
131 S. Ct. 2527 (2011) ............................................................. 29

*Arvig Tel. Co. v. Nw. Bell Tel. Co.,*
270 N.W.2d 111 (Minn. 1978) ............................................................. 19

*Baldwin v. G.A.F. Seelig, Inc.,*
294 U.S. 511 (1935) ............................................................. *passim*

*Bonaparte v. Tax Court,*
104 U.S. 592 (1881) ............................................................. 10

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988) ............................................................. 19

*Brown v. Estate of Fletcher,*
210 U.S. 82 (1908) ............................................................. 10

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
476 U.S. 573 (1986) ............................................................. 8

*C&A Carbone, Inc. v. Town of Clarkstown,*
511 U.S. 383 (1994) ............................................................. *passim*

*Conn. Nat'l Bank v. Germain,*
503 U.S. 249 (1992) ............................................................. 18

*Cotto Waxo Co. v. Williams,*
46 F.3d 790 (8th Cir. 1995) ............................................................. *passim*

*EPA v. EME Homer City Generation, L.P.,*
134 S. Ct. 1584 (2014) ............................................................. 29

Appellate Case: 14-2156     Page: 7     Date Filed: 01/30/2015 Entry ID: 4239723

*H.P. Hood & Sons, Inc. v. Du Mond*,
  336 U.S. 525 (1949) ............................................................ 7

*Hardage v. Atkins*,
  619 F.2d 871 (10th Cir. 1980) ........................................... 26

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ................................................... *passim*

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) ............................................................ 6

*Lee v. Lee*,
  775 N.W.2d 631 (Minn. 2009) ........................................... 17

*Martin ex rel. Hoff v. City of Rochester*,
  642 N.W.2d 1 (Minn. 2002) ............................................... 19

*Missouri v. Harris*,
  No. 14-341, 2014 WL 4961473 (E.D. Cal. Oct. 2, 2014) ..................... 34

*N. Haven Bd. of Educ. v. Bell*,
  456 U.S. 512 (1982) .......................................................... 12

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
  272 F.3d 104 (2d Cir. 2001) .............................................. 21

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*,
  63 F.3d 652 (7th Cir. 1995) .............................................. 25

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*,
  165 F.3d 1151 (7th Cir. 1999) ....................................... 25, 28

*Pharm. Research & Mfrs. of Am. v. Walsh*,
  538 U.S. 644 (2003) ................................................... 26, 27

*Prudential Ins. Co. v. Benjamin*,
  328 U.S. 408 (1946) .......................................................... 30

*Rocky Mountain Farmers Union v. Corey*,
  730 F.3d 1070 (9th Cir. 2013), *reh'g denied*, 740 F.3d 507 (9th
  Cir. 2014) ................................................................... 33

Appellate Case: 14-2156     Page: 8     Date Filed: 01/30/2015 Entry ID: 4239723

*Shelby Cnty. v. Holder,*
133 S. Ct. 2612 (2013) ........................................................................ 10

*State v. Shattuck,*
104 N.W. 719 (Minn. 1905) .................................................. 12, 13, 19

*Wallace v. Comm'r of Taxation,*
184 N.W.2d 588 (Minn. 1971) ............................................................ 17

*W. Lynn Creamery, Inc. v. Healy,*
512 U.S. 186 (1994) .............................................................................. 7

*Westinghouse Elec. Corp. v. Tully,*
466 U.S. 388 (1984) .............................................................................. 6

*World-Wide Volkswagen Corp. v. Woodson,*
444 U.S. 286 (1980) .................................................................... 7, 9, 10

## CONSTITUTION AND STATUTES

U.S. Const. art I, § 8, cl. 3 .................................................................... 6

21 U.S.C. § 951(a)(1) .......................................................................... 13

Minn. Stat. § 216H.03 ................................................ 11, 12, 13, 15, 16

## LEGISLATIVE HISTORY

H.B. 2186 (Or. 2009) ........................................................................... 34

Minn. House Journal (Mar. 8, 2007), *available at*
http://www.house.leg.state.mn.us/cco/journals/2007-
08/J0308026.doc ............................................................................... 14

## SCHOLARLY AUTHORITIES

Katherine Florey, *State Courts, State Territory, State Power:*
*Reflections on the Extraterritoriality Principle in Choice of Law*
*and Legislation,* 84 Notre Dame L. Rev. 1057 (2009) ........................ 34

Appellate Case: 14-2156     Page: 9     Date Filed: 01/30/2015 Entry ID: 4239723

Douglas Laycock, *Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice of Law*, 92 Colum. L. Rev. 249 (1992) ...................................................................... 9

Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of Am. and Dormant Commerce Clause Doctrine; (II) Ex-traterritorial State Legislation*, 85 Mich. L. Rev. 1865 (1987) .......... 10

**OTHER AUTHORITIES**

*Webster's Third New International Dictionary* (1993) ........................... 13

Life Cycle Assocs. LLC, *A Clean Fuel Standard in Washington State: Revised Analysis with Updated Assumptions* (2014), http://ofm.wa.gov/initiatives/cleanfuelstandards/Documents/Carbon_Fuel_Standard_evaluation_2014_final.pdf. ............................... 34

Or. Dep't of Envtl. Quality, *Oregon Clean Fuels Program*, http://www.deq.state.or.us/aq/cleanFuel/ (last viewed Jan. 27, 2015) ...................................................................................... 34

Wash. Exec. Order 14-04 (2014) .............................................................. 34

Appellate Case: 14-2156    Page: 10    Date Filed: 01/30/2015 Entry ID: 4239723

# INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than three million companies and organizations of every size, in every industry sector, from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases that raise issues of concern to the nation's business community.

