**Nos. 14-2156 & 14-2251**

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

STATE OF NORTH DAKOTA, *et al.*,
Appellees/Cross-Appellants,

v.

BEVERLY HEYDINGER, COMMISSIONER AND CHAIR,
MINNESOTA PUBLIC UTILITIES COMMISSION, *et al.*,
Appellants/Cross-Appellees.

On Appeal From The United States District Court
For The District Of Minnesota

**BRIEF OF *AMICI CURIAE* MONTANA COAL COUNCIL AND
MOUNTAIN STATES LEGAL FOUNDATION IN SUPPORT OF
APPELLEES URGING AFFIRMANCE**

Steven J. Lechner, Esq.
*Counsel of Record*
Maegan L. Woita, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
lechner@mountainstateslegal.com
mwoita@mountainstateslegal.com

Counsel for Amici Curiae Montana Coal Council
and Mountain States Legal Foundation

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c)(1), the undersigned attorney provides the following corporate disclosure statement:

The Montana Coal Council is a nonprofit industry association organized under the laws of the State of Montana and has no parent corporation, subsidiaries, or affiliates that have issued shares to the public.

Mountain States Legal Foundation is a nonprofit, public-interest legal foundation organized under the laws of the State of Colorado and has no parent corporation, subsidiaries, or affiliates that have issued shares to the public.

DATED this 27th day of January 2015.

Respectfully submitted,

/s/ Steven J. Lechner
Steven J. Lechner, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
lechner@mountainstateslegal.com

ii

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................... ii

TABLE OF AUTHORITIES .................................................. v

IDENTITY AND INTEREST OF *AMICI CURIAE* .............................. 1

SUMMARY OF ARGUMENT ................................................. 3

ARGUMENT ............................................................. 4

I.    THE FRAMERS OF THE CONSTITUTION SOUGHT TO AVOID BALKANIZATION BY PREVENTING STATES FROM PROJECTING THEIR LEGISLATION INTO OTHER STATES. ........................................................ 4

II.   MINN. STAT. § 216H.03 VIOLATES THE DORMANT COMMERCE CLAUSE. ................................................ 8

    A.    The District Court Properly Held Minn. Stat. § 216H.03 Violates The Extraterritoriality Doctrine ............. 10

        1.    The extraterritoriality doctrine applies to non-price control laws like Minn. Stat. § 216H.03 ........ 12

        2.    Minn. Stat. § 216H.03 directly regulates commerce that takes place wholly outside of Minnesota ............................................... 13

        3.    If legislation similar to Minn. Stat. § 216H.03 were adopted by other states, it would lead to Balkanization. ......................................... 17

    B.    Minn. Stat. § 216H.03 Violates The Dormant Commerce Clause Because It Discriminates Against Interstate Commerce ........................................... 19

Appellate Case: 14-2156    Page: 3    Date Filed: 01/30/2015 Entry ID: 4239941

1. Minn. Stat. § 216H.03 discriminates against interstate commerce in its purpose............................ 20

2. Minn. Stat. § 216H.03 discriminates against interstate commerce through its practical effects. ............................................... 22

C. Minn. Stat. § 216H.03 Fails The *Pike* Balancing Test. ...... 24

1. Minn. Stat. § 216H.03 does not effectuate a legitimate local public interest. ............................... 25

2. Minn. Stat. § 216H.03's effects on interstate commerce are not incidental. ................................... 25

3. Minn. Stat. § 216H.03's burden on interstate commerce is clearly excessive in relation to reducing Minnesota's local carbon dioxide emissions. ................................................. 26

CONCLUSION ..................................................... 28

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(C) ................................................... 30

CERTIFICATE OF COMPLIANCE WITH 8TH CIR. R. 28A(h)(2)................................................... 31

CERTIFICATE OF SERVICE ............................................. 32

iv

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amer. Booksellers Found. v. Dean*,
  342 F.3d 96 (2d. Cir. 2003) ....................................................... 8, 13, 14, 15, 16

*Amer. Libraries Ass'n v. Pataki*,
  969 F. Supp. 160 (S.D. N.Y. 1997) ............................................. 13

*Baldwin v. G.A.F. Seeling, Inc.*,
  294 U.S. 511 (1935) ................................................................... 5, 7, 13

*Best & Co. v. Maxwell*,
  311 U.S. 454 (1940) ................................................................... 22

*Brimmer v. Rebman*,
  138 U.S. 78 (1891) ..................................................................... 24

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
  476 U.S. 573 (1986) ................................................................... 8, 11, 17

*C & A Carbone, Inc. v. Clarkstown, N.Y.*,
  511 U.S. 383 (1994) ................................................................... 19–20, 24

*Caldwell v. N. Carolina*,
  187 U.S. 622 (1903) ................................................................... 7

*Chem. Waste Mgmt., Inc. v. Hunt*,
  504 U.S. 334 (1992) ................................................................... 21

*Cotto Waxo Co. v. Williams*,
  46 F.3d 790 (8th Cir. 1995) ........................................................ 11, 13, 16, 17, 19

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ................................................................... 10, 13

*Exxon Corp. v. Governor of Maryland*,
  437 U.S. 117 (1978) ................................................................... 4, 22, 26

v

Appellate Case: 14-2156     Page: 5     Date Filed: 01/30/2015 Entry ID: 4239941

*General Motors Corp. v. Tracy*,
    519 U.S. 278 (1997)..................................................................... 7, 21–22

*Gibbons v. Ogden*,
    22 U.S. 1 (1824)........................................................................... 6, 10

*Grand River Enter. Six Nations, Ltd. v. Beebe*,
    574 F.3d 929 (8th Cir. 2009)......................................................... 9–10, 20

*Granholm v. Heald*,
    544 U.S. 460 (2005)..................................................................... 20

*Gonzales v. Raich*,
    545 U.S. 1 (2005)......................................................................... 6

*H. P. Hood & Sons, Inc. v. Du Mond*,
    336 U.S. 525 (1949)..................................................................... 4, 5, 6, 10, 18

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)..................................................................... 8, 11, 17, 19

*Hughes v. Alexandria Scrap Corp.*,
    426 U.S. 794 (1976)..................................................................... 8

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979)..................................................................... 5, 18, 20

*Jones v. Gale*,
    470 F.3d 1261 (8th Cir. 2006)....................................................... 9

