IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

State of North Dakota, et al.,

Appellees/Cross-Appellants,

vs.

Beverly Heydinger, Commissioner and Chair, Minnesota Public Utilities,
Commission, et al.,

Appellants/Cross-Appellees.

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

_____

**APPELLANTS'/CROSS-APPELLEES' REPLY AND RESPONSE BRIEF**

_____

Thomas H. Boyd
Atty. Reg. No. 200517
Brent A. Lorenz
Atty. Reg. No. 386865
Derek R. Allen
Atty. Reg. No. 392065
Winthrop & Weinstine, P.A.
Capella Tower, Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
(612) 604-6400

Attorneys for Appellees/Cross-Appellants

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

ALETHEA M. HUYSER
Assistant Attorney General
Atty. Reg. No. 0389270
MICHAEL EVERSON
Assistant Attorney General
Atty. Reg. No. 0388310
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
Telephone: (651) 757-1243
Fax: (651) 282-5832

Attorneys for Appellants/Cross-Appellees

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

ARGUMENT ...................................................................................................1

I.    APPELLEES HAVE FAILED TO DEMONSTRATE ANY JUSTICIABLE
      CLAIMS. ...............................................................................................1

      A.    Appellees Have Not Proven Standing. ......................................1

            1.    Appellees Have Not Suffered A Concrete Injury-In-Fact
                  That Is Actual Or Imminent. ...........................................1

                  a.    Basin Electric Proceeding. ...................................6

                  b.    Great River Energy Docket. .................................8

                  c.    Matter of Dairyland Power Cooperative. .............9

            2.    Appellees Cannot Show That Any Alleged Injury Is
                  Fairly Traceable To Section 216H.03. .........................12

      B.    Appellees' Claims Are Not Ripe. ...........................................17

II.   IF ANY UNCERTAIN ISSUES OF STATE LAW EXIST REGARDING SECTION
      216H.03'S PROPER INTERPRETATION, THE COURT SHOULD ABSTAIN
      AND PERMIT THE MPUC TO INTERPRET THE LAW. ..........................19

III.  THE LANGUAGE OF SECTION 216H.03 ONLY REGULATES ELECTRICITY
      PROCURED TO SERVE MINNESOTA AND DOES NOT REGULATE
      ELECTRONS THAT FLOW THROUGH MISO. ......................................19

IV.   SECTION 216H.03 DOES NOT VIOLATE THE DORMANT COMMERCE
      CLAUSE. ..............................................................................................23

      A.    Section 216H.03 Does Not Regulate In An Extraterritorial
            Manner. ...................................................................................24

      B.    Section 216H.03 Does Not Discriminate Against Interstate
            Commerce. ..............................................................................32

i

C.     Section 216H.03 Easily Satisfies *Pike* Balancing. .............................35

     1.     Section 216H.03 Provides Substantial Putative Local Benefits. ...................................................................36

     2.     Section 216H.03 Imposes Virtually No Cognizable Burden On Interstate Commerce. .............................39

IV.    Section 216H.03, Subd. 3(2) and 3(3) Is Not Preempted By Federal Law. ..................................................................40

     A.     The Federal Power Act Does Not Preempt Section 216H.03, Subd. 3(2) Or 3(3). ...........................................41

     1.     Section 216H.03 Is Not Preempted By Virtue Of Field Preemption. ..................................................................41

     2.     Section 216H.03 Is Not Preempted By The FPA By Virtue Of Conflict Preemption. ...................................46

     B.     Section 216H.03 Is Not Preempted By The Clean Air Act. ..............47

     1.     Section 216H.03 Does Not Regulate Air Emissions And Is Not Subject To Field Preemption. .........................47

     2.     Section 216H.03 Does Not Conflict With The CAA. .............49

V.     The District Court Erred In Granting A Facial Challenge. .............49

VI.    As The District Court Initially Determined, Cross-Appellants Should Not Receive Attorneys' Fees Or Non-Taxable Costs. ..........50

     A.     Summary Of Argument ...................................................50

     B.     Cross-Appellants Should Not Receive Attorneys' Fees or Non-Taxable Costs ...........................................51

CONCLUSION .......................................................................53

Appellate Case: 14-2156    Page: 3    Date Filed: 03/17/2015    Entry ID: 4255089

# TABLE OF AUTHORITIES

Page

## FEDERAL COURT CASES

*1-800-411-Pain Referral Service, LLC v. Otto,*
744 F.3d 1045 (8th Cir. 2014) ............................................................50

*Alliant Energy Corp. v. Bie,*
277 F.3d 916 (7th Cir. 2002) ..............................................................4

*Am. Elec. Power Co. v. Conn.,*
131 S. Ct. 2527 (2011) .......................................................................48

*American Beverage Ass'n v. Snyder,*
735 F.3d 362 (6th Cir. 2013) .............................................................24

*Arizona v. United States,*
-- U.S.--, 132 S. Ct. 2492 (2012) ......................................................41

*Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Com'n,*
461 U.S. 375 (1983).............................................................................32

*Bates v. Dow Agrosciences LLC,*
544 U.S. 431 (2005)............................................................................41

*C&A Carbone, Inc. v. Town of Clarkstown, N.Y.,*
511 U.S. 383 (1994)............................................................................26

*Cherry Hill Vineyard, LLC v. Baldacci,*
505 F.3d 28 (1st Cir. 2007).................................................................33

*Chicago & Grand Trunk R. Co. v. Wellman,*
143 U.S. 339 (1892).............................................................................1

*Clapper v. Amnesty Intern.,*
133 S. Ct. 1138 (2013).......................................................................1, 4

*Clean Air Markets Group v. Pataki,*
338 F.3d 82 (2nd Cir. 2003)........................................................ 48, 49

Appellate Case: 14-2156     Page: 4     Date Filed: 03/17/2015 Entry ID: 4255089

*Clinton v. City of New York,*
    524 U.S. 417 (1998)......................................................................................3

*Cotto Waxo Co. v. Williams,*
    46 F.3d 790 (8th Cir. 1995) ................................................. 23, 25, 27

*Department of Revenue of Ky. v. Davis,*
    553 U.S. 328 (2008)....................................................................................23

*Electric Power Supply Ass'n v. FERC,*
    753 F.3d 216 (D.C. Cir. 2014).................................................................45

*Farrar v. Hobby,*
    506 U.S. 103 (1992)............................................................................ 51, 52

*Friends for Ferrell Parkway v. Stasko,*
    282 F.3d 315 (4th Cir. 2002) ..................................................................16

*General Motors Corp. v. Tracy,*
    519 U.S. 278 (1997)....................................................................................33

*Habecker v. Town of Estes Park, Colo.,*
    518 F.3d 1217 (10th Cir. 2008) ............................................................16

*Harmon v. City of Kansas City, Mo.,*
    197 F.3d 321 (8th Cir. 1999) ..................................................................10

*Hughes v. Oklahoma,*
    441 U.S. 322 (1979)....................................................................................35

*International Dairy Foods Ass'n v. Boggs,*
    622 F.3d 628 (6th Cir. 2010) ..................................................................24

*Iowa Right to Life Committee, Inc. v. Tooker,*
    717 F.3d 576 (8th Cir. 2013) .............................................................2, 7

*Jones v. Gale,*
    470 F.3d 1261 (8th Cir. 2006) ..........................................................4, 16

*Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Util. Com'n,*
    837 F.2d 600 (3rd Cir. 1988) ........................................................ 41, 45

iv

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton,*
    422 F.3d 490 (7th Cir. 2005) ................................................................4

*Land v. Washington County, Minn.,*
    243 F.3d 1093 (8th Cir. 2011) ...........................................................51

*Lewis v. Casey,*
    518 U.S. 343 (1996) ............................................................................3

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................5

*Maine v. Taylor,*
    477 U.S. 131 (1986) ..........................................................................38

*N.C. ex rel. Cooper v. Tenn. Valley Auth.,*
    615 F.3d 291 (4th Cir. 2010) .............................................................48

*National Elec. Mfrs. Ass'n v. Sorrell,*
    272 F.3d 104 (2nd Cir. 2001) ............................................................25

*National Paint & Coating Ass'n v. Chicago,*
    45 F.3d 1124 (7th Cir. 1995) ..................................................... 34, 39

*National Right to Life v. Connor,*
    323 F.3d 684 (8th Cir. 2003) .............................................................18

*National Solid Wastes Management Ass'n v. Meyer,*
    63 F.3d 652 (7th Cir. 1995) ....................................................... 24, 25

*New York v. F.E.R.C.,*
    535 U.S. 1 (2002) ..............................................................................43

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
    523 U.S. 726 (1998) ..........................................................................17

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
    461 U.S. 190 (1983) ..........................................................................41

*Panhandle Eastern Pipe Line Co. v. Michigan Pub. Serv. Comm'n,*
    341 U.S. 329 (1951) ..........................................................................29

Appellate Case: 14-2156   Page: 6   Date Filed: 03/17/2015   Entry ID: 4255089

*Perdue v. Kenny A. ex rel. Winn,*
    559 U.S. 542 (2010)...............................................................51

*Pharmaceutical Care Mgmt Ass'n v. Rowe,*
    429 F.3d 294 (1st Cir. 2005)...................................................38

*PPL EnergyPlus v. Nazarian,*
    753 F.3d 467 (4th Cir. 2014) .............................................. 43, 44, 46

*PPL Energyplus, LLC v. Solomon,*
    766 F.3d 241 (3rd Cir. 2014) ....................................... 41, 42, 43, 44, 46

*Railroad Commission of Tex. v. Pullman Co.,*
    312 U.S. 496 (1941).............................................................19

*Sabri v. United States,*
    541 U.S. 600 (2004).............................................................12

*South Carolina Pub. Serv. Auth. v. FERC,*
    762 F.3d 41 (D.C. Cir. 2014) ...............................................45

*South Dakota Farm Bureau v. Hazeltine,*
    340 F.3d 583 (8th Cir. 2003) .................................................3

*Southern Pacific Co. v. Arizona,*
    325 U.S. 761 (1945)......................................................... 39, 40

*Southern Union Co. v. Missouri Public Service Com'n,*
    289 F.3d 503 (8th Cir. 2002) .......................................... 27, 28, 38

*Texas State Teachers Ass'n v. Garland Independent School Dist.,*
    489 U.S. 782 (1992).............................................................52

*U&I Sanitation v. City of Columbus,*
    205 F.3d 1063 (8th Cir. 2000) ..............................................23

*United Haulers Ass'n v. Oneidea-Herkimer Solid Waste Mgmt. Auth.,*
    550 U.S. 330 (2007).............................................................38

*United States v. Salerno,*
    481 U.S. 739 (1987).............................................................49

Appellate Case: 14-2156     Page: 7     Date Filed: 03/17/2015 Entry ID: 4255089

*United States v. Stephens,*
    594 F.3d 1033 (8th Cir. 2010) .............................................................11

*Valley Forge Christian Coll. v. Americans United for Separation of Church
    & State, Inc.,*
    454 U.S. 464 (1982) ...........................................................................1

*White Stallion Energy Center, LLC v. United States Environmental
    Protection Agency,* 748 F.3d 1222 (D.C. Cir. 2014) ...........................................13