The Minnesota Chamber of Commerce represents over 2,300 business locations throughout the state of Minnesota, with a diverse range of energy usage levels. As the voice of Minnesota businesses on statewide policy issues, the Minnesota Chamber's main goal is to make Minnesota's business environment competitive relative to other states

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), *amici curiae* states that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and no person other than *amici curiae*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. A motion for leave to participate as *amici curiae*—to which both appellants and appellees have indicated that they do not intend to assert any objection—has been filed with the Court.

Appellate Case: 14-2156   Page: 11   Date Filed: 01/30/2015 Entry ID: 4239723

and nations. Energy is a critical component to a successful business environment. Therefore, a focal point of the Minnesota Chamber's work is ensuring Minnesota has a competitively priced, reliable, and diverse energy supply.

The National Association of Manufacturers is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs over 12 million men and women, contributes roughly $2.1 trillion to the U.S. economy annually, has the largest economic impact of any major sector and accounts for two-thirds of private-sector research and development. NAM's mission is to enhance the competitiveness of manufacturers and improve American living standards by shaping a legislative and regulatory environment conducive to U.S. economic growth.

The American Fuel & Petrochemical Manufacturers is a national trade association of more than 400 companies, including virtually all U.S. refiners and petrochemical manufacturers; AFPM members operate 122 U.S. refineries comprising more than 95% of U.S. refining capacity. AFPM petrochemical members support 1.4 million American

Appellate Case: 14-2156   Page: 12   Date Filed: 01/30/2015 Entry ID: 4239723

jobs, including approximately 214,000 employed directly in petrochemical manufacturing plants. AFPM members operate industrial facilities engaged in interstate commerce and are large consumers of electricity.

Minnesota's Next Generation Energy Act (NGEA) and the proliferating group of laws like it are of particular concern to *amici* and their members. In a purported effort to combat the challenges of global climate change, Minnesota has sought to regulate commerce outside its borders and impose its policies on sister states. If the district court's decision properly striking down the NGEA is not upheld, the statute's practical effect will be that Minnesota sets energy and environmental policies not only for itself but for an entire region.

This has significant implications for *amici*'s members, including businesses in the energy sector and others impacted by the NGEA's attempt to legislate across state lines. The law will substantially impede the interstate market for electricity, both directly and if it becomes a template for similar laws in other states. Directly, the NGEA will increase business costs by raising electric rates. Among other things, Minnesota's economy is at a critical juncture as companies grapple with frequent electric rate increases, with political and economic uncertainty

-3-

regarding carbon taxation and other environmental regulation, and with new advances in the extraction of shale gas that create rapid swings in the natural gas market. Increasing energy rates make Minnesota less competitive regionally, nationally, and internationally. Increased electricity costs will thus damage Minnesota's many energy-intensive industries: mining, forestry and paper, steel production, manufacturing, and more. For such companies, electricity is not just a cost of doing business; it can be one of the largest costs.

Regarding the precedent of the NGEA more broadly, a decision upholding Minnesota's extraterritorial experiment may encourage more states to try to export their environmental or other policies by restricting imports, resulting in a web of inconsistent and clashing local regulations that would destroy the national common market and impose untold costs on businesses and consumers. *Amici* and their members, therefore, have a strong interest in the proper resolution of this case.

## SUMMARY OF ARGUMENT

The Commerce Clause was designed to establish and maintain a national common market, unhampered by state-imposed trade barriers. To ensure the free flow of goods in that market, the clause forbids states

-4-

from regulating commerce outside their borders. In doing so, it safe-guards not just interstate commerce, but also the fundamental principle of interstate federalism that each state is sovereign within—and only within—its own territory. Extraterritorial state laws are per se invalid.

Applying these bedrock principles, the district court correctly saw the NGEA for what it is: a statute that by its plain terms regulates wholly out-of-state commerce. The NGEA applies to any "person"—regardless of location—who introduces power from new coal-fired facili-ties into Minnesota or who enters into long-term power contracts that increase carbon emissions from the generation of electricity consumed in Minnesota, even when the generation and the carbon emissions occur outside Minnesota. The statute thus sweeps up out-of-state entities and, given how the electricity market works, their out-of-state transactions as well. That is a paradigmatic violation of the Commerce Clause.

No doubt aware of the difficulty the NGEA presents on its face, appellants and their *amici* have strived in this litigation to re-write it. Notwithstanding the statute's absolute language, they now say it ap-plies only to Minnesota buyers who enter into agreements for power. The legislature certainly could have written (and knew how to write)

Appellate Case: 14-2156    Page: 15    Date Filed: 01/30/2015 Entry ID: 4239723

such a law, but the statute it enacted contains no such limitations. Moreover, even if the Court were to adopt appellants' limiting construction, the statute would still represent an unconstitutional effort to legislate extraterritorially. Under the Commerce Clause, Minnesota cannot condition the importation of electricity on out-of-state generators' compliance with Minnesota's policies concerning electricity generation.

## ARGUMENT

### I. The Commerce Clause Prevents States From Creating Barriers To The National Common Market Through Extraterritorial Regulation.

The Founders knew better than anyone—having just lived through the failings of the balkanized market that grew up under the Articles of Confederation—that a properly functioning national economy needs a national market. To ensure that the mistakes of the past would not be repeated, the Commerce Clause lodges the exclusive power to "regulate Commerce … among the several States" with Congress. U.S. Const. art. I, § 8, cl. 3. In doing so, the Constitution establishes an "overriding requirement of a national 'common market.'" *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 350 (1977); *accord Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 402 (1984) ("The very purpose of the Commerce Clause was to create an area of free trade among the

-6-

several States.") (internal quotation marks and alteration omitted); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980) ("Nation was to be a common market, a 'free trade unit'"). The Founders thus ensured that every producer "shall be encouraged to produce by the certainty that he will have free access to every market in the Nation [and that] every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949).