*Joseph E. Seagram & Sons, Inc. v. Hostetter*,
    384 U.S. 35 (1966)....................................................................... 7

*Lacoste v. La. Dept. of Conservation*,
    263 U.S. 545 (1924)..................................................................... 20–21

*Lewis v. BT Inv. Managers, Inc.*,
    447 U.S. 27 (1980)....................................................................... 15

Appellate Case: 14-2156    Page: 6    Date Filed: 01/30/2015 Entry ID: 4239941

*Maine v. Taylor,*
    477 U.S. 131 (1986)....................................................................... 20

*Maryland v. Louisiana,*
    451 U.S. 725 (1981)....................................................................... 22

*Minnesota v. Clover Leaf Creamery Co.,*
    449 U.S. 456 (1981) ................................................................. 26, 27

*Nat'l Ass'n of Optometrists & Opticians v. Harris,*
    682 F.3d 1144 (9th Cir. 2012) .......................................................... 8

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001)............................................................ 27

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    132 S. Ct. 2566 (2012)..................................................................... 2

*New Energy Co. v. Limbach,*
    486 U.S. 269 (1988)....................................................................... 22

*North Dakota v. Heydinger,*
    15 F. Supp. 3d 891 (D. Minn. 2014)........................................ *passim*

*Or. Waste Sys., Inc. v. Dept. of Envtl. Quality of Or.,*
    511 U.S. 93 (1979)............................................................. 18, 20, 21

*Pac. Nw. Venison Producers v. Smitch,*
    20 F.3d 1008 (9th Cir. 1994)............................................................ 2

*Permoli v. First Municipality of New Orleans,*
    44 U.S. 589 (1845)........................................................................... 5

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137(1970).......................................................... 9, 10, 19, 24, 26

*Quill Corp. v. N. Dakota By & Through Heitkamp,*
    504 U.S. 298 (1992)......................................................................... 6

Appellate Case: 14-2156    Page: 7    Date Filed: 01/30/2015 Entry ID: 4239941

*R & M Oil & Supply, Inc. v. Saunders*,
 307 F.3d 731 (8th Cir. 2002)....................................................... 9, 10–11

*Reeves, Inc. v. Stake*,
 447 U.S. 429 (1980) ....................................................... 7

*Robbins v. Shelby County Taxing Dist.*,
 120 U.S. 489 (1887)....................................................... 7

*SPGCC, LLC v. Blumenthal*,
 505 F.3d 183 (2nd Cir. 2007)....................................................... 16

*Shafer v. Farmers Grain Co.*,
 268 U.S. 189 (1925)....................................................... 13

*Shaffer v. Heitner*,
 433 U.S. 186 (1977)....................................................... 10

*S. Carolina State Highway Dep't v. Barnwell Bros.*,
 303 U.S. 177 (1938)....................................................... 7

*Strader v. Graham*,
 51 U.S. 82 (1850)....................................................... 5

*U & I Sanitation v. Columbus*,
 205 F.3d 1063 (8th Cir. 2000)....................................................... 20, 21

*United States v. Lopez*,
 514 U.S. 549 (1995)....................................................... 6

*United States v. Morrison*,
 529 U.S. 598 (2000)....................................................... 6

*Van Brocklin v. Tennessee*,
 117 U.S. 151 (1886)....................................................... 5

*West Lynn Creamery, Inc. v. Healy*,
 512 U.S. 186 (1994)....................................................... 12–13, 22, 24

Appellate Case: 14-2156     Page: 8     Date Filed: 01/30/2015 Entry ID: 4239941

*Wilson v. Spain*,
209 F.3d 713 (8th Cir. 2000) ...................................................... 19

*Woodruff v. Parham*,
75 U.S. 123 (1868)........................................................................ 5

## **Constitutional Provisions**

U.S. CONST. art. I, § 8, cl. 3 ............................................................. 6

## **Statutes**

Minn. Stat. § 216H.02 ..................................................................... 23

Minn. Stat. § 216H.03 .............................................................. *passim*

subd. 1 ...................................................................... 9, 16

subd. 2 ................................................................... 9, 16, 21

subd. 3(2) ................................................................. *passim*

subd. 3(3) ................................................................. *passim*

subd. 4 ............................................................. 16, 17, 23, 27

subd. 4(5) ...................................................................... 23

subd. 4(6) ...................................................................... 23

subd. 4(7) ...................................................................... 23

subd. 7(3) ...................................................................... 23

## **Rules**

Fed. R. App. P. 29(c)(5)..................................................................... 1

Appellate Case: 14-2156    Page: 9    Date Filed: 01/30/2015 Entry ID: 4239941

**Other**

JOSEPH STORY, 2 COMMENTARIES ON THE CONSTITUTION OF THE
UNITED STATES (1833) ...................................................................... 4, 5

    § 259....................................................................... 4

    § 260....................................................................... 5

MAX FARRAND, 3 THE RECORDS OF THE FEDERAL CONVENTION
OF 1787 (M. Farrand ed. 1911)......................................................... 10

P. HARTMAN, STATE TAXATION OF INTERSTATE COMMERCE 2
(1953) ............................................................................................... 4

Appellate Case: 14-2156   Page: 10   Date Filed: 01/30/2015 Entry ID: 4239941

## IDENTITY AND INTEREST OF *AMICI CURIAE*

Members of the Montana Coal Council and Mountain States Legal Foundation ("MSLF") respectfully submit this amicus curiae brief in support of Appellees, urging the Court to affirm the judgment of the District Court that Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) violate the dormant Commerce Clause.

The Montana Coal Council is a nonprofit industry association whose membership includes all major coal mine operators in Montana, holders of Montana coal reserves, transporters of coal, utilities using coal, and numerous suppliers and businesses directly and indirectly involved in the coal industry.[1] Montana Coal Council members have a strong interest in this case because Minn. Stat. § 216H.03 negatively affects the production and transportation of coal from Montana to electricity generators that supply electricity to the regional electricity grid operated by the Midcontinent Independent System Operator ("MISO").[2]

---

[1] Appellee Great Northern Properties Limited Partnership is a member of the Montana Coal Council. However, pursuant to Fed. R. App. P. 29(c)(5), the undersigned affirms that no party's counsel authored this brief in whole or in part, and no person, party, or party's counsel, other than MSLF, its members, or its counsel, made a monetary contribution specifically for the preparation or submission of this brief.