*Yamaha Motor Corp. v. Jim's Motorcycle, Inc.,*
    401 F.3d 560 (4th Cir. 2005) .............................................................38

## STATE COURT CASES

*Appeal of Sinclair Mach. Products, Inc.,*
    498 A.2d 696 (N.H. 1985) ...................................................................45

*Dairyland Power Co-op. v. Brennan,*
    82 N.W.2d 56 (Minn. 1957)..................................................................31

*Minnesota Center for Envtl. Advocacy v. Minnesota Pollution Control
    Agency,*
    644 N.W.2d 457 (Minn. 2002)....................................................... 22, 23

*Pee De Elec. Co-op. v. Public Service Commission,*
    92 S.E.2d 171 (S.C. 1956) ..................................................................31

*Pike County Light and Power Comp. v. Pennsylvania Pub. Util. Com'n,*
    465 A.2d 735 (Pa. Cmwlth. 1983) .........................................................45

## ADMINISTRATIVE DECISIONS

*Cal. Pub. Utils. Comm'n,*
    134 FERC ¶ 61,044 (Jan. 20, 2011)............................................. 30, 45

*Central Vermont Pub. Serv. Corp.,*
    84 FERC ¶ 61,194 (Aug. 21, 1998)..................................................45

*In the Matter of Great River Energy's Proposed Carbon Offset Plan*
    MPUC Docket No. ET-2/M-10-1188 ........................................ 6, 9, 22

Appellate Case: 14-2156    Page: 8    Date Filed: 03/17/2015    Entry ID: 4255089

*In re Midwest Power Systems, Inc.*,
  78 FERC ¶ 61,067 (Jan. 29, 1997) ......................................................45

*In Re So. California Edison Co.*,
  70 FERC ¶ 61,215 (Feb. 23, 1995)............................................. 30, 45

*Pennsylvania Power & Light*,
  23 FERC ¶ 61,006 (Apr. 1, 1983) ..................................................45

*Petition of Minnesota Power for Approval of Investments in the Bison I
  Wind Project*,
  MPUC Docket No. E-015/M-09-285 ............................................34

*Petition of Minnesota Power*,
  MPUC Docket No. E-015/M-11-234 ............................................34

*Petition of Otter Tail Power*,
  MPUC Docket No. E-017/M-13-386 ............................................34

*Petition of Xcel Energy*,
  MPUC Docket No. E-002/M-13-603 ............................................34

*Petition of Xcel Energy*,
  MPUC Docket No. E-002/M-13-716 ............................................34

## FEDERAL STATUTORY AUTHORITIES

16 U.S.C. § 824 ................................................................................42

16 U.S.C. § 824a.-3................................................................................45

42 U.S.C. § 1988 ................................................................................52

## STATUTORY AUTHORITIES

Ark. Code Ann. §  23-18-201 ...........................................................31

17 C.R.R. §§ 95814, 95830, 95922 ....................................................22

Ky. Rev. Stat. Ann. § 279.210 ..........................................................31

Minn. Stat. § 216B.01.......................................................... 29, 31, 32

Minn. Stat. § 216B.02 ........................................................................31

Appellate Case: 14-2156   Page: 9   Date Filed: 03/17/2015 Entry ID: 4255089

Minn. Stat. § 216B.09 ...................................................................32

Minn. Stat. § 216B.0975 ...............................................................32

Minn. Stat. § 216B.39 ...................................................................32

Minn. Stat. § 216B.1691 ................................................................31

Minn. Stat. § 216B.241 ..................................................................32

Minn. Stat. § 216B.2422 ................................................................31

Minn. Stat. § 216C.09(b). ................................................................6

Minn. Stat. § 216H.03 ......................................................... *passim*

Minn. Stat. § 308A.311 ..................................................................31

Minn. Stat. § 308A.327 ..................................................................31

Minn. Stat. § 645.17 ......................................................................20

## FEDERAL RULES AND REGULATIONS

61 Fed. Reg. 21540 (May 10, 1996) .................................... 43, 46

79 Fed. Reg. 1430  (Jan. 8, 2014) ....................................... 14, 15

79 Fed. Reg. 34829  (June 18, 2014) .........................................14

## ADDITIONAL AUTHORITIES

Comments of American Coalition for Clean Coal Electricity on the Carbon Emission Guidelines for Existing Stationary Sources: Electricity Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25764 (Dec. 1, 2014) ...................................................................................37

Comments from the Attorneys General of North Dakota, et al., on Proposed EPA Carbon Pollution Emissions Guidelines for Existing Stationary Sources:  Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25433 (Dec. 15, 2014) ...........................................15

Appellate Case: 14-2156     Page: 10     Date Filed: 03/17/2015 Entry ID: 4255089

Comments of Missouri River Energy Services on the Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-23810 (Nov. 26, 2014) ...................................................................................................37

Comment of National Rural Electric Cooperative Association on the Proposed Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-33118 (Dec. 1, 2014) ...............................................................37

North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944 (Nov. 25, 2014) ....................................................................... *passim*

North Dakota Public Service Commission comments on the Proposed Standards of Performance for Greenhouse Gas Emissions From New Stationary Sources: Electric Utility Generating Units, Docket No. EPA-HQ-OAR-2013-0495-9505 (May 9, 2014).........................................................15

Regional Greenhouse Gas Initiative ("RGGI"), www.rggi.org/design/regulations.................................................................................................22

Rules, Regulations & Policies for Renewable Energy, Database of State Incentives for Renewables & Efficiency, U.S. Dep't of Energy, available at www.dsireusa.org/summarytables/rrpre.cfm...................................................30

Rachel Wilson and Bruce Biewald, *Best Practices in Electric Utility Integrated Resource Planning,* Synapse Energy Economics, (June 2013) .........30

Appellate Case: 14-2156     Page: 11     Date Filed: 03/17/2015 Entry ID: 4255089

**ARGUMENT**

**I.    APPELLEES HAVE FAILED TO DEMONSTRATE ANY JUSTICIABLE CLAIMS.**

Judicial power is "legitimate only in the last resort[.]" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982) (citing *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345 (1892)).    However, Appellees admit they brought this case as a "preemptive strike" to make sure "the State of Minnesota understands how this statute would be applied."  Appx. 96-97.  Appellants have never tried to enforce section 216H.03 against Appellees.    Indeed, Appellants have yet to threaten enforcement of section 216H.03 against any entity.    Appellants have also vehemently disavowed Appellees' absurd and unworkable claims that the law applies to the MISO market.  As fully discussed in Appellants' principal brief, for numerous reasons Appellees have failed to satisfy their burden to prove both standing and ripeness.  Appellants' Brief ("Appellants' Br.") 15-31.

**A.    Appellees Have Not Proven Standing.**

**1.    Appellees Have Not Suffered A Concrete Injury-In-Fact That Is Actual Or Imminent.**

Contrary to Appellees' suggestions, Article III standing necessarily requires a concrete injury-in-fact which is actual or "*certainly* impending."  Appellants' Br. 15-16 (citing *Clapper v. Amnesty Intern.*, 133 S. Ct. 1138, 1146-48 (2013); *Valley Forge Christian Coll.*, 454 U.S. at 471-42).    Appellees' alleged fears and

1

apprehensions arise from their own contrived interpretations of the statute as applying to transactions in the MISO short-term market, interpretations that Appellants have never embraced nor sought to enforce. Appellants' Br. at 17-19; *infra* at 19-22. To the contrary, Appellants have expressly rejected the interpretation that forms the basis for Appellees' claimed harm. *See, e.g.,* Appellants' Br. 34-42; Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. (ECF 166), at 7-8 (explaining that section 216H.03 "does not apply to the MISO energy markets"). The undisputed record establishes that Appellants have yet to enforce or threaten enforcement of subdivision 3(2) and 3(3) of section 216H.03.[1]

Appellants also have not suffered actual harm because they cannot identify an existing agreement or a particularized plan to serve Minnesota retail customers with electricity from a new large energy facility subject to subdivision 3(2). Appellants' Br. 18. Appellants also have conceded that they cannot identify any large 50 MW contract for more than five years with an existing large energy facility that would occur but for subdivision 3(3) of the NGEA. *Id.* at 18-19;

---

[1] Appellees claim that "Basin has already been confronted with threatened enforcement." Appellee's Br. at 28. To the contrary, one month before filing its complaint in this case, Basin chose to voluntarily file a document with the MPUC in which Basin articulated some vague concern about the NGEA's application to the Dry Fork facility. *See infra* at 6-7. While Basin was asked for clarification as to their asserted concerns, no further action was taken and the docket was resolved and closed. *Id.; Iowa Right to Life Committee, Inc. v. Tooker*, 717 F.3d 576, 585-86 (8th Cir. 2013) (holding that questions asked by state agencies to determine whether the plaintiff qualified as a PAC did not confer standing).

Appx. 92. *See also, e.g., Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (stating that "standing is not dispensed in gross" and that "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject").

The cases cited by Appellees do not change the foundational requirement that the claimed injury-in-fact must be certain and imminent, and not speculative or abstract. Rather, the cases simply arise in different factual circumstances where injury-in-fact existed. For example, the cases Appellees term as "competitor standing" cases recognize that an injury-in-fact is imminent and sufficiently concrete when the unenforced law would plainly, immediately, and directly cause a significant and indisputable financial loss. *See, e.g., Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (finding New York state had standing to challenge legislation giving president line item veto because the president used the line item veto to revive "a substantial [multibillion] contingent liability" owed by the state); *South Dakota Farm Bureau v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003) (standing existed for feedlots to challenge a law that unambiguously prohibited them from

3

renewing existing contracts with non-family corporate farms); *Jones v. Gale*, 470 F.3d 1261 (8th Cir. 2006) (same).[2]

In contrast, Appellees do not meet the required standard because their purported injuries are not imminent or clear. *See, e.g.,* Appx. 310 (noting "apprehension" as to how Minnesota's interpretation might affect sales); Appx. 302 (expressing concern about how subdivision 3(2) "might be construed"); Appx. 324 (worrying about "time and money" spent "figuring out" § 216.03, although all deals failed for unrelated reasons).[3] *See also Clapper*, 133 S. Ct. at 1151 (stating that a party "cannot manufacture standing merely by inflicting harm on themselves based on their fears of a hypothetical future"). *Also compare* Appellees' Br. 14, 16-17, 28 (claiming that offsets are "illusory") *with* Appellants' Br. 18-19, (showing that MPUC has not applied the provision) and *infra* at 21-22 (noting that

---

[2] The other cases cited by Appellees arose in the context of a Rule 12 motion to dismiss, and therefore apply a different and more deferential standard. *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 918-919 (7th Cir. 2002) (recognizing that "mealy-mouthed" corporate representations raised significant questions as to whether there is a real, concrete injury, but declining to dismiss at Rule 12 stage); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 499-50 (7th Cir. 2005) (declining to dismiss complaint on Rule 12 motion because the Court could "conceive of facts" that would establish standing).

[3] A proceeding before the MPUC would be the appropriate venue to determine the details of how implementation of the NGEA interacts with various utility business models, because the MPUC is the state agency with the technical expertise and experience with Minnesota's utility framework. Instead of seeking to resolve their concerns with the MPUC, Appellants chose to pursue this "preemptive strike."

4

utilities and others have previously been able to propose numerous options for offsets under § 216H.03).