Fostering such a national market, of course, means preventing states from erecting trade barriers to obstruct it. The Commerce Clause thus includes a "'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Healy v. Beer Inst.*, 491 U.S. 324, 326 n.1 (1989); *see also W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 n.9 (1994) (clause was "'intended as a negative and preventive provision against injustice among the States themselves'"). It "prohibit[s] state or municipal laws whose object is local economic protectionism" and, instead, "presumes a national market free from local legislation that discriminates in favor of local interests." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390, 393 (1994). Without that,

Appellate Case: 14-2156    Page: 17    Date Filed: 01/30/2015 Entry ID: 4239723

"the door [would be] opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation," and "economic barrier[s]" between states would present "an unreasonable clog upon the mobility of commerce." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 522, 527 (1935).

In addition to prohibiting local protectionism, the Commerce Clause also "'precludes the application of a state statute to commerce that takes place wholly outside of the State's borders.'" *Healy*, 491 U.S. at 336; *accord Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 581 (1986). States cannot impose "obstructions to the normal flow of commerce," *Baldwin*, 294 U.S. at 524, or "attach restrictions to exports or imports in order to control commerce in other States," *Carbone*, 511 U.S. at 393. This bar is categorical: an extraterritorial law "is invalid regardless of whether [its] extraterritorial reach was intended by the legislature." *Healy*, 491 U.S. at 336; *accord Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995) ("a state regulation is per se invalid when it has an 'extraterritorial reach'").

The purpose of this prohibition is twofold. First, it helps prevent "the kind of competing and interlocking local economic regulation that

Appellate Case: 14-2156    Page: 18    Date Filed: 01/30/2015 Entry ID: 4239723

the Commerce Clause was meant to preclude." *Healy*, 491 U.S. at 337. By forbidding states from overreaching, the Commerce Clause facilitates the free flow of goods in interstate commerce. Second, it prevents a state from "extend[ing] [its] police power beyond its jurisdictional bounds." *Carbone*, 511 U.S. at 393; *see also Healy*, 491 U.S. at 336 (an extraterritorial law "exceeds the inherent limits of the enacting State's authority"); *Baldwin*, 294 U.S. at 521 (no state has the "power to project its legislation into [another]"). By keeping states from regulating commerce outside their own borders, then, the Commerce Clause "reflect[s] the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy*, 491 U.S. at 335–36 (footnote omitted).

In this way, the Commerce Clause reinforces broader structural "principles of interstate federalism embodied in the Constitution." *World-Wide Volkswagen*, 444 U.S. at 293.[2] It has been said many times

---

[2] *See, e.g.*, Katherine Florey, *State Courts, State Territory, State Power: Reflections on the Extraterritoriality Principle in Choice of Law and Legislation*, 84 Notre Dame L. Rev. 1057, 1060 (2009) (the extraterritoriality principle is "rooted in general structural principles of horizontal federalism"); Douglas Laycock, *Equal Citizens of Equal and Territorial*

Appellate Case: 14-2156    Page: 19    Date Filed: 01/30/2015 Entry ID: 4239723

and in many contexts that "[n]o state can legislate except with reference to its own jurisdiction." *Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881). Because our constitutional system is based on a federal union of 50 sovereign states whose spheres of authority are defined by territorial boundaries, "[t]he sovereignty of each State … implie[s] a limitation on the sovereignty of all of its sister States." *World-Wide Volkswagen*, 444 U.S. at 293; *see Brown v. Estate of Fletcher*, 210 U.S. 82, 89 (1908) ("The several States are of equal dignity and authority, and the independence of one implies the exclusion of power from all others."). The bar on extraterritorial legislation thus serves one of the Constitution's most enduring purposes: to ensure that "'all the States enjoy equal sovereignty.'" *Shelby Cnty. v. Holder*, 133 S. Ct. 2612, 2621 (2013).

---

*States: The Constitutional Foundations of Choice of Law*, 92 Colum. L. Rev. 249, 315–18 (1992) (addressing territorial limit on state legislative jurisdiction); Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of Am. and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation*, 85 Mich. L. Rev. 1865, 1885 (1987) (bar on extraterritorial laws is "one of those foundational principles of our federalism which we infer from the structure of the Constitution as a whole").

Appellate Case: 14-2156   Page: 20   Date Filed: 01/30/2015 Entry ID: 4239723

## II. As Properly Construed By The District Court, The NGEA Impermissibly Regulates Commerce Occurring Wholly Outside Of Minnesota.

With these precepts in mind, it is readily apparent that the district court's decision striking down the NGEA was correct. The statute regulates parties and conduct wholly outside of Minnesota and, in so doing, both obstructs interstate commerce and usurps the sovereignty of Minnesota's sister states over commerce conducted within their borders. The NGEA is thus "per se invalid." *Cotto Waxo*, 46 F.3d at 793.

### A. The NGEA regulates wholly out-of-state commerce.

The NGEA provides, in relevant part, that:

[N]o person shall: …

(2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or

(3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions. For purposes of this section, a long-term power purchase agreement means an agreement to purchase 50 megawatts of capacity or more for a term exceeding five years.

Minn. Stat. § 216H.03, subd. 3. The term "statewide power sector carbon dioxide emissions" means "the total annual emissions of carbon dioxide from the generation of electricity within the state and all emis-

Appellate Case: 14-2156    Page: 21    Date Filed: 01/30/2015 Entry ID: 4239723

sions of carbon dioxide from the generation of electricity imported from outside the state and consumed in Minnesota." *Id.* § 216H.03, subd. 2.