[2] MISO "operates and controls transmission facilities in the Midwest (including Minnesota, North Dakota, Wisconsin, and Iowa)." *North Dakota v. Heydinger*, 15 F. Supp. 3d 891, 895–96 (D. Minn. 2014). MISO also ensures, hourly, that the supply and demand of electricity are equal. *Id*. Essentially, MISO oversees a market where generators indicate the amount of electricity they are willing to sell and at what price, while buyers select from an array of varying bids. *Id*. Although buyers accept certain bids, "whether the electricity that a buyer ultimately receives

1

MSLF is a nonprofit, public-interest legal foundation organized under the laws of the State of Colorado. MSLF is dedicated to bringing before the courts those issues vital to the defense and preservation of individual liberties, the right to own and use property, the free enterprise system, and limited and ethical government. MSLF has members who reside, own property, and work in all 50 states. Additionally, MSLF has members directly and indirectly involved in all facets of the coal and electric power industry—from coal production to electricity consumption. MSLF has been extensively involved in litigating constitutional issues since its founding in 1977, including numerous cases involving the Commerce Clause. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012) (Amicus Curiae); *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008 (9th Cir. 1994) (represented Plaintiffs-Appellants).

This case raises an important constitutional question that will affect many interests, particularly those of the coal and electric power industries. The Montana Coal Council and MSLF believe that their unique free enterprise and legal advocacy perspectives will assist this Court. More specifically, the following

is from the generation resources that it bid into the market or that it contracted for is unknown." *Id*. at 897. This means that a buyer in Minnesota may accept electricity offered by a Minnesota generator, but may ultimately receive electricity from a generator in another state, like North Dakota. Likewise, a generator does not know where its produced electricity is ultimately consumed. Appellants assert that "MISO markets merely serve as a mechanism for setting wholesale prices," Appellants' Brief at 53, but in reality the MISO market encompasses much more. *See* Appellees' Brief at 26–28.

2

amicus curiae brief demonstrates that Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) violate the dormant Commerce Clause, because it is precisely the type of legislation that can lead to Balkanization and disrupt the more perfect Union the Framers of the Constitution envisioned.

## SUMMARY OF ARGUMENT

The crux of the issue is that Minn. Stat. § 216H.03, specifically subdivision 3, subsections (2)–(3), reach well beyond Minnesota's borders to regulate *any person* engaged in activities that may lead to generation, transmission, or wholesale transactions involving coal-generated electricity, even though that electricity may not be consumed in Minnesota. The stated purpose of Minn. Stat. § 216H.03 is to curtail carbon dioxide emissions globally, which it does by directly and discriminately regulating the purported source of carbon dioxide emissions— out-of-state coal-fired power plants.

The District Court properly held that Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) have an extraterritorial reach that directly regulates commerce wholly outside of Minnesota in violation of the dormant Commerce Clause. *Heydinger*, 15 F. Supp. 3d at 918–19. First, Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) directly regulate non-Minnesota entities engaged in conduct wholly outside of Minnesota by regulating carbon dioxide emissions generated in other states. Second, Minn. Stat. § 216H.03 discriminates against interstate

3

commerce in purpose and through effects on interstate commerce. Third, even if

Minn. Stat. § 216H.03 is found to regulate non-discriminately, the burdens on

interstate commerce, particularly non-Minnesota entities that use electricity

generated by coal, are clearly excessive in relation to Minnesota's purported

interest in reducing carbon dioxide emissions.

## ARGUMENT

## I. THE FRAMERS OF THE CONSTITUTION SOUGHT TO AVOID BALKANIZATION BY PREVENTING STATES FROM PROJECTING THEIR LEGISLATION INTO OTHER STATES.

After the Revolutionary War, "a drift toward anarchy and commercial

warfare between states began," where "'each state would legislate according to its

own interests . . . .'" *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533

(1949) (quoting 2 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED

STATES § 259 (1833)). More specifically:

> [U]nder the Articles of Confederation, . . . authority to regulate
> commerce rested with the States rather than with Congress. The
> pursuit by each State of the particular interests of its economy and
> constituents nearly wrecked the national economy. "The almost
> catastrophic results from this sort of situation were harmful
> commercial wars and reprisals at home among the States" . . . .

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 151 (1953) (Blackmun, J.,

concurring in part and dissenting in part) (quoting P. HARTMAN, STATE TAXATION

OF INTERSTATE COMMERCE 2 (1953)). Indeed, an "immediate reason for calling the

Constitutional Convention" was "the conviction that in order to succeed, the new

4

Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979) (citing *H. P. Hood & Sons*, 336 U.S. at 533–34); *cf. Woodruff v. Parham*, 75 U.S. 123, 142 (1868) ("At the time of the Convention and formation of the Constitution the States were independent and foreign to each other, except as bound together by the feeble 'league of friendship' in the Articles of Confederation . . . ."). It was against this backdrop, which "'threaten[ed] the peace and safety of the Union[,]'" that the Constitution was created. *H. P. Hood & Sons*, 336 U.S. at 533 (quoting 2 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 260 (1833)); *cf. Van Brocklin v. Tennessee*, 117 U.S. 151, 159 (1886) ("The articles of confederation ceased to exist upon the adoption of the federal constitution . . . ." (citing *Permoli v. First Municipality of New Orleans*, 44 U.S. 589, 610 (1845) and *Strader v. Graham*, 51 U.S. 82, 96–97 (1850))).

Consequently, the Constitution "'was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.'" *H. P. Hood & Sons*, 336 U.S. at 532 (quoting *Baldwin v. G.A.F. Seeling, Inc.*, 294 U.S. 511, 523 (1935)). The Commerce Clause sought to address that very theory. Indeed, "[t]he necessity of centralized regulation of commerce among states was so obvious and so fully

5

recognized that the few words of the Commerce Clause were [not] illuminated by debate." *Id*. at 534.