Appellees also cannot identify a single long-term power purchase agreement or other transaction that failed to materialize due to either subdivision 3(2) or 3(3). Appx. 92; Appellants' Br. 18. Although Appellees claim to have "identified potential transactions with which 216H.03 has interfered," Appellees' Br. at 29, the record pages referenced all discuss transactions that failed for unrelated business reasons. *See* Appellants' Br. at 17-19, 23-27. *See also* Brief of Amicus Environmental Defense Fund 5-16. Ultimately, Appellees have not and cannot show that section 216H.03 specifically harmed any aspect of their business operations, despite the fact that it was enacted in 2007, over 4 years before Appellees filed suit. *See, e.g.,* Appx. 109 (acknowledging that Basin Electric has not "changed [its] day-to-day operations" as a result of section 216H.03); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (noting that a plaintiff must show clear injury-in-fact "so as to reduce the possibility of deciding a case in which no injury would have occurred at all").

Recognizing that subdivision 3(2) and 3(3) have had no impact on their operations, Appellees erroneously rely on isolated comments made by parties (not the MPUC) during MPUC proceedings in an effort to manufacture standing. Appellees' Br. 21-25, 28, 31. An accurate examination of these dockets reveals no

5

actual or certainly impending injury. Appellees refer only to comments made by Commerce Department employees, who appear as a party in MPUC proceedings.[4] But the Commerce Department never suggested that any entity violated section 216H.03 and never caused any concrete injury-in-fact to any Appellee. To the contrary, the Commerce Department employees advocated that section 216H.03 not apply to wholly out-of-state transactions. *See, e.g., In the Matter of Great River Energy's Proposed Carbon Offset Plan*, MPUC Docket No. ET-2/M-10-1188.

### a. Basin Electric Proceeding.

Appellees reference a resource planning proceeding involving Basin Electric. Appellees' Br. 28. Far from establishing injury-in-fact, the Basin Electric proceeding reflects a vague issue raised by Basin Electric in an effort to manufacture an injury.

In October 2011, one month before filing the complaint in this case, Basin Electric submitted a letter and filing to the MPUC requesting a one-year extension on the due date for their Integrated Resource Plan ("IRP"). Appx. 394-95. As part of that filing, Basin Electric voluntarily included a Notice of Changed Circumstances, stating that "it is possible to argue that theoretically, a portion of [a

---

[4] The Commerce Department merely advocates for the interests of ratepayers in MPUC proceedings. Minn. Stat. § 216C.09(b).

6

particular coal-fired facility's] power . . . might end up serving Basin Electric's members in Minnesota" and that "[section 216H.03] could be interpreted to condition or prohibit the above described transfers necessary for Basin Electric to serve its members." Appx. 398.

In response to Basin Electric raising the issue before MPUC, the Commerce Department filed a comment suggesting that the MPUC ask Basin Electric for further information on the requested extension of time, as well as an analysis of whether section 216H.03 could apply as Basin Electric indicated it "theoretically" could. Appx. 401-403; *Iowa Right to Life Committee, Inc.*, 717 F.3d at 585-86 (questions asked by state agency to determine whether law applied to plaintiff did not confer standing). Basin Electric agreed to submit supplementation, and MPUC "accept[ed] Basin's agreement." Appx. 407. As part of that supplementation, Basin specifically requested that the MPUC *not* provide an interpretation of section 216H.03. Appx. 409.[5]

There was no enforcement action in the Basin Electric docket, nor did the Commerce Department suggest that enforcement action was appropriate. Rather, the MPUC granted the one-year extension Basin requested on December 23, 2011.

---

[5] Despite the fact that Basin Electric specifically requested the MPUC take no action, Appellees filed affidavits in this case complaining that "neither the MPUC nor the MDOC have responded to Basin Electric's [] submission to confirm whether or not Basin Electric's" power transfers violated section 216H.03. Appx. 293

7

Appx. 406-407. Because there was no additional request pending, the MPUC took no further action on the docket.

## b. Great River Energy Docket.

Appellees also cite isolated Commence Department comments made during a MPUC resource planning docket involving Great River Energy ("GRE"), which is not a party to this litigation. Appellees' Br. 23-25. Like the Basin Electric docket, nothing in this docket suggests injury-in-fact on the part of any Appellee.

As part of GRE's resource planning proceeding before the MPUC, several environmental groups raised the issue of whether section 216H.03, subdivision 3(2) might apply to GRE's reliance on Spiritwood, a coal-fired plant located in North Dakota. Appellees' Supplemental Appendix (SA) 260. GRE responded by arguing that it was relying on Spiritwood for less than 50 MW of capacity, and therefore subdivision 3(2) did not apply. SA 260. Recognizing disagreement about whether subdivision 3(2) applied to reliance on capacity from Spiritwood to serve Minnesota customers, the MPUC provided parties the opportunity to submit legal briefs on the issue. SA 260.

During the briefing period, the Commerce Department filed comments advocating that MPUC direct its resources to determining whether Spiritwood qualified for an exemption for need under section 216H.03, rather than focusing on application of the enforcement provisions. SA 260. The parties then provided

8

some briefing proposing a variety of ways GRE could offset the new Spiritwood capacity. SA 264; *In the Matter of Great River Energy's Proposed Carbon Offset Plan*, MPUC Docket No. ET-2/M-10-1188. While these issues were pending, the Minnesota Legislature enacted an exemption to the law that applied to Spiritwood, 2011 Minn. Laws., ch. 97, § 30, which mooted the issues in the MPUC proceeding. Appx. 383-84.

### c. Matter of Dairyland Power Cooperative.

In September 2011, Dairyland Power, which is not a party to this action, filed its 2011-2026 resource plan with the MPUC. SA 273. The docket focused overall on a variety resource issues not germane to this case. *See, e.g.,* SA 217-221. However, several environmental groups filed comments indicating that Dairyland's resource plan was incomplete for failing to address the applicability of section 216H.03 to its Weston 4 coal-fired facility. SA 227-229. Dairyland responded by asserting that section 216H.03 could not apply to Dairyland because it was a member of MISO. Appellants' Supplemental Appendix 4-5.

Consistent with the position taken by Appellants in this litigation, the Commerce Department responded that section 216H.03 applied to Dairyland to the extent it relied on Weston 4 to meet capacity needs for Minnesota customers. SA 333. Indeed, the comments recognized that section 216H.03 could not apply to the flow of electrons because "it is impossible to determine which electrons from

9

which generations units reached which end-use customers." SA 334. Ultimately, the Commerce Department did not make a recommendation and instead indicated it was "not reach[ing] a conclusion as to whether and how Minn. Stat. § 216H.03 applies to" Dairyland. SA 335.

The Commerce Department subsequently raised the possibility that an exemption may apply under section 216H.03, subdivision 7(1). SA 327-28. On October 12, 2012 the MPUC found the exemption applied. SA 341-42.

None of these three dockets establishes any injury-in-fact by any Appellee. At most, Appellees point to comments made by Commerce Department employees in their role as advocates for ratepayers before the MPUC. But the Commerce Department's comments never advocated that any entity violated subdivisions 3(2) or 3(3), never asserted that section 216.03 regulated transactions in the MISO short-term market, and never pursued any type of enforcement action against any entity. In short, the comments do not support Appellees' claimed injury-in-fact.

Furthermore, because Appellees seek only injunctive relief, the district court's reliance on the Commerce Department's past statements was legal error. In *Harmon v. City of Kansas City, Mo.*, 197 F.3d 321, 326-27 (8th Cir. 1999), this Court considered whether an individual had standing to challenge a city ordinance. Unlike this case, the plaintiff sought damages because police officers had explicitly threatened him with prosecution under the statute, and the court held those past

10

threats of enforcement were sufficient to confer standing for backward-looking damages claims. *Id.* However, by the time of the appeal, the city had clarified that the city ordinance did not prohibit the activities that the plaintiff alleged created constitutional concerns. *Id.* at 327. As such, the Court rejected standing on the claims for prospective relief because the plaintiff could not "establish a real, immediate threat" of future injury. *Id.* Likewise, given the plain language of the statute and because Appellants have clarified that section 216H.03, subdivision 3(2) and 3(3) are not meant to apply and would not be enforced in the unconstitutional manner that Appellees allege, Appellees lack standing to seek injunctive relief.

Appellees also wrongly intimate that they are relieved of the obligation to show the requisite Article III injury-in-fact because their constitutional challenge is a facial one. Appellees Br. 29-30; *United States v. Stephens*, 594 F.3d 1033, 1037 (8th Cir. 2010) ("The Supreme Court's disdain for facial challenges is an expression of judicial restraint apart from the case-or-controversy requirement . . . which is the basis of much standing doctrine" (citation omitted)). As discussed above, Article III jurisdiction can only be invoked if the required actual or certainly impending concrete injury-in-fact exists. *Supra* at 2-3. Appellees have not articulated a concrete and imminent injury-in-fact in the eight years since the

11

statute was enacted, and the impact of the regulation on them is neither direct nor immediate. *Id.* at 2-5.

In addition, the Supreme Court in *Sabri v. United States*, 541 U.S. 600, 608 (2004), reiterated the disfavor of facial challenges, warning that "facial challenges are best when infrequent." As the Court explained:

> Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks. **Facial adjudication carries too much promise of premature interpretation of statutes . . . .**

*Id.* at 608-09 (emphasis added). *See also infra* at 49-50.

### 2. Appellees Cannot Show That Any Alleged Injury Is Fairly Traceable To Section 216H.03.

Beyond failing to demonstrate an injury-in-fact, Appellees have not shown that any alleged injury is fairly traceable to either subdivision 3(2) or 3(3). As outlined in Appellants' principal brief, Appellees admit that other factors totally unrelated to the challenged law have stopped the development of coal-fired facilities. Appellants' Br. 20-23. These factors include less-expensive energy resources such as natural gas that have shifted market interest away from coal, as well as existing federal mercury and air toxics standards ("MATS") rules that, according to Appellee North Dakota, result in "early [coal-fired] plant retirements"

12

and "effectively end the construction of new coal-fired facilities."[6]   In their responsive brief, Appellees fail to even address shifting market conditions, the MATS rules, or their admissions.

In addition to the existing MATS regulations, proposed Environmental Protection Agency (EPA) rules for both new and existing carbon-emitting power plants are a further cause of any business losses to Appellees.  The North Dakota Public Service Commission, which regulates electric utilities in North Dakota, recently described the proposed EPA regulations for existing power plants as having "ten times the magnitude of the retirements that were projected for MATS, and EPA's projections for retirements under the MATS rule were vastly understated."[7]   In other words, the proposed carbon regulations are ten times more significant than an existing regulation that Appellees believe will result in "early [coal-fired] plant retirements" and "effectively end the construction of new coal-fired facilities."[8]

---

[6] Joint Brief of Petitioners, *White Stallion Energy Center, LLC v. United States Environmental Protection Agency*, 748 F.3d 1222 (D.C. Cir. 2014), at 42 n.39 (No. 12-1100 (and consolidated cases)).

[7] North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944, at 11 (Nov. 25, 2014).

[8] Joint Brief of Petitioners, *White Stallion Energy Center, LLC v. United States Environmental Protection Agency*, 748 F.3d 1222 (D.C. Cir. 2014), at 42 n.39 (No. 12-1100 (and consolidated cases)).