The district court correctly concluded that these provisions sweep up wholly extraterritorial commerce. To begin with, the statute reaches out-of-state entities, including generating facilities, by its plain terms. The prohibitions start with the unbounded command that "no person shall" do any of the things that follow. *Id.* § 216H.03, subd. 3. That language, on its face, "is not subject to any qualifications regarding location [and] plainly applies to 'all persons' regardless of their location or corporate form." Appellants' Br. Add. 30; *see also* Appellees' Br. 12; *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520 (1982) (rejecting narrow interpretation of the "broad directive" in "no person" language); *Am. Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003) (reading "no person" provision to apply extraterritorially); *Cotto Waxo*, 46 F.3d at 792 (similar). Indeed, in *State v. Shattuck*, the Minnesota Supreme Court confronted a prohibition stating that "'[n]o person shall sell to any one at any time ruffled grouse.'" 104 N.W. 719, 719 (Minn. 1905). The court refused to read this language narrowly to exclude persons selling game brought into Minnesota from another state because, among other things, the

-12-

language was "unequivocal [and] [t]he statute means just what it says." *Id.*

Consistent with subdivision 3's expansive opening phrase, the operative verbs in subsections (2) and (3) likewise apply to entities outside Minnesota. Anyone anywhere—including out-of-state generators—can "enter into a long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions." Minn. Stat. § 216H.03, subd. 3(3). The same is true for subdivision 3(2), which bars anyone from "import[ing] or commit[ting] to import" power from outside the state. *Id.* § 216H.03, subd. 3(2). The plain meaning of "import" encompasses introducing or carrying power into Minnesota. *See, e.g.*, *Webster's Third New International Dictionary* 1135 (1993) ("to bring or carry into, introduce, cause"); Appellants' Br. 36 ("'bring[ing] or carrying in'"); 21 U.S.C. § 951(a)(1) ("'import' means … any bringing in or introduction of [an] article into any area"). Out-of-state generators who supply electricity that enters Minnesota introduce power into Minnesota. *See also* Appellees' Br. 10–25, 41–45.

The legislative history further confirms that subdivision 3(2) covers out-of-state generators, as reflected in the following colloquy:

-13-

Representative Mariani: … in the Delete-All Amendment we have under section 5 the import or commit to import provision…. Has … the Governor taken a position or identified, well taken a position I suppose, in terms of, of his approach to outside … of the State generators of power in terms of what this State's position or posture should be relative to that generation of power[']s contribution to carbon emissions?

Chair: Commissioner Garvey.

Commissioner Garvey: … the Governor's position is that new fossil fuel generates [sic] facilities that will service retail loads in the state of Minnesota should offset the carbon emissions, regardless of where they are located. And we have so indicated to the facilities that would be proposed to do so.

Representative Mariani: And Mr. Chair, and the operative words there are *inside the State of Minnesota*. No?

Commissioner Garvey: No.

Representative Mariani: Okay, I'm sorry.

Commissioner Garvey: Regardless of where they are located.

Appx. 138.[3] Beyond the unabashed statement about regulating facilities "[r]egardless of where they are located," there would be no need to "indicat[e]" anything to out-of-state facilities about offsets if those facilities were not subject to subdivision 3, because offsets only come into

---

[3] This colloquy concerned an earlier version of the statute, H. F. No. 375, but the relevant provisions do not differ materially from what was enacted. *See* Minn. House Journal 914, 917–18 (Mar. 8, 2007), *available at* http://www.house.leg.state.mn.us/cco/journals/2007-08/J0308026.doc (reporting H. F. No. 375).

Appellate Case: 14-2156    Page: 24    Date Filed: 01/30/2015 Entry ID: 4239723

play to counteract "the prohibitions of subdivision 3." Minn. Stat. § 216H.03, subd. 4.

The NGEA applies not only to out-of-state generators, but also to wholly out-of-state transactions. Subdivision 3(2) bans the importation of "power," which means energy that has already been generated. *E.g.*, Appellees' Br. 64; Pltfs.' Reply to Defs.' Opp. To Pltfs.' Mot. for Summ. J., No. 0:11-cv-03232-SRN-SER, Dkt. No. 187, at 4 (D. Minn.) (citing testimony). And, as the district court explained, due to "the manner in which the electricity industry operates," there is simply no way to ensure that "power" generated by a facility outside of Minnesota and intended for another entity outside of Minnesota will not, in fact, be introduced into Minnesota. Appellants' Br. Add. 42–43; *see also, e.g.*, Appellees' Br. 44. Likewise, a long-term agreement to purchase capacity for the grid that includes Minnesota could also govern non-Minnesota capacity obligations over that same grid. *E.g.*, Appx. 323–24. Because an out-of-state entity servicing Minnesota and non-Minnesota customers cannot siphon off Minnesota power from non-Minnesota power, the NGEA necessarily captures the out-of-state entity's wholly out-of-state transactions.

-15-

With the statutory text against them, appellants scramble to justify writing new limitations into the NGEA. Their arguments all fail. Focusing on subdivision 3(2), appellants principally maintain that the provision regulates only "contracts or other commitments to provide electricity for use in Minnesota," and, more specifically, the "persons who contract with a generating facility to import electricity into Minnesota for use by Minnesota customers." Appellants' Br. 36. But that interpretation proceeds as if neighboring subdivision 3(3) did not exist. Subdivision 3(3) is explicitly addressed to "power purchase agreement[s]," and thus demonstrates that the legislature knew how to target "agreements" when it wanted to and, in fact, did so with particular types of agreements in mind (those for "50 megawatts of capacity or more for a term exceeding five years"). Minn. Stat. § 216H.03, subd. 3(3).