It is clear that Congress has the enumerated power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[,]" U.S. CONST. art. I, § 8, cl.3, though the specific parameters of the Commerce Clause's express grant of power continue to evolve. *See e.g.*, *Gonzales v. Raich*, 545 U.S. 1 (2005); *United States v. Morrison*, 529 U.S. 598 (2000); and *United States v. Lopez*, 514 U.S. 549 (1995). Yet, it is the "great silences" in the Commerce Clause that draw the boundaries around state regulations. *H. P. Hood & Sons*, 336 U.S. at 535; *cf. Quill Corp. v. N. Dakota By & Through Heitkamp*, 504 U.S. 298, 309 (1992) ("[T]he Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well." (citing *Gibbons v. Ogden*, 22 U.S. 1, 231–32 (1824) (Johnson, J., concurring))). As the Supreme Court explained:

> While the Constitution vests in Congress the power to regulate commerce among the states, it does not say what the states may or may not do in the absence of congressional action, nor how to draw the line between what is and what is not commerce among the states. Perhaps even more than by interpretation of its written word, this Court has advanced the solidarity and prosperity of this Nation by the meaning it has given to these great silences of the Constitution.

*H. P. Hood & Sons*, 336 U.S. at 534–35. Thus, out of the silences in the Commerce Clause emerged the dormant Commerce Clause.

6

Appellate Case: 14-2156    Page: 16    Date Filed: 01/30/2015 Entry ID: 4239941

It is true that the dormant Commerce Clause "do[es] not forestall all state action affecting interstate commerce[,]" *S. Carolina State Highway Dep't v. Barnwell Bros.*, 303 U.S. 177, 185 (1938); *cf. Reeves, Inc. v. Stake*, 447 U.S. 429, 441 (1980) (a state may try novel experiments), so long as such state action remains within the prescribed bounds of dormant Commerce Clause jurisprudence. However, if a state's novel experiment "discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national market place . . . ," then it runs afoul of the dormant Commerce Clause. *General Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (quoting *Reeves*, 447 U.S. at 437 (1980)) (internal citations omitted); *see also S. Carolina State Highway Dep't* ., 303 U.S. at 185–86 ("[T]he decisions of this Court have recognized that . . . [the dormant Commerce Clause applies] when state legislation nominally of local concern is in point of fact aimed at interstate commerce, or by its necessary operation is a means of gaining a local benefit by throwing the attendant burdens on those without the state." (citing *Robbins v. Shelby County Taxing Dist.*, 120 U.S. 489, 498 (1887) and *Caldwell v. North Carolina*, 187 U.S. 622, 626 (1903))).

The modern era has brought challenges to the dormant Commerce Clause that differ greatly from past state regulations controlling the prices of milk or alcoholic beverages in other states. *See e.g.*, *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935); *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35 (1966);

7

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986);

and *Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989).  Rather, states have enacted

statutes regulating things that "do[] not recognize geographic boundaries . . . ."

*Amer. Booksellers Found. v. Dean*, 342 F.3d 96, 100, 103 (2d. Cir. 2003)

(invalidating a criminal law penalizing all persons for posting pornographic

materials that are accessible to Vermont minors online, because the law projected

itself into other states).  Because states in the modern era are vastly more

connected by roads, telephone lines, electric lines, and the like, dormant

Commerce Clause jurisprudence and its prohibitions are more important now than

ever before.  *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144,

1148 (9th Cir. 2012) ("[A] corollary concern of the dormant Commerce Clause is

that 'this Nation is a common market in which state lines cannot be made barriers

to the free flow of both raw materials and finished goods.'" (quoting *Hughes v.*

*Alexandria Scrap Corp.*, 426 U.S. 794, 803 (1976))).

## II.    MINN. STAT. § 216H.03 VIOLATES THE DORMANT COMMERCE CLAUSE.

Under Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3), *no person shall*

(2)    import or commit to import from *outside the state* power from new large energy facility[3] that would contribute to statewide power carbon dioxide emissions; or

---

[3] "New large energy facility" means a large energy facility that is in operation after January 1, 2007, and:  (1) does not use natural gas; (2) is not "designed to provide peaking, intermediate, emergency backup, or contingency services[;]" (3) does not

8

     (3)     enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions.[4]

*Id.* (emphasis added). These two particular subsections are problematic, because they regulate interstate commerce in ways that are prohibited by the dormant Commerce Clause of the U.S. Constitution.

A statute can violate "'the dormant implication of the Commerce Clause'" in three ways. *Grand River Enter. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 941–42 (8th Cir. 2009) (quoting *R&M Oil & Supply, Inc. v. Saunders*, 307 F.3d 731, 734 (8th Cir. 2002)). First, a statute violates the extraterritoriality doctrine if "it has the practical effect of extraterritorial control of interstate commerce . . . ." *Grand River*, 574 F.3d at 942. Second, a statute violates the dormant Commerce Clause if it "clearly discriminates against interstate commerce in favor of in-state commerce[.]" *Id.* (citing *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006)). Third, a statute violates the dormant Commerce Clause if it "imposes a burden on interstate commerce that outweighs any benefits received . . ." under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Grand River*, 574

---

use "simple cycle or combined cycle turbine technology[;]" *and* (4) is not "capable of achieving full load operations within 45 minutes of startup for a simple cycle facility, or is [not] capable of achieving full load operations within 185 minutes of startup for a combined cycle facility." Minn. Stat. § 216H.03, subd. 1 (emphasis added).

[4] "Statewide power section carbon dioxide emissions" means, in pertinent part, "all emissions of carbon dioxide from the generation of electricity imported from outside the state and consumed in Minnesota." *Id*. § 216H.03, subd. 2.

9

F.3d at 942 (citing *Pike*, 397 U.S. at 142). If the statute falls under any of the three tests, it violates the dormant Commerce Clause. As demonstrated below, Minn. Stat. § 216H.03 violates the dormant Commerce Clause under each of the three tests.

### A. The District Court Properly Held Minn. Stat. § 216H.03 Violates The Extraterritoriality Doctrine.

The extraterritoriality doctrine exists because any attempt to directly "'assert extraterritorial jurisdiction over persons or property would *offend sister States* and exceed the inherent limits of the State's power.'" *Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 197 (1977)) (emphasis added). Its existence harkens back to the pre-Constitution era, which was "'engendered [by] rival, conflicting, and angry regulations'" between the states. *H. P. Hood & Sons*, 336 U.S. at 534 (quoting 3 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 547 (M. Farrand ed. 1911)); *see also Gibbons*, 22 U.S. at 231 (Johnson, J., concurring) ("If there was any one object riding over every other in the adoption of the constitution, it was to keep the commercial intercourse among the States free from all invidious and partial restraints.").