13

Appellees erroneously state that the proposed EPA regulations are "less problematic" because they "generally take the form of a proposed carbon tax which effectively create a charge for each ton of carbon dioxide emitted by generating plants." Appx. 295-96, 312-13, 325-26; Appellees' Br. 30. In fact, the proposed EPA regulations, released in June 2014, impose specific limits on statewide carbon emissions. 79 Fed. Reg. 34829 (June 18, 2014).

As the North Dakota Public Service Commission stated in its recent comments filed with the EPA, "[t]he Proposed Rule sets firm CO2 standards that must be met by North Dakota beginning in 2020 and accelerating through 2030."[9] Similarly, the proposed regulations for new carbon-emitting power facilities place mandatory limits on carbon emissions. 79 Fed. Reg. 1430 (Jan. 8, 2014). The EPA based its standards for new coal-fired facilities on what a new facility could achieve using partial implementation of carbon capture technology,[10] a technology that Appellees claim is not currently viable. *See* Appellees' Br. 14 (stating that "carbon capture and sequestration technology is not currently commercially available for power plants"); Appx. 278 (Appellees' Expert Report stating that carbon capture and sequestration is not a viable option).

---

[9] North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944, at 6 (Nov. 25, 2014).

[10] 79 Fed. Reg. 1430, 1433 (Jan. 8, 2014) ("This action proposes a standard of performance . . . based on partial implementation of carbon capture and storage").

Appellate Case: 14-2156    Page: 25    Date Filed: 03/17/2015 Entry ID: 4255089

The North Dakota Public Service Commission also stated in EPA comments that the proposed carbon regulations for both new and existing facilities result in "significant shifts in electrical generating capacity away from carbon-intensive [power generating facilities] to less carbon-intensive [facilities] and zero-carbon generation" that "threatens North Dakota's ability to continue to use lignite and other coals[.]"[11]  The North Dakota Attorney General, a party to this case, recently submitted separate comments to the EPA in which he and a number of other attorneys general asserted that the proposed regulations for new carbon-emitting facilities would "effectively prohibit[] new coal-fired power plants from being built."[12]  Regarding proposed regulations for existing power plants, he stated that the regulations would impose "significant shifts in energy policy" away from coal-fired energy sources.[13]

The reason the MPUC has not had occasion to interpret or apply section 216H.03, and the reason any asserted injury is not fairly traceable to subdivision

---

[11] North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944, at 6 (Nov. 25, 2014).

[12] Comments of North Dakota, et al. on the Proposed Standards of Performance for Greenhouse Gas Emissions From New Stationary Sources: Electric Utility Generating Units, Docket No. EPA-HQ-OAR-2013-0495-9505, at 6 (May 9, 2014).

[13] Comments from the Attorneys General of North Dakota, et al., on Proposed EPA Carbon Pollution Emissions Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25433, at 25 (Dec. 15, 2014).

Appellate Case: 14-2156    Page: 26    Date Filed: 03/17/2015 Entry ID: 4255089

3(2) or 3(3), is because market and federal regulatory conditions have had a severe adverse impact on the development or expansion of new or existing coal-fired facilities. *See also* Appellants' Br. at 20-23.

Notwithstanding market and regulatory conditions that they themselves admit have and will stop development of coal projects, Appellees argue that section 216H.03 could still contribute to some unspecified business loss. Appellees' Br. 30-31. But Article III standing requires an injury be caused by the challenged law, not merely that the challenged law might affect Appellees if other factors were not already limiting their business opportunities. *See Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (recognizing that Article III "require[s] proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact"); *Friends for Ferrell Parkway v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) ("The traceability requirement ensures that it is likely the plaintiff's injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court.").

Appellees must also show that it is "likely," rather than "speculative," that a favorable judicial decision will redress their injury. *Jones*, 470 F.3d at 1265. For the same reason Appellees' alleged injuries are not fairly traceable to Minnesota state law, it is entirely speculative that a favorable decision for Appellees on the merits will redress the claimed harm related to coal-fired power plants. Indeed, a

16

decision in Appellants' favor will not change the overriding market conditions or federal regulation, and as such, would be merely advisory in nature.

For these and all other reasons discussed in Appellants' principal brief, Appellees lack standing.

## B.   Appellees' Claims Are Not Ripe.

Appellees have also failed to show that their claims are ripe for judicial review. Appellants' Br. 27-31. They suggest that the issues in this case are ripe because this case "present[s] straightforward legal questions." Appellees' Br. 32. But Appellees' own brief includes inconsistencies in their view of how the statute might apply in various hypothetical circumstances. *Compare* Appellees' Br. 4 ("The statute traces consumption of prohibited power to Minnesota LSEs using a 'contract path' method") *with id*. at 10 (suggesting that subdivision 3 regulates the flow of electrons, rather than a contract path) *and id.* at 44 (indicating that the statute regulates based on "the actual supply and consumption of power").

Appellees essentially ask for judicial review of a state regulatory statute that the responsible state agency has yet to apply, *i.e.* Appellees ask the Court to entangle itself in abstract disagreements involving hypothetical situations. *See, e.g., Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734-35 (1998) (stating that the ripeness doctrine reflects a judgment that premature review "hinder[s]

17

agency efforts to refine its policies" and risks a decision that "prove[s] too abstract or unnecessary").

Given current market and federal regulatory conditions, it is speculative whether the MPUC will ever have occasion to apply or enforce section 216H.03. *See National Right to Life v. Connor*, 323 F.3d 684, 693 (8th Cir. 2003) (stating that the ripeness doctrine prevents courts "from entangling themselves in abstract disagreements"). As the North Dakota Public Service Commission points out, the proposed federal regulations involve "significant shifts in electrical generating capacity away from carbon-intensive EGUs [Electric Generating Units] to less carbon-intensive EGUs and zero-carbon generation[,]" which will result "in a very different mix of power resources than exists today."[14]

Appellees' constitutional challenge is not fit for judicial review. Nor would the parties suffer hardship if the court withholds review, especially in light of the current market conditions, as well as existing and proposed federal regulations. *See* Appellants' Br. at 28-31; *supra* at 12-15. Consequently, this case is also not ripe for judicial review.

---

[14] North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944, at 6, 11 (Nov. 25, 2014).

Appellate Case: 14-2156     Page: 29     Date Filed: 03/17/2015 Entry ID: 4255089

## II. IF ANY UNCERTAIN ISSUES OF STATE LAW EXIST REGARDING SECTION 216H.03'S PROPER INTERPRETATION, THE COURT SHOULD ABSTAIN AND PERMIT THE MPUC TO INTERPRET THE LAW.

MPUC has articulated how section 216H.03 applies and why Appellees' have failed to prove the statute unconstitutional. As such, Appellants seek a reversal of the district court decision and judgment entered in its favor. However, should the Court have concerns about the interpretation or implementation of section 216H.03, it would be appropriate to abstain to allow the MPUC to issue a formal interpretation as part of an administrative proceeding. *See* Appellants' Br. at 32 (explaining that abstention is appropriate when resolution of a federal constitutional claim is dependent upon or may be materially altered by determination of an uncertain issue of state law); *Railroad Commission of Tex. v. Pullman Co.*, 312 U.S. 496, 499 (1941) (recognizing abstention as based in part on the fact that a federal court's interpretation of state law is "a forecast rather than a determination" that "may be displaced tomorrow by a state adjudication").

## III. THE LANGUAGE OF SECTION 216H.03 ONLY REGULATES ELECTRICITY PROCURED TO SERVE MINNESOTA AND DOES NOT REGULATE ELECTRONS THAT FLOW THROUGH MISO.

As is fully set out in Appellants' initial brief, Appellants' Br. at 34-43, the district court erred in interpreting section 216H.03, subdivision 3(2) and 3(3) as applying to the MISO market. In doing so, the district court ignored the unambiguous language of the statute that plainly only applies to electricity

19

acquired for use in Minnesota. *See, e.g., id.* at 37, 40-41 (explaining that subdivision 3(2) and (3) apply only to agreements, acquisition, or generation that would "increase statewide power sector carbon dioxide emissions," which is defined as electricity generated or consumed in Minnesota); 36 (noting that the phrase "import" in 3(2) requires the electricity actually be contracted for Minnesota consumers); 42 (explaining why the plain language of 3(3), which applies to long-term power purchase agreements, cannot apply to the short-term MISO market). In short, the Minnesota legislature did not provide the MPUC authority to regulate out-of-state transactions unconnected to Minnesota.

The district court's interpretation was also absurd because it rendered the statute unenforceable. Minn. Stat. § 645.17(1) (requiring courts to presume the legislature does not intend an absurd result). Electrons are not controllable or traceable, making it impossible to track the actual movement of electricity in the MISO short-term market. *See* Appellants' Br. at 38, 42.[15] Interpreting section

---

[15] For these reasons, arguments that the use of "power" in section 216H.03, subd. 3 only refers to generated electricity and not capacity are nonsensical. Appellees' Brief at 64; Brief of Amici Curiae Chamber of Commerce of the United States of America *et al.*, at 15. Indeed, "power purchase agreements" as referred to in subdivision 3(3) indisputably may include capacity agreements. Appx. 337, 346, 355.

Amici Chamber of Commerce *et al.*'s attempt to argue that 3(2) cannot refer to capacity contracts because the word "agreement" is explicitly used in 3(3) is similarly unavailing. Subdivision 3(2) applies to a broader array of planning arrangements beyond just power purchase agreements. For example, a utility that (Footnote Continued on Next Page.)

20

216H.03 as applying to such non-traceable movement of electrons would therefore render it unenforceable. *Id.*

Rather than attempting to track electrons, utility resources are tracked by the MPUC using contract paths, and Appellees now acknowledge the correctness of this approach. *See, e.g.,* Appellees' Br. at 4. This is consistent with the MPUC's authority over the resource planning completed by utilities serving Minnesota customers. *See infra* at 29-32 & n. 18 (explaining that state authority over the generation resources relied on by utilities serving state customers is a well-established and widely-spread practice); Brief of Steven Gaw and Steven Weissman as Amici Curiae at 3-8. *See also* Appellants' Br. at 36-37 (explaining that similar methods are used for tracing renewable energy standards in Minnesota).

Appellees assert that the offsets provided for in section 216H.03, subdivision 4 are "illusory." Appellees' Br. at 13-14. But when offsets were considered as part of the GRE Spiritwood docket before the MPUC in 2009, the parties to that proceeding identified multiple potential offsets. Proposed offsets in that case included projects proposed by GRE itself, retirement of power purchase

---

(Footnote Continued From Previous Page.)
builds or otherwise acquires an interest in a new large energy facility which it then relies on to fulfill capacity obligations for Minnesota customers would not necessarily execute a power purchase agreement.

agreements, and possible use of the Midwest Renewable Energy Tracking system to retire produced or purchased renewable energy credits, among other things.[16] Although the Spiritwood generating facility was exempted before MPUC had the opportunity to approve offsets or interpret the statute, *see supra* at 8-9, the offset options proved flexible and certainly were not illusory.