Subdivision 3(2), by contrast, imposes a blanket ban on the importation of "power" from a new facility by any "person," with or without a contract in place. It would have been quite easy to limit subdivision 3(2) to Minnesota buyers, to agreements, or to Minnesota buyers that sign specific kinds of agreements, but the statute imposes no such re-

Appellate Case: 14-2156    Page: 26    Date Filed: 01/30/2015 Entry ID: 4239723

strictions. And "courts cannot supply that which the legislature purposely omits or inadvertently overlooks." *Wallace v. Comm'r of Taxation*, 184 N.W.2d 588, 594 (Minn. 1971); *see also Lee v. Lee*, 775 N.W.2d 631, 638 (Minn. 2009) (use of different terms in related provisions "demonstrate[s] that the legislature knew how to distinguish" them).

Appellants' next two arguments build off their initial mistake by implicitly assuming they are right that the NGEA regulates only Minnesota purchasers. They first point to the definition of "statewide power sector carbon dioxide emissions" and say that "[e]lectricity purchased from a generating facility for use outside of Minnesota is not included in the definition" and thus is not regulated. Appellants' Br. 37, 40–43 (citing Minn. Stat. § 216H.03, subd. 2). Similarly, they contend that the district court's interpretation would be "absurd" and impossible to enforce because Minnesota purchasers cannot know the source of their electricity and thus whether it originates at a covered facility. *Id.* at 38–40.

The problem with both of these contentions is that they ignore the NGEA's application to out-of-state entities. Electricity consumed outside Minnesota may fall outside the definition of "statewide power sec-

-17-

tor carbon dioxide emissions," but regulated facilities outside Minnesota have no way to segregate sales to non-Minnesota customers from their sales to Minnesota customers. Likewise, it is neither absurd nor impossible to enforce subdivisions 3(2) and 3(3) against out-of-state generators selling to Minnesota. Quite the opposite: Minnesota has apparently told such entities about its plans to do so in the past. *See supra* at 14; Appellees' Br. 10–25, 41–45.

Apart from textual arguments, appellants also invoke two interpretive canons in an effort to bolster their position: the presumption against extraterritorial application of statutes and agency deference. Appellants' Br. 37–43. Neither helps. The presumption against extraterritoriality is just that—a presumption that applies when the text is unclear—and thus cannot resuscitate appellants' counter-textual interpretation. *See, e.g.*, *Cotto Waxo*, 46 F.3d at 792 (rejecting non-extraterritorial saving construction because "a statute's plain meaning is not to be disregarded if the language is clear and unambiguous"); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, … 'judicial inquiry is complete.'").

Appellate Case: 14-2156     Page: 28     Date Filed: 01/30/2015 Entry ID: 4239723

Appellants' half-hearted plea for deference—to an interpretation they acknowledge was formulated in this litigation rather than during any formal process or administrative proceeding, Appellants' Br. 10—is no better. Not only is the statutory text unambiguous, but *Chevron*-style deference is also "not appropriate" because the agency interpretation "does not reflect formal rules or agency adjudications." *Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 21 (Minn. 2002). Nor is it "one of long-standing application." *Arvig Tel. Co. v. Nw. Bell Tel. Co.*, 270 N.W.2d 111, 114 (Minn. 1978). Instead, appellants' view represents an apparent about-face from what officials have said previously. *See supra* at 14. "Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988).

At bottom, the NGEA "means just what it says," *Shattuck*, 104 N.W. at 719: it regulates out-of-state entities and, by extension, wholly out-of-state commerce.

Appellate Case: 14-2156    Page: 29    Date Filed: 01/30/2015 Entry ID: 4239723

**B. By requiring out-of-state generators to comply with Minnesota law when servicing out-of-state customers, the NGEA violates the Commerce Clause.**

As properly construed by the district court, the NGEA plainly violates the Commerce Clause's prohibition on extraterritorial regulation. "[T]he 'Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.'" *Healy*, 491 U.S. at 336 (alteration omitted). The "critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id*. Stated differently, "[e]xtraterritorial reach invalidates a state statute when the statute requires people or businesses to conduct their out-of-state commerce in a certain way." *Cotto Waxo*, 46 F.3d at 793. Indeed, even appellants concede that "a state may not enact laws that regulate transactions having absolutely no connection to a state." Appellants' Br. 44.

That is just what Minnesota has tried to do. The NGEA's text extends to anyone anywhere and ensnares conduct and transactions entirely outside Minnesota. This is hardly hypothetical: plaintiffs have submitted numerous declarations about how the NGEA's breadth

-20-

threatens their out-of-state commerce. *See* Appellees' Br. 10–25, 41–45. Plaintiffs fear, for example, that the NGEA will cause a non-Minnesota entity with Minnesota obligations to refuse to enter into long-term agreements to buy surplus power—a significant source of revenue. Appx. 310–11; *see also id.* at 323–25 (describing abandoned long-term agreement and concern that the NGEA will impact every project the company might consider). In short, the statute "limit[s] [out-of-state generators'] ability to transmit power and enter into purchase agreements necessary to serve load growth occurring entirely outside Minnesota." *Id.* at 291–92. As a result, the NGEA "has the practical effect of controlling conduct beyond the boundaries of [Minnesota]." *Cotto Waxo*, 46 F.3d at 793.