As demonstrated, *supra*, the purpose of the Commerce Clause, and its dormant counterpart, was to prevent the states from legislating in a way that would harm other states, particularly encumbering "'free private trade in the national marketplace.'" *Grand River*, 574 F.3d at 941 (quoting *R & M Oil & Supply, Inc.*,

10

307 F.3d at 734). Based upon these principles, a statute violates the extraterritoriality doctrine if: (1) the statute applies "'to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State . . . ;'" *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (quoting *Edgar*, 457 U.S. at 642–43); (2) the statute "directly controls commerce occurring wholly outside the boundaries of a State exceed[ing] the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature[,]" *Healy*, 491 U.S. at 336 (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Authority*, 476 U.S. 573, 579 (1986)); or (3) "the practical effect of the statute must be evaluated . . . considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Healy*, 491 U.S. at 336. In short, "[t]he critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id*. (citing *Brown-Forman*, 476 U.S. at 579); *see Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995). ("a state regulation is per se invalid when it has an 'extraterritorial reach,'" (citing *Healy*, 491 U.S. at 336)).

The District Court properly found that "Minnesota projected its legislation into other states and directly regulated commerce therein[,]" thereby holding that

11

Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) "constitute[] impermissible extraterritorial legislation and [are] a per se violation of the dormant Commerce Clause." *Heydinger*, F. Supp. 3d at 919. However, Appellants and their *amici* continue to argue that Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) do not directly regulate persons wholly outside of Minnesota, like Appellees. Appellants' Br. at 58–62; *Amici* Environmental Defense Fund, et al. Br. at 28–34; *Amici* Steven Gaw & Steven Weissman Br. at 18–22; *Amici* The American Wind Energy Association, et al. Br. at 26–33 (hereinafter "AWEA Br."). These arguments are untenable.

### 1. The extraterritoriality doctrine applies to non-price control laws like Minn. Stat. § 216H.03.

The District Court properly applied the extraterritoriality doctrine to Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3), even though it is not a price control law, because it "is a classic example of extraterritorial regulation because of the manner in which the [electric power] industry operates." *Heydinger*, 15 F. Supp. 3d at 911–16. However, *amici* for Appellants argue that the extraterritoriality doctrine is limited to statutes with the premise being economic protectionism. AWEA Br. at 27; *contra Heydinger*, 15 F. Supp. 3d at 916 (recognizing *amici* for Appellants admitted applicability of the extraterritoriality doctrine). But, the extraterritoriality doctrine is not so narrowly limited. *West Lynn Creamery, Inc. v. Healy*, 512 U.S.

12

186, 201 (1994) ("Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce.").

The extraterritoriality doctrine invalidates state regulatory measures that have a practical effect of controlling prices in other states to protect the regulating state's own economy. *See e.g.*, *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 527–28 (1935). However, contrary to *amici* for Appellants, such jurisprudence does not limit the extraterritoriality doctrine's application to price control or affirmation laws. *See* AWEA Br. at 27. Indeed, just the opposite is true—the extraterritoriality doctrine applies to non-price control laws. *See e.g.*, *Edgar*, 457 U.S. at 640; *Amer. Booksellers*, 342 F.3d at 103–04; *Cotto Waxo*, 46 F.3d at 792–93; *Amer. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 176–77 (S.D. N.Y. 1997). Thus, the District Court properly applied the extraterritoriality doctrine to Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3).

### 2. Minn. Stat. § 216H.03 directly regulates commerce that takes place wholly outside of Minnesota.

As emphasized by the Supreme Court, "direct regulation [of interstate commerce by states] is prohibited." *Edgar*, 475 U.S. at 640 (citing *Shafer v. Farmers Grain Co.*, 268 U.S. 189, 199 (1925)). Yet, Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) do precisely that—directly regulate the generation of electricity outside of Minnesota that is transmitted through a regional interconnected grid, where the ultimate destination is beyond the generators' or wholesalers' control.

13

*Heydinger*, 15 F. Supp. 3d at 917 ("[W]hen a non-Minnesota entity injects electricity into the grid to satisfy its obligations to a non-Minnesota member, it cannot ensure that the electricity will not travel to and be removed—in other words, be imported to and contribute to statewide power sector carbon dioxide emissions in—Minnesota."); *Amer. Booksellers*, 342 F.3d at 103 (invalidating a Vermont statute because it directly regulated non-residents who cannot prevent Vermont residents from viewing their internet postings). For this reason, the District Court properly found the plain language of Minn. Stat. § 216H.03 "applies to power and capacity transactions occurring wholly outside of Minnesota's borders."[5] *Heydinger*, 15 F. Supp. 3d at 916–17.

The practical effect of Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3), is to directly control the generation of electricity occurring wholly outside of Minnesota, especially those entities that participate in regional interconnected grids, like the MISO market. *Heydinger*, 15 F. Supp. 3d at 896 ("once electricity is generated and injected into the power grid, there are no qualitative differences based on generation source, so the buyer is unaware of the type of resource that generated the electricity it receives"); *see Amer. Booksellers*, 342 F.3d at 102 ("The 'dormant' Commerce Clause protects against state regulations that 'erect barriers

---

[5] The District Court properly determined that: (1) "no person shall" applies to all persons, without qualification; (2) "import or commit to import" has no knowledge component; and (3) "long-term power purchase agreement" deals with capacity, not energy. *Heydinger*, 15 F. Supp. 3d at 909–10.

14

against interstate trade.'" (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980))).  Because there is no way of controlling the destination once electricity is transmitted into the power grid, the practical effect of Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) is to directly and discriminately regulate the purported source of carbon dioxide emissions—coal-fired power plants outside of Minnesota.

The District Court properly analogized Minnesota's attempt to prevent electricity generated by coal-fired power plants from entering the state to Vermont's statute in *American Booksellers*.  *Heydinger*, 15 F. Supp. 3d at 917.  In *American Booksellers*, a Vermont statute regulated internet activity by non-Vermont residents wholly outside of Vermont.  342 F.3d at 103.  The Second Circuit found:

> A person outside Vermont who posts information on a website or on an electronic discussion group cannot prevent people in Vermont from accessing the material.  If someone in Connecticut posts material for the intended benefit of other people in Connecticut, that person must assume that someone from Vermont may also view the material.  This means that those outside Vermont must comply with [the statute] or risk prosecution by Vermont.