Appellees also argue that "neither Minnesota nor any other state in this region has established a carbon dioxide cap and trade system."  Appellees' Br. 14. But section 216H.03, subdivision 4 does not require the system exist in the "region," and Appellees are undoubtedly aware that there are cap and trade systems run by "a state or group of states."  *See, e.g.,* 17 C.C.R. §§ 95814, 95830, 95922 (California cap and trade system which allows out-of-state entities to participate); Regional Greenhouse Gas Initiative ("RGGI"), www.rggi.org/design/regulations (collecting statutes from nine northeastern states who operate cap and trade system that allows out-of-state entities to participate).

The district court's interpretation of the plain language of section 216H.03 was absurd and wrong as a matter of law.  MPUC's interpretation is consistent with the language and purpose of the statute, reasonable, and entitled to deference under applicable law.  *Minnesota Center for Envtl. Advocacy v. Minnesota*

---

[16] *In the Matter of Great River Energy's Proposed Carbon Offset Plan*, MPUC Docket No. ET-2/M-10-1188.

Appellate Case: 14-2156     Page: 33     Date Filed: 03/17/2015 Entry ID: 4255089

*Pollution Control Agency*, 644 N.W.2d 457, 463-64 (Minn. 2002) (recognizing deference is given to agencies with expertise and special knowledge in their technical field).

## IV. SECTION 216H.03 DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE.

As discussed in Appellants' principal brief, the "modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism[.]" *See Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). Courts apply a strict level of scrutiny to laws that overtly discriminate against out-of-state economic interests, but apply a minimal level of scrutiny to laws that regulate in-state and out-of-state interests evenhandedly. *U&I Sanitation v. City of Columbus*, 205 F.3d 1063, 1067-68 (8th Cir. 2000). In addition to this two-tier test, the dormant Commerce Clause also narrowly limits state authority to directly regulate wholly out-of-state activities or transactions. *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995).

Section 216H.03 does not regulate extraterritorially, nor does it discriminate against or unduly burden interstate commerce in a manner clearly excessive to the putative local benefits. Instead, section 216H.03 merely regulates in an area of traditional state authority, *i.e.* the types of generation resources relied on by utilities to serve Minnesota consumers. The district court erred in finding section 216H.03, subdivision 3(2) and 3(3) facially unconstitutional. The district court did

23

not rule on an as-applied challenge but, to the extent raised, any such claim also must fail as a matter of law.

**A.    Section 216H.03 Does Not Regulate In An Extraterritorial Manner.**

The extraterritoriality doctrine precludes a state from *directly* regulating *wholly out-of-state* transactions.  Appellants' Br. 43-46.  A law does not run afoul of the extraterritoriality doctrine merely because it has extraterritorial effects. *American Beverage Ass'n v. Snyder*, 735 F.3d 362, 379 (6th Cir. 2013).  Rather, for a law to regulate extraterritorially, it must directly regulate transactions completely unconnected to a state.  *See International Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 647 (6th Cir. 2010) (rejecting extraterritorial claim related to a milk labeling requirement because, although the law interfered with "complex national distribution channels," it did not inescapably require milk sold out-of-state be labeled in a certain manner).  Because section 216H.03, subdivision 3(2) and 3(3) regulates only transactions connected to Minnesota, it is does not directly regulate wholly out-of-state transactions.

*National Solid Wastes Management Ass'n v. Meyer*, 63 F.3d 652 (7th Cir. 1995), illustrates when a law directly regulates wholly out-of-state conduct.  The challenged Wisconsin statute in *National Solid Waste* barred out-of-state waste generators from using Wisconsin landfills unless they resided in a community that adopted an "effective recycling program."  *Id.* at 653-54.  For an out-of-state

24

community to have an "effective recycling program," it needed to implement a plan for public education about recycling and require local businesses to use certain specified waste-reducing measures, including that larger buildings provide access to recycling containers. *Id.* at 654-55. The Wisconsin statute therefore required *everybody* in the out-of-state community to comply with Wisconsin's recycling requirement. *Id.* at 651-62.

In contrast, there is no extraterritoriality violation when a statute has extraterritorial effects but does not inescapably regulate out-of-state actors engaged in wholly out-of-state transactions. In *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2nd Cir. 2001), light bulb manufacturers challenged a Vermont statute that imposed certain labeling requirements on mercury-containing light bulbs, referred to as "lamps" under the law. The Second Circuit rejected the manufacturers' extraterritoriality claim, stating that:

> The Vermont statute, by its terms, is "indifferent" to whether lamps sold anywhere else in the United States are labeled or not. *See, e.g., Cotto Waxo*, 46 F.3d at 794. . . . To the extent the statute may be said to "require" labels on lamps sold outside Vermont, then, it is only because the manufacturers are unwilling to modify their production and distribution systems to differentiate between Vermont-bound and non-Vermont-bound lamps.

*Id.* at 110.

Section 216H.03 is not extraterritorial because it only regulates utilities serving Minnesota, and regulates only transactions for power contracted to serve

25

Minnesota's capacity needs. *See* Appellants' Br. 44-46. As Appellees' note, the statute uses the "contract path" to trace consumption of power in Minnesota. Appellees' Br. 4; Appx. 276 (Appellees' expert explaining that in the "'contract path' model" the contract is used as evidence of what power is generated to serve Minnesota's consumption needs). *See also* Appx. 334 (describing the "contract path" as the flow of dollars from buyer of electricity to seller, not the flow of electrons). The only contracts that fall within the ambit of § 216H.03 are those intended to serve Minnesota's capacity needs. *See* Appellants' Br. 36, 41. This is not a wholly out-of-state transaction.

Appellees argue that section 216H.03, subdivision 3(2) and 3(3) is extraterritorial because certain Appellees have not previously structured their contracts to readily differentiate which contracts are serving Minnesota customers.[17] Appellees' Br. 4-5, 15-16. But the dormant Commerce Clause "does not 'protec[t] the particular structure or methods of operation in a[ny] . . market." *C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 425 (1994) (alteration in original). An entity cannot insulate itself from state regulation by structuring its contracts or business practices in a certain manner, especially an

---

[17] Regardless, Appellees certainly have the means to reasonably determine the percentage of electricity purchased under a contract that is attributable to Minnesota consumers. *See* Appellees' Br. 5 (explaining that utilities can allocate a pro-rated portion of capacity or energy to customers in a particular state).

26

entity doing business in a highly regulated industry such as the provision of electricity. *See Cotto Waxo*, 46 F.3d at 794 (finding statute was not extraterritorial even though it interfered with plaintiffs' established distribution practices because it did "not require Cotto Waxo to conduct its commerce according to Minnesota's terms"). Under Appellees' theory, any business could craft contracts that would effectively immunize them from state regulation for activities conducted in the regulating state.

In *Southern Union Co. v. Missouri Public Service Com'n*, 289 F.3d 503 (8th Cir. 2002), the plaintiff public utility challenged a state statute that required it to obtain state regulatory approval before acquiring securities of another utility, whether or not the other utility operates in the state. After noting that a major purpose of the Federal Power Act was preserving and protecting state regulation of electricity service, this Court recognized the states' authority to protect in-state ratepayers, even if a regulation had extraterritorial effects. *Id.* at 508. The Court stated:

> Though Southern Union's stock purchases are no doubt conducted from its corporate headquarters in Texas, the Commission scrutinizes these transactions because they potentially affect the company's regulated rate of return in Missouri. Thus, [the challenged statute] regulates interstate stock purchases because of their impact on Southern Union's regulated local activities in Missouri.

27

*Id.* at 508. Because the challenged statute protected local ratepayers by ensuring that entities providing electricity within the state were acting prudently, the Court held that the statute was not extraterritorial. *Id.*

Section 216H.03 has a much greater in-state connection than the challenged statute in *Southern Union* – section 216H.03 regulates the acquisition of electricity to fill the capacity needs of Minnesota customers in order to ensure the long-term reliability and affordability of electricity in Minnesota. Recent North Dakota Public Service Commission filings with the EPA regarding proposed carbon emission standards for existing generating plants illustrate exactly why the Minnesota Legislature enacted section 216H.03 to protect ratepayers. The North Dakota Public Service Commission stated:

> If finalized, EPA's Proposed Rule would substantially increase rates North Dakota consumers pay for their electricity, and could significantly impact the reliability of the electric service they receive . . . . Using conservative assumptions, the incremental cost of compliance for North Dakota utilities would likely be several billion dollars on a net present value basis. Compliance costs will increase the cost of providing electric service, which must be paid for by residents and businesses in North Dakota.

North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944, at 1-2 (Nov. 25, 2014). Even more alarming:

28

> The Proposed Rule places at risk **several billion dollars** of investments in existing coal-fired facilities in North Dakota that North Dakota ratepayers have only begun to pay off. Much of this investment has been constructed to comply with EPA requirements.

*Id.* at 2 (emphasis in original).

Section 216H.03 protects Minnesota from the very scenario now confronting North Dakota, and does so by limiting Minnesota's long-term in-state reliance on an energy resource with a risky future. *See, e.g.,* Appx. 191 (legislative hearing transcript in which a Minnesota state senator explained that "[i]f we act now it will prevent us from making some very costly mistakes in the next decade that our rate payers will be paying the price for, for decades after CO2 regulations become enacted across the country.")

Appellees complain that section 216H.03 allows Minnesota to impose its will on other states. Appellees' Br. 41-46. But section 216H.03 regulates only electricity contracted for Minnesota customers. *See* Appellants' Br. 36, 40-41. Furthermore, the regulation of generation resources to ensure the reliability, affordability, and stability of electricity to meet in-state energy needs is a traditional and well-established authority. *Panhandle Eastern Pipe Line Co. v. Michigan Pub. Serv. Comm'n*, 341 U.S. 329, 333 (1951); Minn. Stat. § 216B.01. *See also* Brief of Steven Gaw and Steven Weissman as Amici Curiae at 3-8. As Appellee North Dakota has explained, state resource planning is an essential tool that "allow[s] the utility, customers, other stakeholders and the Commission to

29

review the planning assumptions, projected fuel costs, and resource options" used to serve in-state customers. North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944, at 13 (Nov. 25, 2014).[18]

---

[18] Appellees articulate a notably limited role for state regulation of generation resources and procurement, *e.g.,* Appellees' Br. 65-68, but it is not an accurate portrait of utility regulation in the United States. As indicated above, North Dakota's Public Service Commission has taken a more expensive view of its authority over planning and resource procurement decisions of utilities serving North Dakota customers, and appropriately so. The majority of states engage in such a process. *See, e.g.,* Rachel Wilson and Bruce Biewald, *Best Practices in Electric Utility Integrated Resource Planning*, Synapse Energy Economics, 5 (June 2013), available at www.raponline.org/document/download/id/6608. *See also* Rules, Regulations & Policies for Renewable Energy, Database of State Incentives for Renewables & Efficiency, U.S. Dep't of Energy, available at www.dsireusa.org/summarytables/rrpre.cfm (showing that at 43 states and territories have regulations governing the types of generation resources relied upon by utilities).