The district court, moreover, was entirely correct to recognize that the nature of the electricity industry distinguishes the NGEA and this case from many others. An out-of-state generator servicing Minnesota and non-Minnesota customers cannot "modify [its] production and distribution systems to differentiate between [Minnesota]-bound and non-[Minnesota]-bound [power]," *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001), or "sell to out-of-state purchasers regardless of

-21-

[its] relationship to Minnesota," *Cotto Waxo*, 46 F.3d at 794. Instead, just as a person who posts content on the internet cannot prevent people in other states from accessing that content, "a person outside [Minnesota] who [sends power onto the grid] cannot prevent people in [Minnesota] from accessing the [power]." *Dean*, 342 F.3d at 103; *see also* Appellees' Br. 43–44. Because the NGEA reaches such out-of-state entities, it also reaches their out-of-state transactions. As a result, the NGEA "necessarily requires out-of-state commerce to be conducted according to in-state terms." *Cotto Waxo*, 46 F.3d at 794. That means it is "per se invalid." *Id.* at 793.

## III. Even Under Appellants' Limiting Construction, The NGEA Violates The Extraterritoriality Doctrine By Restricting Imports In Order To Control Commerce In Other States.

Even if the Court were to accept appellants' limiting construction and read the statute to apply only to Minnesota entities that enter into agreements to import power into Minnesota, the NGEA would still violate the extraterritoriality doctrine. Under the Commerce Clause, Minnesota cannot condition importation of electricity on out-of-state generators' compliance with Minnesota's environmental policies. A contrary rule—allowing states to ban imported products based solely on how

-22-

they were produced in other states—would spell the end of the national common market the Commerce Clause was designed to protect.

## A.  States may not restrict imports in order to control commerce in other states.

The basic premise underlying the contentions of appellants and their *amici* is that a law does not regulate extraterritorially if it places legal obligations only on in-state entities. *See, e.g.*, Appellants' Br. 45 (contending the NGEA regulates only "facilities located in Minnesota"). That premise is mistaken. A state may not ban its residents from buying goods produced in other states because it disapproves of the producer's out-of-state conduct. That is, states "may not attach restrictions to exports or imports in order to control commerce in other States," as this "would extend the [state's] police power beyond its jurisdictional bounds." *Carbone*, 511 U.S. at 393 (citing *Baldwin*, 294 U.S. 511).

*Baldwin* is instructive. There the Supreme Court struck down a New York law that prohibited the resale of milk imported into New York if it had been bought in another state at a price below New York's minimum price. 294 U.S. at 519. New York defended the law on the ground that, by raising the prices out-of-state producers charged for their New York-bound milk, it would "lift up the level of economic wel-

Appellate Case: 14-2156    Page: 33    Date Filed: 01/30/2015 Entry ID: 4239723

fare" of milk producers in other states and thereby "stimulate the observance of sanitary requirements in the preparation of the product." *Id.* at 524. In a unanimous opinion by Justice Cardozo, the Court rejected this argument, holding that "[o]ne state may not put pressure … upon others to reform their economic standards" by imposing "obstructions to the normal flow of commerce" between the states. *Id.*

The courts have not often been called upon to apply the principle announced in *Baldwin*—no doubt because states rarely attempt to "project [their] legislation" into other states by restricting imports. *Id.* at 521. But the decision has lost none of its vitality. In *Carbone*, the Supreme Court expressly reaffirmed *Baldwin* in striking down a town ordinance that required all solid waste generated in the town to be processed at an in-town transfer station rather than exported for processing elsewhere. 511 U.S. at 383. The town defended the ordinance as an environmental measure "necessary to ensure the safe handling and proper treatment of solid waste." *Id.* Citing *Baldwin*, the Court rejected this argument, holding that the town's police power did not extend to "steer[ing] solid waste away from out-of-town disposal sites that it might deem harmful to the environment." *Id.*

-24-

The Seventh Circuit applied the same principle in *National Solid Wastes Management Association v. Meyer*, 63 F.3d 652 (7th Cir. 1995) (*Meyer I*), invalidating a Wisconsin statute that forbade the disposal of out-of-state waste in Wisconsin landfills if the region in which the waste was generated had not adopted Wisconsin's recycling standards. *Id.* at 653–54. Like the NGEA, the Wisconsin statute in *Meyer I* restricted importation of waste from other states because those states had not "adopt[ed] the Wisconsin view of environmental management." *Id.* at 662. The court held that the statute impermissibly regulated extraterritorial commerce because its "practical effect" was to "impose the requirements of Wisconsin law" on out-of-state waste generation as a condition of access to the Wisconsin market. *Id.* at 661.

When Wisconsin enacted a revised version of the statute that required Wisconsin's recycling standards to be applied only to Wisconsin-bound waste, the Seventh Circuit again struck the statute down, reiterating that "[n]o state has the authority to tell other polities what laws they must enact or how affairs must be conducted outside its borders." *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 165 F.3d 1151, 1153 (7th Cir. 1999) (per curiam) (*Meyer II*) ("Wisconsin defends as environmentally

Appellate Case: 14-2156    Page: 35    Date Filed: 01/30/2015 Entry ID: 4239723

sound the specifications it has told its neighbors to adopt. Under the Constitution, however, it just does not matter what those specifications are."); *accord Hardage v. Atkins*, 619 F.2d 871, 873 (10th Cir. 1980) (striking down a similar Oklahoma law because Oklahoma was attempting to "forc[e] its judgment with respect to hazardous wastes on its sister states").

These cases refute any contention that the NGEA does not regulate extraterritorially if it is read to apply only to Minnesota entities that buy electricity for consumption in Minnesota. The New York law in *Baldwin* regulated only New York milk sellers, the town ordinance in *Carbone* regulated only in-town waste generators, and the Wisconsin statutes in *Meyer I* and *II* regulated only Wisconsin landfills. Yet each of those laws was unconstitutional, because each obstructed interstate commerce in an effort to control how commerce was conducted outside the state. These cases stand squarely for the proposition that a state may not ban its residents from engaging in interstate transactions because it disapproves of the out-of-state party's out-of-state conduct.[4]

---

[4] *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003), is not to the contrary. The law in that case did not restrict imports in an effort to change producers' out-of-state activities.