*Id*.  The Second Circuit held the Vermont statute invalid because it "project[ed] [Vermont's values] on the rest of the nation."  *Id*.  As in *American Booksellers*, non-Minnesota entities participating in the MISO market cannot prevent electricity generated by using coal from being consumed in Minnesota.  Thus, necessarily, non-Minnesota entities must comply with Minn. Stat. § 216H.03 or sacrifice

15

engaging in business transactions or investments beneficial to their members. *See* Minn. Stat. § 216H.03, subd. 1–4.

Appellants try to distinguish the Vermont statute at issue in *American Booksellers* from Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) by focusing on *SPGCC, LLC v. Blumenthal*, 505 F.3d 183 (2nd Cir. 2007). Appellants' Br. at 60–62. In *SPGCC*, the Second Circuit considered the extraterritorial reach of a Connecticut statute that regulated the sale of gift cards with inactivity fees or expiration dates. 505 F.3d at 187. The Second Circuit held the Connecticut law did not violate the extraterritoriality doctrine in part, because unlike in *American Booksellers*, "SPGCC has readily available a near-perfect means of distinguishing between online consumers of the [gift card] who reside in Connecticut and those who reside elsewhere—their credit card billing addresses." *SPGCC*, 505 F.3d at 195. That distinguishing element alone puts Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) squarely in line with *American Booksellers*, not *SPGCC,* because electricity cannot be distinguished by source—once generated, electricity has no credit card billing address.

Minn. Stat. § 216H.03, subd. 3–4 also unlawfully "require[] people or business[es] to conduct their out-of-state commerce in a certain way." *Cotto Waxo*, 46 F.3d at 793. Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) reaches into other states, because it puts non-Minnesota entities between a rock and a hard place—

16

they must either forego entering into business transactions or investments to satisfy non-Minnesota demand (which benefit their members), or seek regulatory approval in the form of costly offsets from Appellants. *See id.* at 794 ("a statute has extraterritorial reach when it necessarily requires out-of-state commerce to be conducted according to in-state terms"). Either way, a non-Minnesota entity must capitulate to Minnesota's terms in order to utilize the power grid.

It is axiomatic "that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another." *Healy*, 491 U.S. at 337 (citing *Brown-Forman*, 476 U.S. at 582). However, this is precisely what Minn. Stat. § 216H.03, subd. 3–4, require. If the non-Minnesota entity uses energy generated by a post-2007 coal-fired power plant or enters into a new long-term power purchase agreement, then the non-Minnesota entity must seek regulatory approval, in the form of offsets. *See* Minn. Stat. § 216H.03, subd. 4 (listing offset options subject to Appellants' "satisfaction"). By requiring regulatory approval, Minnesota is also directly regulating non-Minnesota entities, because providing non-Minnesota members with energy requires Appellants' subjective, regulatory approval of offsets.

### 3. If legislation similar to Minn. Stat. § 216H.03 were adopted by other states, it would lead to Balkanization.

A demonstrated above, the prohibition on regulations that would lead to Balkanization is reminiscent of problematic rivalries among the Colonies and

17

States before the Constitutional Convention. *Hughes*, 441 U.S. at 325–26; *see also*

*Or. Waste Sys., Inc. v. Dept. of Envtl. Quality of Or.*, 511 U.S. 93, 98–99 (1979)

("'This principle that our economic unit is the Nation, which alone has the gamut

of powers necessary to control of the economy . . . has as its corollary that the

states are not separable economic units." (quoting *H. P. Hood & Sons*, 336 U.S. at

537–38)). The District Court properly held that Minn. Stat. § 216H.03 could lead

to Balkanization if other states adopted similar statutes. *Heydinger*, 15 F. Supp. 3d

at 916.

     If other states enacted legislation similar, or even rival, to Minn. Stat. §

216H.03, then the states would essentially become "separable economic units."

*Or. Waste Sys.*, 511 U.S. at 98–99. It would be nearly impossible for out-of-state

entities, engaged in the interstate market of electricity, to comply with conflicting

state statutes requiring different standards or prohibiting certain sources of

electricity. This is the exact problem the Framers of the Constitution sought to

avoid through adoption of the Commerce Clause. *See H. P. Hood & Sons*, 336

U.S. at 532 ("The action of the State would neutralize the economic consequences

of free trade among the states . . . . Such a power, if exerted, will set a barrier to

traffic between one state and another as effective as if customs duties, equal to the

price differential, and been laid upon the thing transported.") (internal quotations

omitted); *Hughes*, 441 U.S. at 325.

18

In short, Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) directly regulate interstate commerce by prohibiting non-Minnesota entities from engaging in business activities wholly outside of Minnesota. *A fortiori*, similar statutes with the same practical effect will lead to Balkanization. Thus, the District Court properly held that Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) violate the extraterritoriality doctrine of the dormant Commerce Clause, and this Court should affirm that ruling.

### B. Minn. Stat. § 216H.03 Violates The Dormant Commerce Clause Because It Discriminates Against Interstate Commerce.[6]

A statute discriminates against interstate commerce if it favors "local business or investment," and "is *per se* invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest."[7] *C & A Carbone*, 511 U.S. at

---

[6] If a statute violates the extraterritoriality doctrine, then it is per se invalid. *Cotto Waxo*, 46 F.3d at 793 (citing *Healy*, 491 U.S. at 336). Because the District Court found Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) violate the extraterritoriality doctrine, and are per se invalid, the District Court did "not address whether the statute is discriminatory or fails a *Pike* analysis." *Heydinger*, 15 F. Supp. at 910–11. However, because a statute can violate the dormant Commerce Clause in three ways, *amici* will demonstrate that Minn. Stat. § 216H.03 is also invalid because it discriminates against interstate commerce and fails the *Pike* balancing test. *See Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000) (the appellate court may affirm a district court's ruling "on any basis supported by the record").

[7] The dormant Commerce Clause has an underlying goal of preventing states from engaging in regulatory warfare:

19

392 (citing *Maine v. Taylor*, 477 U.S. 131, 148–51 (1986)). "'[D]iscrimination'

simply means differential treatment of in-state and out-of-state economic interests

that benefits the former and burden the latter." *Or. Waste Sys.*, 511 U.S. at 99; *see*

*Grand River*, 574 F.3d at 942. A statute may "overtly discriminate[] against

interstate commerce" either "on its face, in its purpose, or through its effects . . . ."