Indeed, the Federal Energy Regulatory Commission ("FERC") has explained that "the guidance provided by the Commission in this proceeding simply reflects the reality that states have the authority to dictate the generation resources from which utilities may procure electric energy," including authority to require utilities to avoid "generators with certain characteristics." *Cal. Pub. Utils. Comm'n*, 134 FERC ¶ 61,044, 61,160 (Jan. 20, 2011). *See also In Re So. California Edison Co.*, 70 FERC ¶ 61,215, 61,676 (Feb. 23, 1995) ("[W]e acknowledge California's ability under its authorities over the electric utilities subject to its jurisdiction to favor particular generation technologies over others. We respect the fact that resource planning and resource decisions are the prerogative of state commissions and that states may wish to diversify their generation mix. . . .") It is also undisputed that the generation resources relied upon by in-state utilities, and thus the subject of state regulation, are commonly regional in nature. *See* Appellees' Br. 67.

Appellate Case: 14-2156     Page: 41     Date Filed: 03/17/2015 Entry ID: 4255089

Appellees argue that an entity's status as a cooperative somehow diminishes the State's constitutional authority to protect Minnesota electrical consumers and regulate resource planning. Appellees' Br. 40-41. As a matter of policy, the Minnesota Legislature has decided not to regulate an electric cooperative's rate-making decisions,[19] but Minnesota does regulate many other aspects of an electric cooperative including generation resources. Minn. Stat. § 216B.1691 (requiring all utilities, including cooperatives, to meet certain energy diversity standards); Minn. Stat. § 216B.2422 (requiring all utilities, including cooperatives, to submit a

---

[19] There is longstanding authority for the proposition that electric cooperatives are subject to regulation should a state legislature choose to do so. *Dairyland Power Co-op. v. Brennan*, 82 N.W.2d 56, 64 (Minn. 1957) ("Whether electrical cooperatives need any regulation and the type of regulation that should be imposed are matters for determination by the [state] legislature.") *See also Pee Dee Elec. Co-op. v. Public Service Commission*, 92 S.E.2d 171, 175 (S.C. 1956) (recognizing that electric "cooperatives are not immune from [state] police power and may be subjected to regulatory legislation"). Some states have chosen to closely regulate cooperatives. *See, e.g.,* Ky. Rev. Stat. Ann. § 279.210 (stating that electric cooperatives "shall be subject to the general supervision of the Public Service Commission"); Ark. Code Ann. § 23-18-201 ("Electric cooperative corporations generating, manufacturing, purchasing, acquiring, transmitting, distributing, selling, furnishing, and disposing of electric power and energy in this state . . . shall be subject to the general jurisdiction of the Arkansas Public Service Commission").

In Minnesota, the legislature enacted findings specifically indicating that while Minnesota has authority to regulate municipal and cooperative electrical associations, it has chosen not to regulate rate setting. Minn. Stat. § 216B.01. As it relates to cooperatives, the board of directors of an electric cooperative is elected directly by customers of the cooperative. *See* Minn. Stat. §§ 216B.02, subd. 4; 308A.311, 308A.327. As a result, the legislature has found less need to review a cooperative's rate-making decisions. Minn. Stat. § 216B.01. However, the legislature chose not to exclude cooperatives from § 216H.03.

Appellate Case: 14-2156    Page: 42    Date Filed: 03/17/2015 Entry ID: 4255089

resource plan).  *See also, e.g.,* Minn. Stat. §§ 216B.39 (requiring a cooperative to serve all customers in an assigned area); 216B.241 (requiring investments in energy conservation projects); 216B.0975 (limiting when a cooperative may disconnect electric service during cold-weather months); 216B.09, subd. 2 (applying standards and requirements governing service, current, and voltage to cooperatives).  In any event, a state has broad authority to regulate the provision of electricity to customers in that state.  *See Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Com'n*, 461 U.S. 375, 377 (1983) (recognizing that "the regulation of utilities is one of the most important functions traditionally associated with the police powers of the States").

If successful, North Dakota's attempt to strike down section 216H.03 would undermine Minnesota's ability to regulate how utilities serving Minnesota meet the long-term energy needs of Minnesota homes and businesses.  As such, it is North Dakota that is attempting to impose its will on Minnesota's regulatory authority and its residents' use of electricity.   Section 216H.03 does not violate the extraterritoriality doctrine.

### B. Section 216H.03 Does Not Discriminate Against Interstate Commerce.

As outlined in Appellants' principal brief, section 216H.03 applies evenhandedly to in-state and out-of-state interests.  Appellants' Br. 47-49.  It prohibits the construction of new large carbon-emitting energy facilities in

32

Minnesota; limits the purchase, commitment to purchase, or other importation of electricity for purposes of fulfilling Minnesota's capacity needs from a new large carbon-emitting facility located outside of Minnesota; and restricts utilities serving Minnesota from entering into contracts of five or more years to purchase at least 50 megawatts of electricity for use in Minnesota.[20]  Nothing on the face of section 216H.03 benefits in-state interests to the detriment of out-of-state interests.

Appellees suggest that section 216H.03 has a discriminatory effect because Minnesota does not produce coal.  Appellees' Br. 54.  But the appropriate inquiry is whether the challenged statute provides substantially different treatment to similarly situated in-state and out-of-state interests.  *See General Motors Corp. v. Tracy*, 519 U.S. 278, 298-99 (1997).  A plaintiff alleging discriminatory effect must make a "substantial" showing through submission of "probative evidence of adverse impact."  *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36 (1st Cir. 2007).

---

[20] Appellees suggest that subdivision 3(3) overtly discriminates because it applies to all out-of-state generation sources while applying to no in-state generation sources unless they increase statewide power sector carbon dioxide emissions. Appellees' Br. 54-55.  This is incorrect.  As explained in Appellants' principal brief, subdivision 3(3) limits long-term contracts that "increase the annual carbon dioxide emissions produced with respect to the utility's aggregate amount of electricity obtained for use to serve retail customers in the State."  Appellants' Br. 6.  Thus, subdivision 3(3) would apply to a long-term contract to procure power from an in-state generation source.

Appellate Case: 14-2156    Page: 44    Date Filed: 03/17/2015 Entry ID: 4255089

Appellees have not shown that section 216H.03 actually impacted their businesses, *supra* at 1-6, 12-16, let alone probative evidence of discrimination. There is no evidence establishing that coal-fired electricity is being replaced by Minnesota-based energy sources. Any reduced consumption of coal-fired electricity would be replaced by other energy sources, including North Dakota wind or natural gas. *See National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995) (finding no discriminatory effect in the absence of evidence that consumers would replace a banned interstate product with an in-state product). There is no evidence that section 216H.03 has produced a substantial discriminatory effect that benefits in-state energy generators to the detriment of out-of-state energy generators. To the contrary, public MPUC records indicate that out-of-state energy sources are being awarded significant contracts.[21]

---

[21] Several examples in which the MPUC has recently approved power purchase agreements to purchase from North Dakota wind projects include: *Petition of Minnesota Power for Approval of Investments in the Bison I Wind Project*, MPUC Docket No. E-015/M-09-285 (approving investment in wind generation facility in Center, North Dakota, to serve Minnesota customers); *Petition of Minnesota Power*, MPUC Docket No. E-015/M-11-234 (approving purchase from 105 MW wind generation facility in Salem, North Dakota, to serve Minnesota consumers); *Petition of Otter Tail Power*, MPUC Docket No. E-017/M-13-386 (approval of power purchase agreement for 62.4 MW of wind-generated electricity from a project in Barnes County, North Dakota); *Petition of Xcel Energy*, MPUC Docket No. E-002/M-13-603 (approving acquisition of 200 MW of wind-powered electricity from a wind farm in Jamestown, North Dakota); *Petition of Xcel Energy*, MPUC Docket No. E-002/M-13-716 (approving purchase from wind farm with 150 MW of capacity in Rolette County, North Dakota).

Appellate Case: 14-2156    Page: 45    Date Filed: 03/17/2015 Entry ID: 4255089

Finally, Appellees argue that exemptions to subdivision 3(2) and 3(3) render the statute discriminatory. Appellees' Br. 55. Many of the exemptions relate to reliance on coal-fired facilities located outside of Minnesota,[22] and there has been no showing that these exemptions favored Minnesota-based entities. As mentioned in Appellant's principal brief, one of the exemptions clearly favors out-of-state interests. Appellants' Br. 49 (citing Minn. Stat. § 216H.03, subd. 7(3) (permitting reliance on electricity from a power purchase agreement with "a new large energy facility *located outside of Minnesota* that the [MPUC] has determined is essential to ensure the long-term reliability of Minnesota's electricity system [or is necessary] to avoid placing a substantial financial burden on Minnesota ratepayers"). Appellees fail to address this exemption or otherwise show any overt discrimination.

### C. Section 216H.03 Easily Satisfies *Pike* Balancing.

A statute satisfies *Pike* balancing so long as any burden on interstate commerce is not "*clearly* excessive in relation to the putative local benefits." *Hughes v. Oklahoma*, 441 U.S. 322, 331 (1979) (emphasis added). Section 216H.03 easily satisfies this test.

---

[22] *See, e.g.,* Appx. 272, 383-84 (exemption found at Minn. Stat. § 216H.03, subd. 7(4) applies to contracts with Spiritwood, a North Dakota-based energy facility); SA 342 (exemption found at Minn. Stat. § 216H.03, subd. 7(1) applies to contracts with Weston 4, a Wisconsin-based energy facility).

35

### 1. Section 216H.03 Provides Substantial Putative Local Benefits.

Section 216H.03 confers significant local benefits. Appellees' Br. 51-53. Appellees argue that section 216H.03 provides no putative local benefit, but in doing so Appellees ignore the long-term benefits associated with the legislation, as well as the deference given to state legislative judgment. As discussed *supra* at 28, Appellee North Dakota recently recognized the tremendous economic risks associated with long-term reliance on coal-fired energy facilities. Several examples of North Dakota's concerns about the long-term impact of EPA regulations on North Dakota ratepayers include:

- "EPA's Proposed Rule would substantially increase rates North Dakota consumers pay for their electricity, and could significantly impact the reliability of the electrical service they receive."

- "The Proposed Rule places at risk **several billion dollars** of investments in existing coal-fired facilities in North Dakota that North Dakota ratepayers have only begun to pay off."

- "If, like North Dakota, [neighboring] States are not allocated reasonable emission rates and flexibility for achieving compliance, North Dakota residents and businesses may face additional stranded costs and additional costs for the construction and operation of new generation needed to replace affected generation located outside of North Dakota."

North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944, at 1, 2, 17 (Nov. 25, 2014) (emphasis in original).

36

Other Appellees and Amici similarly recognize the extreme risk of future rate increases for customers serviced by coal-fired generating facilities. Appellee MRES estimates that the impact of EPA's proposed rules could result in a 20-percent retail rate increase, which must be paid by consumers and businesses who depend on stable energy prices.[23] Amici American Coalition for Clean Coal Electricity described the proposed regulations as "the most expensive environmental regulation ever proposed for the power sector" that would, based on conservative estimates, "cost at least $366 billion between 2017 and 2031" and result in rate increases of at least "12 percent nationwide, with 43 states experiencing double digit price increases."[24] Amici National Rural Electric Cooperative Association projects that electricity rates for many rural customers will increase by over 40 percent under the EPA's proposed rules.[25]

Moreover, "under *Pike*, it is the *putative* local benefits that matter. It matters not whether these benefits actually come into being at the end of the day."

---

[23] Comments of Missouri River Energy Services on the Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-23810, at 17 (Nov. 26, 2014).