Appellate Case: 14-2156   Page: 36   Date Filed: 01/30/2015 Entry ID: 4239723

That is precisely what the NGEA does, under appellants' own reading—it bans Minnesota utilities from importing electricity from generators in other states if the electricity was not generated according to Minnesota's specifications. Minnesota cannot leverage its authority over in-state electricity purchasers to "regulat[e] by indirection" the generation of electricity in other states. *Baldwin*, 294 U.S. at 524. This would allow Minnesota to "extend [its] police power beyond its jurisdictional bounds." *Carbone*, 511 U.S. at 393 (citing *Baldwin*, 294 U.S. 511).

Of course, this does not mean that states lack authority to regulate or even ban goods, including goods produced outside the state, based on their physical properties or production processes that cause the goods to be unsafe or otherwise harmful *when consumed in the state*. States have undoubted authority to prevent the introduction of harmful products into their territories. The Court in *Baldwin*, for example, recognized New York's authority to "exclud[e]" milk produced in other states "if necessary safeguards have been omitted," causing the milk to be unfit for consumption in New York. 294 U.S. at 524.

---

Rather, it sought to influence producers' *in-state* conduct (payment of rebates to the state). *See id.* at 669.

Appellate Case: 14-2156    Page: 37    Date Filed: 01/30/2015 Entry ID: 4239723

But that is not what the NGEA does. There is no contention that the electricity the statute bans causes any distinct harms when consumed in Minnesota; nor could there be, since it is identical in all respects to electricity generated in the way Minnesota favors. *See Meyer II*, 165 F.3d at 1153 (Wisconsin law was invalid because it banned importation of waste not generated according to "Wisconsin's specifications, even if [the] waste [was] identical to that from 'approved' jurisdictions"). Indeed, by permitting the importation of physically identical electricity generated in the way Minnesota favors, the NGEA makes clear that Minnesota's objection is not to any perceived harm from electricity consumption in Minnesota but is instead to carbon emissions from the production of electricity in other states, which Minnesota believes are causing harms in Minnesota.

But when out-of-state commerce allegedly causes in-state harms, the remedy rests with federal law, not with state regulation of interstate commerce. "[T]he Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, *whether or not the commerce has effects within the State*." *Healy*, 491 U.S. at 336 (emphasis added; internal quotation marks and al-

Appellate Case: 14-2156    Page: 38    Date Filed: 01/30/2015 Entry ID: 4239723

teration omitted). That is especially true here, where any harm caused by the conduct Minnesota has targeted—the emission of carbon dioxide—is an undifferentiated harm visited on the entire world, not a distinct harm to Minnesota.

In fact, the problem of interstate pollution is not new, and the answer has never been for states to resort to self-help under state law, even in cases involving conventional pollutants that inflict discrete harms. A state injured by pollution from a plant across the border cannot ban its residents from buying goods produced at the plant or otherwise impose barriers to interstate commerce in an effort to stop the pollution. Rather, the state's recourse lies with federal law. Historically, the state could bring an abatement action under federal common law, *see Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2535–36 (2011), and today the field is occupied by federal statutory law, *see id.* at 2537–38; *see also EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584 (2014) (addressing the Clean Air Act's "good neighbor" provision).

Thus, if Minnesota believes that not enough is being done to curb carbon dioxide emissions in other states, its remedy is not to obstruct interstate commerce in an effort to reduce out-of-state emissions, but to

-29-

persuade the federal government to act pursuant to its broad authority over interstate commerce. *See Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce."). Minnesota may not arrogate to itself the power to regulate commerce outside its borders. Regulation of interstate commerce is reserved "to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state statutes." *Healy*, 491 U.S. at 340.

**B.    The rule advanced by appellants and their *amici* would destroy the national common market.**

In addition to being foreclosed by precedent, the rule advanced by appellants and their *amici* would have sweeping consequences for the national common market. In determining whether a law regulates extraterritorially, the Supreme Court has instructed courts to consider not only the consequences of the statute itself, but also "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.* at 336. If every state asserted the authority claimed by Minnesota to restrict imported products based on the

-30-

way they are produced in other states, the result would be "to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." *Id.* at 337.

This can be seen by considering just the case of electricity. Different states have different policies about how best to generate electricity. Some, like Minnesota, may disfavor coal because of concerns about carbon dioxide emissions. Others may disfavor nuclear energy because of different environmental concerns. Still others may for economic reasons favor cheap and widely available energy sources. There are countless ways in which different states might balance the competing considerations in determining how best to power their economies and provide electricity to their citizens. But one thing is certain: if each state could forbid the importation of electricity generated in states with different policies, the interstate market in electricity would come to a grinding halt.

But the logic of appellants' position does not stop there. Electricity is not the only product whose generation produces carbon dioxide emissions. Far from it—because carbon dioxide is ubiquitous, no sector of the economy would be off limits. By the same logic that appellants use

Appellate Case: 14-2156    Page: 41    Date Filed: 01/30/2015 Entry ID: 4239723

in attempting to justify the NGEA, Minnesota (or any other state) could ban its residents from buying any imported good whose production causes more carbon dioxide emissions than Minnesota deems appropriate. Minnesota could, for example, ban the importation of any good produced in a facility powered by electricity from coal, or any good produced in a facility whose carbon dioxide emissions exceed a Minnesota-specified level.