*U & I Sanitation v. Columbus*, 205 F.3d 1063, 1068–69 (8th Cir. 2000).

Appellants argue that Minn. Stat. § 216H.03 "evenhandedly applies to in-

state and out-of-state interests." Appellants' Br. at 63. However, Minn. Stat. §

216H.03 does not regulate evenhandedly, but rather clearly discriminates against

electricity generated by out-of-state, coal-fired power plants.

### 1. Minn. Stat. § 216H.03 discriminates against interstate commerce in its purpose.

In determining the purpose of a challenged statute, the court "is not bound

by '[t]he name, description or characterization given it by the legislature or the

courts of the State . . . .'" *Hughes*, 441 U.S. at 336 (quoting *Lacoste v. La. Dept. of*

---

> The rule prohibiting state discrimination against interstate commerce
> follows also from the principle that States should not be compelled to
> negotiate with each other regarding favored or disfavored status for
> their own citizens. States do not need, and may not attempt, to
> negotiate with other States regarding their mutual economic interests .
> . . . Rivalries among the States are kept to a minimum, and a
> proliferation of trade zones is prevented.

*Granholm v. Heald*, 544 U.S. 460, 472 (2005) (citing *C & A Carbone, Inc. v.*
*Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994) (internal citation omitted).

20

*Conservation*, 263 U.S. 545, 550 (1924)). Further, "the purpose of, or justification

for a law has no bearing on whether it is facially discriminatory." *Or. Waste Sys.*,

511 U.S. at 100 (citing *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 340

(1992)).

Minn. Stat. § 216H.03 discriminates against interstate commerce "in its

purpose" by singling out the use of coal to generate electricity to further

Minnesota's crusade to limit carbon dioxide emissions globally. *U & I Sanitation*,

205 F.3d at 1069. Because Minnesota has no coal reserves, Minn. Stat. § 216H.03

plainly seeks to prohibit carbon dioxide emissions generated wholly outside of

Minnesota by coal-fired power plants. Minn. Stat. § 216H.03, subd. 2–3. This is

demonstrated by Minn. Stat. § 216H.03's definition of "statewide power sector

carbon dioxide emissions," which includes *all* out-of-state carbon dioxide

emissions. Minn. Stat. § 216H.03, subd. 2. There is seemingly no reason to

include out-of-state carbon dioxide emissions in Minnesota's carbon footprint,

other than to prohibit the use of coal to generate electricity wholly outside of

Minnesota. *See Heydinger*, 15 F. Supp. 3d at 895 ("To the extent carbon dioxide

emissions occur, they occur at [the generation] stage."). Minn. Stat. § 216H.03

benefits laudable, but quixotic, renewable energy industries, while burdening the

coal industry *in toto*, because the coal industry is forced to bear the costs of Minn.

Stat. § 216H.03—unlike the solar and wind industry. *See Gen. Motors Corp. v.*

21

*Tracy*, 519 U.S. 278, 298 (1997) ("any notion of discrimination assumes a comparison of substantially similar entities").  Thus, clearly Minn. Stat. § 216H.03 discriminates in its purpose.

### 2.    Minn. Stat. § 216H.03 discriminates against interstate commerce through its practical effects.

In determining if a statute discriminates against interstate commerce through its practical effects, the question is "'whether . . . the statute in its practical operation work[s] discrimination against interstate commerce." *West Lynn Creamery*, 512 U.S. at 201 (quoting *Best & Co. v. Maxwell*, 311 U.S. 454, 455–56 (1940); *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 147 (1978); *Maryland v. Louisiana*, 451 U.S. 725, 756 (1981)).  If discrimination is patent, "neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown." *New Energy Co. v. Limbach*, 486 U.S. 269, 276 (1988).

Minn. Stat. § 216H.03 is also discriminatory in effect, because its practical operation is to discriminate against non-Minnesota entities that wish to enter into long-term power purchase agreements for more than five years. *Id.* § 216H.03, subd. 3, subsect. (3).  The statute's express definition of "statewide power sector carbon dioxide emissions" gauges carbon dioxide emissions differently in-state versus out-of-state. *Id.* subd. 2.  This is especially true because a long-term power purchase agreement is prohibited if it would *increase* statewide carbon dioxide

22

emissions.  Appellants argue that Minn. Stat. § 216H.03 does not discriminate in effect because it treats all sources the same in Minnesota and other states. Appellants' Br. at 64.  However, the offset exemptions contained in Minn. Stat. § 216H.03, subd. 4, subsect. (5)–(7) favor in-state interests.  Those exemptions, in effect, are tailored to Minnesota industries, like steel and iron nugget production. Minn. Stat. § 216H.03, subd. 5, 6.

Appellants also argue that one exemption purportedly favors out-of-state interests.  Appellants' Br. at 64; *see* Minn. Stat. § 216H.03, subd. 7, subsect. (3) (concerning "a power purchase agreement between a Minnesota utility and a new large energy facility located outside Minnesota . . . .").  However, that exemption requires that such agreement is "essential to ensure the long-term reliability of Minnesota's electric system, to allow electric service for increased industrial demand, or to avoid placing a substantial burden on Minnesota ratepayers."  Minn. Stat. § 216H.03, subd. 7, subsect. (3).  It is unlikely that Appellants would find electricity generated by a new coal-fired power plant to be "essential" to the long-term reliability of Minnesota's electric system, especially because the statute's purported goal is to reduce carbon dioxide emissions.  *See e.g.*, Minn. Stat. § 216H.02.

Even if this Court disagrees that the practical effect of Minn. Stat. § 216H.03 is not to discriminate against non-Minnesota entities that rely on electricity

Appellate Case: 14-2156    Page: 33    Date Filed: 01/30/2015 Entry ID: 4239941

generated by coal to serve their members, there is no doubt that Minn. Stat. § 216H.03 imposes a burden on in-state retailers and consumers.  Minnesota's in-state retailers and consumers are burdened because they cannot import (or commit to import) electricity generated by a post-2007 coal-fired power plant, nor enter into long-term contracts concerning the same.  *See* Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3).  For those reasons, Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) are invalid, "because a burden placed at any point will result in a disadvantage to the out-of-state producer."  *West Lynn Creamery*, 512 U.S. at 202.