[24] Comments of American Coalition for Clean Coal Electricity on the Carbon Emission Guidelines for Existing Stationary Sources: Electricity Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25764, at 4 (Dec. 1, 2014).

[25] Comment of National Rural Electric Cooperative Association on the Proposed Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-33118, at 3 (Dec. 1, 2014).

Appellate Case: 14-2156    Page: 48    Date Filed: 03/17/2015 Entry ID: 4255089

*Pharmaceutical Care Mgmt Ass'n v. Rowe*, 429 F.3d 294, 313 (1st Cir. 2005).  *See also Yamaha Motor Corp. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 569 (4th Cir. 2005) (stating that courts "proceed with deference to the state legislature" when weighing putative local benefits and do not "second-guess the empirical judgments of lawmakers concerning the utility of legislation").[26]

This is especially true where the putative local benefits fall into areas of traditional state authority, and involve protecting the welfare of state citizens. *Supra* at 29-30; Appellants Br. 52; *Maine v. Taylor*, 477 U.S. 131, 151 (1986) (upholding ban on the importation of live baitfish in part because states "retain[] board regulatory authority to protect the health and safety of its citizens"); *United Haulers Ass'n v. Oneidea-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 344 (2007).

Here, the legislature's judgment was reasonable and should be given significant weight when conducting *Pike* balancing.  *See Southern Union Co.*, 289 F.3d at 509 (recognizing that "local public utility regulation is presumptively valid" and "the Supreme Court has rarely invoked *Pike* balancing to invalidate

---

[26] In making their policy arguments against section 216H.03, Appellees and Amici also ignore the fact that section 216H.03 contains a provision exempting a power purchase agreement to serve Minnesota customers with electricity or capacity from a new large energy facility located outside of Minnesota that is necessary "to avoid placing a substantial financial burden on Minnesota ratepayers."  Minn. Stat. § 216H.03, subd. 7(3).

38

state regulation under the Commerce Clause"). Indeed, events occurring since section 216H.03's enactment in 2007 vindicate the legislative judgment underlying the statute and belie any suggestion by Appellees that section 216H.03 fails to protect local ratepayers. For the many reasons identified by Appellants, there are substantial putative local benefits associated with section 216H.03.

## 2. Section 216H.03 Imposes Virtually No Cognizable Burden On Interstate Commerce.

At a minimum, a plaintiff challenging a statute under *Pike* must demonstrate that the challenged law results in disparate treatment of in-state and out-of-state economic interests. *National Paint & Coating Ass'n v. Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995). *See also* Appellant's Br. 50. Appellees have made no such showing.

Instead, Appellees argue that section 216H.03 burdens interstate commerce merely because it regulates electricity consumed in Minnesota, even if the electricity was initially generated outside of Minnesota. Appellees' Br. 58-59. They fail to articulate how state resource planning rules such as section 216H.03 unduly burden interstate commerce or impede the flow of interstate commerce. In fact, they fail to cite any evidence establishing any undue burden.

Appellees rely almost exclusively on *Southern Pacific Co. v. Arizona*, 325 U.S. 761 (1945), in which the Supreme Court struck down an Arizona law limiting the length of trains traveling through the state. The Court reasoned that

39

"[c]ompliance with a state statute limiting train lengths requires interstate trains of a length lawful in other states to be broken up and reconstituted as they enter each state[,]" which imposes substantial burdens as a train travels through numerous states. *Id.* at 773.

In contrast, section 216H.03 does not require that anything be "broken up and reconstituted[,]" nor does it restrict the flow of electrons into or through Minnesota. It regulates contracts to serve the energy need of Minnesota customers, a subject matter that the Federal Energy Regulatory Commission (FERC) has long recognized is a state function. *See* Appellants' Br. 56-57 (citing numerous FERC orders recognizing the states' long-standing authority over resource planning and decisions about which resources utilities may use to meet in-state energy demand). Appellees present little to no evidence showing any burden to interstate commerce, and they certainly fail to show a burden that is *clearly* excessive in relation to the substantial putative local benefits.

The district court should have granted summary judgment in favor of Appellants on all dormant Commerce Clause claims.

## IV. SECTION 216H.03, SUBD. 3(2) AND 3(3) IS NOT PREEMPTED BY FEDERAL LAW.

A state law is preempted by federal law only if: (1) it regulates a field that federal law so pervasively regulates that Congress plainly intended to leave no room for states to supplement it; or (2) there is a clear and actual conflict between

40

state and federal law. *Arizona v. United States*, -- U.S. --, 132 S. Ct. 2492, 2501 (2012). There is a strong presumption against preemption in areas of traditional state authority, including regulation of electricity suppliers. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005); *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983).

## A. The Federal Power Act Does Not Preempt Section 216H.03, Subd. 3(2) Or 3(3).

Section 216H.03, subd. 3(2) and 3(3) lawfully regulate the long-term resource decisions of utilities that serve Minnesota customers. Neither provision regulates wholesale electricity rates or the interstate transmission of electricity, and therefore neither provision is preempted by the Federal Power Act (FPA).

### 1. Section 216H.03 Is Not Preempted By Virtue Of Field Preemption.

The Federal Power Act gives FERC authority to regulate the interstate transmission and wholesale sale of electricity, while preserving broad state authority to regulate most other aspects of electricity generation and distribution. Appellants' Br. 55. *See also Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Util. Com'n*, 837 F.2d 600, 606 (3rd Cir. 1988) (noting that the FPA was "tailored to supplement, not limit, the reach of state regulation"). Congress intended the FPA only to "regulate matters of interstate commerce that the states could not[]," such as interstate wholesale rates. *PPL Energyplus, LLC v. Solomon*,

41

766 F.3d 241, 246 (3rd Cir. 2014).  *See also* 16 U.S.C. § 824(a) (stating that federal regulatory authority "[is] to extend only to those matters which are not subject to regulation by the States").

Notwithstanding the express reservation of traditional state authority, Appellees argue that the FPA's regulation of wholesale sales precludes state regulation of how utilities meet the long-term energy needs of in-state customers. Appellees' Br. 62-63.  In making this argument, Appellees ignore overwhelming authority recognizing that regulation of wholesale sales under the FPA refers to rates and terms offered by the seller on the wholesale market, not the decision of the buyer to purchase electricity.  *See* Appellants' Br. 56-58.

As recognized by the North Dakota Public Service Commission, states have broad authority to regulate which energy resources are used to meet in-state electricity demand:

> [T]he individual states (like North Dakota) retain ultimate authority for determining the adequacy of their generation resources.  In determining the adequacy and reliability of its system, North Dakota must balance various public interest concerns and technical considerations to maintain sufficient and efficient service at just and reasonable rates.  The overarching technical and policy concern in this area is the appropriate generation mix to be employed by jurisdictional utilities.

North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944, at 12 (Nov. 25, 2014).

It is and always has been the role of the states to regulate resource portfolios used to meet the demands of in-state customers. *See, e.g.,* FERC Order No. 888, 61 Fed. Reg. 21540, 21626, n.544 (May 10, 1996); *New York v. F.E.R.C.*, 535 U.S. 1, 24 (2002) (recognizing that states retain regulatory authority over integrated resource planning, utility buy-side decisions, and the composition of utility resource portfolios).

Appellees wrongly argue that two recent federal circuit decisions found preemption of any state regulation with potential to affect the energy resources sold in wholesale markets. Appellees' Br. 67-68. In *PPL EnergyPlus v. Nazarian*, 753 F.3d 467 (4th Cir. 2014), the Maryland Public Service Commission issued an order requiring that electric distribution companies sign contracts to pay the builder of a new energy facility the difference between the wholesale price of electricity generated at the new facility and the price specified in the contract. In effect, the Commission's order set a guaranteed wholesale price for the 20-year life of the contract. *Id.* at 476. Similarly, in *PPL Energyplus v. Solomon*, 766 F.3d 241 (3rd Cir. 2014), a New Jersey law required local electric distribution companies sign similar contracts that effectively guaranteed the builder of a new energy facility would receive a particular wholesale price for a 15-year period.

In both cases, the court held state action to mandate that a facility receive a particular wholesale price was preempted because FERC regulates "interstate rates

43

for wholesales of electric capacity." *Id.* at 246; *Nazarian*, 753 F.3d at 478 (finding state-law requirement directly interfered with FERC's authority "to establish rates for the sale of electric energy[.]"). The court in both cases noted the narrow nature of its holding, stating in *Soloman*:

> [W]e do not view [the challenged law's] incidental effects on the interstate wholesale price of electric capacity as the basis for its preemption problem. Indeed, were we to determine otherwise, the states might be left with no authority whatsoever to regulate . . . *The states' regulatory choices accumulate into the available supply transacted through the interstate market.* The Federal Power Act grants FERC exclusive control over whether interstate rates are "just and reasonable," but FERC's authority over interstate rates does not carry with it exclusive control over any and every force that influences interstate rates.

*Solomon*, 766 F.3d at 255 (emphasis added); *Nazarian*, 753 F.3d at 479-80.

Section 216H.03 is among the state regulatory choices that accumulate into the available supply transacted through the interstate market. The FPA does not preempt these state regulatory choices, and Appellees' argument to the contrary is without merit.

Appellees are also flatly wrong when suggesting cases and FERC orders recognizing broad state authority to regulate how utilities meet in-state energy needs, *see* Appellants' Br. 55-57, are merely "[p]assing comments made in PURPA cases regarding state authority in the PURPA context[.]" Appellees' Br.

68-69.[27]  Most of the authority cited by Appellants makes no mention of PURPA whatsoever.[28]  The remaining authority mentions PURPA, but plainly recognizes broad state regulatory authority over resource planning outside of the PURPA context.[29]

In any event, as FERC made clear (in an order that has nothing to do with PURPA), the regulation of wholesale sales "does not . . . determine whether a purchaser has prudently chosen among available supply options."  *Central Vermont Pub. Serv. Corp.*, 84 FERC ¶ 61194 (Aug. 21, 1998).  That is an issue left for states to regulate.  *See id.* (citing multiple FERC orders recognizing broad state authority to regulate an electricity supplier's decision to choose among available supply options).

---

[27] PURPA is a federal statute that *inter alia* directs state regulatory authorities to implement rules setting certain wholesale rates in limited circumstances not relevant to this case.  *See* 16 U.S.C. § 824a.-3.

[28] The following cases and FERC orders cited by Appellants do not even mention PURPA: *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014); *Electric Power Supply Ass'n v. FERC*, 753 F.3d 216 (D.C. Cir. 2014); *Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Utility Com'n*, 837 F.2d 600 (3rd Cir. 1988); *Appeal of Sinclair Mach. Products, Inc.*, 498 A.2d 696 (N.H. 1985); *Pike County Light and Power Comp. v. Pennsylvania Pub. Util. Com'n,* 465 A.2d 735 (Pa. Cmwlth. 1983); *Pennsylvania Power & Light*, 23 FERC ¶ 61006, order on reh.g, 23 FERC ¶ 61325 (Apr. 1, 1983); *Central Vermont Pub. Serv. Corp.*, 84 FERC ¶ 61194 (Aug. 21, 1998).