Further, if Minnesota can ban the importation of goods based on the carbon dioxide emissions from their production, there is no reason why Minnesota (or any other state) could not also ban the importation of goods based on other aspects of the production process that it disfavors. Suppose, for example, that Minnesota decided to raise its minimum wage but feared this would place Minnesota businesses at a disadvantage compared to businesses in states with lower minimum wages. By appellants' logic, Minnesota could ban its residents from buying imported goods produced by workers who were not paid Minnesota's minimum wage. *But see Baldwin*, 294 U.S. at 524 (states cannot "condition importation upon proof of a satisfactory wage scale in factory or shop").

Appellate Case: 14-2156    Page: 42    Date Filed: 01/30/2015 Entry ID: 4239723

The consequences of such a rule for the national economy—not to mention the affront to the states' co-equal sovereignty—are not difficult to imagine. The national common market would become balkanized, as groups of like-minded states traded only with each other and walled themselves off from goods produced in states whose policies they disfavor for one reason or another. Or, perhaps, the states with the largest markets, such as California or New York, would be able to successfully export their regulatory policies to other states, as businesses in less populous states would be forced to conform their commercial activities to the largest states' standards as a condition of access to their markets.

Indeed, California has recently begun to exploit its economic clout in precisely this way. For example, California recently promulgated a regulation that penalizes imported fuels based on the out-of-state carbon dioxide emissions from their production and transportation. The Ninth Circuit wrongly upheld the regulation, dismissing the Supreme Court's Commerce Clause jurisprudence as "archaic formalism," over the dissent of seven judges who would have reheard the case en banc and invalidated the regulation under the Commerce Clause. *See Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1107 (9th Cir. 2013),

Appellate Case: 14-2156    Page: 43    Date Filed: 01/30/2015 Entry ID: 4239723

*reh'g denied*, 740 F.3d 507 (9th Cir. 2014).[5] Similarly, California recently enacted a law banning the importation of eggs produced on out-of-state farms that do not comply with California's animal-care standards. *See Missouri v. Harris*, No. 14-341, 2014 WL 4961473 (E.D. Cal. Oct. 2, 2014) (dismissing suit brought by Missouri, Nebraska, Oklahoma, Alabama, Kentucky, and Iowa on standing grounds without reaching Commerce Clause question).

This Court should not give its imprimatur to this misbegotten constitutional experiment. As Justice Cardozo explained long ago, our Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin*, 511 U.S. at 523. A decision upholding the NGEA, thereby allowing Minnesota to project its regulatory policies into other states by obstructing the flow of

---

[5] Oregon and Washington have also contemplated and developed proposals like California's low carbon fuel standard. *See, e.g.*, H.B. 2186 (Or. 2009); Or. Dep't of Envtl. Quality, *Oregon Clean Fuels Program*, http://www.deq.state.or.us/aq/cleanFuel/ (last viewed Jan. 27, 2015) (chronicling regulatory progress, including the January 2015 approval the second phase of regulations); Wash. Exec. Order 14-04 (2014); Life Cycle Assocs., LLP, *A Clean Fuel Standard in Washington State: Revised Analysis with Updated Assumptions* (2014), http://ofm.wa.gov/initiatives/cleanfuelstandards/Documents/Carbon_Fuel_Standard_evaluation_2014_final.pdf.

Appellate Case: 14-2156    Page: 44    Date Filed: 01/30/2015 Entry ID: 4239723

interstate commerce, would endorse a legal principle that could hardly be more destructive of the Founders' vision, so successfully realized, of a national common market unimpeded by a multiplicity of state-imposed trade barriers. The decision below is correct and should be affirmed.

Appellate Case: 14-2156    Page: 45    Date Filed: 01/30/2015 Entry ID: 4239723

## CONCLUSION

For these reasons, the judgment below should be affirmed.

Respectfully submitted,

/s/ *Eric D. McArthur*
Roger R. Martella, Jr.
Eric D. McArthur
Joshua J. Fougere
Maureen B. Soles
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Kate Comerford Todd
Sheldon Gilbert
U.S. CHAMBER LITIGATION CENTER
U.S. CHAMBER OF COMMERCE
1615 H Street, N.W.
Washington, DC 20062
(202) 463-5685

Benjamin L. Gerber
MINNESOTA CHAMBER OF COMMERCE
400 Robert St. N., Suite #1500
St. Paul, MN 55101
(651) 292-4650

Linda E. Kelly
Quentin Riegel
NATIONAL ASSOCIATION OF
  MANUFACTURERS
MANUFACTURERS' CENTER FOR
  LEGAL ACTION
733 10th Street, NW, Suite 700
Washington, DC  20001
(202) 637-3000

Appellate Case: 14-2156    Page: 46    Date Filed: 01/30/2015 Entry ID: 4239723

Richard Moskowitz
AMERICAN FUEL & PETROCHEMICAL
  MANUFACTURERS
1667 K Street, N.W.
Suite 700
Washington, D.C. 20006
(202) 457-0480

January 27, 2015

Appellate Case: 14-2156    Page: 47    Date Filed: 01/30/2015 Entry ID: 4239723

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(d) because it contains 6,836 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

3. This brief complies with Local Rule 28A(h)(2) because it has been scanned for viruses and is virus-free.

/s/ *Eric D. McArthur*
Eric D. McArthur

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January, 2015, I caused the foregoing Motion for Leave to Participate as *Amici Curiae* and Brief of *Amici Curiae* Chamber of Commerce of the United States of America, the Minnesota Chamber of Commerce, the National Association of Manufacturers, and the American Fuel and Petrochemical Manufacturers Supporting Appellees and Affirmance, to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit through the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Eric D. McArthur*
Eric D. McArthur