### C.    Minn. Stat. § 216H.03 Fails The *Pike* Balancing Test.

Under the *Pike* balancing test, where a statute "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental . . . [the statute] will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  397 U.S. at 142; *see also C & A Carbone*, 511 U.S. at 405 (Connor, J., concurring) ("'[A] burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to . . . the people of the State enacting the statute.'" (quoting *Brimmer v. Rebman*, 138 U.S. 78, 83 (1891))).  Minn. Stat. § 216H.03 fails the *Pike* balancing test.

24

### 1. Minn. Stat. § 216H.03 does not effectuate a legitimate local public interest.

Appellants argue that Minn. Stat. § 216H.03's legitimate interest is "minimizing long-term costs, promoting the use of clean energy, and bettering the environment." Appellants' Br. at 68. Minnesota's interest in reducing its carbon footprint by prohibiting carbon dioxide emissions from energy sources wholly outside of Minnesota is plainly not local in nature, but rather global. The carbon dioxide emissions are not carried through transmission lines into Minnesota, rather; such emissions are generated at the source creating the electricity. *See Heydinger*, 15 F. Supp. 3d at 895. Certainly, Minnesota's interest in prohibiting contributions to or increases in carbon dioxide emissions in other states is not a local concern.

### 2. Minn. Stat. § 216H.03's effects on interstate commerce are not incidental.

Minn. Stat. § 216H.03's effects on interstate commerce are not incidental. Rather, the statute has direct effects on non-Minnesota entities that participate in the MISO market, or other regional interconnected grids that include Minnesota, as well as the coal industry. Because Minn. Stat. § 216H.03's definition of "statewide power sector carbon dioxide emissions" includes "all emissions of carbon dioxide from the generation of electricity imported from outside the state and consumed in Minnesota[,]" its effects on interstate commerce are widespread. Minn. Stat. § 216H.03, subd. 2. Plainly, non-Minnesota entities that participate in the MISO

25

market cannot control where the electricity generated by coal-fired power plants is consumed. *Heydinger*, 15 F. Supp. 3d at 917. Even if such entities intend for such electricity to reach Wisconsin, not Minnesota, they do not know if it will end up there. *Id*. Nor do they know if the electricity their members receive is from renewable or non-renewable sources. *Id*.

### 3. Minn. Stat. § 216H.03's burden on interstate commerce is clearly excessive in relation to reducing Minnesota's local carbon dioxide emissions.

Even if a statute regulates "'evenhandedly,'" and imposes only "'incidental'" burdens on interstate commerce, the courts must nevertheless strike it down if "'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981) (quoting *Pike*, 397 U.S. at 142); s*ee Exxon Corp.*, 437 U.S. at 151 (Blackmun, J., concurring in part and dissenting in part) ("One of the basic purposes of the [Commerce] Clause, therefore, is to prevent the vindication of such self-interest from unfairly burdening out-of-state concerns and thereby disrupting the national economy."). "Moreover, 'the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.'" *Id*.

26

Minn. Stat. § 216H.03's burdens on non-Minnesota entities and their explicit

purpose of regulating carbon dioxide emissions wholly outside of Minnesota is

clearly excessive. It places non-Minnesota entities in a straightjacket—sacrifice

entering into business transactions or investments to satisfy non-Minnesota load to

benefit their members/shareholders, or seek regulatory approval in the form of

costly offsets from Appellants. *See* Minn. Stat. § 216H.03, subd. 4 (requirements

to receive an exemption). This burden is not minor, but rather has major

implications—like higher rates for members, especially those outside of

Minnesota. *See Clover Leaf Creamery*, 449 U.S. at 472 (finding that a statute's

burden is not clearly excessive because the burden is "relatively minor").

Furthermore through its prohibitions and in-state favored offset exceptions,

Minnesota will not be bearing the true cost of its regulation. *See Nat'l Elec. Mfrs.

Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001) ("Such circumstances raise the

risk that state policymakers will not bear the true political costs of their decisions,

because those costs will fall in some measure on the residents of other political

jurisdictions.").

In conclusion, Minn. Stat. § 216H.03 regulates with a global interest in

mind, which directly affects interstate commerce—especially regional

interconnected energy grids like MISO. Even if Minn. Stat. § 216H.03 is found to

have a legitimate local interest with incidental effects, there is no doubt that its

27

burdens on interstate commerce are clearly excessive and will have major consequences.

Therefore, Minn. Stat. § 216H.03, subd. 3, subsect. (2)–(3) violate the dormant Commerce Clause.  First, Minnesota has projected Minn. Stat. § 216H.03 into other states by directly regulating conduct wholly outside of Minnesota and out-of-state carbon dioxide emissions.  Second, Minn. Stat. § 216H.03 discriminates against interstate commerce in purpose and through its effects on interstate commerce, particularly by favoring renewable energy industries.  Third, Minn. Stat. § 216H.03's burdens on interstate commerce, particularly on non-Minnesota entities that use electricity generated by coal, are clearly excessive in relation to Minnesota's purported interest in reducing carbon dioxide emissions.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the District Court should be affirmed.

DATED this 27th day of January 2015.

28

Respectfully submitted,

/s/ Steven J. Lechner
Steven J. Lechner, Esq.
*Counsel of Record*
Maegan L. Woita, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
lechner@mountainstateslegal.com
mwoita@mountainstateslegal.com

Counsel for Montana Coal Council and Mountain
States Legal Foundation

29

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(C)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,864 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally, double-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ Steven J. Lechner
Steven J. Lechner, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
lechner@mountainstateslegal.com

Appellate Case: 14-2156     Page: 40     Date Filed: 01/30/2015 Entry ID: 4239941

**CERTIFICATE OF COMPLIANCE WITH 8TH CIR. R. 28A(h)(2)**

In accordance with 8th Cir. R. 28A(h)(2), this brief has been scanned for viruses and the brief is virus free.

/s/ Steven J. Lechner
Steven J. Lechner, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
lechner@mountainstateslegal.com

31

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25, I hereby certify that, on the 27th day of January 2015, the foregoing was filed using the appellate CM/ECF system and that all parties of record were served through that system.

I further certify the following participant is not a CM/ECF user in this case. I have mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participant:

Mr. Claire M. Olson
1717 Interstate Avenue, E.
Bismarck, ND 58501

/s/ Steven J. Lechner
Steven J. Lechner, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
lechner@mountainstateslegal.com

32