[29] *California Pub. Util. Com'n,* 134 FERC ¶ 61044, 61160 (Jan 20, 2011); *In re Midwest Power Systems, Inc.*, 78 FERC ¶ 61067, 61246 (Jan. 29, 1997); FERC Order 888, 61 Fed. Reg. 21540, 21626 n. 544 (May 10, 1996); *In Re So. California Edison Co.*, 70 FERC ¶ 61215, 61676 (Feb. 23, 1995).

45

Appellees' argument about section 216H.03 supposedly regulating electricity transmission is also without merit. Appellees' Br. 63-64. As explained in Appellants' principal brief, regulation of transmission refers to the terms and conditions of transmitting electricity that has already been generated, not the resource type used to generate the electricity. Appellants' Br. 58. Section 216H.03 regulates contracts and other commitments to acquire electricity for use by Minnesota retail customers, not the process of moving electricity. Section 216H.03 is not field preempted by the FPA.

### 2. Section 216H.03 Is Not Preempted By The FPA By Virtue Of Conflict Preemption.

Section 216H.03 is also not subject to conflict preemption by the FPA. Appellees cannot identify any specific provision of the FPA that conflicts with section 216H.03, and they do not allege that subdivision 3 makes it impossible to comply with federal law. Appx. 90. Appellees vaguely argue that section 216H.03 could conflict with the FPA by impacting which contracts a utility would sign to serve Minnesota customers. Appellees' Br. 68. As pointed out by the Third and Fourth Circuits, virtually all state regulation will affect which wholesale contracts a utility signs, and a decision finding such a law preempted "would thoroughly undermine precisely the division of the regulatory field that Congress went to so much trouble to establish[.]" *See Nazarian*, 753 F.3d at 479-80; *Solomon*, 766 F.3d at 255.

46

Appellees fail to identify or offer evidence to show that section 216H.03 in any way undermines FERC's authority to set wholesale prices or regulate transmission. The district court should have granted summary judgment in favor of Appellants.

## B. Section 216H.03 Is Not Preempted By The Clean Air Act.

Section 216H.03 regulates how utilities serving Minnesota meet the long-term energy needs of Minnesota customers. This traditional state function is not preempted by the Clean Air Act (CAA).

### 1. Section 216H.03 Does Not Regulate Air Emissions And Is Not Subject To Field Preemption.

As discussed in Appellants' principal brief, section 216H.03 does not regulate air emissions. Appellants' Br. 59-61. Rather, section 216H.03 directs utilities not to serve Minnesota customers with certain long-term contracts or commitments that both the Minnesota Legislature and the North Dakota Public Service Commission believe may result in long-term price increases.[30]

---

[30] *See* North Dakota Public Service Commission comments on EPA's Carbon Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, ID No. EPA-HQ-OAR-2013-0602-25944, at 1 (Nov. 25, 2014) (stating that "EPA's Proposed Rules would substantially increase rates North Dakota consumers pay for their electricity, and could significantly impact the reliability of the electrical service they receive"); Appellants' Br. 3-4 (discussing legislative history of section 216H.03 and concerns about increased costs to ratepayers associated with federal regulation of carbon emissions).

Section 216H.03, subd. 3(2) and 3(3) does not mandate that any facility emit less carbon dioxide. If an entity were to someday construct a new large carbon-emitting facility in North Dakota, section 216H.03 would not limit or otherwise regulate its emissions. Rather, section 216H.03 directs a utility serving Minnesota customers not to contract to meet Minnesota's long-term energy needs with electricity from new carbon-emitting facilities, unless the risk of future regulatory costs is mitigated through offsets or the contract is necessary to ensure long-term reliability or affordability of electricity for Minnesota customers. *See* Minn. Stat. § 216H.03, subd. 4, 7(3). This is sound energy policy that regulates the energy resources serving Minnesota, not the emission of carbon dioxide in other states.

Appellees cite cases standing for the basic proposition that states may not use nuisance lawsuits or federal common law claims to seek an injunction against air emissions in other states.[31] These cases involved attempts to impose direct

---

[31] *Am. Elec. Power Co. v. Conn.*, 131 S. Ct. 2527 (2011) (finding federal common law nuisance action that sought to enjoin emissions in another state was displaced by the CAA, and noting that legislative displacement does not require "the same sort of evidence of a clear and manifest congressional purpose demanded for preemption of state law"); *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010) (holding that state common law nuisance claim seeking injunctive relief against sulfur dioxide emissions occurring in other states was preempted by the CAA because it sought to effectively set emission rates and enjoin emissions occurring other states). Appellees also cite *Clean Air Markets Group v. Pataki,* 338 F.3d 82 (2nd Cir. 2003), which involved a state law that regulated how utilities could trade sulfur dioxide allowances in a cap-and-trade program established under Title IV of the CAA. The court found preemption because the CAA expressly (Footnote Continued on Next Page.)

48

limits on out-of-state emissions, whereas section 216H.03 regulates the purchasing decisions of utilities serving Minnesota customers. Section 216H.03 does not regulate air emission and therefore is not subject to field preemption by the CAA.

## 2. Section 216H.03 Does Not Conflict With The CAA.

For the same reasons that section 216H.03 is not subject to field preemption, it is not subject to conflict preemption. The CAA regulates air emissions, while section 216H.03 regulates which resources utilities rely on to meet Minnesota's long-term energy needs. Appellees have not identified any conflicts between the CAA and section 216H.03, nor do they contend that compliance with both laws is impossible. Appx. 89-90. For these reasons, section 216H.03 is not subject to conflict preemption.

## V. THE DISTRICT COURT ERRED IN GRANTING A FACIAL CHALLENGE.

As outlined in Appellants' principal brief, it is well established that, to mount a successful facial challenge to a legislative act, "the challenger must establish that no set of circumstances exist under which the Act would be valid." Appellants' Br. 61, quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987). Appellees do not even address *Salerno*, nor do they explain their conclusory

_____

(Footnote Continued From Previous Page.)
allowed utilities to transfer sulfur dioxide allowances to "any other person," whereas the challenged state statute restricted such transfers. *Id.* at 87-88. Unlike the state law in *Pataki,* section 216H.03 does not conflict with any CAA provision, nor does it regulate emissions.

Appellate Case: 14-2156     Page: 60     Date Filed: 03/17/2015 Entry ID: 4255089

suggestion that "there is no constitutional interpretation or application" of section 216H.03. Appellees' Br. 73-74. *See 1-800-411-Pain Referral Service, LLC v. Otto*, 744 F.3d 1045, 1060 (8th Cir. 2014) ("Plaintiffs have not shown, as they must, that the disclosure requirements are unconstitutional in all cases.... Accordingly, we reject any facial challenges to the disclosure requirements at issue in this case.").

Not only is there an interpretation of section 216H.03 that is consistent with the Constitution, but the MPUC's interpretation of the statute is a constitutional interpretation. *Supra* at 19-22; Appellants' Br. 34-43, 45-47. By enjoining all enforcement of subdivision 3(2) and 3(3), the district court prevented enforcement even as to the constitutional manner in which the MPUC interprets the statute. The district court also enjoined enforcement as to multiple applications that plainly could not violate the extraterritoriality doctrine, such as regulation of contracts between Minnesota facilities and Minnesota utilities. As such, the district court erred in granting a facial challenge and enjoining § 216H.03 subdivision 3(2) and (3).

## VI. AS THE DISTRICT COURT INITIALLY DETERMINED, CROSS-APPELLANTS SHOULD NOT RECEIVE ATTORNEYS' FEES OR NON-TAXABLE COSTS.

### A. Summary Of Argument.

The issue of attorneys' fees is moot because judgment as a matter of law should issue in favor of Appellants. Nonetheless, even if Cross-Appellants could

50

prevail, a hypothetical and technical victory on a challenge to an unenforced statute does not entitle Cross-Appellants to attorneys' fees.

### B. Cross-Appellants Should Not Receive Attorneys' Fees or Non-Taxable Costs.

Because the judgment as a matter of law should issue in favor of Appellants, the issue of attorneys' fees is moot. Nonetheless, under 42 U.S.C. § 1988, a district court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs" in a section 1983 action. *See also Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 559 (2010) (recognizing the intent behind section 1988's fee-shifting provision as "making it possible for persons without means to bring suit to vindicate their civil rights"); *Land v. Washington County, Minn.*, 243 F.3d 1093, 1095-96 (8th Cir. 2011) (stating that a judgment may be affirmed "on any grounds supported by the record, even if not relied upon by the district court").

Cross-Appellants' hypothetical and technical victory on a facial challenge to an unenforced statute does not entitle them to attorneys' fees. As the United States Supreme Court explained in *Farrar v. Hobby*, such a "technical victory" does not render a plaintiff a prevail party. 506 U.S. 103, 113 (1992).

The example used by the Court in *Farrar* to illustrate the point was drawn from a prior decision, in which a lower court declared unconstitutionally vague a regulation requiring that "non-school hour meetings be conducted only with prior

51

approval from the local school principal." *Id.* (citing *Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782, 792 (1992)). The Court explained that, in the absence of evidence that the plaintiffs were refused permission to use the school during non-school hours, a mere finding of unconstitutional vagueness would not sustain a prevailing party status because "the plaintiffs' could not alter the defendant school board's behavior towards them for their benefit." *Id.*

Cross-Appellants in this case have likewise sought relief from a statute that has indisputably never been enforced against them. Cross-Appellants' alleged standing was predicated on "concerns" about how the statute might be enforced, not actions taken by any agency with enforcement authority. Just as in *Garland*, Cross-Appellants received a judgment based on a facial challenge to the language of the statute that has never been enforced, let alone enforced in the manner allegedly feared by Cross-Appellants.

The United States Supreme Court "would not sustain a prevailing party status if there were no evidence that the plaintiffs were ever refused permission to use school premises during non-school hours." *Farrar*, 506 U.S. at 113. Likewise, Cross-Appellants have produced no evidence that the statute would have been applied in an unconstitutional manner, and thus have not materially altered Cross-

Appellate Case: 14-2156    Page: 63    Date Filed: 03/17/2015 Entry ID: 4255089

Appellees' behavior towards them. As such, the district court's original decision to deny attorneys' fees should stand.

## CONCLUSION

For all the reasons set forth, Appellants respectfully request the Court reverse the judgment of the district court on the merits and remand with instructions that judgment as a matter of law be entered in favor of Appellants. Appellants further request the Court dismiss as moot or, in the alternative, uphold the district court's denial of attorneys' fees.

Dated: March 16, 2015

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota


s/ Alethea M. Huyser
ALETHEA M. HUYSER
Assistant Attorney General
Atty. Reg. No. 0389270

MICHAEL EVERSON
Assistant Attorney General
Atty. Reg. No. 0388310

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1243 (Voice)
(651) 296-1410 (TTY)

ATTORNEYS FOR APPELLANTS /
CROSS-APPELLEES

53

## CERTIFICATE OF COMPLIANCE
## WITH FRAP 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,471 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 pt Times New Roman font.

<u>s/ Alethea M. Huyser</u>
ALETHEA M. HUYSER
Assistant Attorney General

54

## CERTIFICATE OF COMPLIANCE
## WITH 8th Cir. R. 28A(h)(2)

The undersigned, on behalf of the party filing and serving this brief, certifies

that the brief has been scanned for viruses and that the brief is virus-free.


s/ Barbara Fehrman
Barbara Fehrman

55